AEV, CLOSED

## U.S. District Court

0 7 c v 1 8 6

## Southern District of Florida (West Palm Beach)
## CIVIL DOCKET FOR CASE #: 9:07-mc-80223-KLR

L.G. Philips LCD Co., LTD v. Tatung Company et al

Assigned to: Judge Kenneth L. Ryskamp

Referred to: Ch. Magistrate Judge Ann E. Vitunac

Cause: 28:1331 Fed. Question: Trademark

Date Filed: 03/09/2007

Jury Demand: Plaintiff

Nature of Suit: 830 Patent

Jurisdiction: Federal Question

### Plaintiff

**L.G. Philips LCD Co., LTD**

represented by **Geoffrey Michael Cahen**

Greenberg Traurig et al

5100 Town Center Circle

Suite 400

Boca Raton, FL 33486

561-955-7600

Fax: 561-659-9113

Email: caheng@gtlaw.com

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Martin Briner Woods**

Stearns Weaver Miller Weissler

Alhadeff & Sitterson

200 E Las Olas Boulevard

New River Center Suite 2100

Fort Lauderdale, FL 33301

954-462-9555

Fax: 462-9567

Email: mwoods@swmwas.com

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Marissa D. Kelley**

Stearns Weaver Miller Weissler

Alhadeff & Sitterson

200 E Las Olas Boulevard

New River Center Suite 2100

Fort Lauderdale, FL 33301

Certified to be a true and
correct copy of the document on file
Clarence Maddox, Clerk,
U.S. District Court
Southern District of Florida
by
Deputy Clerk
Date 3/26/2007

954-462-9500
Fax: 462-9567
Email: mkelley@swmwas.com
*ATTORNEY TO BE NOTICED*

**Shari L. Klevens**
McKenna Long & Aldrige
1900 K Street, NW
Washington, DC 20006
202-496-7612
Email:
sklevens@mckennalong.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Tatung Company**                    represented by **Geoffrey Michael Cahen**
                                       (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Tatung Company of America,**        represented by **Geoffrey Michael Cahen**
**Inc.**                               (See above for address)
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Viewsonic Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/09/2007 | 🔍1 | MOTION FOR A PROTECTIVE ORDER LIMITING SCOPE OF THIRD PARTY DEPOSITION AND SUPBPOENA against Tatung Company, Tatung Company of America, Inc., Viewsonic Corporation Filing fee $ 39. Receipt#: 722519, filed by L.G. Philips LCD Co., LTD.(vt) (Entered: 03/12/2007) |
| 03/12/2007 | 🔍2 | ORDER Granting re 1 Motion for Protective Order Limiting Scope of Third Party Deposition and Subpoena/Complaint filed by L.G. Philips LCD Co., LTD, Signed by Judge Kenneth |

| | | L. Ryskamp on 3/12/2007 (ls) (Entered: 03/12/2007) |
|---|---|---|
| 03/14/2007 | ◑3 | MOTION to Expedite *Relief from Order* by L.G. Philips LCD Co., LTD. (Attachments: # 1 Exhibit 1; # 2 Exhibit 2; # 3 Exhibit 3; # 4 Exhibit 4; # 5 Proposed Order)(Woods, Martin) **Modified to add description of attachments on 3/15/2007 (gp)**. (Entered: 03/14/2007) |
| 03/15/2007 | ◑4 | Notice of Instruction to Filer, Notice of Docket Correction re 3 MOTION to Expedite *Relief from Order* filed by L.G. Philips LCD Co., LTD; ERROR: Attachments to Motion did not have a description; *FUTURE* documents containing attachments need to be described.- Corrected by Court. (gp) (Entered: 03/15/2007) |
| 03/15/2007 | ◑5 | NOTICE by Tatung Company, Tatung Company of America, Inc. re 3 MOTION to Expedite *Relief from Order of Intent to File Memorandum of Law in Opposition to Plaintiff L.G. Philips LCD Co., Ltd's Motion for Expedited Relief from Order Pursuant to Fed. R. Civ. P. 60(b) and Local Rule 7.1(E)* (Cahen, Geoffrey) (Entered: 03/15/2007) |
| 03/19/2007 | ◑6 | NOTICE of Hearing on 3 MOTION to Expedite Relief from Order: Motion Hearing set for 3/23/2007 at 09:00 AM in West Palm Beach Division before Judge Kenneth L. Ryskamp. (sh) (Entered: 03/19/2007) |
| 03/19/2007 | ◑7 | ENDORSED ORDER granting 3 Motion to Expedite. Defendants' response is due by 5:00 p.m. on March 21, 2007. Plaintiff's reply is due by 2:00 p.m. on March 22, 2007.Signed by Judge Kenneth L. Ryskamp on March 19, 2007.(lc1) (Entered: 03/19/2007) |
| 03/20/2007 | ◑8 | MOTION to Permit Parties to Appear Telephonically re 6 Notice of Hearing on Motion *for Expedited Relief from Order [DE 3]* by L.G. Philips LCD Co., LTD. (Kelley, Marissa) (Entered: 03/20/2007) |
| 03/21/2007 | ◑9 | ENDORSED ORDER granting 8 Motion to permit parties to appear for hearing via telephone. Both Plaintiff and Defendants are instructed to contact chambers by 10:00 a.m. on 3/22/2007 for instructions.Signed by Judge Kenneth L. Ryskamp on March 21, 2007.(lc1) (Entered: 03/21/2007) |
| 03/21/2007 | ◑10 | MEMORANDUM in Opposition re 3 MOTION to Expedite *Relief from Order* filed by Tatung Company, Tatung Company |

| | | |
|---|---|---|
| | | of America, Inc.. (Cahen, Geoffrey) (Entered: 03/21/2007) |
| 03/21/2007 | ⊕11 | AFFIDAVIT in Opposition re 3 MOTION to Expedite *Relief from Order of Charlene L. Oh* filed by Tatung Company, Tatung Company of America, Inc.. (Attachments: # 1 Exhibit A: Rough Transcript of March 16 2007 telephonic hearing# 2 Exhibit B: Court's March 12, 2007 Order granting Motion for Protective Order# 3 Exhibit C: District of Minnesota's Order dated March 15, 2007# 4 Exhibit D: Tatung Defendants' Letter to the Special Master dated March 2, 2007)(Cahen, Geoffrey) (Entered: 03/21/2007) |
| 03/21/2007 | ⊕12 | Verified MOTION for Admission Pro Hac Vice of Shari L. Klevens, Filing Fee $75, Receipt #539632. (cw) (Entered: 03/22/2007) |
| 03/22/2007 | ⊕13 | REPLY to Response to Motion re 3 MOTION to Expedite *Relief from Order* filed by L.G. Philips LCD Co., LTD. (Attachments: # 1 Exhibit Order from Northern District of California# 2 Exhibit Order from Eastern District of California# 3 Exhibit Order from Eastern District of Massachusetts# 4 Exhibit Order from Western District of Washington# 5 Exhibit Order from Southern District of California# 6 Exhibit Order from Northern District of Texas# 7 Exhibit Order from Western District of Arkansas# 8 Exhibit Order from District of Minnesota# 9 Exhibit Correspondence from Tyco Electronics Corp.# 10 Exhibit Special Master's Report and Recommendations (Main Case)# 11 Exhibit Safer Submission Eastern District Virginia# 12 Exhibit Transcript Main Case)(Kelley, Marissa) (Entered: 03/22/2007) |
| 03/23/2007 | ⊕14 | Minute Entry for proceedings held before Judge Kenneth L. Ryskamp : Motion Hearing held on 3/23/2007. Court Reporter: Vicky Miller, Official Reporting Service (ir) (Entered: 03/23/2007) |
| 03/23/2007 | ⊕15 | ORDER granting 12 Motion to Appear Pro Hac Vice. Name of Attorney Shari L. Klevens for L.G. Philips LCD Co., LTD Signed by Judge Kenneth L. Ryskamp on 3/23/07. (sh) (Entered: 03/23/2007) |
| 03/26/2007 | ⊕16 | ORDER directing transfer to United States District Court for the District of Delaware and staying discovery;Signed by Judge Kenneth L. Ryskamp on 03/23/2007.(bs) (Entered: 03/26/2007) |
| | | |

| 03/26/2007 | ⊛17 | Transmittal Letter Sent With Order of Transfer, To: District of Delaware (bs) (Entered: 03/26/2007) |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,                     Case No. 04-343-JJF (D. Del.)

    Plaintiff,                    **07-80223**

TATUNG COMPANY; TATUNG                  **CIV-RYSKAMP**
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,                  **MAGISTRATE JUDGE**
                                        **VITUNAC**
    Defendants.
_____/

## MOTION FOR A PROTECTIVE ORDER LIMITING SCOPE OF THIRD PARTY DEPOSITION AND SUBPOENA

### FRCP 26(C) CERTIFICATE OF COMPLIANCE

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, counsel for

Defendants Tatung Company and Tatung Company of America, Inc. certify that they

conferred in good faith with counsel for plaintiff L.G. Philips LCD Co., Ltd. to resolve

this dispute prior to filing this motion and were unsuccessful.

### BASIS FOR EMERGENCY HEARING

This Motion for Protective Order Limiting Scope of Third Party Deposition and

Subpoena (the "Motion for Protective Order") concerns a deposition notice and third-

party subpoena issued in this district in connection with a patent infringement lawsuit

pending in the United States District Court for the District of Delaware (the "Delaware

Action").

Defendants respectfully request an expedited hearing and briefing schedule on the

Motion for Protective Order for the following reasons:

•       Discovery cut-off in the Delaware Action is set for March 30, 2007.

•       Fully aware of the impending discovery cut-off date, Plaintiff waited until the last minute to serve 23 separate third-party subpoenas and deposition notices, issued out of 15 different judicial districts, throughout the country starting in mid-February 2007.

•       On February 27, 2007, Defendants requested that Plaintiff meet and confer about the scope of discovery demanded by Plaintiff in those 23 third-party subpoenas and deposition notices.  Following Defendants' February 27, 2007 request, Plaintiff agreed to meet and confer on March 5, 2007.

•       During the March 5, 2007 meet and confer, Plaintiff refused to limit the scope of the third-party subpoenas and deposition notices in any meaningful way.

•       Plaintiff's subpoenas demand production of documents by March 5, 2007, and its deposition notices set depositions for March 12, 2007 through March 28, 2007.  Because of Plaintiff's last-minute discovery tactics and its failure to meaningfully meet and confer with Defendants, an emergency hearing is necessary to resolve these discovery issues in a timely manner.  Pursuant thereto, Defendants respectfully request an emergency hearing.

2

**DEFENDANTS TATUNG COMPANY AND TATUNG COMPANY OF
AMERICA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER
LIMITING SCOPE OF THIRD PARTY DEPOSITION AND SUBPOENA**

## I.    INTRODUCTION

Defendants Tatung Company and Tatung Company of America (collectively, "the

Tatung Defendants") submit this Memorandum of Points and Authorities in support of

their Motion for Protective Order Limiting Scope of Third Party Deposition and

Subpoena (the "Motion for Protective Order").

This Motion for Protective Order seeks to limit the scope of a subpoena and

deposition notice issued on third-party Sensormatic, Inc. ("Sensormatic") out of this

district in connection with a patent infringement lawsuit pending in the United States

District Court for the District of Delaware (the "Delaware Action," C.A. No. 04-343-

JJF). The subpoena at issue is attached as Exhibit 1 hereto and made a part hereof.

Defendants submit that any third-party discovery should be limited to the accused

products. *See* Declaration of Charlene Oh at ¶3, which is attached hereto as Exhibit 2.

For the reasons discussed in greater detail below, the Tatung Defendants' request for a

protective order should be granted because the discovery sought by Plaintiff L.G. Philips

LCD Co., Ltd. ("LPL") is:

1.    A transparent and improper effort by LPL to perform an "end run" around

a potentially unfavorable ruling by the Special Master in the Delaware Action concerning

the proper scope of LPL's discovery, namely, the Special Master's impending ruling on

LPL's motion to compel discovery pertaining to *unaccused* products from the Tatung

Defendants and the Tatung Defendants' motion to stay discovery regarding *unaccused*

3

products pending resolution of issues relating to LPL's and its attorneys' violations of Protective Orders in cases pending between the parties;

  2.  Irrelevant in that it seeks extremely broad categories of communications and information from the Tatung Defendants' customers entirely unrelated to the patents-in-suit or the accused products in the Delaware Action;

  3.  Not reasonably calculated to lead to the discovery of admissible evidence in the Delaware Action, but instead, is information about the Tatung Defendants' confidential business communications and trade secret information that LPL seeks for ulterior and improper purposes; and

  4.  Unduly burdensome in that the third-party discovery Plaintiff seeks from Sensormatic and the Tatung Defendants' other customers will require the production of thousands of documents and is calculated to harass the Tatung Defendants' customers, some of whom have already responded to subpoenas issued by LPL during jurisdictional discovery.

## II.  STATEMENT OF FACTS

### A.  The Nature Of This Lawsuit.

  Defendant Tatung sells electronic products including computer monitors and televisions to resellers and retailers worldwide. Defendant Tatung Company of America, a California corporation, is a reseller of computer monitors and other LCD applications in the United States. The Tatung Defendants also perform OEM (Original Equipment Manufacturer) services for a number of customers. LPL and its parent company, LG Electronics, Inc. ("LGE"), compete with the Tatung Defendants in the market of flat display panel products (e.g., LCD monitors, LCD televisions and plasma televisions).

4

Third-party Sensormatic, the recipient of LPL's subpoena and deposition notice, is located in Boca Raton, Florida and is a customer of the Tatung Defendants.

The Tatung Defendants integrate more than 800 models of computer monitors and flat panel display products, referred to collectively as "visual display products." As OEMs, many of the Tatung Defendants' products are branded and otherwise customer specific; in most instances, the products are made to exacting customer specifications. Because the monitor business is highly competitive, the particular product design requirements and specifications of the Tatung Defendants' OEM customers, including those of Sensormatic, are extremely valuable trade secrets. The Tatung Defendants' specific pricing arrangements with customers also are extremely valuable trade secrets.

LPL commenced the Delaware Action against the Tatung Defendants on May 27, 2004. In the Delaware Action, LPL has alleged patent infringement claims against the Tatung Defendants based on certain "rear-mount" patents with respect to 20 of its products.

The discovery cut-off date in the Delaware Action is March 30, 2007.

**B.     The Tatung Defendants Have Already Provided LPL With Voluminous Discovery Relating to Both Its Accused and Non-Accused Products.**

LPL served its initial discovery requests in the Delaware Action over two years ago. In response to those discovery requests, the Tatung Defendants produced technical specifications and assembly drawings covering approximately 800 models of monitors and flat panel displays they sell. Until November 2006, LPL had accused only one Tatung product of infringing the patents-in-suit. In November 2006, LPL identified two

5

additional accused products. It was not until mid-January 2007 that LPL accused the remaining products.

The Tatung Defendants have expended a great deal of effort to comply with their discovery obligations. Since late January 2007 alone, the Tatung Defendants have produced approximately 15,000 pages of documents, including the following:

- Highly confidential Tatung America product work instructions;

- Highly confidential exploded view drawings of products; and

- Highly confidential sales summaries from 2002 to the present (quarter 1, 2007) containing model, price, and quantity information for *all* of its visual display products.

In addition, the Tatung Defendants have made available for LPL's inspection, and LPL has examined, disassembled, and photographed more than 40 monitor and television products. Of the hundreds of products for which LPL has been provided technical documents, LPL to date has accused only 20 products of infringing the patents-in-suit.

## C. LPL's Motion To Compel Further Customer Information Is Pending Before the Special Master.

In January 2007, LPL filed a motion to compel the production of additional documents such as highly confidential agreements and communications between the Tatung Defendants and their customers relating to *all* of the Tatung Defendants' visual display products including the hundreds of unaccused products. The Tatung Defendants vigorously opposed that motion on the grounds that LPL's requested discovery is not limited in any way to the accused products at issue in the Delaware Action and is instead a transparent attempt by LPL to obtain highly sensitive business information. That

6

motion is presently pending before the Special Master. The parties expect a decision shortly, as discovery cut-off is March 30, 2007.

**D.   LPL Now Seeks the Same Discovery Directly From the Tatung Defendants' Customers.**

In what can only be characterized as a blatant attempt to circumvent a potentially unfavorable ruling by the Special Master on a motion LPL itself filed, LPL recently served Sensormatic, as well as two dozen other customers of the Tatung Defendants, with a subpoena and deposition notice seeking voluminous discovery about highly confidential customer information on hundreds of products that LPL has *never accused of infringement*.

Specifically, LPL's request for documents seeks, *inter alia*, "all documents" including but not limited to writings, accounting records, agreements, communications, correspondence, faxes, summaries of records or telephone conversations, minutes or records of meetings or conferences, lists of persons attending meetings or conferences, documents between the Tatung Defendants and Sensormatic concerning such subject matter area as (a) marketing, sales, business documents or presentation materials provided by the Tatung Defendants, (b) technical specifications and/or assembly drawings regarding the Tatung Defendants' "visual display products," (c) Sensormatic's design requirements for its "visual display products," (d) Sensormatic's market for its "visual display products," (e) the business relationship between Sensormatic and the Tatung Defendants since January 1, 2002, (f) the manufacture and/or assembly of the Tatung Defendants' "visual display products," and more.

7

These extensive and broad-reaching requests for "visual display products" encompass *all* of the products the Tatung Defendants sell to Sensormatic and not just the accused products that are the subject of the Delaware Action. To date, LPL has failed to provide any legitimate explanation why information on *unaccused* products is relevant to its patent infringement claims in the Delaware Action.

### III. LEGAL ARGUMENT

**A.    The Tatung Defendants Have Standing Under FRCP 26(c) To Move For A Protective Order.**

Rule 26(c) of the Federal Rules of Civil Procedure ("FRCP") provides that "[u]pon motion *by a party* or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred…and for good cause shown… the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person…" (emphasis added). Courts within the Eleventh Circuit have recognized that this language gives parties to a lawsuit, as well as third-parties themselves, standing to challenge third-party subpoenas. *See Maxwell v. Health Ctr. of Lake City, Inc.*, No. 3:05-cv-1056-J-32MCR, 2006 U.S. Dist. LEXIS 36774, at *6-8 (M.D. Fla. 2006) (granting Defendant's motion for protective order against third party subpoenas under FRCP 26(c)); *see also, Garcia v. Jefferson Capital Sys., LLC*, No. 8:05-CV-1967-T-23EAJ, 2006 U.S. Dist. LEXIS 56147, at *9-10 (M.D. Fla. 2006) (stating that Defendants have standing to move for protective order against third party subpoenas seeking irrelevant information, pursuant to FRCP 26(c)); *see also, Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.,* 231 F.R.D. 426, 429 (M.D. Fla.

8

2005) (holding that a party has standing to challenge a subpoena issued to a non-party if the party alleges a personal right or privilege with respect to the subpoenas).

In meet and confer discussions, LPL has asserted that the Tatung Defendants do not have standing to object to the information sought from third parties. LPL is mistaken and references inapposite authority.[1]

Based on the above, the Tatung Defendants, as parties to the Delaware Action, clearly have standing to seek a protective order against LPL's attempts to obtain extremely broad and irrelevant discovery from third-parties.

**B.    Good Cause Supports The Issuance of A Protective Order.**

**1.    Legal Standard Governing The Issuance Of Protective Orders.**

Pursuant to Federal Rule of Civil Procedure 26(c), "upon a showing of good cause," the Court may issue a protective order precluding or limiting the scope of discovery in order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense. *See, e.g., Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.*, 234 F.R.D.

---

[1]    For example, LPL will likely cite *Dart Industries, Inc. v. Liquid Nitrogen Processing* for the proposition that "unless a party to an action can make claim to some personal right or privilege in respect to the subject matter of a subpoena duces tecum directed to a nonparty witness, the party to the action has no right to relief under FRCP 45(b) or 30(b)." 50 F.R.D. 286, 291 (D. Del. 1970), *quoting Shepherd v. Castle*, 20 F.R.D. 184, 188 (W.D.Mo. 1957).

Dart Industries *is inapposite for two reasons. First, that case involved a party's motion to* quash a third party subpoena under FRCP 45(b); *here, the Tatung Defendants move for a* protective order pursuant to FRCP 26(c), *which expressly grants parties standing to move the court to limit the scope of, or altogether preclude certain issues from, third party discovery.[1] FRCP 26(c)(4), 26(c)(7). The Tatung Defendants have chosen not to quash under FRCP 45(b) because they agree that LPL may seek relevant and appropriate discovery from third parties; FRCP 26(c) is the more appropriate mechanism to strike a balance between allowing open discovery and ensuring that such discovery is fairly tailored to the accused products.*

Second, unlike the Tatung Defendants, the moving party in Dart Industries *did not assert any personal privilege with respect to the requested documents. 50 F.R.D. at 291. In fact, the court expressly "decline[d] to hold that Dart lacks standing to move to quash the subpoena duces tecum on the grounds stated in FRCP 45(b)," averring that Dart's interest "may be sufficient to give it standing to move to limit the production sought here."* Id., *emphasis added.*

9

175, 178 (N.D. Ill. 2006); *see also, Pulsecard, Inc. v. Discover Card Services, Inc.*, 1995

WL 526533 at *14 (D. Kan. 1995). The protective order may include limiting the scope

of discovery to certain matters, precluding altogether the discovery of certain matters, and

ordering that a trade secret or other confidential research, development, or commercial

information not be revealed. Fed R. Civ Proc. 26(c)(4), 26(c)(7).

In the context of Federal Rule of Civil Procedure 26(c)(7) specifically, "good

cause" requires the party seeking the protective order to demonstrate that: (1) the material

sought to be protected is confidential, and (2) disclosure will create a competitive

advantage for the party. *Pulsecard*, 1995 WL 526533 at * 16, *citing Georgia Television

Co. v. TV News Clips of Atltanta*, 718 F. Supp. 939, 953 (N.D. Ga. 1989).

### 2. The Requested Discovery Seeks Overly Broad Categories Of Communications and Information Completely Unrelated To Claims At Issue in The Delaware Action.

A protective order is appropriate because LPL's third-party discovery requests are

overly broad and seek information that is not relevant to its claims, nor the Tatung

Defendants' defenses, in the Delaware Action. Instead, LPL seeks to obtain, through the

guise of "discovery," sensitive and confidential information relating to the Tatung

Defendant's business operations that would help LPL gain a competitive advantage.

"[D]iscovery may not be had regarding a matter which is not 'relevant to the

subject matter involved in the pending action.'" *Micro Motion, Inc. v. Kane Steel Co.*,

894 F.2d 1318, 1323 (Fed. Cir. 1990). Moreover, "[e]*ven if relevant*, discovery is not

permitted where no need is shown, or compliance would be unduly burdensome, or

where harm to the person outweighs the need of the person seeking discovery of the

10

information." *Id; see also, American Standard, Inc. v. Pfizer Inc.*, 828 F.2d 734, 739-42 (Fed. Cir. 1987).

In this regard, the case of *Joy Technologies, Inc. v. Flakt, Inc.*, 772 F. Supp. 842 (D. Del. 1991) is instructive, and presents a nearly identical situation to that found here. In *Joy Technologies*, the defendant sought a protective order preventing plaintiff from seeking discovery from *any of the defendant's customers or potential customers* until plaintiff made a showing that the information: (a) was necessary and relevant to the action, and (b) could not be obtained from any other source. *Id.* at 845. The court granted the requested protective order, stating:

> [I]t is undisputed that [plaintiff] and [defendant] are fierce competitors in the technology that is the subject of this lawsuit, and [plaintiff] has not convinced the Court that the same information it seeks from third parties is not available from [defendant]. Therefore, unless [plaintiff] can demonstrate that it has a specific need for evidence available only from third party customers of [defendant], the Court concludes that [defendant] and its customers are entitled to protection.

*Id.* at 849.

Similarly, in *Micro Motion, supra*, the plaintiff sought to obtain information from a nonparty competitor that was purportedly relevant to the issue of damages in the underlying patent suit. The court held that the plaintiff was embarking on a "fishing expedition" with its "merely speculative inquiries in the guise of relevant discovery." 894 F.2d at 1327-28, *see also Visto Corp. v. Smartner Info. Systems, Ltd.,* 2007 WL 218771 at * 5 (N.D. Cal. 2007) (granting protective order such that third party did not have to respond to the subpoena).

Here, LPL's discovery requests to Sensormatic seek broad categories of documents and information concerning both accused and *unaccused* products that also

11

are not limited as to time period. Such overly broad discovery requests encompass documents and information that, in reality, have nothing to do with the pending Delaware Action. Instead, it is readily apparent that LPL seeks to obtain such information about the Tatung Defendants to obtain a competitive advantage over them.

It also should be noted that the Tatung Defendants do not seek to prevent LPL from obtaining all third-party discovery being requested in its subpoena and deposition notice. Rather, such third-party discovery should focus on deposition topics and documents *pertaining to the accused products* at issue in the Delaware Action.

### 3. The Requested Third-Party Discovery Is Irrelevant To Any Purported Claim of Indirect Infringement.

The Tatung Defendants anticipate that LPL will claim that it needs customer information in order to determine indirect infringement. However, LPL has not shown why such information is relevant to any such indirect infringement claim.

Determining whether a patent claim has been infringed involves a two step analysis. First, the claim must be properly construed by the Court to determine its scope and meaning. Second, the claim, as construed, must be compared to the accused device or process. *PC Connector Solutions LLC v. Smartdisk Corp.*, 406 F.3d 1359, 1362 (Fed. Cir. 2005). Infringement analysis therefore focuses on the products or processes and the claims of the patents.

Here, the Tatung Defendants have already produced technical documents that depict their products' components, as well as the assembly methods used. LPL is *already in possession* of all the technical information it needs to compare Tatung's products to the

12

asserted claims. There is no need to directly subpoena and depose the Tatung Defendants' customers.

Moreover, there can be no indirect infringement without direct infringement and an infringing product. "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, ... and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Minnesota Mining and Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304 (Fed. Cir. 2002).

Here, there is no allegation of direct infringement with respect to the hundred of products for which LPL seeks thousands of documents from third parties. LPL is therefore not entitled to the broad categories of documents it seeks from Sensormatic.

### 4. The Requested Discovery Seeks Confidential Business Information To Which LPL Would Not Otherwise Be Entitled.

A protective order also is appropriate because LPL's subpoena and deposition notice seeks disclosure of confidential, proprietary trade secret information belonging to the Tatung Defendants. Such confidential commercial information warrants special protection under Rule 26(c)(7). *Micro Motion,* 894 F.2d at 1323, *citing Smith & Wesson v. United States*, 782 F.2d 1074, 1082 (1st Cir. 1986).

The Tatung Defendants and LPL are active competitors in the computer monitor business. Declaration of Jackson Chang ("Chang Decl.") at ¶ 2, which is attached hereto as Exhibit 3. Producing the information and testimony LPL seeks would cause major competitive harm to the Tatung Defendants. Chang Decl. at ¶ 3. As just one example, LPL designates as a deposition topic: "The nature of the business relationship and

13

transactions between Sensormatic and [the Tatung Defendants] relating to the sale, manufacture, assembly, distribution, or import of visual display products, including but not limited to the agreements between Sensormatic [and the Tatung Defendants]." These topics are closely guarded by the Tatung Defendants as highly sensitive and confidential business information. *Id.* at ¶ 4. The Tatung Defendants' methods of manufacturing its visual display products, for example, are not disclosed publicly; divulging this information would likely result in competitors using the information to 1) undercut the Tatung Defendants in pricing; 2) deduce the exact specifications required by existing customers; and/or 3) specifically target and lure away Tatung's existing customers. *Id.* at ¶ 7. All of this information is kept secret by the Tatung Defendants. Only authorized personnel have access to the information and information kept on computers are password protected. *Id.* at ¶ 6. The product specifications and features required by each customer, including Sensormatic, constitute competitive value and maintaining the confidentiality of such information is essential to the fair conduct of this litigation.

### 5. LPL's Discovery Is Unduly Burdensome And Is Intended to Harass The Tatung Defendants' Customers.

Ordering compliance with LPL's subpoena would pose an undue and unnecessary burden and expense on non-party Sensormatic to gather and produce such information and defend depositions in the requested time frame, particularly given the utter irrelevance of the majority of requested documents and testimony.

The Tatung Defendants respectfully submit that LPL's discovery requests have been interposed solely to harass Sensormatic and aggravate the business relationship between the Tatung Defendants and their customers.

14

**C.** **The Need For a Protective Order Limiting Third Party Discovery Is Even More Compelling Due To LPL's Violations Of Previous Protective Orders.**
LPL will likely argue that a Protective Order entered in the Delaware Action is

sufficient for discovery produced by third parties. The Tatung Defendants disagree on

two grounds, both of which are pending before the Special Master.

**1.** **LPL Has Violated Other Protective Orders On At Least Two Occasions.**

The Tatung Defendants have recently petitioned the Special Master for relief

regarding LPL's multiple violations of protective orders issued in different cases,

implicating different patents, pending between the parties. LPL has *admitted* that its

lawyers have viewed, used and disclosed confidential materials produced in other

litigation between the parties for purposes of this case, which is expressly prohibited by

the Protective Orders in the other litigation. The cases include *LPL v. Tatung Company,*

*et. al.*, Case No. 05-292-JJF in Delaware District Court and *LPL v. Tatung Company, et.*

*al.,* Case No. CV-02-6775-CBM in the Central District of California. Such conduct

flagrantly disregards the letter and spirit of the applicable protective orders.

**2.** **LPL Is Potentially In Violation Of the Patent Prosecution Bar.**

Second, the PTO records appear to show that LPL staffs its litigation team with

attorneys who also prosecute patents in the area of flat panel display technology. The

Tatung Defendants' investigation of this conduct, which would directly violate the

Protective Order, is ongoing, and the issue has been raised with the Special Master.

For these reasons, the Tatung Defendants submit that the parties' current

Protective Order is insufficient to protect against the potential harm posed by disclosure

of unlimited confidential information by third parties, including Sensormatic. *See*

15

*Pulsecard*, 1995 WL 526533 at * 26 ("The court does not find that the entry of a prior protective order should necessarily bar a second one, if facts justify it").

## IV. CONCLUSION

To be clear, the Tatung Defendants do not contest LPL's right to seek discovery from Sensormatic. They submit, however, that discovery obtained from third-parties must be *relevant* to this litigation and serve a legitimate purpose. Here, LPL's overly broad and improper requests do not serve such purposes. Accordingly, the Tatung Defendants respectfully request that the Court issue a protective order limiting discovery from Sensormatic to deposition testimony and documents relating to the accused products.

GREENBERG TRAURIG, P.A.
5100 Town Center Circle, Suite 400
Boca Raton, FL 33486
Telephone:    561.955.7600
Facsimile:    561.338.7099

By: _____
      Geoffrey M. Cahen
      Florida Bar No. 0013319
      Counsel for Defendants Tatung
      Company and Tatung Company of
      America, Inc.

16

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing

upon all parties to this matter by depositing a true copy of same in the U.S. Mail, proper

postage prepaid, properly addressed to the parties on the attached service list:

This 9th day of March, 2007.

GREENBERG TRAURIG

By: _____

Geoffrey M. Cahen
Attorney For Defendants Tatung
Company and Tatung Company of
America, Inc.

17

## SERVICE LIST

Richard D. Kirk
rkirk@bayardfirm.com
**The Bayard Firm**
222 Delaware Avenue # 900
Wilmington, DE 19899

Gaspare J. Bono
gbono@mckennalong.com
Rel S. Ambrozy
rambrozy@mckennalong.com
Cass W. Christenson
cchristenson@mckennalong.com
Lora A. Brzezynski
lbrzezynski@mckennalong.com
**McKenna Long & Aldridge LLP**
1900 K Street, N.W.
Washington, DC 20006

Jeffrey B. Bove
jbove@cblh.com
James D. Heisman
jheisman@cblh.com
Jaclyn M. Mason
jmason@cblh.com
**Connolly Bove Lodge & Hutz LLP**
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Tracy R. Roman
troman@raskinpeter.com
**Raskin Peter Rubin & Simon LLP**
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

Scott R. Miller
smiller@cblh.com
**Connolly Bove Lodge & Hutz LLP**
355 South Grand Avenue, Suite 3150
Los Angeles, CA 90071

Frederick L. Cottrell, III
Cottrell@RLF.com
Anne Shea Gaza
Gaza@RLF.com
**Richards Layton & Finger, PA**
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Frank E. Merideth, Jr.
meridethf@gtlaw.com
Valerie W. Ho
hov@gtlaw.com
Mark H. Krietzman
krietzmanm@gtlaw.com
Steve P. Hassid
hassids@gtlaw.com
**Greenberg Traurig LLP**
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

                      Plaintiff,

      v.

TATUNG COMPANY, et al.,

                    Defendants.

Civil Action No. 04-343 (JJF)

## NOTICE OF FED.R.CIV.P. 30(b)(6) DEPOSITION *DUCES TECUM* AND FED.R.CIV.P. 45 SERVICE OF SUBPOENA
### (SENSORMATIC)

TO:

Jeffrey B Bove, Esq.
Jaclyn M. Mason, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207

Frederick L. Cottrell, III, Esq.
Anne Shea Gaza, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Valerie Ho, Esq.
Mark H. Krietzman, Esq.
Frank C. Merideth, Jr., Esq.
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Scott R. Miller, Esq.
Connolly Bove Lodge & Hutz LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Tracy Roman, Esq.
Raskin Peter Rubin & Simon LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

PLEASE TAKE NOTICE that Plaintiff will take the deposition *duces tecum* of

Sensormatic ("Sensormatic") pursuant to Fed. R. Civ. P. 30(b)(6), on March 16, 2007. The

deposition will take place at Esquire Deposition Services, 2385 NW Executive Ctr. Suite 120,

Boca Raton, FL 33431. The deposition will be videotaped and taken before a notary public or

651702-1



EXHIBIT

1

court reporter, duly authorized to administer oaths and transcribe the testimony of the deponent(s) and may use technology that permits the real time display of the deposition transcript for attendees who bring a compatible computer. The deposition may continue from day to day until completed if authorized by the Court or stipulated by the parties.

PLEASE ALSO TAKE NOTICE that LG.Philips LCD Co., Ltd. is serving Sensormatic with a subpoena (the "Subpoena"), a copy of which is attached hereto. The subjects covered in the deposition will include (but are not limited to) the subjects listed on Attachment A to the Subpoena. Pursuant to Fed. R. Civ. P. 30(b)(6), Sensormatic is required to designate one or more persons to testify at the deposition as to the matters known or reasonably available to Sensormatic concerning all topics listed in Attachment A to the Subpoena. In addition, the Subpoena requires Sensormatic to produce at the deposition the documents listed in Attachment B to the Subpoena.

You are invited to attend and cross examine.

February 13, 2007

THE BAYARD FIRM

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, Suite 900
OF COUNSEL:                        P.O. Box 25130
Gaspare J. Bono                    Wilmington, DE 19899-5130
Matthew T. Bailey                  rkirk@bayardfirm.com
Lora A. Brzezynski                 (302) 655-5000
Cass W. Christenson                Counsel for Plaintiff
McKenna Long & Aldridge LLP        LG.PHILIPS LCD CO., LTD.
1900 K Street, NW
Washington, DC 20006
(202) 496-7500

651702-1

OAO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| L.G.PHILIPS LCD CO., LTD.<br>V.<br>TATUNG COMPANY, et al. | **SUBPOENA IN A CIVIL CASE** |

Case Number:[1]   04-343 (JJF)

TO:   **Sensormatic, Inc.**
      **6600 Congress Ave**
      **Boca Raton, Florida 33431-0837**

United States District Court for the District of Delaware

**X**   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

**X**   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. (See Attachment A for topics.)

| PLACE OF DEPOSITION<br>Esq. Deposition Svcs, 2385 NW Executive Center Dr., Ste. 120, Boca Raton, FL 33431 | DATE AND TIME<br>March 16, 2007 at 9 am. |
|---|---|

**X**   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): All documents listed in Attachment B.

| PLACE<br>Mail documents to: McKenna Long & Aldridge LLP, Attn: Shari Klevens c/o<br>Esq. Deposition Svcs, 2385 NW Executive Center Dr., Ste. 120, Boca Raton, FL 33431 | DATE AND TIME<br>March 5, 2007 at 9:00 a.m. |
|---|---|

**G**   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER=S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR<br>Shari Klevens (Attorney for Plaintiff) *[signature]* | DATE<br>February 13, 2007 |
|---|---|

ISSUING OFFICER=S NAME, ADDRESS AND PHONE NUMBER
Shari Klevens
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
Telephone: 202-496-7612

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number

DC:50459511 1

AO88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
                         DATE                              SIGNATURE OF SERVER

                                                  _____
                                                       ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)   fails to allow reasonable time for compliance,
(ii)  requires a person who is not a party or an officer of a

party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)   subjects a person to undue burden.

(B) If a subpoena

(i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert=s opinion or information not describing specific events or occurrences in dispute and resulting from the expert=s study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

DC:50459531.1

## ATTACHMENT A: TOPICS TO BE ADDRESSED AT THE DEPOSITION

For purposes of this Attachment, Sensormatic should use the following definition for the terms used herein.

A.    "Sensormatic," "you," and "your" as used herein, means Sensormatic and all persons or entities acting or purporting to act on your behalf, and any affiliates of Sensormatic.

B.    "ViewSonic" means Defendant ViewSonic Corporation, and all persons or entities acting or purporting to act on ViewSonic Corporation's behalf, and any affiliates of ViewSonic, including, but not limited to, entities, divisions, and affiliates located in Taiwan.

C.    "ViewSonic products" as used herein means any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs, and is made or assembled in whole or in part by or for ViewSonic.  This includes all such products, regardless of brand name, and thus includes, but is not limited to, ViewSonic brand products.

D.    "Tatung Company" means Defendant Company and all persons or entities acting or purporting to act on Tatung Company's behalf, including, but not limited to Tatung America and TSTI.

E.    "Tatung Company products" as used herein any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs, and is made or assembled in whole or in part by or for Tatung.  This includes all such products, regardless of brand name, and thus includes, but is not limited to, Tatung brand products.

F.  "Tatung America" means Defendant Tatung Company of America, Inc., and all persons or entities acting or purporting to act on Tatung Company of America's behalf, including but not limited to Tatung Company and any affiliates of Tatung Company of America.

G.  "Tatung America products" as used herein means any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs, and is made or assembled in whole or in part by or for Tatung America. This includes all such products, regardless of brand name, and thus includes, but is not limited to, Tatung America brand products.

H.  "TSTI" means Tatung Science and Technology, Inc., and all persons or entities acting or purporting to act on Tatung Science and Technology's behalf, including but not limited to Tatung Company, and any affiliates of Tatung Science and Technology.

I.  "TSTI products" as used herein means any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs, and is made or assembled in whole or in part by or for TSTI. This includes all such products, regardless of brand name, and thus includes, but is not limited to, TSTI brand products.

J.  "Affiliate(s)" means any corporation or other entity that controls, is controlled by or is under common control with the identified corporation or entity, including without limitation partnerships, parents, subsidiaries and divisions.

K.  "Visual display products" means any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs.

L.    "Communication" means, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer or exchange of information between two of more persons of any nature whatsoever, by or to whomever, whether oral or written or whether face-to-face, by telephone, email, mail, personal delivery or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interviews, consultations, agreements and other understandings.

M.    "Concern" and "concerning" are used in their broadest sense and embrace all matter relating to, referring to, describing, discussing, evidencing or constituting the referenced subject.

N.    "Discuss," "discussing," "relate to" "relating to," "support" or "supporting" means in any way directly or indirectly, in whole or in part, discussing, referring to, regarding, constituting, concerning, about, pertaining to, relating to, reflecting, considering, underlying, modifying, amending, confirming, mentioning, endorsing, evidencing, summarizing, memorializing, describing, discussing, analyzing, evaluating, representing, supporting, qualifying, terminating, revoking, canceling or negating.

O.    "Identify" used in respect to a company or corporate or business entity of any kind means to set forth:

      a.  the full name of the company;

      b.  the full name of the division or office involved, if applicable; and

      c.  the address of the company and of the division or office involved, if applicable.

P.    "Identify" used in respect to a document or thing means:

     a.  to provide a brief description of such document or thing, including date, author, recipients, type, and content or substance;

     b.  to identify the custodian of the document or thing;

     c.  to identify the place where the document or thing may be inspected; and

     d.  if a copy of the document has been supplied to LPL, to so state and specifically identify the copy supplied by reference to production numbers or other identifying information.

Q.    "Identify" used with respect to a natural person means to state:

     a.  the full name;

     b.  the present or last known business and residence addresses;

     c.  the last known employer or job affiliation; and

     d.  the last known occupation and business position or title held.

R.    "Import" or "importation" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

S.    "Make" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

T.    "Offer to sell" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

U.    "Person" means any natural person, firm, association, partnership, corporation, or other form of legal entity.

V.    "Sell" or "sale" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

W.    The use of the singular form of any word includes the plural and vice versa.

The topics to be covered in the deposition include:

1.     The nature of the business relationship and transactions between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic relating to the sale, manufacture, assembly, distribution, or import of visual display products, including but not limited to the agreements between Sensormatic, Tatung Company, Tatung America, TSTI, and/or ViewSonic.

2.     The scope, nature and purpose of communications between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic (a) concerning the sale or marketing in the United States of visual display products manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic, (b) communications regarding any product support assistance or warranties that Tatung Company, Tatung America, TSTI, and/or ViewSonic have provided to Sensormatic, (c) communications regarding the market trends for visual display products in the United States, (d) communications regarding the technical specifications of Tatung Company, Tatung America, TSTI, and/or ViewSonic visual display products, and (e) communications regarding your required or desired technical specifications for visual display products manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic.

3.     The scope, nature and purpose of communications between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic concerning the technical assembly of Tatung Company's, Tatung America's, TSTI's, or ViewSonic's visual display products, including, but not limited to, the use and identity of original equipment manufacturers ("OEMs") or systems integrators used by Sensormatic, Tatung Company, Tatung America, TSTI, and ViewSonic.

4.    Any agreements or contracts pursuant to which Sensormatic has agreed to purchase Tatung Company's, Tatung America's, TSTI, and/or ViewSonic's visual display products either directly from Tatung Company, Tatung America, TSTI, or ViewSonic or indirectly by purchasing such products from any OEMs.

5.    Sensormatic's activities or efforts related to the distribution or sale of visual display products in the United States manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic.

6.    All channels, distributors, suppliers, and networks through which products made in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic have been shipped, imported, sold, and/or distributed in the United States.

7.    Sensormatic's sales of its visual display products that were manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic, including the quantity and dollar amount of such sales, by product.

8.    The substance of any meetings between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic whether in the U.S. or abroad.

DC:50159632.1

## ATTACHMENT B: DOCUMENTS TO BE PRODUCED

For purposes of this Attachment, Sensormatic should refer to Attachment A for the definition or meaning of terms used herein, which definitions are incorporated herein by reference. In addition, the following definition applies:

A.    "Document" means all types of documents and things embraced within Federal Rules of Civil Procedure 34 and includes, without limitation, any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy, of the following items, however produced or reproduced, namely: books, accounting records of any nature whatsoever, agreements, communications, correspondence, facsimiles, telegrams, cable, telexes, memoranda, recordings, studies, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, letters, forecasts, statistical statements, graphs, laboratory or engineering reports and records, notebooks, charts, plans, sketches, drawings, video tapes, films, slides, information bearing photographic products of any nature whatsoever, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, reports or summaries or interviews, reports or summaries of investigations, opinions or reports of consultants, patent studies, or opinions of counsel, records, reports or summaries of negotiations, sales literature of any nature whatsoever, brochures, catalogues, catalogue sheets, pamphlets, periodicals, advertisements, circulars or trade letters, press releases, trade releases, publicity releases, new product releases, reprints, drafts of any documents, working papers, indices, original or preliminary notes, computer printouts, floppy disks, hard drives, CD-ROM's, magnetic tapes and other data compilations from which

information can be obtained or translated, if necessary by Sensormatic through detection devices into reasonably usable form. The term document also refers to any tangible object other than a document as described above, and includes objects of every kind and nature such as, but not limited to, prototypes, models, and specimens.

The documents to be produced on or before March 5, 2007, include the following:

1. All documents provided by Tatung Company, Tatung America, TSTI, and/or ViewSonic to Sensormatic since January 1, 2002 regarding: (i) marketing, sales, or business documents or presentation materials; (ii) technical specifications and/or drawings regarding Tatung Company's, Tatung America's, TSTI's or ViewSonic's visual display products, including but not limited to the assembly of such products; and (iii) any documents relating to warranties, product support, or service provided by Tatung Company, Tatung America, TSTI, and/or ViewSonic regarding their visual display products.

2. Documents provided by Sensormatic to Tatung Company, Tatung America, TSTI or ViewSonic since January 1, 2002 sufficient to show (i) Sensormatic's design requirements for its visual display products, (ii) Sensormatic's market for its visual display products, and/or (iii) market trends in the United States for visual display products.

3. Documents sufficient to show the business relationship between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic since January 1, 2002, including communications with Tatung Company, Tatung America, TSTI, and/or ViewSonic, notes from meeting with Tatung Company, Tatung America, TSTI, and/or ViewSonic, and documents in which Sensormatic has agreed to purchase visual display products directly from Tatung Company, Tatung America, TSTI, and/or ViewSonic.

4. All documents related to the manufacture and/or assembly of Tatung Company's, Tatung America's, TSTI's, and/or ViewSonic's visual display products.

5. All documents since January 1, 2002 evidencing or relating to Sensormatic's purchase from original equipment manufacturers ("OEMs") any visual display products that Sensormatic had reason to believe were manufactured or assembled in whole or in part by Tatung Company, Tatung America, TSTI, and/or ViewSonic, and documents sufficient to show that Tatung Company, Tatung America, TSTI, and/or ViewSonic received notice of Sensormatic's agreements to purchase.

6. Documents sufficient to show Sensormatic's receipt or purchase of visual display products sold, manufactured, shipped, imported, or distributed in whole or in part by Tatung Company, Tatung America, TSTI, and ViewSonic since January 1, 2002.

7. Documents sufficient to show the total quantity of visual display products sold, by product, by Sensormatic that were manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic since January 1, 2002, including separate summaries for (1) Tatung Company products, (2) Tatung America products, (3) TSTI, and (4) ViewSonic products.

8. Documents sufficient to show the sales by total dollar value and by quantity of visual display products sold, by product, by Sensormatic that were manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic since January 1, 2002, including separate summaries for (1) Tatung Company products, (2) Tatung America products, (3) TSTI, and (4) ViewSonic products.



9.    Documents sufficient to identify each person Sensormatic has communicated with at Tatung Company, Tatung America, TSTI, and/or ViewSonic.

DC:5C459602.1

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on February 13, 2007, he electronically

filed the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Jeffrey B Bove, Esq.
Jaclyn M. Mason, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207

Frederick L. Cottrell, III, Esq.
Anne Shea Gaza, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

The undersigned counsel further certifies that copies of the foregoing document

were sent by hand to the above counsel and by email and will be sent by first class mail

to the following non-registered participants:

Scott R. Miller, Esq.
Connolly Bove Lodge & Hutz LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Valerie Ho, Esq.
Mark H. Krietzman, Esq.
Frank C. Merideth, Jr., Esq.
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Tracy Roman, Esq.
Raskin Peter Rubin & Simon LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

/s/ Richard D. Kirk (rk922)
Richard D. Kirk

571447-1

## DECLARATION OF CHARLENE OH

I, Charlene Oh, declare:

1.      I am an attorney licensed to practice before the Courts of the State of California.  I
am an associate with the law firm of Greenberg Traurig, LLP, counsel for Defendants
Tatung Company and Tatung Company of America, Inc.  I make this Declaration in
support of Defendants' Motion for a Protective Order Limiting Scope of Third Party
Deposition and Subpoena (the "Motion for Protective Order").

2.      The Motion for Protective Order concerns a deposition notice and third party
subpoena issued in this district in connection with a patent infringement lawsuit pending
in the United States District Court for the District of Delaware, C.A. No. 04-343-JJF (the
"Delaware Action").

3.      The following list identifies those products Plaintiff L.G. Philips LCD Co., Ltd.
has accused of infringement in the C.A. No. 04-343-JJF case.  The list is taken from
Plaintiff's Fifth Supplemental Response to Defendants' Interrogatory No. 1.

| |
|---|
| L17AMTN |
| L17UCCT |
| TLM1705 |
| Tatung ADMNC1LCD17 |
| American Dynamics ADMNC1LCD17 |
| Unidentified American Dynamics Product |
| P42HSMT |
| P46T |
| (Triview) TLM1505 |
| TriviewFST-1503RV-4B |
| TLM1703T |
| TLM1703 |
| TLM1903 |
| V23CLTT |
| V23DLWX-U12 |
| V27CMTT-U01 |
| V30CMTT-U62 |

126743326_1

EXHIBIT

2

| V30CMTT-U01 |
| HP RG556AA |
| IloFCBT |
| Hitachi 37HDL52 |

4.      The Motion for Protective Order requests that this Court limit discovery from third parties to deposition testimony and documents that relate to the above accused products.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 8, 2007 in Los Angeles, CA.

_____
Charlene Oh

## DECLARATION OF JACKSON CHANG

I, Jackson Chang, under penalty of perjury, hereby declare and state:

1.      I am the General Manager of Display BU Sales for Tatung Company.

2.      Tatung Company and Tatung Company of America, Inc. (the "Tatung Defendants"), actively compete with L.G. Philips LCD Co., Ltd. ("LPL") and its parent company, LG Electronics, Inc. ("LGE") in the computer monitor business.

3.      Producing the information and testimony LPL seeks would cause major competitive harm to the Tatung Defendants.

4.      The noticed deposition topics are closely guarded by the Tatung Defendants as highly sensitive and confidential business information.

5.      The requested documents also implicate highly sensitive commercial information.

6.      All of this information is kept secret by the Tatung Defendants. Only authorized personnel have access to the information and information kept on computers are password protected.

7.      A third party's disclosure of the requested information would likely result in competitors using the information to 1) undercut the Tatung Defendants in pricing; 2) deduce the exact specifications required by existing customers; and/or 3) specifically target and lure away Tatung's existing customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 8, 2007 in Los Angeles, CA.

_____
Jackson Chang

EXHIBIT

3

OJS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| L.G. Philips LCD CO., LTD. | TATUNG COMPANY, TATUNG COMPANY OF AMERICA, INC. and VIEWSONIC CORPORATION |

**CIV-RYSKAMP**

**MAGISTRATE JUDGE VITUNAC**

**07-80223**

| (b) County of Residence of First Listed Plaintiff  Seoul, Korea | County of Residence of First Listed  Taipei, Taiwan |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED. |

| (c)  Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| The Bayard Firm<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, DE 19899-5130<br>302-655-5000 | Greenberg Traurig<br>5100 Town Center Circle, Suite 400<br>Boca Raton, FL 33486<br>561-955-7600 |

2007 MAR -9  FILED BY

(d) Check County Where Action Arose: ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☒ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE / HIGHLANDS

## II.  BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

*07CV 80223  KLR/AEV*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☒ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V.  ORIGIN (Place an "X" in One Box Only)

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Re-filed- (see VI below)
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

| VI.  RELATED/RE-FILED CASE(S). | a) Re-filed Case ☐ YES ☐ NO      b) Related Cases ☒ YES ☐ NO |
|---|---|
| (See instructions second page) | JUDGE Joseph J. Fernan, Jr.     **District of Delaware (Wilmington)**     DOCKET NUMBER 1:04-cv-00343-JJF |

| VII.  CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): Fed. R. Civ. P. 26(c)<br><br>LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case) |
|---|---|

| VII.  REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND: ☐ Yes ☒ No |
|---|---|---|---|

| ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE | SIGNATURE OF ATTORNEY OF RECORD | DATE 03/09/07 |
|---|---|---|

*722519*

FOR OFFICE USE ONLY     AMOUNT

Reed Elsevier LegalNet, Inc.     www.USCourtForms.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,

Plaintiff,

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

Defendants

Case No. 04-343-JJF (D. Del.)

**07-80223**

**CIV-RYSKAMP**

THIS MATTER having been opened to the Court on motion by defendants, the

Tatung Co. and the Tatung Company of America, Inc., by their attorneys, for a protective

order pursuant to Fed. R. Civ. P. 26(c), limiting the scope of discovery from third party

Sensormatic, Inc. ("Sensormatic"); and plaintiff L.G.Philips LCD Co., Ltd., by their

attorneys, having opposed the motion; and the Court having considered the papers

submitted and the arguments presented; and for good cause shown:

**IT IS HEREBY ORDERED THAT:**

1. The motion is GRANTED.

2. Any deposition testimony taken from third party Sensormatic shall be

limited to the accused products at issue in *L.G. Philips LCD Co., Ltd. v. Tatung*

*Company, et. al.*, C.A. No. 04-343-JJF (United States District Court for the District of

Delaware) (the "Delaware Action"). Such deposition testimony shall be subject to the

provisions of the Stipulated Protective Order dated January 24, 2005 entered in the

Delaware Action.

3. Any documents produced in response to the subpoena by third party

Sensormatic shall be limited to those documents relating to the accused products at issue

in the Delaware Action. Additionally, any documents produced shall be stamped

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER and shall be produced subject

to the Stipulated Protective Order dated January 24, 2005 entered in the Delaware Action,

which is attached hereto as Exhibit 1.

Dated: March 9, 2007
~~Boca Raton,~~ Florida
WPB

United States District Court Judge for the
Southern District of Florida

Copies to:  Richard D. Kirk, Esq. (rkirk@bayardfirm.com)
Gaspare J. Bono, Esq. (gbono@mckennalong.com)
Jeffrey B. Bove, Esq. (jbove@cblh.com)
Tracy R. Roman, Esq. (troman@raskinpeter.com)
Scott R. Miller, Esq. (smiller@cblh.com)
Frederick L. Cottrell, III, Esq. (Cottrell@RLF.com)
Frank E. Merideth, Jr., Esq. (meredith@gtlaw.com)
Geoffrey M. Cahen, Esq. (caheng@gtlaw.com)

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 JAN 24  AM 9: 45

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LG PHILIPS LCD CO., LTD ,                )
                                         )
Plaintiff,                               )
                                         )       C A. No. 04-343-JJF
v                                        )
                                         )
TATUNG COMPANY;                          )
TATUNG COMPANY OF AMERICA,               )
INC. and VIEWSONIC CORPORATION,          )
                                         )
Defendants.                              )


### STIPULATED PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the parties stipulate to the
following Protective Order, subject to the approval of the Court:

1.      Scope of Protection.

1.1     This Protective Order shall govern any record of information, designated pursuant
to Paragraph 2 of this Protective Order, produced in this action, including all designated
deposition testimony, all designated testimony taken at a hearing or other proceeding,
interrogatory answers, documents and other discovery materials, whether produced
informally or in response to interrogatories, requests for admissions, requests for
production of documents or other formal method of discovery.

1.2     This Protective Order shall also govern any designated record of information
produced in this action pursuant to required disclosures under any federal procedural rule
or District of Delaware local rule, and any supplementary disclosures thereto.

1.3     This Protective Order shall apply to the parties and any nonparty from whom
discovery may be sought and who desires the protection of this Protective Order
(collectively herein referred to as a "party" or the "parties").

2       Designation.

2.1     Each party shall have the right to designate as confidential and subject to this
Protective Order any information produced by it in this action which contains, reflects, or

EXHIBIT

1

otherwise discloses confidential technical, business or financial information ("CONFIDENTIAL information"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered confidential under this Protective Order. The parties will use reasonable care to avoid designating any documents or information CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER that are generally available to the public.

2.2     Each party shall have the right to designate as restricted to review by those categories of individuals listed in Paragraphs 4.1(a) - 4.1(e) and subject to this Protective Order any information produced in this action which contains, reflects, or otherwise discloses (1) trade secrets, (2) research and development, manufacturing, operational or other highly sensitive technical information, or (3) highly sensitive business related information, such as customer, supplier or financial information (collectively, "HIGHLY SENSITIVE CONFIDENTIAL information"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend HIGHLY SENSITIVE CONFIDENTIAL prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered HIGHLY SENSITIVE CONFIDENTIAL under this Protective Order. To the extent that material is marked HIGHLY SENSITIVE CONFIDENTIAL, such material shall be revealed to or used by limited categories of individuals, as provided for in Paragraph 4.2, and shall not be communicated in any manner, either directly or indirectly, to any person or entity not permitted disclosure pursuant to this Protective Order. Any copies of such material, abstracts, summaries or information derived therefrom, and any notes or other records regarding the contents thereof, shall also be deemed HIGHLY SENSITIVE CONFIDENTIAL, and the same terms regarding confidentiality of these materials shall apply as apply to the originals. Use of this highly restrictive designation is limited to information of the highest sensitivity. The parties will use reasonable care to avoid designating any documents or information HIGHLY SENSITIVE CONFIDENTIAL for which the designating party does not have a good faith belief that the documents or information satisfy the criteria set forth in this Paragraph 2.2. HIGHLY SENSITIVE CONFIDENTIAL information shall be used only for purposes directly related to this action, and for no other purpose whatsoever, except by consent of all of the parties or order of the Court.

2.3     To the extent that any party has, prior to the date that this Order is entered, produced to the other side materials that the producing party has marked with confidentiality designation, all such materials shall be considered to have been designated under this Order as HIGHLY SENSITIVE CONFIDENTIAL unless otherwise agreed by the Parties

3.     Limit On Use And Disclosure Of Designated Information.

3.1    Each party and all persons bound by the terms of this Protective Order shall use any information or document governed by this Protective Order only in connection with the prosecution or defense of this action and for no other purpose, except by consent of the parties or order of the Court. No party or other person shall disclose or release to any person not authorized under this Protective Order any information or document governed by this Protective Order for any purpose, or to any person authorized under this Protective Order for any other purpose.

3.2    It is, however, understood that counsel for a party may give advice and opinions to his or her client in connection with the prosecution or defense of this action based on his or her evaluation of designated confidential information received by the party, provided that such rendering of advice and opinions counsel shall not reveal the content of such information except by prior written agreement with counsel for the producing party.

3.3    The attorneys of record for the parties and other persons receiving information governed by this Protective Order shall exercise reasonable care to ensure that the information and documents governed by this Protective Order are (a) used only for the purposes specified herein, and (b) disclosed only to authorized persons.

4.    Disclosure Of Confidential Material.

4.1    Documents or information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER shall be disclosed by the recipient thereof only to:

(a)    the attorneys who are actively involved in this action that are partners of or employed by the following law firms of record for the parties, and their authorized secretarial, clerical and legal assistant staff: Morris, James, Hitchens & Williams LLP; McKenna, Long & Aldridge LLP; Potter Anderson & Corroon LLP; Bingham McCutchen LLP; Rosethal, Monhait, Gross & Goddess; and Baum & Weems provided that such attorneys shall not be provided access to HIGHLY SENSITIVE CONFIDENTIAL information if such attorneys

> (1)    have participated in, directed or supervised any patent prosecution activitiy related to the patents-in-suit or currently participate in, direct or supervise any patent prosecution activity involving (i) flat panel display technology or (ii) technology related or refering to or incorporating flat panels or flat panel displays (collectively, "the Subject Matter"). During the pendency of this litigation and for one year after the full and final conclusion of this litigation, including all appeals, those attorneys at outside counsel for the parties defined above who are provided access to HIGHLY SENSITIVE CONFIDENTIAL materials covered by this order will not participate in, direct or supervise any patent prosecution activity in the United States Patent and Trademark Office or with any patent office outside the United States involving the Subject Matter;

(2)     provide non-legal, business advice or non-legal, business representation or to clients in the flat panel display industry wherein the highly sensitive business-related financial information of any opposing party would be relevant to such non-legal, business advice or non-legal, business representation. During the pendency of this litigation and for one year after the full and final conclusion of this litigation, including all appeals, those attorneys at outside counsel for the parties defined above who are provided access to HIGHLY SENSITIVE CONFIDENTIAL materials covered by this order will not provide non-legal, business advice or non-legal, business representation to clients in the flat panel display industry wherein the highly sensitive business-related information of any opposing party would be relevant to such non-legal, business advice or representation; or

(3)     are related to or have a personal, social relationship with any officer, director or employee of a party

(b)     the Court and Court personnel, as provided in Paragraph 12;

(c)     consultants or experts and their staffs retained by the parties or their attorneys for purposes of this action, who are agreed upon by the parties pursuant to Paragraph 6, who are not employees or otherwise affiliated with any of the parties (except persons scheduled to be deposed by any of the parties pursuant to Rule 30(b)(6), Fed.R.Civ P.), and who first agree to be bound by the terms of this Protective Order;

(d)     court reporters employed in connection with this action;

(e)     outside copying and computer services necessary for document handling, and other litigation support personnel (e.g., translators, graphic designers and animators);

(f)     One member of LG.Philips LCD, Co., Ltd.'s in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(g)     One member of Viewsonic Corporation's in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(h)     One member of Tatung Company's in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(i)     One attorney of Tatung Company of America, Inc.'s regular out-side counsel, provided that each such individual must first agree to be bound by the terms of this Protective Order;

4.2     Documents or information designated HIGHLY SENSITIVE CONFIDENTIAL shall be disclosed by the recipient thereof only to those categories of individuals listed in Paragraphs 11 4.1(a) - 4.1(e) subject to the restrictions therein.

LG Philips v Tatung Co, Case No 04-343-JJF
Protective Order, Page 4

5.    Redaction

Counsel for a party producing documents may mask ("redact") material deemed exempt from discovery because it is protected from disclosure under the attorney-client privilege or work product immunity afforded by Rule 26(b), Fed.R.Civ.P. However, any document from which material is masked must identify in the masked area that masking or redaction has occurred. The reason for any such masking must be stated on a log to be provided within thirty (30) days after the production of the documents. Sufficient information regarding the masked material must be provided to the other party to enable it to evaluate the legitimacy of the asserted privilege or immunity. The parties reserve the right to pursue categories for redaction in addition to those identified above, by either consent of the parties or order of the Court, to be addressed on a case-by case basis.

6.    Disclosure to Independent Consultants and Identification of Experts

6.1    If any party desires to disclose information designated CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL to any expert or consultant pursuant to Paragraph 4 above, it must first identify in writing to the attorneys for the producing party each such expert or consultant. The attorney for the producing party shall have ten (10) business days from receipt of such notice to object to disclosure of such information to any of the experts or consultants so identified.

6.2    Such identification shall include the full name and professional address and/or affiliation of the proposed expert or consultant, an up-to-date curriculum vitae identifying at least all other present and prior employments or consultancies of the expert or consultant in the field of flat panel and flat panel display technologies, and a list of the cases in which the expert or consultant has testified at a deposition, an arbitral hearing or trial within the last four years. The parties shall attempt to resolve any objections informally. If the objections cannot be resolved, the party seeking to disclose the CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information to the expert or consultant may move the Court for an Order allowing the disclosure. On any motion challenging the disclosure of such information to an expert or consultant, the burden of proof shall lie with the party objecting to the disclosure to establish that the information should not be disclosed to the expert or consultant. In the event objections are made and not resolved informally, disclosure of information to the expert or consultant shall not be made except by Order of the Court (or to any limited extent upon which the parties may agree).

7.    Agreement Of Confidentiality.

In no event shall any information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL be disclosed to any person authorized pursuant to Paragraph 4, other than (a) the Court and Court personnel, (b) the parties' attorneys identified in Paragraph 4.1(a) and their authorized secretarial and legal assistant staffs, (c) court reporters, and (d) outside copying and computer services necessary for document handling, until such person has executed a written

Confidentiality Undertaking (in the form set forth in Exhibit A hereto) acknowledging and agreeing to be bound by the terms of this Protective Order. Copies of such Confidentiality Undertakings shall be promptly served on the producing party.

8       Related Documents.

Information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL shall include (a) all documents, copies, extracts, and complete or partial summaries prepared from or containing such information; (b) portions of deposition transcripts and exhibits thereto which contain or reflect the content of any such documents, copies, extracts, or summaries; (c) portions of briefs, memoranda or any other papers filed with the Court and exhibits thereto which contain or reflect the content of any such documents, copies, extracts, or summaries; (d) deposition testimony designated in accordance with Paragrapah 9; and (e) testimony taken at a hearing or other proceeding that is designated in accordance with Paragraph 10.

9.      Designation Of Deposition Transcripts.

9.1     Deposition transcripts, or portions thereof, may be designated as subject to this Protective Order either (a) at the time of such deposition, in which case the transcript of the designated testimony shall be marked by the reporter with the appropriate legend (see Paragraph 2.1) as the designating party may direct, or (b) within twenty-one (21) days following the receipt of the transcript of the deposition by providing written notice to the reporter and all counsel of record, in which case all counsel receiving such notice shall mark the copies or portions of the designated transcript in their possession or under their control as directed by the designating party.

9.2     All deposition transcripts not previously designated shall be deemed to be, and shall be treated as, HIGHLY SENSITIVE CONFIDENTIAL until the expiration of the period set forth in Paragraph 9.1, and neither the transcript nor the content of the testimony shall be disclosed by a non-designating party to persons other than those persons named or approved according to Paragraph 4.

9.3     The designating party shall have the right to exclude from a deposition, before the taking of testimony which the designating party designates CONFIDENTIALSUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL and subject to this Protective Order, all persons other than those persons previously qualified to receive such information pursuant to Paragraph 4.

9.4     In addition, to the extent that any document or information that has been designated as either CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL and subject to this Protective Order, such document or information shall not be disclosed to or otherwise used with any witness not currently or previously employed or retained by the producing party during a deposition without at least three (3) calendar days prior notice to the designating party of such potential use in order to permit counsel for the designating party to attend and to take

such action as it deems appropriate to protect the confidentiality of the documents and/or information. Counsel for the parties shall attempt to resolve any objection(s) and they will only seek redress to the Court if no resolution can be reached. However, the receiving party shall not use or otherwise disclose the confidential documents or information subject to such objection at such deposition of a witness not currently or previously employed or retained by the producing party until the Court has ruled upon any such objection(s), provided that the producing party submits the matter to the Court within three (3) calendar days of the parties being unable to resolve the objection(s).

10.     Designation Of Hearing Testimony Or Argument.

With respect to testimony elicited during hearings and other proceedings, whenever counsel for any party deems that any question or line of questioning calls for the disclosure of CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL information, counsel may designate on the record prior to such disclosure that the disclosure is subject to confidentiality restrictions. Whenever matter designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL is to be discussed in a hearing or other proceeding, any party claiming such confidentiality may ask the Court to have excluded from the hearing or other proceeding any person who is not entitled under this Order to receive information so designated.

11      Disclosure To Author Or Recipient.

Notwithstanding any other provisions of this Order, nothing herein shall prohibit counsel for a party from disclosing a document containing information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL to any person which the document clearly identifies as an author, addressee, or carbon copy recipient of such document, or to any current employee of the producing party who by their testimony indicates they have access to the type of information sought to be disclosed. During deposition or trial testimony, counsel may disclose documents produced by a party to current employees and officers of the producing party who by their testimony indicates they have access to the type of information sought to be disclosed. And regardless of such designation pursuant to this ' Protective Order, if a document or testimony makes reference to the actual or alleged conduct or statements of a person who is a potential witness, counsel may discuss such conduct or statements with such witness without revealing any portion of the document or testimony other than that which specifically refers to such conduct or statement, and such discussion shall not constitute disclosure in violation of this Protective Order

12.     Designation Of Documents Under Seal.

Any information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, if filed with the Court, shall be filed under seal and shall be made available only to the Court and to persons authorized by the terms of this Protective Order. The party filing any paper which reflects, contains or includes

any CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information subject to this Protective Order shall file such paper in a sealed envelope, or other appropriately sealed container, which indicates the title of the action, the party filing the materials, the nature of the materials filed, the appropriate legend (see Paragraph 2.1), and a statement substantially in the following form:

This envelope contains documents subject to a Protective Order of the Court. It should be opened only by the Court. Its contents should not be disclosed, revealed or made public except by Order of the Court or written agreement of the parties.

13. Confidentiality Of Party's Own Documents.

No person may disclose, in public or private, any designated information of another party except as provided for in this Protective Order, but nothing herein shall affect the right of the designating party to disclose to its officers, directors, employees, attorneys, consultants or experts, or to any other person, its own information. Such disclosure shall not waive the protections of this Protective Order and shall not entitle other parties or their attorneys to disclose such information in violation of it, unless by such disclosure of the designating party the information becomes public knowledge (see Paragraph 16). Similarly, the Protective Order shall not preclude a party from showing its own information to its officers, directors, employees, attorneys, consultants or experts, or to any other person, which information has been filed under seal by the opposing party.

14. Other Protections.

14.1 No person shall use any CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information, or information derived therefrom, for purposes other than the prosecution or defense of this action, including without limitation, for purposes of preparing, filing or prosecuting any patent application, continuation or divisional patent application, reissue patent application or request for re-examination.

14.2 Any party may mark any document or thing containing CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information as an exhibit to a deposition, hearing or other proceeding and examine any witness thereon qualified under the terms of this Protective Order to have access to such designated material.

15. Challenge To Confidentiality.

15.1 This Protective Order shall not preclude any party from seeking and obtaining, on an appropriate showing, such additional protection with respect to the confidentiality of documents or other discovery materials as that party may consider appropriate. Nor shall any party be precluded from (a) claiming that any matter designated hereunder is not entitled to the protections of this Protective Order, (b) applying to the Court for an Order permitting the disclosure or use of information or documents otherwise prohibited by this Protective Order, or (c) applying for a further Order modifying this Protective Order in any respect. No party shall be obligated to challenge the propriety of any designation, and

failure to do so shall not preclude a subsequent challenge to the propriety of such designation.

15.2    On any motion challenging the designation of any information, the burden of proof shall lie with the producing party to establish that the information is, in fact, CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information. If a party seeks declassification or removal of particular items from a designation on the ground that such designation is not necessary to protect the interests of the party wishing the designated information, the following procedure shall be utilized:

a. The party seeking such declassification or removal shall give counsel of record for the other party written notice thereof specifying the designated information as to which such removal is sought and the reasons for the request; and

b. If, after conferring, the parties cannot reach agreement concerning the matter, then the party requesting the declassification or removal of particular items may file and serve a motion for a further Order of this Court directing that the designation shall be so removed.

16.    Prior Or Public Knowledge.

This Protective Order shall not apply to information that, prior to disclosure, is public knowledge, and the restrictions contained in this Protective Order shall not apply to information that is, or after disclosure becomes, public knowledge other than by an act or omission of the party to whom such disclosure is made, or that is legitimately and independently acquired from a source not subject to this Protective Order.

17.    Limitation Of Protective Order.

This Protective Order is not intended to address discovery objections to produce, answer, or respond on the grounds of attorney-client privilege or work product doctrine, or to preclude any party from seeking further relief or protective orders from the Court as may be appropriate under the Federal Rules of Civil Procedure.

18    Other Proceedings.

By entering this order and limiting the disclosure of information in this case, the court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who may be subject to a motion to disclose another party's CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information pursuant to this order shall promptly notify that party of the motion so that it may have an opportunity to appear and be heard on whether such information should be disclosed.

19.    Inadvertent Disclosure Of Work Product Or Privileged Information:

Procedure And Waiver.

19.1   If the producing party at anytime notifies the Non-producing party in writing that it has inadvertently produced documents and/or things that are protected from disclosure under attorney-client privilege, work-product immunity, and/or any other applicable privilege or immunity from disclosure, the non-producing party shall return all copies of such documents and/or things to the producing party within five (5) business days of receipt of such notice and shall not further disclose or use such items for any purpose until further order of the Court. Upon being notified by the producing party pursuant to this section, counsel for the non-producing party shall use his or her best efforts to retrieve all copies of the documents at issue.

19.2   The return of any discovery item to the producing party shall not in any way preclude the non-producing party from moving the Court for a ruling that: (a) the document or thing was never privileged or otherwise immune from disclosure; and/or (b) that any applicable privilege or immunity has been waived.

19.3   Inadvertent or unintentional disclosure of information subject to any privilege or immunity during the course of this litigation without proper designation shall not be deemed a waiver of a claim that disclosed information is in fact subject to a privilege or immunity if so designated within ten (10) business days after the producing party actually learns of the inadvertent or unintentional disclosure.

20.    Non-Party Material.

The terms of this Protective Order, as well as the terms of any protective order that may be entered into between a discovering party and third party for the production of information to the discovering party, are applicable to CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information provided by a non-party. Information provided by a non-party in connection with this action and designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, pursuant to the terms of this Protective Order shall be protected by the remedies and relief provided by this Protective Order.

21.    Return Of Designated Information.

Within thirty (30) days of final termination of this action, unless otherwise agreed to in writing by an attorney of record for the designating party, each party shall assemble and return, or certify destruction of, all materials containing information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, including all copies, extracts and summaries thereof, to the party from whom the designated material was obtained, except that (a) any documents or copies which contain, constitute or reflect attorney's work product or attorney-client privilege communications, and (b) archive copies of pleadings, motion papers, deposition transcripts, correspondence and written discovery responses may be retained by counsel.

22. Waiver Or Termination Of Order.

No part of the restrictions imposed by this Protective Order may be waived or terminated, except by written stipulation executed by counsel of record for each designating party, or by an Order of the Court for good cause shown. The restrictions provided for herein shall not terminate upon the conclusion of this action, but shall continue until further Order of this Court.

23. Modification Of Order; Prior Agreements.

To the extent the terms of this Protective Order conflict with Local Rule 26.2 or with any agreements between the parties regarding the confidentiality of particular documents or information entered into before the date of this Protective Order, the terms of this Protective Order shall govern, except as to those documents and information produced or disclosed prior to the entry of this Protective Order, which documents and information shall continue to be governed by the terms of such prior agreements or by the provisions of Local Rule 26.2, as applicable.

24. Section Captions.

The title captions for each section of this Protective Order are for convenience only and are not intended to affect or alter the text of the sections or the substance of the

Order.

Dated: December        , 2004

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG PHILIPS LCD CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 04-343-JJF |
| v. | ) | |
| | ) | |
| TATUNG COMPANY; | ) | |
| TATUNG COMPANY OF AMERICA, | ) | |
| INC. and VIEWSONIC CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |

## CONFIDENTIALITY UNDERTAKING

I certify that I have read the Protective Order in this action and that I fully understand the terms of the Order. I recognize that I am bound by the terms of that Order, and I agree to comply with those terms. I hereby consent to the personal jurisdiction of the United States District Court, District of Delaware, for any proceedings involving the enforcement of that Order and waive any venue objection with respect to any such proceedings.

EXECUTED this     day of  _____, _____.

Name

Affiliation

Business Address

## CERTIFICATE OF SERVICE

I, Jeffrey S. Goddess, hereby certify that on January 24, 2005, I caused two

copies of the foregoing document to be served as follows:

(VIA E-MAIL)                       Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue #900
P. O. Box 25130
Wilmington, DE 19899
Attorneys for Plaintiff L.G. Philips LCD Co., Ltd.

(VIA E-MAIL)                       Richard L. Horwitz, Esquire
Potter Anderson & Corroon, LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
P. O. Box 951
Wilmington, DE 19899

(VIA E-MAIL)                       Cass W. Christenson, Esquire
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006

(VIA E-MAIL)                       Tracy Roman, Esquire
Bingham McCutchen
355 S. Grand Ave., 44th Floor
Los Angeles, CA 90071

JEFFREY S. GODDESS (No. 630)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LG.PHILIPS LCD CO., LTD.

     Plaintiff,

                                 Case No. 07-MC-80223-KLR

TATUNG COMPANY; TATUNG            *D. Delaware Case No. 04-343-JJF*
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION

     Defendants.

---

### PLAINTIFF LG.PHILIPS LCD CO., LTD.'S
### MOTION FOR EXPEDITED RELIEF FROM ORDER
### PURSUANT TO FED. R. CIV. P. 60(b) AND LOCAL RULE 7.1(E)

Plaintiff LG.Philips LCD Co., Ltd. ("LPL" or Plaintiff) respectfully moves for relief from

the March 12, 2007 Protective Order granting Defendant Tatung Co. and Tatung Company of

America, Inc.'s (collectively, "Tatung") Motion for a Protective Order Limiting Scope of Third

Party Deposition and Subpoena (the "Motion"). Tatung filed the Motion on Friday, March 9, 2007.

However, LPL did not receive a copy of the Motion until the afternoon of Monday, March 12, the

same day the Court entered its Order. Because Plaintiff had no opportunity to oppose or otherwise

respond to the Motion, expedited relief pursuant to Local Rule 7.1(e) is appropriate on the grounds

provided in Fed. R. Civ. P. 60(b) including, *inter alia*, unfair surprise.

### I.
### THERE HAS BEEN NO FINDING THAT TATUNG'S MOTION MERITS EXPEDITED
### CONSIDERATION

     **The Order, which was supplied by Tatung, includes no determination that good cause**

**has been shown meriting expedited treatment of Tatung's Motion.** Under the applicable local

Rule, LPL is entitled to a period of ten days from the date of service by mail during which to

prepare and submit its opposition to the Motion. L.R. Civ.P. 7.1(c). This time period can be

waived, and an immediate hearing granted, only upon a determination that "good cause" exists for

"requiring [an] expedited procedure." L.R. Civ. P. 7.1(e). The Order makes no such finding with

respect to Tatung's Motion. In the absence of a finding that good cause exists to expedite hearing,

LPL should be entitled to present its opposition to the Court.

## II.
## PLAINTIFF HAD NO OPPORTUNITY TO OPPOSE TATUNG'S MOTION

**The Order states that Plaintiff "L.G.Philips LCD Co., Ltd. ... opposed the motion."**

**This statement is incorrect.** Tatung filed its sixteen page Motion on Friday, March 9. According

to the certificate of service, Tatung served the Motion on LPL by <u>U.S. mail</u> even though Tatung

had requested expedited review. As a result, LPL received the Motion with the afternoon mail

delivery on Monday, March 12. The Court signed Tatung's proposed Order that same day, and

Plaintiff received a copy of the order just hours later, at 4:30 pm.

Tatung's choice of service method violated prior practice in the principal litigation pending

in the U.S. District Court for the District of Delaware. The practice has been to serve copies of all

papers via <u>electronic mail</u> on the date of filing, and Plaintiff's Delaware local counsel confirmed

that practice just days before Tatung served its "emergency" Motion by mail. (Exhibit 1.) Equally

problematic, Tatung did not direct its Motion to Shari L. Klevens, the attorney who signed and

issued the subpoena to which Tatung objects. <u>Instead, Tatung addressed the Motion to two other</u>

<u>LPL attorneys, one of whom Tatung knew to be out of the office defending depositions in the main</u>

<u>Delaware litigation</u>. It was only the superior office procedures of LPL's attorneys that ensured

LPL had sufficient notice to prepare even this Motion.

At best, electing to serve the emergency Motion by mail and to someone other than the

issuing attorney suggests that Tatung was unconcerned with affording Plaintiff an opportunity to

respond. At worst, the choice represents an intentional effort to delay or altogether deny LPL that

opportunity. Whatever the motivation, the effect was the same. LPL could not have opposed or otherwise responded to the Motion, having received it <u>for the first time the very afternoon the Order was entered</u>.

Considering the lack of specific determination that Tatung's Motion merits expedited treatment, LPL should have been granted the full time period allowed under L.R. Civ. P. 7.1(c) to oppose the Motion. However, Tatung's actions denied Plaintiff <u>any</u> opportunity to respond and be heard. LPL is thus entitled to relief under Fed. R. Civ. P. 60(b), on grounds that include, *inter alia*, unfair surprise.

**III.**
<u>**EXPEDITED CONSIDERATION OF DEFENDANTS' MOTION WAS NOT JUSTIFIED**</u>

**Moreover, even if Tatung had supplied an Order that properly addressed the request for "emergency" or expedited treatment, such treatment would not be merited here. Tatung's "emergency" Motion sought to limit the scope of a third party subpoena that LPL served, and Tatung received, fully <u>one month</u> ago.** Tatung received a copy of the subpoena via electronic mail (as has been the practice in this case) on approximately February 13, 2007. (Exhibit 2.) Tellingly, Tatung's Motion never mentions this date.

Tatung allowed nearly two full weeks to pass before requesting, on February 27, an opportunity to meet and confer regarding the scope of the subpoena, with the result that the conference was scheduled for March 5, the document return date on the face of the subpoena. (Exhibit 3.) After the conference, Tatung waited an additional four days before filing the Motion with the Court. Plaintiff should not be denied an opportunity to defend the scope of its properly served third-party subpoena simply because Tatung failed to act promptly. Given the amount of

time that has passed since Tatung first received notice of LPL's allegedly objectionable subpoena,

any "emergency" results exclusively from Tatung's unreasonable delay in responding.[1]

## IV.
## PLAINTIFF WILL BE SEVERELY PREJUDICED IF THE ORDER IS ALLOWED TO STAND AS ISSUED

**Tatung is attempting to exploit the Order as part of a larger strategy to sway the outcome of similar motions in other jurisdictions. Thus, allowing the Order to stand as issued and without response or opposition could severely prejudice LPL.** The subpoena at issue here is one of a larger number that LPL has been forced, at great expense, to serve on a variety of distributors, retailers, and purchasers of Tatung's products in the United States in an effort to obtain discovery that Tatung has failed or refused to produce. Simultaneously with the instant Motion, Tatung filed virtually identical motions in other jurisdictions where Plaintiff has served subpoenas. LPL is presently attempting to respond to the motions. However, Tatung is encouraging courts in these other jurisdictions to consider the Order as authority for granting protective orders limiting the scope of other subpoenas without affording Plaintiff the opportunity to respond. (Exhibit 4.) LPL respectfully submits that this is an improper use of an Order originally obtained on questionable grounds, and moreover a use that threatens to prejudice LPL's rights in other jurisdictions. To fully understand how the Order relates to Tatung's larger strategy, additional background details may be useful.

## A.   Tatung's Refusal to Cooperate in Discovery Forced Plaintiffs to Subpoena Records From Third Parties

This discovery dispute arises out of a patent infringement action pending in the United

---

[1] In addition, on Friday, March 16, 2007, Vincent Poppiti, the Special Master overseeing discovery disputes in the main litigation pending in the District of Delaware, will consider whether to extend the deadline for third party discovery. If that motion is granted, any alleged need for expedited resolution of this motion will be rendered moot.

States District Court for the District of Delaware ("Main Case"). LPL is the owner of U.S. Patent No. 6,498,718 and U.S. Patent No. 6,501,641, which relate to mounting systems used in the Defendants' visual display products such as liquid crystal display ("LCD") televisions, computer monitors and laptop computers. LPL has asserted patent infringement claims against Tatung as well as against ViewSonic Corporation (collectively, the "Defendants"). LPL alleges Defendants' products incorporate LPL's patented mounting systems. Among its claims, LPL alleges that Defendants have induced other parties to infringe LPL's patents.[2]

1.  Tatung's Deficient Discovery Responses Forced Plaintiff to Seek Necessary Information from Third Parties, Including Sensormatic

On December 27, 2006, LPL served a third party subpoena on Hewlett-Packard Company. On February 13 and 14, 2007, LPL served approximately 23 other third party subpoenas ("Subpoenas"), including the subpoena at issue here, on various distributors, retailers, and purchasers of Defendants' products in the United States. The Subpoenas were issued based on LPL's understanding that these parties, who have current or former business relationships with Tatung and ViewSonic Corporation ("ViewSonic"), have documents that are relevant to the instant action, including but not limited to documents related to purchase and sale of the infringing products in the United States, documents relating to Defendants' efforts to market the infringing products in the United States, and other important discovery concerning infringement, inducement,

---

[2] "A person induces infringement under § 271(b) by actively and knowingly aiding and abetting another's direct infringement." *C. R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 675 (Fed. Cir. 1990). If the defendant has knowledge of the patent, then upon a showing that defendant "had intent to induce the specific acts constituting infringement, intent additionally to cause an infringement can be presumed." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1379 (Fed. Cir. 2005). A jury could conclude that e-mails between a foreign defendant and a U.S. company "represent product support" showing that the defendant was aware of potentially infringing activities in the U.S. by the U.S. company and that the defendant "intended to encourage those activities." *Id.* at 1379-80. *See also Minnesota Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002) (evidence did not support finding of no inducement where defendant was aware of patents and supplied infringing products to customers "with instructions on how they were to be used, which, when followed, would lead to infringement."); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed. Cir. 2001) (defendant's acts in connection with selling infringing audio chips, manufactured in Singapore and sold to customers that resold to the U.S. PC market, constituted active inducement).

damages, and other issues.[3]

It is simply not true, as Defendants allege, that LPL sought the information requested in the subpoenas "at the last minute." LPL been requesting similar information and documents from the Defendants since November 2005 without success. Defendants have produced some – but certainly not all – of the discovery that LPL seeks. Much of Defendants' production is subject to objections and limitations that LPL disputes as wholly unreasonable. For instance, although Tatung has identified over 300 potentially infringing products, it only produced about 60 technical drawings and then claimed, without explaining its reasoning, that this fractional production covered as much as 96 percent of the relevant products.

   2.   Plaintiff's Service of the Third Party Discovery Was Both Necessary and Entirely Proper

LPL vigorously disputes Tatung's assertion that the instant subpoena or any of the other third party subpoenas represent a "transparent and improper effort ... to perform an 'end run' around ... an impending" ruling by the Special Master overseeing discovery in the Main Case.[4] It is correct that discovery disputes are presently pending before the Special Master in Delaware, but

---

[3] Indeed, based on information available to LPL and LPL's belief, the third parties are likely to have information showing that the Defendants have imported, sold, and used their products in the United States, activities which infringe upon LPL's U.S. patents and which support LPL's claims of direct infringement or inducement of infringement. Thus, the third parties are likely to have documents pertaining to communications, business coordination efforts, contracts or other agreements between itself and the Defendants pertaining to Defendants' products and sales of those products in the United States. The employees of the third parties are likely to have knowledge of the manner in which the third party conducted business with the Defendants and their customers in the United States. The employees of the third parties are also likely to have knowledge of the methods and practices and any coordination efforts related to the third parties' acquisition of infringing LCD components from the Defendants. All of this information will assist LPL in evaluating its patent infringement and inducement claims against the Defendants and will enable LPL to verify whether the Defendants' own document productions and deposition testimony have been complete and accurate. *See generally MEMC Elec. Materials, Inc., v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1379-80 (Fed. Cir. 2005) (discussing factors evidencing inducement to infringe on patents).

[4] Tatung fails to explain how Plaintiff is somehow violating the letter or the spirit of an order <u>yet to be issued</u> by the Delaware Court. Plaintiff respectfully submits, however, that Tatung's position offers further support for LPL's position that the proper forum for litigating such a matter is Delaware, not Florida.

no rulings in the Main Case limit LPL's ability to obtain the scope of discovery that it seeks from Sensormatic.

In an effort to remedy Tatung's deficient responses, LPL filed motions to compel in the Main Case in September, October, November, and December 2006 and in January, February, and March 2007. Most of these issues are not yet resolved, and are still pending before the Special Master overseeing discovery in the Main Case. Perhaps in anticipation of the Special Master's forthcoming rulings, Tatung recently made a critical admission concerning the outstanding discovery. In a hearing on March 12 – the same day LPL first received the Motion and Order at issue here – Tatung admitted that additional categories of critically relevant technical drawings remain outstanding and that Tatung, after resisting LPL's discovery efforts for more than one year, would finally produce these documents in April 2007.

However, the Delaware Court's Scheduling Order requires the parties to complete third party discovery by March 30. Tatung's efforts to limit the scope of LPL's subpoena to products that have been accused of infringement will artificially narrow the scope of the subpoena to those that are <u>currently</u> identified as infringing products. LPL is entitled to discovery into all infringing products. That discovery should not be artificially limited as a result of Tatung's efforts to withhold information necessary to identify such products. Although Tatung resists LPL's discovery in the main case, that resistance does not, by itself, erect roadblocks to LPL's discovery from third parties.

**B.      <u>Tatung Lacks Standing to Challenge Plaintiff's Third-Party Subpoenas</u>**

Tatung has no standing to object to LPL's Rule 45 subpoena to Sensormatic, or to any of LPL's other Rule 45 subpoenas. Rule 45(c) protects persons "subject to subpoenas." Indeed, "[u]nless a party to an action can make claim to some personal right or privilege in respect to the subject matter of a subpoena duces tecum directed to a nonparty witness, the party to the action has no right to relief under Rule 45(b) or 30(b)." *Dart Industries, Inc. v. Liquid Nitrogen Processing*, 50 F.R.D. 286, 291 (D. Del. 1970); *see Ponsford v. United States*, 771 F.2d 1305, 1308 (9th Cir. 1985) (denying motion to quash for lack of standing); *Nova Products, Inc. v. Kisma Video, Inc.*,

220 F.R.D. 238, 241 (S.D.N.Y. 2004) (denying motion to quash because no showing of personal right or privilege); *Oliver B. Cannon and Son, Inc. v. Fidelity and Cas. Co. of New York*, 519 F. Supp. 668, 680 (D. Del. 1981) (denying motion to quash because movant failed to prove documents sought were privileged).

Tatung's Motion identifies no "personal right or privilege" that will be harmed by production of the materials LPL seeks from Sensormatic or other third parties. Tatung thus has no standing to move to quash or to seek a protective order against either the subpoena at issue here or any other third party subpoenas served by LPL. As such, Tatung evidently filed the instant Motion and related motions across the country with the sole objective of delaying and impeding LPL's efforts to obtain discovery to which it is legitimately entitled.

The effort appears to be working. Significantly, Sensormatic did not file any motion with respect to this subpoena itself, and had indicated to LPL that it was prepared to fully comply. However, on March 7, 2007, LPL's attorneys received a telephone message from Dennis Lynch, chief litigation counsel for Sensormatic, rescinding the company's previous agreement to produce the documents requested in the subpoena. In that message, Mr. Lynch stated that Tatung told Sensormatic that it planned to move for a protective order. Mr. Lynch further expressed concern about being in the middle of the dispute between the parties regarding the subpoena. Since that time, Sensormatic has produced no documents despite its prior commitment to do so. This communication is clear evidence that Tatung's Motion is delaying LPL's legitimate discovery in this action.

That Tatung waited until March 9 to file a Motion pertaining to a subpoena served a full month ago strongly suggests that Tatung timed the filing to maximize its chances of preventing LPL from obtaining third party discovery prior to the March 30 deadline. Further evidence of Tatung's dilatory purpose can be found in its approach to communicating with LPL regarding its many other motions now pending in jurisdictions around the country. Many of the motions were filed on an *ex parte* basis. With respect to the remaining motions, which were not technically filed *ex parte*, service was questionable. Like the instant Motion, none of the other twenty-two motions

were addressed to issuing attorney Shari Klevens, despite the fact that LPL's Delaware counsel had sent an email on Friday, March 2, 2007 identifying a service list for all pleadings relevant to the litigation. (Exhibit 1.)

Moreover, and again like the instant Motion, Tatung served the majority of its motions by regular mail rather than electronically, while simultaneously seeking expedited hearings regarding those motions. Finally, as further evidence of Tatung's conduct with respect to the Motions for Protective Order, not only did Tatung provide untimely and/or no notice of the motions, but Defendants failed to confer with LPL on possible times for the hearing and scheduled several overlapping hearings in conflicting courts. For example, Defendants initially tried to schedule three oral arguments, all on the morning of March 15, 2007, in New Jersey, Massachusetts, and Illinois.[5]

In light of all of the foregoing, allowing the Order as drafted by Tatung to stand raises the prospect of compromising Plaintiff's ability to obtain needed discovery not simply from Sensormatic, but broadly from multiple third parties around the country on issues critical to the development of LPL's case. The danger is particularly acute in light of Tatung's evident interest in disrupting that discovery, its lack of legitimate bases for quashing this or any of Plaintiff's other third party subpoenas, and most importantly the efforts it has already made to influence other courts' consideration of those subpoenas in light of this Court's March 12 Order. (Exhibit 4.)

## V.
## THE COURT SHOULD EXERCISE ITS DISCRETION TO TRANSFER TATUNG'S MOTION TO THE DISTRICT OF DELAWARE

Considering the scope of issues implicated by the subpoena and Motion at issue, the Court's – and the parties' – resources may be better served by vacating the Order and transferring Tatung's

---

[5] As Tatung is aware, all of these emergency hearings have been scheduled to occur simultaneously with depositions of Tatung's witnesses. Because LPL's lead trial counsel are busy taking and defending depositions this week, it appears that Tatung strategically filed these requests for expedited hearing in an attempt to prevent LPL from obtaining significant and relevant information it needs from the third parties or to divert LPL's focus from the Tatung depositions.

Motion to the District of Delaware. The Court has the authority to make such a transfer. *See Devlin v. Transportation Communications International Union*, 2000 WL 249286, *1 (S.D.N.Y. 2000) (stating that there is ample authority for the court from which a subpoena issues to transfer any motions relating to that subpoena back to the court where the main case is pending); *Digital Equipment Corp.*, 949 F.2d 228, 231 (8th Cir. 1991) (holding that while the court initially has exclusive jurisdiction to rule on the objections, it may in its discretion remit the matter to the court in which the action is pending).[6]

As explained above, all 23 motions filed by LPL are nearly identical. Yet, by having the Motions heard in 15 different jurisdictions, the parties risk that inconsistent opinions will be rendered. In light of this issue, and the other related discovery issues currently pending in the Main Case as described below, this Court should not attempt to decide the issues in the pending motion in a vacuum.

For all of the foregoing reasons, LPL respectfully moves the Court to relieve LPL from the March 12, 2007 Order by:

- Vacating that Order; and

- Transferring the Motion for a Protective Order Limiting Scope of Third Party Deposition and Subpoena to the Delaware District Court for consideration, or in the alternative;

- Establishing a schedule for submission of further briefing on these issues, and scheduling a mutually convenient time for the parties to appear telephonically and present argument to this Court.

---

[6] *See also* Fed.R.Civ.P. 26(c), advisory committee's note. The Advisory Committee's Note to Rule 26(c) (Protective Orders) explains: The subdivision recognizes the power of the court in the district where a deposition is being taken to make protective orders...The court in the district where the deposition is being taken may, and frequently will, remit the deponent or party to the court where the action is pending.

Dated: March 14, 2007

Respectfully Submitted,

Martin B. Woods, Esq. (Fla. Bar No. 340294)
mwoods@swmwas.com
Marissa D. Kelley, Esq. (Fla. Bar No. 379300)
mkelley@swmwas.com
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: 954-462-9500
Facsimile: 954-462-9567
*Attorney for LG Philips*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a true and correct copy of the foregoing via e-mail

transmission and U.S. Mail to all counsel or parties of record on the attached service list on this

14th day of March, 2007.

Martin B. Woods, Esq. (Fla. Bar No. 340294)
mwoods@swmwas.com
Marissa D. Kelley, Esq. (Fla. Bar No. 379300)
mkelley@swmwas.com

## SERVICE LIST

Richard D. Kirk, Esq.
rkirk@bayardfirm.com
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE 19899

Jeffrey B. Bove, Esq.
jbove@cblh.com
James D. Heisman, Esq.
jheisman@cblh.com
Jaclyn M. Mason, Esq.
jmason@cblh.com
Connolly Bove Lodge & Hurtz, LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Tracy R. Roman, Esq.
troman@raskinpeter.com
Raskin Peter Rubin & Simon, LLP
1801 Century Park East
Suite 2300
Los Angeles, CA 90067

Scott R. Miller, Esq.
smiller@cblh.com
Connolly Bove Lodge & Hurtz, LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Frederick L. Cottrell, III, Esq.
Cottrell@RLF.com
Anne Shea Gaza, Esq.
Gaza@RLF.com
Richards Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

I:\W-LIT\LG Philips\M Relief.DOC

Frank E. Merideth, Jr., Esq.
meridethf@gtlaw.com
Valerie W. Ho, Esq.
hov@gtlaw.com
Mark H. Krietzman, Esq.
krietzmanm@gtlaw.com
Greenberg Traurig, LLP
2450 Colorado Avenue
Suite 400E
Santa Monica, CA 90404

Geoffrey M. Cohen, Esq.
coheng@gtlaw.com
Greenberg Traurig, LLP
5100 Town Center Circle
Suite 400
Boca Raton, FL 33486

Shari L. Klevens, Esq.
sklevens@mckennalong.com
Lora A. Brzezynski, Esq.
lbrzezynski@mckennalong.com
Cormac T. Connor, Esq.
cconnor@mckennalong.com
McKenna Long & Aldridge, LLP
1900 K. Street, NW
Washington, DC 20006

# EXHIBIT 1

**From:** Gaza, Anne [mailto:gaza@RLF.com]
**Sent:** Friday, March 02, 2007 1:18 PM
**To:** Dick Kirk; Frank C. Merideth, Jr.; Cottrell, Frederick; Jaclyn Mason; Jeff Bove; Jim Heisman; JP Hong, Esquire; Mark Krietzman; Monika Bialas; Scott Miller; Steve Hassid; Tracy Roman; Valerie Ho
**Subject:** RE: LG.Philips LCD Co., Ltd. v. Tatung

In conjunction with Dick's email below, below is the list of addressees for email correspondence going forward. Please let me know if you are aware of any individuals who should be added or deleted.

rkirk@bayardfirm.com; astitzer@bayardfirm.com; tnuble@bayardfirm.com; gbono@mckennalong.com; cchristenson@mckennalong.com; rambrozy@mckennalong.com; cconnor@mckennalong.com; jbove@cblh.com; jheisman@cblh.com; jmason@cblh.com; smiller@cblh.com; troman@raskinpeter.com; cottrell@rlf.com; gaza@rlf.com; lees@rlf.com; meridethf@gtlaw.com; krietzmanm@gtlaw.com; hov@gtlaw.com; hassids@gtlaw.com; bialasm@gtlaw.com

Thanks, Anne


Anne Shea Gaza, Esquire
RICHARDS, LAYTON & FINGER
Phone: (302) 651-7539
gaza@rlf.com

Richards, Layton and Finger, P.A. is not providing any advice with respect to any federal tax issue in connection with this matter.

The information contained in this e-mail message is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this

communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

---

**From:** Dick Kirk [mailto:rkirk@bayardfirm.com]
**Sent:** Friday, March 02, 2007 11:59 AM
**To:** Gaza, Anne; Frank C. Merideth, Jr.; Cottrell, Frederick; Jaclyn Mason; Jeff Bove; Jim Heisman; JP Hong, Esquire; Mark Krietzman; Monika Bialas; Scott Miller; Steve Hassid; Tracy Roman; Valerie Ho
**Subject:** LG.Philips LCD Co., Ltd. v. Tatung

Dear Counsel:

For future email service, please add the following people from McKenna Long & Aldridge to your service lists:

Gap Bono, gbono@mckennalong.com
Cass Christenson, cchristenson@mckennalong.com
Rel Ambrozy, rambrozy@mckennalong.com
Cormac Connor, cconnor@mckennalong.com

Thanks for your accommodation.

Richard D. Kirk
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, Delaware 19801
Main: (302) 655-5000
Direct: (302) 429-4208
Fax: (302) 658-6395
rkirk@bayardfirm.com

------------------------------------
IRS Circular 230 DISCLOSURE:
Notice regarding federal tax matters: Internal Revenue Service Circular 230 requires us to state herein that any federal tax advice set forth in this communication (1) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed by federal tax laws, and (2) cannot be used in promoting, marketing, or recommending to another person any transaction or matter addressed herein.
------------------------------------
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
------------------------------------
IRS Circular 230 DISCLOSURE:
Notice regarding federal tax matters: Internal Revenue Service Circular 230 requires us to state herein that any federal tax advice set forth in this communication (1) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed by federal tax laws, and (2) cannot be used in promoting, marketing, or recommending to another person any transaction or matter addressed herein.
------------------------------------
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

                Plaintiff,

        v.

TATUNG COMPANY, et al.,

                Defendants.

Civil Action No. 04-343 (JJF)

## NOTICE OF FED.R.CIV.P. 30(b)(6) DEPOSITION *DUCES TECUM* AND FED.R.CIV.P. 45 SERVICE OF SUBPOENA (SENSORMATIC)

TO:

Jeffrey B Bove, Esq.
Jaclyn M. Mason, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207

Frederick L. Cottrell, III, Esq.
Anne Shea Gaza, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Valerie Ho, Esq.
Mark H. Krietzman, Esq.
Frank C. Merideth, Jr., Esq.
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Scott R. Miller, Esq.
Connolly Bove Lodge & Hutz LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Tracy Roman, Esq.
Raskin Peter Rubin & Simon LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

PLEASE TAKE NOTICE that Plaintiff will take the deposition *duces tecum* of

Sensormatic ("Sensormatic") pursuant to Fed. R. Civ. P. 30(b)(6), on March 16, 2007. The

deposition will take place at Esquire Deposition Services, 2385 NW Executive Ctr. Suite 120,

Boca Raton, FL 33431. The deposition will be videotaped and taken before a notary public or

court reporter, duly authorized to administer oaths and transcribe the testimony of the

deponent(s) and may use technology that permits the real time display of the deposition

transcript for attendees who bring a compatible computer. The deposition may continue from

day to day until completed if authorized by the Court or stipulated by the parties.

PLEASE ALSO TAKE NOTICE that LG.Philips LCD Co., Ltd. is serving Sensormatic

with a subpoena (the "Subpoena"), a copy of which is attached hereto. The subjects covered in

the deposition will include (but are not limited to) the subjects listed on Attachment A to the

Subpoena. Pursuant to Fed. R. Civ. P. 30(b)(6), Sensormatic is required to designate one or

more persons to testify at the deposition as to the matters known or reasonably available to

Sensormatic concerning all topics listed in Attachment A to the Subpoena. In addition, the

Subpoena requires Sensormatic to produce at the deposition the documents listed in Attachment

B to the Subpoena.

You are invited to attend and cross examine.

February 13, 2007

THE BAYARD FIRM

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
rkirk@bayardfirm.com
(302) 655-5000
Counsel for Plaintiff
LG.PHILIPS LCD CO., LTD.

OF COUNSEL:
Gaspare J. Bono
Matthew T. Bailey
Lora A. Brzezynski
Cass W. Christenson
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
(202) 496-7500

OAO88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

LG.PHILIPS LCD CO., LTD.
V.
TATUNG COMPANY, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]    04-343 (JJF)

TO:   **Sensormatic, Inc.**
       **6600 Congress Ave**
       **Boca Raton, Florida 33431-0837**

United States District Court for the District of Delaware

X    YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

X    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. (See Attachment A for topics.)

| PLACE OF DEPOSITION<br>Esq. Deposition Svcs, 2385 NW Executive Center Dr., Ste. 120, Boca Raton, FL 33431 | DATE AND TIME<br>March 16, 2007 at 9 am. |
| --- | --- |

X    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): All documents listed in Attachment B.

| PLACE<br>Mail documents to: McKenna Long & Aldridge LLP, Attn: Shari Klevens c/o<br>Esq. Deposition Svcs, 2385 NW Executive Center Dr., Ste. 120, Boca Raton, FL 33431 | DATE AND TIME<br>March 5, 2007 at 9:00 a.m. |
| --- | --- |

G    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER=S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR<br>Shari Klevens (Attorney for Plaintiff) *CKlevens* | DATE<br>February 13, 2007 |
| --- | --- |

ISSUING OFFICER=S NAME, ADDRESS AND PHONE NUMBER
Shari Klevens
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
Telephone: 202-496-7612

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88  (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
          DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance,
(ii)   requires a person who is not a party or an officer of a

party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)   subjects a person to undue burden.

(B) If a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)   requires disclosure of an unretained expert=s opinion or information not describing specific events or occurrences in dispute and resulting from the expert=s study made not at the request of any party, or
(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A: TOPICS TO BE ADDRESSED AT THE DEPOSITION

For purposes of this Attachment, Sensormatic should use the following definition for the terms used herein.

A.     "Sensormatic," "you," and "your" as used herein, means Sensormatic and all persons or entities acting or purporting to act on your behalf, and any affiliates of Sensormatic.

B.     "ViewSonic" means Defendant ViewSonic Corporation, and all persons or entities acting or purporting to act on ViewSonic Corporation's behalf, and any affiliates of ViewSonic, including, but not limited to, entities, divisions, and affiliates located in Taiwan.

C.     "ViewSonic products" as used herein means any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs, and is made or assembled in whole or in part by or for ViewSonic. This includes all such products, regardless of brand name, and thus includes, but is not limited to, ViewSonic brand products.

D.     "Tatung Company" means Defendant Company and all persons or entities acting or purporting to act on Tatung Company's behalf, including, but not limited to Tatung America and TSTI.

E.     "Tatung Company products" as used herein any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs, and is made or assembled in whole or in part by or for Tatung. This includes all such products, regardless of brand name, and thus includes, but is not limited to, Tatung brand products.

F.     "Tatung America" means Defendant Tatung Company of America, Inc., and all persons or entities acting or purporting to act on Tatung Company of America's behalf, including but not limited to Tatung Company and any affiliates of Tatung Company of America.

G.     "Tatung America products" as used herein means any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs, and is made or assembled in whole or in part by or for Tatung America.  This includes all such products, regardless of brand name, and thus includes, but is not limited to, Tatung America brand products.

H.     "TSTI" means Tatung Science and Technology, Inc., and all persons or entities acting or purporting to act on Tatung Science and Technology's behalf, including but not limited to Tatung Company, and any affiliates of Tatung Science and Technology.

I.     "TSTI products" as used herein means any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs, and is made or assembled in whole or in part by or for TSTI. This includes all such products, regardless of brand name, and thus includes, but is not limited to, TSTI brand products.

J.     "Affiliate(s)" means any corporation or other entity that controls, is controlled by or is under common control with the identified corporation or entity, including without limitation partnerships, parents, subsidiaries and divisions.

K.     "Visual display products" means any flat panel computer monitor, flat panel television, and/or laptop computer that uses, contains or incorporates without limitation, one or more LCDs, PDPs and/or FEDs.

L.     "Communication" means, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer or exchange of information between two of more persons of any nature whatsoever, by or to whomever, whether oral or written or whether face-to-face, by telephone, email, mail, personal delivery or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interviews, consultations, agreements and other understandings.

M.     "Concern" and "concerning" are used in their broadest sense and embrace all matter relating to, referring to, describing, discussing, evidencing or constituting the referenced subject.

N.     "Discuss," "discussing," "relate to" "relating to," "support" or "supporting" means in any way directly or indirectly, in whole or in part, discussing, referring to, regarding, constituting, concerning, about, pertaining to, relating to, reflecting, considering, underlying, modifying, amending, confirming, mentioning, endorsing, evidencing, summarizing, memorializing, describing, discussing, analyzing, evaluating, representing, supporting, qualifying, terminating, revoking, canceling or negating.

O.     "Identify" used in respect to a company or corporate or business entity of any kind means to set forth:

        a.   the full name of the company;

        b.   the full name of the division or office involved, if applicable; and

        c.   the address of the company and of the division or office involved, if applicable.

P.     "Identify" used in respect to a document or thing means:

    a.   to provide a brief description of such document or thing, including date, author, recipients, type, and content or substance;

    b.   to identify the custodian of the document or thing;

    c.   to identify the place where the document or thing may be inspected; and

    d.   if a copy of the document has been supplied to LPL, to so state and specifically identify the copy supplied by reference to production numbers or other identifying information.

Q.    "Identify" used with respect to a natural person means to state:

    a.   the full name;

    b.   the present or last known business and residence addresses;

    c.   the last known employer or job affiliation; and

    d.   the last known occupation and business position or title held.

R.    "Import" or "importation" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

S.    "Make" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

T.    "Offer to sell" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

U.    "Person" means any natural person, firm, association, partnership, corporation, or other form of legal entity.

V.    "Sell" or "sale" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

W.    The use of the singular form of any word includes the plural and vice versa.

The topics to be covered in the deposition include:

1. The nature of the business relationship and transactions between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic relating to the sale, manufacture, assembly, distribution, or import of visual display products, including but not limited to the agreements between Sensormatic, Tatung Company, Tatung America, TSTI, and/or ViewSonic.

2. The scope, nature and purpose of communications between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic (a) concerning the sale or marketing in the United States of visual display products manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic, (b) communications regarding any product support assistance or warranties that Tatung Company, Tatung America, TSTI, and/or ViewSonic have provided to Sensormatic, (c) communications regarding the market trends for visual display products in the United States, (d) communications regarding the technical specifications of Tatung Company, Tatung America, TSTI, and/or ViewSonic visual display products, and (e) communications regarding your required or desired technical specifications for visual display products manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic.

3. The scope, nature and purpose of communications between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic concerning the technical assembly of Tatung Company's, Tatung America's, TSTI's, or ViewSonic's visual display products, including, but not limited to, the use and identity of original equipment manufacturers ("OEMs") or systems integrators used by Sensormatic, Tatung Company, Tatung America, TSTI, and ViewSonic.

4. Any agreements or contracts pursuant to which Sensormatic has agreed to purchase Tatung Company's, Tatung America's, TSTI, and/or ViewSonic's visual display products either directly from Tatung Company, Tatung America, TSTI, or ViewSonic or indirectly by purchasing such products from any OEMs.

5. Sensormatic's activities or efforts related to the distribution or sale of visual display products in the United States manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic.

6. All channels, distributors, suppliers, and networks through which products made in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic have been shipped, imported, sold, and/or distributed in the United States.

7. Sensormatic's sales of its visual display products that were manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic, including the quantity and dollar amount of such sales, by product.

8. The substance of any meetings between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic whether in the U.S. or abroad.

DC:50459632.1

Attachments A to Fed. R. Civ. P. 45 Subpoena

Page 6 of 6

## ATTACHMENT B: DOCUMENTS TO BE PRODUCED

For purposes of this Attachment, Sensormatic should refer to Attachment A for the definition or meaning of terms used herein, which definitions are incorporated herein by reference. In addition, the following definition applies:

A.      "Document" means all types of documents and things embraced within Federal Rules of Civil Procedure 34 and includes, without limitation, any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy, of the following items, however produced or reproduced, namely: books, accounting records of any nature whatsoever, agreements, communications, correspondence, facsimiles, telegrams, cable, telexes, memoranda, recordings, studies, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, letters, forecasts, statistical statements, graphs, laboratory or engineering reports and records, notebooks, charts, plans, sketches, drawings, video tapes, films, slides, information bearing photographic products of any nature whatsoever, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, reports or summaries or interviews, reports or summaries of investigations, opinions or reports of consultants, patent studies, or opinions of counsel, records, reports or summaries of negotiations, sales literature of any nature whatsoever, brochures, catalogues, catalogue sheets, pamphlets, periodicals, advertisements, circulars or trade letters, press releases, trade releases, publicity releases, new product releases, reprints, drafts of any documents, working papers, indices, original or preliminary notes, computer printouts, floppy disks, hard drives, CD-ROM's, magnetic tapes and other data compilations from which

Attachments B to Fed. R. Civ. P. 45 Subpoena

Page 1 of 3

information can be obtained or translated, if necessary by Sensormatic through detection devices into reasonably usable form. The term document also refers to any tangible object other than a document as described above, and includes objects of every kind and nature such as, but not limited to, prototypes, models, and specimens.

The documents to be produced on or before March 5, 2007, include the following:

1.     All documents provided by Tatung Company, Tatung America, TSTI, and/or ViewSonic to Sensormatic since January 1, 2002  regarding:  (i) marketing, sales, or business documents or presentation materials; (ii) technical specifications and/or drawings regarding Tatung Company's, Tatung America's, TSTI's or ViewSonic's visual display products, including but not limited to the assembly of such products; and (iii) any documents relating to warranties, product support, or service provided by Tatung Company, Tatung America, TSTI, and/or ViewSonic regarding their visual display products.

2.     Documents provided by Sensormatic to Tatung Company, Tatung America, TSTI or ViewSonic since January 1, 2002 sufficient to show (i) Sensormatic's design requirements for its visual display products, (ii) Sensormatic's market for its visual display products, and/or (iii) market trends in the United States for visual display products.

3.     Documents sufficient to show the business relationship between Sensormatic and Tatung Company, Tatung America, TSTI, and/or ViewSonic since January 1, 2002, including communications with Tatung Company, Tatung America, TSTI, and/or ViewSonic, notes from meeting with Tatung Company, Tatung America, TSTI, and/or ViewSonic, and documents in which Sensormatic has agreed to purchase visual display products directly from Tatung Company, Tatung America, TSTI, and/or ViewSonic.

4.   All documents related to the manufacture and/or assembly of Tatung Company's, Tatung America's, TSTI's, and/or ViewSonic's visual display products.

5.   All documents since January 1, 2002 evidencing or relating to Sensormatic's purchase from original equipment manufacturers ("OEMs") any visual display products that Sensormatic had reason to believe were manufactured or assembled in whole or in part by Tatung Company, Tatung America, TSTI, and/or ViewSonic, and documents sufficient to show that Tatung Company, Tatung America, TSTI, and/or ViewSonic received notice of Sensormatic's agreements to purchase.

6.   Documents sufficient to show Sensormatic's receipt or purchase of visual display products sold, manufactured, shipped, imported, or distributed in whole or in part by Tatung Company, Tatung America, TSTI, and ViewSonic since January 1, 2002.

7.   Documents sufficient to show the total quantity of visual display products sold, by product, by Sensormatic that were manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic since January 1, 2002, including separate summaries for (1) Tatung Company products, (2) Tatung America products, (3) TSTI, and (4) ViewSonic products.

8.   Documents sufficient to show the sales by total dollar value and by quantity of visual display products sold, by product, by Sensormatic that were manufactured or assembled in whole or in part by or for Tatung Company, Tatung America, TSTI, and/or ViewSonic since January 1, 2002, including separate summaries for (1) Tatung Company products, (2) Tatung America products, (3) TSTI, and (4) ViewSonic products.

9.    Documents sufficient to identify each person Sensormatic has communicated with at Tatung Company, Tatung America, TSTI, and/or ViewSonic.

DC:50459602.1

# CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on February 13, 2007, he electronically

filed the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Jeffrey B Bove, Esq.  
Jaclyn M. Mason, Esq.  
Connolly Bove Lodge & Hutz LLP  
1007 North Orange Street  
P.O. Box 2207  
Wilmington, Delaware 19899-2207  

Frederick L. Cottrell, III, Esq.  
Anne Shea Gaza, Esq.  
Richards, Layton & Finger  
One Rodney Square  
P.O. Box 551  
Wilmington, DE 19899  

The undersigned counsel further certifies that copies of the foregoing document

were sent by hand to the above counsel and by email and will be sent by first class mail

to the following non-registered participants:

Scott R. Miller, Esq.  
Connolly Bove Lodge & Hutz LLP  
355 South Grand Avenue  
Suite 3150  
Los Angeles, CA 90071  

Valerie Ho, Esq.  
Mark H. Krietzman, Esq.  
Frank C. Merideth, Jr., Esq.  
Greenberg Traurig LLP  
2450 Colorado Avenue, Suite 400E  
Santa Monica, CA 90404  

Tracy Roman, Esq.  
Raskin Peter Rubin & Simon LLP  
1801 Century Park East, Suite 2300  
Los Angeles, CA 90067  

/s/ Richard D. Kirk (rk922)  
Richard D. Kirk

571447-1

# EXHIBIT 3

# Greenberg
# Traurig

February 27, 2007

**Via E-Mail and U.S. Mail**

Cormac T. Connor
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006

> Re: **LG.Philips LCD Co., Ltd. v. Tatung Company et al.**
> **U.S. District Court Case No. 04-343 JJF**

Dear Cormac:

I write in regard to LPL's subpoenas to Planar Systems, CTX Technologies, Tatung Science and Technology Inc., Edward Service, Ingram Micro, eMachines, Wal-Mart Stores Inc., Avnet Inc., Sensormatic, Tyco International, Tri-Ed Distribution, CLI, Medion USA, TMX Logistics, American Dynamics, Best Buy, Radio Shack, Safeway, Amazon.com Inc., Gateway Inc., Sam's Club, Tweeter Home Entertainment, CompUSA Inc., and Pelco (the "subpoenas").

As previously discussed, one of the issues currently pending before Special Master Poppiti is whether the Tatung Defendants are required to produce documents, including highly confidential agreements and communications with their customers, that do not pertain to the products LPL has accused in this case. While the Special Master has not yet rendered a decision on this issue, we do expect a decision from him shortly.

The subpoenas served by LPL are attempts to circumvent a potential ruling that may be favorable to the Tatung Defendants. LPL has subpoenaed the aforementioned entities for broad categories of confidential, commercially sensitive information relating to the Tatung Defendants' business relationships with these entities and has made no attempt to limit the information sought to the accused products at issue. As such, LPL's subpoenas to the Tatung Defendants' customers appear to serve no legitimate purpose and are merely calculated to harass. Please be advised that the Tatung Defendants object to all Topics and Document Requests on the grounds that they are not limited to the accused products and seek confidential, proprietary, trade secret information belonging to the Tatung Defendants. The deposition topics and document requests are overly broad and seek information that is not relevant to any claims or defenses and is not reasonably calculated to lead to the discovery of admissible evidence. The topics and document requests are also overly broad because they are not limited as to time.

Cormac T. Connor, Esq.
February 27, 2007
Page 2


     Unless the parties can reach an immediate agreement regarding the scope of the subpoenas, we intend to file motions for protective orders. Please advise regarding your availability for a meet and confer. We are available in the late afternoon on Wednesday, February 28, 2007, or anytime on Thursday, March 1 or Friday, March 2, 2007.

Very truly yours,

Valerie W. Ho

cc:    Rel Ambrozy (via email)
      Lora Brzezynski (via email)
      Richard Kick (via email)
      Scott Miller (via email)
      Jeffrey Bove (via email)
      James Heisman (via email)
      Tracy Roman (via email)
      Anne Gaza (via email)
      Frank Merideth (via email)
      Mark Krietzman (via email)
      Steve Hassid (via email)

Greenberg Traurig, LLP

Case 9:07cv80223-KLR-18-Document-Entered-on-FLSD-Docket-03/14/2007 Page 4 of 7

# McKenna Long
# & Aldridge LLP
### Attorneys at Law

Albany
Atlanta
Brussels
Denver
Los Angeles

New York
Philadelphia
San Diego
San Francisco
Washington, D.C.

1900 K Street, NW • Washington, DC 20006-1108
Tel: 202.496.7500 • Fax: 202.496.7756
www.mckennalong.com

CORMAC T. CONNOR
(202) 496-7439

EMAIL ADDRESS
cconnor@mckennalong.com

February 28, 2007

**VIA EMAIL AND U.S. MAIL**

Valerie W. Ho, Esq.
Greenberg Traurig LLP
2450 Colorado Avenue
Suite 400E
Santa Monica, CA 90404
hov@gtlaw.com

> Re:  *LG.Philips LCD Co. v. ViewSonic Corp. et. al.*
> **U.S. District Court Case No. 04-343 JJF**

Dear Valerie:

This letter responds to yours of February 9 and 27. We are still unable to determine how the Tatung Defendants have standing to object to any of LPL's third party subpoenas. We discussed the Tatung Defendants' lack of standing during the parties' meet-and-confer on January 30, which pertained to LPL's subpoena on Hewlett-Packard ("HP"). However, the Tatung Defendants have yet to provide LPL with any basis - other than naked allegations - for their standing to object to LPL's subpoenas on behalf of third parties. The scope and subject-matter of LPL's subpoenas are entirely reasonable and, even if the Special Master were to limit LPL's discovery requests on the Tatung Defendants, that ruling would not necessarily limit LPL's discovery requests on third parties.

Further, we do not understand why the Tatung Defendants still have not produced the documents that we discussed in our January 30 meet-and-confer, which related to LPL's inquiries of HP. In your February 9 letter, you said that the Tatung Defendants "agreed that we would search for and produce such documents," namely the so-called "process management plans," but you have not produced any such documents and you have not provided any estimation as to when those documents will be produced. You also failed to address our request for documents that would correlate Tatung's product numbers with the product numbers used by third parties, such as HP, so that LPL can determine whether Tatung's products are being sold in the United States under different brand names or model numbers.

Valarie W. Ho, Esq.
February 28, 2007
Page 2

Additionally, while you may not be under an obligation to assist LPL with its discovery from third parties, you are not allowed to impede LPL's discovery efforts by refusing to provide third parties, such as HP, with the consents that they need in order to produce documents to LPL. We understand your February 9 letter to be providing HP with consent to produce documents that relate to accused products and - because you apparently did not communicate this consent directly to HP - we have forwarded a copy of your letter to HP for their review. However, as HP has explained to us, even if LPL agreed to your limitations (which it does not), HP cannot identify which of its own products correspond to Tatung's accused products because HP does not have any way to link its product numbers with Tatung's. Thus, as discussed above, we need the Tatung Defendants to provide correlation information promptly. We intend to raise this issue with the Special Master.

Returning to the Tatung Defendants' purported ability to object on behalf of third parties, we will agree to meet-and-confer with you again on this matter. However, in order for our negotiations to be productive, please provide us with legal authority that supports your claims that the Tatung Defendants have standing to file motions for protective orders on behalf of third parties. Given the press of other deadlines in this case, we are not able to meet-and-confer with you this week; however we can meet with you on March 5 between 1 and 4 p.m. EST. Please let us know if this will work for you.

Sincerely,

Cormac T. Connor

cc:   Frank Meredith, Esq. (via email)
      Mark Krietzman, Esq. (via email)
      Steve Hassid, Esq. (via email)

DC:50464263.1

**From:** HoV@GTLAW.com [mailto:HoV@GTLAW.com]
**Sent:** Wednesday, February 28, 2007 9:16 PM
**To:** Connor, Cormac
**Cc:** KrietzmanM@GTLAW.com; MeridethF@GTLAW.com; JansenA@gtlaw.com; HassidS@gtlaw.com; SMiller@cblh.com; MNelson@cblh.com; TRoman@raskinpeter.com; gaza@RLF.com
**Subject:** Meet and confer regarding Tatung's motions for protective order

Dear Cormac,

This responds to your letter, which is attached. We are available for the meet and confer on Monday, March 5, 2007 at 11:00 PST. My assistant, Monica Solorzano, will circulate the dial in information.

Your suggestion that the Tatung Defendants do not have standing to bring motions for protective order relating to subpoenas that seek the Tatung Defendants' confidential proprietary information (including information that is completely irrelevant to this case) is simply wrong. Contrary to your misunderstanding, we are filing the motions on behalf of the Tatung Defendants, and not on behalf of the subpoenaed parties. As for your request for legal authority, please refer to FRCP 26(c).

With respect to the other issues raised in your letter, I already have addressed those issues in my previous letters to you. We are not impeding third party discovery, and in fact, as previously stated, HP has been provided with the correlation information that Tatung was able to locate. With respect to documents/information we previously agreed to produce, we hope to produce those by the end of this week. We do not believe this issue requires the Special Master's involvement. If LPL feels differently, then LPL should file an appropriately noticed motion. Absent such a motion, we will object to LPL raising this issue on an ad hoc basis at any upcoming status conferences/hearings.

Valerie

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties

under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@gtlaw.com.

---

**From:** Burrello, Meta [mailto:mburrello@mckennalong.com]
**Sent:** Wednesday, February 28, 2007 2:11 PM
**To:** Ho, Valerie W. (Shld-LA-LT); Merideth, Frank (Shld-LA-LT); Krietzman, Mark H. (Shld-LA-IP); Hassid, Steve (Assoc-LA-IP)
**Cc:** Connor, Cormac
**Subject:** Letter to Valerie Ho dated 2/28/07

Please see the attached document.

```
CONFIDENTIALITY NOTICE:
This e-mail and any attachments contain information from
the law firm of McKenna Long & Aldridge LLP, and are
intended solely for the use of the named recipient or
recipients. This e-mail may contain privileged
attorney/client communications or work product. Any
dissemination of this e-mail by anyone other than an
intended recipient is strictly prohibited. If you are not a
named recipient, you are prohibited from any further
viewing of the e-mail or any attachments or from making any
use of the e-mail or attachments. If you believe you have
received this e-mail in error, notify the sender
immediately and permanently delete the e-mail, any
attachments, and all copies thereof from any drives or
storage media and destroy any printouts of the e-mail or
attachments.
```

# EXHIBIT 4

# EXHIBIT 4(A)

# Greenberg
# Traurig

Clark P. Russell
(973) 360-7931
russellc@gtlaw.com

March 13, 2007

VIA FEDERAL EXPRESS

Hon. Mary L. Cooper, U.S.D.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Federal Building and U.S. Courthouse
402 East State Street, Room 5000
Trenton, New Jersey 08608

   Re: LG. Philips LCD Co., Ltd. v. Tatung Company, et al
      New Jersey District Court No. 3:07-cv-1140

Dear Judge Cooper:

  We represent defendants Tatung Company and Tatung Company of America, Inc. (the "Tatung Defendants") in the above-referenced matter.

  Please be advised that Judge Riskamp of the Southern District of Florida just granted the Tatung Defendants their motion for a protective order on nearly identical facts. A copy is enclosed for your reference.

  Thank you for your courtesies.

Respectfully submitted,

Clark P. Russell

CPR:cgc
Enclosure
cc: Richard D. Kirk, Esq. (w/enc., via e-mail)
  Gaspare J. Bono, Esq. (w/enc., via e-mail)
  Jeffrey B. Bove, Esq. (w/enc., via e-mail)
  Frederick L. Cottrell III, Esq. (w/enc., via e-mail)
  Valerie W. Ho, Esq. (w/enc., via e-mail)
  Scott R. Miller, Esq. (w/enc., via e-mail)
  Tracy Roman, Esq. (w/enc., via e-mail)

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH

*Strategic Alliance
Tokyo Office/Strategic Alliance

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

L.G. PHILIPS LCD CO., LTD.,

      Plaintiff,

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

      Defendants

Case No. 04-343-JJF (D. Del.)

**07-80223
CIV-RYSKAMP**

THIS MATTER having been opened to the Court on motion by defendants, the

Tatung Co. and the Tatung Company of America, Inc., by their attorneys, for a protective

order pursuant to Fed. R. Civ. P. 26(c), limiting the scope of discovery from third party

Sensormatic, Inc. ("Sensormatic"); and plaintiff L.G.Philips LCD Co., Ltd., by their

attorneys, having opposed the motion; and the Court having considered the papers

submitted and the arguments presented; and for good cause shown:

**IT IS HEREBY ORDERED THAT:**

1.     The motion is GRANTED.

2.     Any deposition testimony taken from third party Sensormatic shall be

limited to the accused products at issue in *L.G. Philips LCD Co., Ltd. v. Tatung*

*Company, et. al.*, C.A. No. 04-343-JJF (United States District Court for the District of

Delaware) (the "Delaware Action"). Such deposition testimony shall be subject to the

provisions of the Stipulated Protective Order dated January 24, 2005 entered in the

Delaware Action.

3.     Any documents produced in response to the subpoena by third party

Sensormatic shall be limited to those documents relating to the accused products at issue

in the Delaware Action. Additionally, any documents produced shall be stamped

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER and shall be produced subject

to the Stipulated Protective Order dated January 24, 2005 entered in the Delaware Action,

which is attached hereto as Exhibit 1.

Dated: March 9, 2007
~~Boca Raton~~, Florida
WPB

_____
United States District Court Judge for the
Southern District of Florida

Copies to:    Richard D. Kirk, Esq. (rkirk@bayardfirm.com)
              Gaspare J. Bono, Esq. (gbono@mckennalong.com)
              Jeffrey B. Bove, Esq. (jbove@cblh.com)
              Tracy R. Roman, Esq. (troman@raskinpeter.com)
              Scott R. Miller, Esq. (smiller@cblh.com)
              Frederick L. Cottrell, III, Esq. (Cottrell@RLF.com)
              Frank E. Merideth, Jr., Esq. (meredith@gtlaw.com)
              Geoffrey M. Cahen, Esq. (caheng@gtlaw.com)

# *EXHIBIT 4(B)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| LG Phillips LCD Co. Ltd., | Court File No.: 07-MC-19 JNE/SRN |
| Plaintiff, | |
| vs. | **AMENDED NOTICE OF MOTION** |
| Tatung Company, Tatung Company of America, Inc.; and ViewSonic Corporation, | <u>Oral Argument Requested</u> |
| Defendants. | |

**PLEASE TAKE NOTICE** that on March 15, 2007 at 3:00 p.m., or as soon thereafter as counsel may be heard, Defendants Tatung Company and Tatung Company of America, Inc. will bring on for hearing a Motion for a Protective Order Limiting the Scope of a Third Party Subpoena and Notice of Deposition Duces Tecum pursuant to Federal Rule of Civil Procedure 26, before the Honorable Susan Richard Nelson in Courtroom 9E of the U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.

Dated: March 14, 2007

Lind, Jensen, Sullivan & Peterson
A Professional Association

Ted E. Sullivan, I.D. No. 122458
William L. Davidson, I.D. No. 201777
Sara J. Lathrop, I.D. No. 0310232
150 South Fifth Street, Suite 1700
Minneapolis, Minnesota 55402
(612) 333-3637

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

LG.PHILIPS LCD CO., LTD.,

                Plaintiff,

vs.

Tatung Company, Tatung
Company of America, Inc., and
ViewSonic Corporation,

                Defendants.

Court File No.: 0:07-MC-19 JNE/SRN

**NOTICE OF APPEARANCE**

---

TO:  PLAINTIFF ABOVE-NAMED AND ITS ATTORNEYS, Gaspare J. Bono,
Rel S. Ambrozy, Lora A. Brzezynski, Cass W. Christenson, AND Cormac
T. Connor, Esq., McKenna, Long & Aldridge, LLP, 1900 K Street N.W.,
Washington, DC 20006 and Richard D. Kirk, The Bayard Firm, 222
Delaware Avenue #900, Wilmington, DE 19899; AND DEFENDANT
VIEWSONIC CORPORATION AND ITS ATTORNEYS, Jeffrey B. Bove,
James D. Heisman, Jaclyn Michele Mason, Connolly, Bove, Lodge & Hutz,
The Nemours Building, 1007 North Orange Street, P.O. Box 2207,
Wilmington, DE 19899 AND Scott R. Miller, Connolly, Bove, Lodge & Hutz,
355 South Grand Avenue, Ste. 3150, Los Angeles, CA 90071, AND Tracy
R. Roman, Esq., Raskin, Peter, Rubin & Simon, LLP, 1801 Century Park
East, Ste. 2300, Los Angeles, CA 90067:

PLEASE TAKE NOTICE that the undersigned Thomas D. Jensen will

hereby appear in this action on behalf of Defendants Tatung Company and

Tatung Company of America, Inc.

Respectfully submitted,

Lind, Jensen, Sullivan & Peterson
A Professional Association

Dated: 3 - 14 - 07

Thomas D. Jensen, I.D. No. 50179
Ted E. Sullivan, I.D. No. 122452
William L. Davidson, I.D. No. 201777
Sara J. Lathrop, I.D. No. 0310232
150 South Fifth Street, Suite 1700
Minneapolis, Minnesota 55402
(612) 333-3637

AND

Frank C. Merideth, Esq.
Valerie Ho, Esq.
Charlene Oh, Esq.
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
(310) 586.7700

Attorneys for Defendants Tatung Company
and Tatung Company of America, Inc.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

LG Phillips LCD Co. Ltd.,

        Plaintiff,

vs.

Tatung Company, Tatung Company of
America, Inc.; and ViewSonic
Corporation,

        Defendants.

Court File No.: 07-MC-19 JNE/SRN

**AFFIDAVIT (II) OF SARA J. LATHROP**

STATE OF MINNESOTA    )
                         ) SS
COUNTY OF HENNEPIN    )

1.    My name is Sara J. Lathrop. I am an attorney licensed to practice law in the State of Minnesota. I am one of the attorneys representing Defendants Tatung Company, Tatung Company of America, Inc. ("the Tatung Defendants) in the above-captioned matter.

2.    I submit this affidavit in support of the Tatung Defendants' Motion for a Protective Order and for an Expedited Hearing, relating to the subpoena and deposition duces tecum notice served by Plaintiff LG Phillips LCD Co. Ltd. ("LPL") upon third-party Best Buy, Inc. ("Best Buy"). The Best Buy subpoena was issued out of this Court.

3.    A true and correct copy of the Protective Order issued by the United States District Court for the Southern District of Florida in LG Philips LCD Co., Ltd. v. Tatung Co., et al., granting Tatung's motion for protective order, filed March 12, 2007 is attached hereto as Exhibit 5.

FURTHER YOUR AFFIANT SAYETH NOT.

_____
Sara J. Lathrop

Subscribed and sworn to before
me this 14th day of March, 2007

_____
Notary Public

JENNIFER STELLINGS GREEN
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

L.G. PHILIPS LCD CO., LTD.,                    Case No. 04-343-JJF (D. Del.)

Plaintiff,

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

Defendants

THIS MATTER having been opened to the Court on motion by defendants; the

Tatung Co. and the Tatung Company of America, Inc., by their attorneys, for a protective

order pursuant to Fed. R. Civ. P. 26(c), limiting the scope of discovery from third party

Sensormatic, Inc. ("Sensormatic"); and plaintiff L.G.Philips LCD Co., Ltd., by their

attorneys, having opposed the motion; and the Court having considered the papers

submitted and the arguments presented; and for good cause shown:

**IT IS HEREBY ORDERED THAT:**

1.      The motion is GRANTED.

2.      Any deposition testimony taken from third party Sensormatic shall be

limited to the accused products at issue in *L.G. Philips LCD Co., Ltd. v. Tatung

Company, et. al.*, C.A. No. 04-343-JJF (United States District Court for the District of

Delaware) (the "Delaware Action"). Such deposition testimony shall be subject to the

provisions of the Stipulated Protective Order dated January 24, 2005 entered in the

Delaware Action.

3.      Any documents produced in response to the subpoena by third party

Sensormatic shall be limited to those documents relating to the accused products at issue

in the Delaware Action. Additionally, any documents produced shall be stamped

5

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER and shall be produced subject

to the Stipulated Protective Order dated January 24, 2005 entered in the Delaware Action,

which is attached hereto as Exhibit 1.

Dated: March 2, 2007
Boca Raton, Florida

United States District Court Judge for the
Southern District of Florida

Copies to:    Richard D. Kirk, Esq. (rkirk@bayardfirm.com)
Gaspare J. Bono, Esq. (gbono@mckennalong.com)
Jeffrey B. Bove, Esq. (jbove@cblh.com)
Tracy R. Roman, Esq. (troman@raskinpeter.com)
Scott R. Miller, Esq. (smiller@cblh.com)
Frederick L. Cottrell, III, Esq. (Cottrell@RLF.com)
Frank E. Merideth, Jr., Esq. (meredith@gtlaw.com)
Geoffrey M. Cahen, Esq. (caheng@gtlaw.com)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**


LG.PHILIPS LCD CO., LTD.

      Plaintiff,

                                  **Case No. 07-MC-80223-KLR**

TATUNG COMPANY; TATUNG            *D. Delaware Case No. 04-343-JJF*
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION

      Defendants.

_____

**ORDER**

      This matter having come before the Court on Plaintiff, LG. Philips LCD Co., Ltd.'s

Motion for Expedited Relief from Order, and the Court, having considered the motion, being

fully advised and for good cause shown, ORDERS:

- The Motion is GRANTED.

- The Order entered on March 12, 2007 in the above-captioned proceeding is hereby VACATED;

- Plaintiff LG.Philips LCD Co., Ltd. ("LPL") shall submit a brief in response to the Motion for a Protective Order Limiting Scope of Third Party Deposition and Subpoena submitted by Tatung Company and Tatung Company of America, Inc. by no later than March ____, 2007;

- The Court will hold a telephonic hearing on this matter on March ____, 2007 at _____ a.m./p.m.

Dated this _____ day of March, 2007.


                                  _____
                                  United States District Court Judge for
                                  the Southern District of Florida

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LG.PHILIPS LCD CO., LTD.

       Plaintiff,

                                  **Case No. 07-MC-80223-KLR**

TATUNG COMPANY; TATUNG              *D. Delaware Case No. 04-343-JJF*
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION

       Defendants.

_____

## ORDER

The Court, being fully advised, ORDERS:

- The Motion is GRANTED.

- The Order entered on March 12, 2007 in the above-captioned proceeding is hereby VACATED;

- The Motion for a Protective Order Limiting Scope of Third Party Deposition and Subpoena submitted by Tatung Company and Tatung Company of America, Inc. is hereby TRANSFERRED to the Delaware District Court for its consideration.

Dated this _____ day of March, 2007.


_____
United States District Court Judge for
the Southern District of Florida


DC:50466795.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,            Case No. 04-343-JJF (D. Del.)

       Plaintiff,

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

       Defendants.

_____/

## NOTICE OF INTENT TO FILE MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF LG.PHILLIPS LCD CO., LTD.'S MOTION FOR EXPEDITED RELIEF FROM ORDER PURSUANT TO FED. R. CIV. P. 60(b) AND LOCAL RULE 7.1(E)

Defendants Tatung Company and Tatung Company of America, Inc. (collectively

"Tatung"), by and through their undersigned counsel, hereby file this notice that they

intend to submit a memorandum of law in opposition to Plaintiff LG.Phillips LCD Co.,

Ltd.'s Motion For Expedited Relief From Order Pursuant to Fed. R. Civ. P. 60(b) and

Local Rule 7.1(E) dated March 14, 2007 (the "Motion") [DE-3].

**WHEREFORE**, Tatung respectfully requests that this Court issue an Order establishing that Tatung's opposition papers to the Motion be due on March 28, 2007 per Local Rule 7.1(C).  In the alternative, if this Court finds that good causes exists for expedited relief pursuant to Local Rule 7.1(E), Tatung respectfully requests that this Court issue an Order establishing that Tatung's opposition papers to the Motion be due on March 21, 2007.

Dated: March 15, 2007
Boca Raton, Florida

GREENBERG TRAURIG, P.A.
5100 Town Center Circle, Suite 400
Boca Raton, FL  33486
Telephone: 561.955.7600
Facsimile:  561.338.7099


By:  s/Geoffrey M. Cahen
    Geoffrey M. Cahen
    Florida Bar No. 0013319
    Counsel for Defendants Tatung
    Company and Tatung Company of
    America, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2007, I served a copy of the foregoing upon the

following:

### <u>Via CM/ECF:</u>

Martin B. Woods, Esq.
mwoods@swmwas.com
Marissa B. Kelly, Esq.
mkelly@swmwas.com
**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
200 East Las Olas Blvd., Suite 2100
Ft. Lauderdale, Florida 33301


### <u>Via U.S. Mail:</u>

Sensormatic, Inc.
6600 Congress Ave.
Boca Raton, Florida 33431-0837

### <u>Via email:</u>

Richard D. Kirk
rkirk@bayardfirm.com
**The Bayard Firm**
222 Delaware Avenue # 900
Wilmington, DE 19899


Gaspare J. Bono
gbono@mckennalong.com
Rel S. Ambrozy
rambrozy@mckennalong.com
Cass W. Christenson
cchristenson@mckennalong.com
Lora A. Brzezynski
lbrzezynski@mckennalong.com
**McKenna Long & Aldridge LLP**
1900 K Street, N.W.
Washington, DC 20006


Jeffrey B. Bove
jbove@cblh.com

James D. Heisman
jheisman@cblh.com
Jaclyn M. Mason
jmason@cblh.com
**Connolly Bove Lodge & Hutz LLP**
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899


Tracy R. Roman
troman@raskinpeter.com
**Raskin Peter Rubin & Simon LLP**
1801 Century Park East, Suite 2300
Los Angeles, CA 90067


Scott R. Miller
smiller@cblh.com
**Connolly Bove Lodge & Hutz LLP**
355 South Grand Avenue, Suite 3150
Los Angeles, CA 90071


Frederick L. Cottrell, III
Cottrell@RLF.com
Anne Shea Gaza
Gaza@RLF.com
**Richards Layton & Finger, PA**
One Rodney Square
P.O. Box 551
Wilmington, DE 19899


By: __s/Geoffrey M. Cahen_____
    Geoffrey M. Cahen

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 07-80223-CIV-RYSKAMP/VITUNAC

LG. PHILIPS LCD CO., LTD.,

       Plaintiff,

v.

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC,,
AND VIEWSONIC CORPORATION

       Defendants.

_____/

## <u>NOTICE OF HEARING</u>

THIS CAUSE comes upon Plaintiff's motion for expedited relief from order **[DE 3]** filed on March 14, 2007.  PLEASE TAKE NOTICE that this case has been set for hearing on Plaintiff's motion **[DE 3]** before the undersigned, United States District Judge Kenneth L. Ryskamp, at the following date and time:

| | |
|---|---|
| DATE: | **March 23, 2007** (Friday) |
| TIME: | **9:00 a.m.**  Thirty minutes have been reserved for this hearing. |
| PLACE: | United States Courthouse, Courtroom #1<br>701 Clematis Street<br>West Palm Beach, FL 33401 |

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this 16 day of March, 2007.

                         __/s/ Kenneth L. Ryskamp_____
                         KENNETH L. RYSKAMP
                         UNITED STATES DISTRICT JUDGE

Copies to:
All Counsel of Record

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 07-MC-80223-KLR

*D. Delaware Case No. 04-343-JJF*

LG.PHILIPS LCD CO., LTD.,

     Plaintiff,

v.

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

     Defendants.

---

### PLAINTIFF LG.PHILIPS LCD CO., LTD.'S
### MOTION TO PERMIT PARTIES TO APPEAR TELEPHONICALLY

Plaintiff LG.Philips LCD Co., Ltd. ("LPL" or Plaintiff) respectfully moves this Court to permit the parties to appear telephonically at the hearing scheduled for 9:00 a.m. on March 23, 2007. The grounds and authority for this Motion are as follows:

1.     On March 14, 2007, Plaintiff filed a motion seeking expedited relief (the "Motion for Relief") **[DE 3]** from a protective order **[DE 2]** limiting the scope of discovery Plaintiff would be permitted to seek from a third party to litigation currently pending in the District of Delaware. The protective order had been entered in response to the motion by Tatung Company and Tatung Company of America, Inc. (collectively, "Tatung"), who are defendants in the Delaware litigation **[DE 1]**.

2.     As Plaintiff discussed at length in the Motion for Relief, the present dispute originated with Tatung's refusal to cooperate in discovery in the Delaware litigation **[DE 3 at p. 4]**. Because Tatung refused to produce certain discoverable materials in the main litigation, LPL

has been forced to serve subpoenas on a variety of distributors, retailers, and purchasers of Tatung's products in jurisdictions throughout the United States, including the Southern District of Florida.

3.      Simultaneously with the motion it filed in this Court, Tatung filed virtually identical motions in other jurisdictions where Plaintiff has served subpoenas. Since then, six different courts have heard argument on Tatung's motion. The offices of Plaintiff's lead counsel are located in Washington, D.C. To minimize expenses, Plaintiff has requested permission for both parties to appear telephonically at the hearings on Tatung's motions.

4.      To date, five of the six courts that have heard argument on Tatung's motion have permitted one or both of the parties to appear telephonically, including the United States District Courts for the following districts: Minnesota, New Jersey, Arkansas, the Central District of California, and the Southern District of California. To date, only the court in the Northern District of California has required personal appearances.

5.      Requiring personal appearances at the March 23 hearing would cause Plaintiff to incur the substantial expense of either a) arranging for lead counsel to travel from Washington, DC to Florida on short notice[1]; or b) arranging for local counsel to develop, on short notice, sufficient knowledge about the Delaware litigation and the multiple third party discovery hearings in courts across the country so as to present full and detailed argument to this Court. Requiring Plaintiff to incur such expense will unduly burden Plaintiff without substantially aiding the Court. The parties have successfully presented argument by telephone in other jurisdictions, and Plaintiff believes it will be possible to do so again in this case.

---

[1] Counsel in the Delaware litigation is in the process of preparing a motion for pro hac vice admission to this Court.

For all of the foregoing reasons, LPL respectfully moves the Court to permit the parties to appear telephonically at the hearing of this matter scheduled for Friday, March 23, 2007 at 9:00 a.m. a proposed order is attached hereto.

Dated: March 20, 2007.

Respectfully Submitted,

_____

Martin B. Woods, Esq. (Fla. Bar No. 340294)
Marissa D. Kelley, Esq. (Fla. Bar No. 379300)
mwoods@swmwas.com
mkelley@swmwas.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: 954-462-9500
Facsimile: 954-462-9567
*Attorneys for Plaintiff, LG.Philips LCD Co., Ltd.*

OF COUNSEL:[2]
Shari L. Klevens, Esq.
sklevens@mckennalong.com
McKenna Long & Aldridge, LLP
1900 K Street, NW
Washington, DC 20006
*Attorneys for Plaintiff, LG.Philips LCD Co., Ltd.*

_____

[2] See note 1.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 20th day of March, 2007, we electronically filed the foregoing document with the Clerk of Court using CM/ECF. We also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List by e-mail and U.S. Mail, with transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Martin B. Woods, Esq. (Fla. Bar No. 340294)
mwoods@swmwas.com
Marissa D. Kelley, Esq. (Fla. Bar No. 379300)
mkelley@swmwas.com

## SERVICE LIST

Richard D. Kirk, Esq.
rkirk@bayardfirm.com
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE 19899

Jeffrey B. Bove, Esq.
jbove@cblh.com
Jaclyn M. Mason, Esq.
jmason@cblh.com
Connolly Bove Lodge & Hurtz, LLP
1007 North Orange Sreet
P.O. Box 2207
Wilmington, DE 19899

Tracy R. Roman, Esq.
troman@raskinpeter.com
Raskin Peter Rubin & Simon, LLP
1801 Century Park East
Suite 2300
Los Angeles, CA 90067

Scott R. Miller, Esq.
smiller@cblh.com
Connolly Bove Lodge & Hurtz, LLP
255 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Frederic L. Cottrell, III, Esq.
Cottrell@RLF.com
Anne Shea Gaza, Esq.
Gaza@RLF.com
Richards Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Frank E. Merideth, Jr., Esq.
merideth@gtlaw.com
Valerie W. Ho, Esq.
hov@gtlaw.com

Mark H. Krietzman, Esq.
krietzmanm@gtlaw.com
Greenberg Traurig, LLP
2450 Colorado Avenue
Suite 400E
Santa Monica, CA 90404

Geoffrey M. Cahen, Esq.
caheng@gtlaw.com
Greenberg Traurig, LLP
5100 Town Center Circle
Suite 400 Boca Raton, FL 33486

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 07-MC-80223-KLR

*D. Delaware Case No. 04-343-JJF*

LG.PHILIPS LCD CO., LTD.

     Plaintiff,

v.

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION

     Defendants.
_____/

## <u>ORDER</u>

The Court, being fully advised, ORDERS:

- That Plaintiff LG.Philips LCD Co., Ltd.'s Motion to Permit Parties to Appear Telephonically is hereby GRANTED; and

- The Court will hold a telephonic hearing on this matter on March 23, 2007 at 9:00 a.m. With respect to call-in information, the parties are instructed as follows:

_____
_____
_____
_____
_____
_____
_____

DONE AND ORDERED in Chambers at West Palm Beach, Florida this ___ day of March, 2007.

_____
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

Copies to:
All Counsel of Record

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,          Case No. 04-343-JJF (D. Del.)

        Plaintiff,

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

        Defendants.

_____/

## OPPOSITION OF DEFENDANTS TATUNG COMPANY AND TATUNG COMPANY OF AMERICA, INC. TO PLAINTIFF'S MOTION FOR EXPEDITED RELIEF FROM ORDER

Defendants Tatung Company and Tatung Company of America, Inc. (collectively, the "Tatung Defendants") submit this Opposition to Plaintiff L.G. Philips LCD Co., Ltd.'s ("LPL") Motion for Expedited Relief From Order Pursuant to Fed. R. Civ. P. 60(b) and Local Rule 7.1(E) [DE-3] ("LPL's Motion") and state as follows:

### I.    INTRODUCTION

The Tatung Defendants commenced this proceeding by filing a Motion for Protective Order Limiting Scope of Third Party Deposition and Subpoena that LPL served on Sensormatic, Inc. [DE-1] (the "Tatung Defendants' Motion"). The Tatung Defendants' Motion seeks to limit the scope of the Third Party Subpoena For Deposition Duces Tecum ("Subpoena") served upon Sensormatic, Inc. ("Sensormatic") to documents and testimony concerning accused products in a patent infringement case pending in the United States District Court for the District of Delaware, Case No. 04-343-JJF (the "Main Case"). On March 12, 2007, this Court issued an Order [DE-2] (the "Order") granting the Tatung Defendants' Motion and ruled that discovery of Sensormatic shall be limited

to accused products only. Similarly, later last week, the Special Master in the Main Case stated his intention to limit discovery only to accused products.

Nevertheless, LPL's Motion requests that this Court: 1) vacate its Order; 2) transfer the Tatung Defendants' original Motion for Protective Order to the Delaware District Court for consideration; or, in the alternative, 3) establish a schedule for further briefing on these issues. In light of the underlying merits of the Tatung Defendants' Motion and the Special Master's statements, the Tatung Defendants respectfully request that this Court deny LPL's Motion and preserve its Order, thereby allowing third party document production and depositions regarding the accused products to proceed without delay.

## II.      ARGUMENT

### A.      The Tatung Defendants' Motion Warranted Expedited Consideration.

LPL argues that the Tatung Defendants' Motion did not deserve expedited consideration, despite the March 30, 2007 cutoff date for third party discovery. On the contrary, the grounds for expedited consideration are sufficiently set forth in the Tatung Defendants' Motion. LPL issued 23 third-party subpoenas for deposition and documents in mid and late February. The Tatung Defendants immediately apprised LPL that its subpoenas were grossly overbroad, in that they sought highly confidential documents concerning unaccused products. The parties agreed to meet and confer to discuss the Tatung Defendants' objections on March 5, 2007. When LPL refused to limit the scope of its subpoenas, the Tatung Defendants filed their Motion on March 9, 2007 seeking to limit the scope of Sensormatic's document production (scheduled for the same day) and its testimony in a deposition scheduled for March 16, 2007. Realizing the need for

126749974_1
BOC 36454391v2 3/21/2007999907829890

expedited consideration, this Court granted the Tatung Defendants' Motion in its Order dated March 12, 2007. The Court has discretion to grant expedited relief and chose to exercise its discretion in this instance. See S. D. Fla. Local Rule 7.1(E).

LPL's remaining arguments concerning the Court's expedited consideration of the Tatung Defendants' Motion are inadequate to warrant vacatur of the Order. LPL concedes that where good cause exists to expedite hearing, it may not be entitled to present its opposition to the Court. See LPL's Motion at p. 2. The very fact that the Court issued the Order on an expedited basis indicates that the Court found the requisite good cause.

In addition, LPL insists that the Tatung Defendants' service method "violated prior practice in the principal litigation," but it advances no case law in support of its claim that it is entitled to such notice. Indeed, the Tatung Defendants, in accordance with all applicable rules, properly and promptly served all attorneys on the service list via U.S. Mail. Similarly, LPL's assertion that the Tatung Defendants should have served its Motion for Protective Order specifically on the individual attorney who signed the subpoena is meritless. That individual was not on the service list, and the Tatung Defendants properly served numerous LPL attorneys at the same law firm who were on the service list.

Finally, LPL argues that "Tatung's actions denied Plaintiff any opportunity to respond and be heard." LPL has misplaced its blame. The Tatung Defendants requested an expedited briefing schedule and hearing. The Tatung Defendants had no way of knowing when this Court would hear or rule on their Motion. There is no basis to

126749974_1

BOC 36454391v2 3/21/2007999907829890

suggest that the Tatung Defendants somehow manipulated the Court's schedule to the disadvantage of LPL.

**B.**      **The Court Should Not Vacate Its Order Because The Special Master In The Main Case Stated That He Will Limit Discovery To The Accused Products.**

On March 16, 2007, after this Court granted the Tatung Defendants' Motion and after LPL submitted the LPL Motion, the parties participated in a telephonic hearing with the Special Master in the Main Case concerning the scope of discovery.  The Special Master indicated that he will rule in the Tatung Defendants' favor and will limit discovery to the accused products as identified by LPL.  He further stated that he will issue written recommendations shortly.

> SPECIAL MASTER POPPITI:  . . .You can expect, and I said it to you last week, but, quite frankly, I wasn't able to turn to it and get to it this week, you will get a finding and recommendation.  It's important that it be as careful -- they all should be careful -- but in more depth in terms of its analysis of dealing with the issue accused/unaccused.  But by virtue of what has been going on, **I am telling you that the discovery is going to be, absent something earth shattering that I consider in the next number of days, it's going to be limited to accused products.**
>
> Now, perhaps I should have done that earlier, and I will even go so far as to suggest, by perhaps doing it earlier in terms of giving you an indication or an inclination on the record, you would have been able to, perhaps, discuss the issue in a meet and confer more meaningfully, and you would have had the opportunity and **you now may have that opportunity to share a Special Master's inclination with other jurisdictions that you will be working in.**

See Exh. A, Rough Transcript of Hearing at 19-20.[1] (**emphasis added**).

The Special Master further noted that LPL had provided no authority for the proposition that he could order the Tatung Defendants to withdraw their motions for protective order.  (Id. at 11-12.)  Having stated his intention to limit discovery to the

---

[1] All Exhibits are attached to the Declaration of Charlene L. Oh ("Oh Decl.").

accused products, the Special Master requested that the parties meet and confer regarding scheduling of third party depositions and report on the status of those discussions on March 21, 2007. (Id. at 26-31.) The Special Master also indicated that he may be willing to extend the third party discovery cutoff so that the parties can complete outstanding third party discovery. (Id. at 26-27.)

Because the Special Master has stated that all discovery will be limited to accused products only, the Court's Order, which imposes similar limits, should stand. See Order dated March 12, 2007 annexed hereto as Exh. B.

**C.     The Court Could Alternatively Transfer The Underlying Motion for Protective Order To The District Of Delaware.**

The Tatung Defendants have no objection to the transfer of their underlying Motion to the Delaware District Court. In fact, in order to save time and expense, the Tatung Defendants originally had asked LPL to agree to consolidate the motions before the Special Master in the Main Case, but LPL refused, contending that the Special Master's rulings would not be binding on third parties. (Exh. A at 8, 17.) In light of LPL's refusal to have the motions heard by the Delaware Court and the fact that the Tatung Defendants had no other available remedy against LPL's improper subpoenas, it smacks of hypocrisy for LPL to now complain that the Tatung Defendants filed their motions in 15 different districts.[2]

Although the Tatung Defendants do not object to transferring the motion to the District of Delaware, in light of the Special Master's statements at the March 16 hearing, the Tatung Defendants believe it would be more efficient for this Court to simply deny

---

[2] As a further example of LPL's hypocrisy, its Motion states: "Plaintiff respectfully submits, however, that Tatung's position offers further support for LPL's position that the proper forum for litigating such a matter is Delaware, not Florida." The Court need only look to the March 16, 2007 Transcript to reveal LPL's blatant deception of the record. See Exh. A at 8, 17.

5

LPL's Motion and preserve its Order limiting discovery from Sensormatic to accused

products only. That is how the Special Master will rule if the Tatung Defendants' Motion

were transferred to his Court and that is presumably why he wanted to give the parties the

"opportunity to share a Special Master's inclination with other jurisdictions that you will

be working in."[3] The Order serves to allow the parties to immediately proceed with third

party depositions regarding the products at issue, and end further proceedings in this

ancillary matter.

**D.    LPL Has Not Established That It is Entitled To Further Briefing
        On The Underlying Motion For Protective Order.**

Notably, nowhere in LPL's motion does LPL address the one salient issue raised

by the Tatung Defendants' underlying Motion - why confidential customer information

relating to hundreds of unaccused products is remotely relevant to this case. Having

failed to put forth a cogent argument for why it is entitled to discovery regarding products

it has not accused of infringing the Patents-in-Suit, LPL attempts to cloud the issues.

Under well-established case law, a patentee like LPL has no right to embark on a fishing

expedition by issuing subpoenas to an accused infringer's customers for confidential

information concerning non-infringing products.

**1.     LPL Should Not Be Allowed To Embark On A Fishing Expedition.**

The parties have been proceeding with discovery regarding the accused products.

The Special Master has already stated his intention to bar discovery regarding unaccused

products. While LPL represents that the Subpoena only seeks information "related to

---

[3] Notably, other courts have granted the Tatung Defendants' underlying Motions for Protective Order. On March 15, 2007, the District of Minnesota stayed any discovery from Best Buy, Inc. regarding unaccused products pending a ruling from the Special Master. See D. Minn. Order annexed hereto as Exhibit C. On March 15, 2007, the District of New Jersey issued a similar ruling with respect to LPL's subpoena to Tyco International. See Oh Decl. at ¶5.

purchase and sale of the *infringing* products in the United States," its Subpoena in fact seeks confidential technical information, negotiations, correspondence, agreements and pricing information regarding *every* "visual display product" sold or offered for sale by the Tatung Defendants.  The Subpoena is not in any way limited to the 20 accused products identified by LPL.  As such, the Subpoena improperly seeks to delve into the confidential business relationship between the Tatung Defendants and Sensormatic, which has absolutely nothing to do with this case.  LPL should not be permitted to embark on a fishing expedition that is a mere pretext to obtain confidential information for competitive purposes.  E.g., Marshall v. Westinghouse Elec. Corp., 576 F. 2d 588, 592 (5th Cir. 1978) (a plaintiff is not permitted to "'go fishing' and a trial court retains discretion to determine that a discovery request is too broad and oppressive")[4]; In re Nofziger, No. 6:04-BK-09253-KSJ, 2006 WL 1889991, *2 (Bkrtcy.M.D.Fla. June 30, 2006) (denying relief from a protective order prohibiting discovery inquiries pertaining to the debtor prior to September, 1999, explaining that the "[e]vidence rules clearly allow a court to balance a party's request for an ambiguous fishing expedition against the need to protect a legitimate security concern of an opposing litigant") (citing to Fed. R. Civ. P. 26(c) and Fed. R. Evid. 611(a)); see also Micro Motion, Inc. v. Kane Steel Co., 894 F.2d 1318, 1327-28 (Fed. Cir. 1990); Joy Technologies, Inc. v. Flakt, Inc., 772 F. Supp. 842, 849 (D. Del. 1991).

---

[4] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, [are] binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." Bonner v. City of Prichard, Ala., 661 F. 2d 1206, 1209 (11th Cir. 1981).

## 2.     LPL's Inducement Argument Is Meritless.

In a footnote, LPL half-heartedly proffers that the broad categories of information it seeks are relevant to the issue of inducement.  However, there can be no indirect infringement (or inducement) without direct infringement.  "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, . . . and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  Minnesota Mining and Manufacturing Co. v. Chemque, Inc., 303 F.3d 1294, 1304 (Fed. Cir. 2002); Medtronix Xomed, Inc. v. Gyrun ENT LLC, 440 F. Supp.2d 1300, 1313 (M.D. Fla. 2006) (same)  In other words, in order for there to be indirect infringement, there must be direct infringement and an infringing product.  The cases cited in LPL's Motion do not hold to the contrary.  Here, there is no allegation of direct infringement with respect to the hundreds of products for which LPL seeks information from the Tatung Defendants' customers.

## 3.     The Tatung Defendants Have Standing To Seek A Protective Order Under Federal Rule Of Civil Procedure 26(c).

While acknowledging that the Tatung Defendants' Motion is filed pursuant to Fed. R. Civ. P. 26(c), LPL nevertheless resorts to citing inapposite case law under Fed. R. Civ. P. 45 for the proposition that the Tatung Defendants do not have standing to file this motion.[5]  The Tatung Defendants have repeatedly informed LPL, including during the March 5, 2007 meet and confer, that their motions are made pursuant Rule 26(c).

---

[5] All of the cases cited in LPL's Motion are inapposite.  *Dart Industries, Inc. v. Liquid Nitrogen Processing,* 50 F.R.D. 286, 291 (D.Del. 1970); *Ponsford v. United States,* 771 F.2d 1305, 1308 (9th Cir. 1985), *Nova Products, Inc. v. Kisma Video, Inc.*, 220 F.R.D. 238, 241 (S.D.N.Y. 2004), *Oliver B. Cannon and Son, Inc. v. Fidelity and Cas. Co. of New York*, 519 F. Supp. 668, 680 (D.Del. 1981) all address a party's standing to bring a motion to quash under FRCP 45.  LPL has not provided any authority to support its assertion that the Tatung Defendants lack standing to move for a protective order under Fed. R. Civ. P. 26(c).

126749974_1

BOC 36454391v2 3/21/2007999907829890

However, LPL has continued to mischaracterize the Tatung Defendants' position in order to manufacture a non-existing standing issue. As briefed fully in the Tatung Defendants' Motion, a party whose confidential information is being sought by way of subpoenas issued to third parties unequivocally has standing to file motions for protective order under Rule 26(c).

**E.     LPL's Motion Is Premised On Baseless Accusations.**

**1.     The Tatung Defendants Have Not Improperly Impeded Third Party Discovery.**

The Tatung Defendants' Motion sought very limited relief: it did not seek to bar all third party discovery; rather, it only asked that third party discovery be limited to the products that have been expressly accused by LPL of infringing the Patents-in-Suit. This approach is entirely consistent with the Special Master's views regarding discovery. Had LPL agreed to narrow the scope of its subpoenas during the meet and confer process, motion practice and the delay associated with it could have been avoided entirely.

Moreover, Rule 26(c) clearly affords a party the right to file a motion for protective order concerning third party discovery. That the Tatung Defendants availed themselves of this procedural right does not in any way serve as evidence of improper conduct. Indeed, the Special Master suggested at the March 16 hearing that it was not improper for the Tatung Defendants to inform their customers of the pending motions for protective order. See Exh. A at p. 12. In most instances, the customers themselves have served formal objections to LPL's subpoenas or filed motions to quash in their respective districts. The Tatung Defendants are informed that Sensormatic may file a motion to quash in this proceeding.

9

## 2.     Any Delay Asserted By LPL Is Self-Inflicted.

Earlier this year, LPL sought to extend the third party discovery cutoff on multiple occasions.  On each of those occasions, the Special Master denied LPL's request to prolong discovery.  LPL nevertheless waited until mid to late February 2007 to issue a series of 23 subpoenas out of  15 different districts to the Tatung Defendants' customers. It could have issued these subpoenas in January or early February 2007, but it did not do so, presumably because it was hoping to obtain an extension of the discovery deadline. In short, any supposed delay associated with third party discovery was caused solely by LPL, and not the Tatung Defendants.

## 3.     Any Inconvenience Asserted By LPL Is Self-Inflicted.

LPL's suggestion that the Tatung Defendants timed the motions and expedited hearings to coincide with depositions of Tatung's witnesses is completely unfounded. First, LPL chose to wait until the eve of the discovery cutoff to notice 23 third party depositions across the country.  In fact, it noticed multiple third party depositions for the same day in different states.  Second, LPL fails to mention that counsel for the Tatung Defendants attend the same depositions attended by LPL's counsel.  Therefore, the Tatung Defendants are no less inconvenienced than LPL.  Third, the parties already had scheduled numerous depositions for the month of March.  The Tatung Defendants' motions for protective orders were prepared and first filed while the Tatung Defendants were deposing LPL's witnesses and preparing their own witnesses for depositions.  LPL itself filed a number of motions with the Special Master at the same time that the Tatung Defendants were in the midst of those depositions.  Fourth, the Tatung Defendants have no control over when the various District Courts schedule expedited hearings on motions.

The Tatung Defendants certainly lack sufficient control over the schedules of District Courts so as to orchestrate overlapping hearings.

### 4. The Tatung Defendants Have Complied With Their Discovery Obligations.

LPL's complaints regarding the Tatung Defendants' document productions are both baseless and irrelevant for purposes of this motion. The Tatung Defendants have fully complied with their discovery obligations. See March 2, 2007 Letter to Special Master Regarding Document Production annexed hereto as Exh. D.

### III. CONCLUSION

For the reasons stated above, the Tatung Defendants respectfully request that the Court deny LPL's Motion, or in the alternative, transfer the motion to the District of Delaware where this case is currently pending.

Dated: March 21, 2007
Boca Raton, Florida

> GREENBERG TRAURIG, P.A.
> 5100 Town Center Circle, Suite 400
> Boca Raton, FL 33486
> Telephone: 561.955.7600
> Facsimile: 561.338.7099
>
>
> By: s/Geoffrey M. Cahen
>     Geoffrey M. Cahen
>     Florida Bar No. 0013319
>     Counsel for Defendants Tatung
>     Company and Tatung Company of
>     America, Inc.

11

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on March 21, 2007, I served a copy of the foregoing upon the

following:

### <u>Via CM/ECF:</u>

Martin B. Woods, Esq.
mwoods@swmwas.com
Marissa B. Kelly, Esq.
mkelly@swmwas.com
**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
200 East Las Olas Blvd., Suite 2100
Ft. Lauderdale, Florida 33301

### <u>Via U.S. Mail:</u>

Sensormatic, Inc.
6600 Congress Ave.
Boca Raton, Florida 33431-0837

### <u>Via email:</u>

Richard D. Kirk
rkirk@bayardfirm.com
**The Bayard Firm**
222 Delaware Avenue # 900
Wilmington, DE 19899

Gaspare J. Bono
gbono@mckennalong.com
Rel S. Ambrozy
rambrozy@mckennalong.com
Cass W. Christenson
cchristenson@mckennalong.com
Lora A. Brzezynski
lbrzezynski@mckennalong.com
**McKenna Long & Aldridge LLP**
1900 K Street, N.W.
Washington, DC 20006

126749974_1
BOC 36454391v2 3/21/2007999907829890

Jeffrey B. Bove
jbove@cblh.com
James D. Heisman
jheisman@cblh.com
Jaclyn M. Mason
jmason@cblh.com
**Connolly Bove Lodge & Hutz LLP**
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899


Tracy R. Roman
troman@raskinpeter.com
**Raskin Peter Rubin & Simon LLP**
1801 Century Park East, Suite 2300
Los Angeles, CA 90067


Scott R. Miller
smiller@cblh.com
**Connolly Bove Lodge & Hutz LLP**
355 South Grand Avenue, Suite 3150
Los Angeles, CA 90071


Frederick L. Cottrell, III
Cottrell@RLF.com
Anne Shea Gaza
Gaza@RLF.com
**Richards Layton & Finger, PA**
One Rodney Square
P.O. Box 551
Wilmington, DE 19899


By:  s/Geoffrey M. Cahen
Geoffrey M. Cahen

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,                    Case No. 04-343-JJF (D. Del.)

        Plaintiff,

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

        Defendants.

_____/

### Declaration of Charlene L. Oh

I, Charlene L. Oh, declare as follows:

1.    I am an attorney at the law firm of Greenberg Traurig, LLP, and I am counsel for Defendants Tatung Company and Tatung Company of America (collectively, "the Tatung Defendants") in the lawsuit styled *L.G. Philips LCD Co., Ltd. v. Tatung Company, et al.*, Civil Action No. 04-343-JJF, in the United States District Court for the District of Delaware (the "Delaware Action").

2.    Attached hereto as Exhibit A is a true and correct copy of the Rough Transcript of the March 16, 2007 telephonic hearing before Vincent J. Poppiti, Special Master in the lawsuit styled *L.G. Philips LCD Co., Ltd. v. Tatung Company, et al.*, Civil Action No. 04-343-JJF.

3.    Attached hereto as Exhibit B is a true and correct copy of the Court's Order granting the Tatung Defendants' Motion for Protective Order, dated March 12, 2007.

4.    Attached hereto as Exhibit C is a true and correct copy of the District of Minnesota's Order, dated March 15, 2007.

5.    On March 15, 2007, the District of New Jersey ruled that LPL's subpoena to Tyco International should be limited to accused products only. The Court has not yet issued an order.

6. Attached hereto as Exhibit D is a true and correct copy of the Tatung Defendants' Letter to the Special Master, dated March 2, 2007.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct. Executed on March 19, 2007 in Los Angeles, California.

Charlene L. Oh

Exh A- Rough Transcript of Hearing.txt

1

```
 1              UNEDITED UNCERTIFIED ROUGH DRAFT

 2

 3             IN THE UNITED STATES DISTRICT COURT

 4               FOR THE DISTRICT OF DELAWARE

 5

   PHILLIPS, L.G., LCD CO., LTD,  )
 6                                )
             Plaintiffs,          )   C.A. No. 04-343(JJF)
 7                                )
   v.                             )
 8                                )
   TATUNG CO., TATUNG COMPANY OF  )
 9 AMERICA, INC., and VIEWSONIC   )
   CORPORATION,                   )
10                                )
             Defendants.          )
11
              Hearing of above matter taken pursuant to
12 notice before Renee A. Meyers, Registered Professional
   Reporter and Notary Public, in the law offices of BLANK
13 ROME, LLP, 1201 North Market Street, Wilmington,
   Delaware, on Friday, March 16, 2007, beginning at
14 approximately 3:00 p.m., there being present:

15 BEFORE:  VINCENT J. POPPITI, SPECIAL MASTER

16 APPEARANCES:

17          THE BAYARD FIRM
            RICHARD D. KIRK, ESQ.
18            222 Delaware Avenue, Suite 900
              Wilmington, Delaware  19899
19            for Plaintiffs

20              CORBETT & WILCOX
            Registered Professional Reporters
21   230 North Market Street      Wilmington, DE 19899
                 (302) 571-0510
22             www.corbettreporting.com
            Corbett & Wilcox is not affiliated
23         with Wilcox & Fetzer, Court Reporters

24
```

2

```
 1
```



EXHIBIT
A

```
                    Exh  A- Rough Transcript of Hearing.txt
 2

 3    APPEARANCES (Continued):

 4            MCKENNA, LONG & ALDRIDGE, LLP
              CASS W. CHRISTENSON, ESQ.
 5            CORMAC CONNOR, ESQ.
              SHERI KLEVINS, ESQ.
 6            REL AMBROZY, ESQ.
                1900 K Street, N.W.
 7              Washington, D.C.  20006
                for Plaintiffs
 8

 9            RICHARDS LAYTON & FINGER
              ANNE SHEA GAZA, ESQ
10              One Rodney Square
                Wilmington, Delaware  19801
11              for Defendant Tatung Co.

12            GREENBERG TRAURIG LLP
              FRANK MERIDETH, ESQ.
13            VALERIE HO, ESQ.
              CHARLENE OWE, ESQ.
14            MARK KREISMAN, ESQ.
                2450 Colorado Avenue, Suite 400E
15              Santa Monica, California  90404
                for Defendant Tatung Company of America, Inc.
16            CONNOLLY BOVE LODGE & HUTZ LLP
              JAMES D. HEISMAN, ESQ.
17              1007 North Orange Street
                Wilmington, Delaware  19899
18              for Defendant Viewsonic Corporation

19    ALSO PRESENT:  Edmond Johnson, Esq.

20

21

22

23

24
```

                                                                3

```
 1

 2

 3               SPECIAL MASTER POPPITI:  Mr. Kirk.

 4               MR. KIRK:  Yes, Your Honor.  Richard

 5    Kirk from The Bayard Firm for the plaintiff, LG Phillips,

 6    LCD Company, Ltd.  With me on the line, from various
```

Exh A- Rough Transcript of Hearing.txt

7  locales, are my colleagues from McKenna, Long & Aldridge,
8  courtroom acknowledge corner, I think Shari Klevens is
9  on; is that correct, Cormac?
10                MR. CONNOR:  That's correct.
11                MR. KIRK:  And Cass Christenson.
12                SPECIAL MASTER POPPITI:  Thank you.
13                MR. HEISMAN:  Good afternoon, Your
14  Honor, Jim Heisman on behalf of ViewSonic Corporation.
15                SPECIAL MASTER POPPITI:  Good afternoon.
16                MS. GAZA:  Good afternoon, Your Honor.
17  It's Anne Gaza again from Richards, Layton & Finger on
18  behalf of the Tatung defendants.  I believe with me on
19  the phone are Charlene Owe, Frank Merideth, Mark
20  Kresiman, and Valerie Ho, but I may have one too many or
21  one too few.
22                SPECIAL MASTER POPPITI:  Good afternoon.
23  I am really amazed at how you are on the phone and I just
24  got some new mail from you.  But in any event --

                                                    4


1                MR. CHRISTENSON:  We are mid deposition,
2  Your Honor.
3                SPECIAL MASTER POPPITI:  I understand.
4  Mid air.
5                Next, please.
6                MR. JOHNSON:  This is Edmond Johnson
7  from Pepper Hamilton.  I represent, the Tyco entities
8  which are the three of the -- subject of the three of the
9  subpoenas of third parties in this matter.
10                SPECIAL MASTER POPPITI:  Thank you, sir.

Exh A- Rough Transcript of Hearing.txt

11    Is that it?  I think it is.
12              Okay.  Let's start with some -- the
13    March 9 filing, some correspondence from Mr. Kirk dated
14    March 9.
15              MR. CONNOR:  Your Honor, I believe you
16    are referring to LPL's request for third-party discovery
17    extension and relief?
18              SPECIAL MASTER POPPITI:  Yes, that's
19    correct.
20              MR. CONNOR:  Well, Your Honor, our
21    position has really not changed very much.  What we are
22    concerned about is that this -- these barrage of motions
23    that Tatung has filed against all of our subpoenas has
24    impeded our ability to proceed with third-party discovery

                                                      5

1     against the various third parties upon whom we have
2     served subpoenas.
3               We have had three of those motions go to
4     hearing in the last three days, and in no case has any of
5     the courts -- any of the Courts that have heard both
6     sides of the story granted Tatung's motion.
7               Notably, this morning, the Northern
8     District of California took Tatung to task for filing
9     motions all over the country, saying that LPL's subpoenas
10    are reasonable and that it is reasonable to request
11    30(b)(6) testimony on the topics listed in the subpoena.
12              The other two court -- and in doing so,
13    the northern district of California denied Tatung's
14    motion outright.
15              The other two courts were the district

Exh  A- Rough Transcript of Hearing.txt

16    of Minnesota and the district of New Jersey, and in both

17    cases there, the courts entered a middle ground

18    provisional order that allowed LPL to proceed with

19    discovery against specifically accused products, but

20    recognized that, as I am sure Your Honor is aware, the

21    components of that category are likely to change, than if

22    Your Honor permits additional discovery beyond March

23    30th, than those orders will be automatically modified to

24    allow LPL to proceed.

6

1         MR. MERIDETH:  The Court in any location

2    never said anything about --

3         SPECIAL MASTER POPPITI:  You will have

4    an opportunity, sir.  I am going to either have to rely

5    on what I am hearing and hopefully there is going to be

6    no dispute; if there is a dispute, I am going to need a

7    document to show me what the Court said, and I will have

8    to do my best.

9         MR. CONNOR:  Thank you, Your Honor.

10    What our concern is, Your Honor, is that those motions

11    have ground to a halt our efforts to get third-party

12    discovery, and, notably, as we explained earlier in the

13    week, we were on the verge of getting discovery

14    production from several of these third parties, and it

15    was only after Tatung contacted those third parties and

16    advised them of Tatung's intent to file these motion that

17    is the third parties pulled up and did not produce

18    discovery, and we have been forced to put all of that on

19    hold.

Page 5

Exh A- Rough Transcript of Hearing.txt

20          SPECIAL MASTER POPPITI:  Let me ask this

21  question:  You have just described a number of

22  jurisdictions where there have been hearings on the

23  respective applications.  And there may be some dispute

24  as to what ultimately occurred in each of those

                                                          7

1  jurisdictions.

2          How many more hearings are expected to

3  occur?  And how long -- and I expect that it will take to

4  have that process come to completion.

5          MR. CONNOR:  Your Honor, by may count,

6  we have got as many as a dozen different jurisdictions

7  that have not held hearings yet, and, notably, at least

8  one of them, I see the northern district of Illinois, has

9  set a briefing schedule by which it is imposed upon

10  itself an April 5 deadline to issue an order.

11          Further, the Southern District district

12  of Florida, we raised this issue with Your Honor on

13  Monday, the Southern District of Florida granted Tatung's

14  motion before hearing any response from LPL.  LPL has

15  since filed a motion for reconsideration and then Tatung

16  has requested that the briefing schedule run through the

17  end of March.

18          So, we have got at least two courts that

19  potentially won't even issue rulings until well after

20  March 30th.  And we, frankly, aren't entirely sure about

21  what the briefing schedules or rulings will be from any

22  of the other courts because we haven't had hearings yet,

23  or, in some cases, have not yet had briefing schedule

24  orders hearings set.

                        Page 6

Exh A- Rough Transcript of Hearing.txt

8

1           SPECIAL MASTER POPPITI:  Let's focus on
2    that response for just a moment.
3           I don't expect, and certainly, in none
4    of your papers, No. 1, you are not asking me to do
5    anything with respect to those applications and with
6    respect to those hearings, and I expect the reason for
7    that is I don't have -- and tell me whether you agree
8    with this -- I don't have the authority to direct Tatung
9    to stand down; do you agree with that?
10          MR. CONNOR:  Not necessarily, Your
11   Honor.
12          SPECIAL MASTER POPPITI:  Tell me why you
13   don't think.
14          MR. CONNOR:  Well, we believe that these
15   motions could have, and Mr. Merideth raised this on
16   Monday, we did discuss it, and, at the time, LPL didn't
17   see how what it understood to be Tatung's plan could be
18   heard before Your Honor, but as it's now taken shape,
19   these issues could be raised with Your Honor if they are
20   going to be raised.  And what we are asking for is that
21   Your Honor issue an order on one hand that extends the
22   time by which LPL can complete its third-party discovery,
23   and we would submit that a reasonable time would be 60
24   days, and then we also; Your Honor, direct Tatung to stop

9

1    interfering and throwing up road blocks in front of LPL's

Page 7

Exh  A- Rough Transcript of Hearing.txt

2  third-party discovery efforts.

3              SPECIAL MASTER POPPITI:  Let me take the

4  second part of that first.  I know, whether it's from a

5  special Master's desk or from the bench of the Court,

6  that the Court has a wide range of opportunities in its

7  arsenal, if you will, to help to direct, to help to

8  ensure that discovery in any case proceeds as the rules

9  expect it to proceed.  I understand that.

10             At the same time -- and I understand

11 that the Court has, in that same arsenal, when

12 appropriate, a broad range of remedies/sanctions that can

13 be issued against a party that is violating the rules of

14 discovery, violating orders with respect to those rules.

15 I mean, I understand that.  And the remedies are broad

16 ranged, I don't think anyone would disagree with that,

17 even during the discovery phase of litigation.

18             At the same time, I am not informed, by

19 virtue of your papers, of any authority in this district

20 and this circuit that says to -- that says a court/a

21 special master has the authority to forestall Tatung from

22 doing what it is doing.

23             At the same time, I understand that, at

24 the back end of this process, if there is an application

10

1  to do more than just extend the opportunity to do

2  third-party discovery, if there is an application later

3  on, then I know I have got the authority to look at what

4  Tatung has -- look at what Tatung did and make some

5  informed judgment based on how other -- how the -- how

6  the Courts that have jurisdiction to deal with these

Page 8

Exh  A- Rough Transcript of Hearing.txt

7     applications view Tatung's efforts.

8               So, I mean, it seems to me that the

9     second application, if you will, comes -- first of all, I

10    don't believe I have the authority to say, "Stand down,"

11    and if you are expecting that you want me to exercise

12    authority with respect to remedy, it comes jurisdiction

13    by jurisdiction or it comes at the end of this process.

14              Now, make no bones about it, I would --

15    a special master and a court certainly has the right, and

16    by virtue of the right, I expect the authority, to say, I

17    encourage everyone to make good faith efforts to complete

18    discovery and to permit discovery that is appropriate to

19    be completed.  Make no bones about that.

20              MR. MERIDETH:  May I now address the

21    Court?

22              SPECIAL MASTER POPPITI:  Well, I have

23    one more question.

24              MR. MERIDETH:  Yes, sir.


                                              11


1               SPECIAL MASTER POPPITI:  Is there any

2     authority, from this district or from the circuit, which

3     stands for the proposition that, in a circumstance

4     similar to what you have described in your papers, that I

5     have the authority to say, "Stand down."

6               MR. CONNOR:  Your Honor, I am afraid

7     that I may have gotten us a little bit off track.  We are

8     not asking -- I need to clarify.  What we are trying to

9     get is confirmation or a determination from Your Honor

10    that gets Tatung to stop its communications, really, with

                        Page 9

Exh A- Rough Transcript of Hearing.txt

11  these -- with the third parties because what we are

12  talking about is, well, they filed these motions, but in

13  advance of these motions, communicated with the third

14  parties to say that the third parties need not tender

15  their production because Tatung was going to be filing a

16  motion.

17          SPECIAL MASTER POPPITI:  Let me make

18  some observation business that.  No. 1, I understand what

19  you represented they have said to individuals that, in

20  turn, contacted you to tell you what they have said.  And

21  I understand that trail.  I don't have -- I am not

22  convinced it would matter anyway -- but I don't have any

23  declaration that permits me to view those precise words

24  coming from the individual that you said used those

                                                    12

1   words.  That's the first observation.

2           The second is if, in fact, what they

3   said was, We have had communication from Tatung, Tatung

4   said that they intended to file a motion for a protective

5   order or motion to quash or however all of these

6   applications are framed in the respective district where

7   is they have been filed, and would they please not do

8   anything until that application is heard, my question is:

9   Aside from the impact that it has on discovery and aside

10  from any ultimate argument you may want to make with

11  respect to Tatung's design from your perspective to

12  frustrate discovery, what can I do, at this juncture, to

13  say to them, You are not permitted to have conversations

14  with third parties?  Where is the authority for that?

15          MR. CONNOR:  Your Honor, I understand

                    Page 10

Exh A- Rough Transcript of Hearing.txt

16   what you are telling us.

17              SPECIAL MASTER POPPITI:  The record that

18   I have, and please help me if this is not the record, it

19   is not a record where a party is saying to each of its

20   third-party customers, Do not, under any circumstances,

21   comply with the subpoena, ignore it, under pain of we are

22   not going to do business with you anymore, for example.

23              I think were you to be bringing an issue

24   like that before me or before the Court, I think the

                                                        13

1    Court has the right to say, Well, you know, wait a

2    minute, discovery is supposed to proceed unimpeded in all

3    good faith in compliance the rules, but I can't, on this

4    record, make a judgment that Tatung is proceeding in, if

5    you will, in bad faith and in an effort to frustrate the

6    discovery process.

7              Is it frustrating?  I am sure it is.

8              MR. CHRISTENSON:  Just as one point with

9    respect to developing the record, and I understand what

10   you just said, we had requested, from Tatung, copies of

11   their communications with the third parties, which we

12   think would be appropriate for us to see as part of

13   developing this record in case of a need for a later

14   determination by you along these lines, and, so, we would

15   like to see that correspondence.

16              SPECIAL MASTER POPPITI:  Well, I am --

17   Mr. Merideth, why don't you speak to that, please, and

18   then we will -- if you would just speak to that so I can

19   bring you back to your speaking about the whole subject

```
                    Exh  A- Rough Transcript of Hearing.txt
20    area, please.

21                    MR. MERIDETH:  We would be happy to

22    provide that correspondences and I assume they will

23    provide with us their correspondence with their third

24    parties as well.  Charlene -- from Tatung.
```

                                                                14


```
1                     SPECIAL MASTER POPPITI:  Just one

2     moment, Ms. Owe, if you don't mind.  Mr. Christenson, did

3     you understand Mr. Merideth's agreement?  And I gather

4     his agreement was conditional.

5                     MR. CHRISTENSON:  Yes, Your Honor,

6     that's fine.

7                     SPECIAL MASTER POPPITI:  So you agree

8     that you will provide your communication with third

9     parties as well?

10                    MR. CHRISTENSON:  Yes, Your Honor.

11                    MR. MERIDETH:  And if I could now

12    address the Court, and I am sure this is what miss owe is

13    also itching to say --

14                    SPECIAL MASTER POPPITI:  Do you want to

15    make sure you are --

16                    MR. MERIDETH:  These statements and

17    accusations that are being made are completely and

18    totally ground less.  Many of these customers that they

19    are referring to have filed objections to the subpoena,

20    and, indeed, in some cases, have filed their own motions

21    to quash.  They have not been encouraged by us to do so.

22    We have filed for very limited relief.  That limited

23    relief relates to data respecting unaccused products.  We

24    have never said or suggested, in the motions or
```
                              Page 12

Exh A- Rough Transcript of Hearing.txt

⬜

15

```
1    otherwise, that there not be full comply answer with the
2    subpoena.  We have signed a protective order of very
3    limited scope, which is that -- the same argument that we
4    have made consistently in this case, information that we
5    consider to be an important trade secret not be
6    communicated to our competitor as relates to unaccused
7    product.  That is all we have asked for.  That's what the
8    Courts in New Jersey and Minnesota have granted.
9                    I don't think that the Court in San
10   Francisco quite grasped that and suggested that we should
11   have gone to the Court in Delaware first, we disagree
12   with that, but that's the issue there.
13                   What we are concerned about here is that
14   ground less statements are being made.  If there are
15   customers who think they have been told not to comply
16   with the subpoenas, they are mistaken, I don't think
17   there are any such customers, and I challenge LG Phillips
18   to produce declarations from those customers suggesting
19   that we have done anything other than inform them that we
20   are filing a motion for a protective order seeking very
21   limited relief.
22                   We are not attempting to interfere with
23   the process.  And let me go back, and, having said that,
24   miss owe has submitted a letter to you, which you just --
```

⬜

16

```
1    which is the document that you just received from Ms.
```

Page 13

Exh A- Rough Transcript of Hearing.txt

2          MS. GAZA:  When we started this
3  discussion, so I am sure you have not had a chance to
4  review it -- but it does say --
5          SPECIAL MASTER POPPITI:  It is sitting
6  here, but you are right, I have had not had chance to
7  review it.
8          MR. MERIDETH:  Before any judgment is
9  made on anything, that letter needs to be read.  But in
10 any event, let me say this:  We approached the LG
11 Phillips attorneys when we received the third-party
12 subpoenas to attempt to meet and confer and limit the
13 scope to accused products.  We were rebuffed.
14         We sought to suggest that we present the
15 matter to the special master, and we were rebuffed.  They
16 told us that you had no jurisdiction, that whatever
17 ruling that you might have made would be unenforceable
18 against third parties, and that we could pound sand.
19         MR. CHRISTENSON:  Your Honor.
20         MR. MERIDETH:  Excuse me, let me finish.
21         SPECIAL MASTER POPPITI:  Let
22 Mr. Merideth finish, please.
23         MR. MERIDETH:  We were left with
24 absolutely no alternative to file these motions in these


                                              17


1  different jurisdictions to prevent an end run around the
2  motion that we had presented to Your Honor which is to
3  sustain our objections and to grant us a protective order
4  with regard to the production of confidential information
5  concerning unaccused products.  And there is -- there is
6  absolutely nothing improper about what we have done.
                        Page 14

Exh A- Rough Transcript of Hearing.txt

7    It's exceedingly important to our client, as we have said
8    on numerous occasions, that information about unaccused
9    products not be shared with our competitor.  There is
10   absolutely no reason to do that.  That very issue is
11   under consideration by Your Honor.  We would have been
12   happy and we asked that the issue be presented to you in
13   some normal that would have precluded having to do this.
14              We don't enjoy going to 13 different
15   jurisdictions and filing these motions.
16              Second, we have asked for emergency
17   consideration of these motions because we want to get the
18   decisions made right away.  So, if a decision is that the
19   information should be produced, then it can be produced
20   by these third-party witnesses.  And we have -- that
21   effort to try to expedite a determination of the issue
22   has been resisted by LG Phillips.
23              So, to suggest somehow or another that
24   we are trying to impede the process is just flat out

                                                    18

1    wrong.  And it's -- well, that's the end of it.  I won't
2    --
3              SPECIAL MASTER POPPITI:  Let me do this
4    before Mr. Christenson says anything:  I hope, if nothing
5    else, over the time that we have -- that I have had an
6    opportunity to be working with all of you, I hope one of
7    the things that you have learned is, when I say I have
8    not made a judgment one way or the other, when I do not
9    have any inclination one way or the other, that you can
10   take me at my word.
                    Page 15

Exh A- Rough Transcript of Hearing.txt
11                 So, the dialogue that I was having
12  earlier about the papers that have been put before me and
13  what, if any, authority I have, notwithstanding the
14  language that I used for purposes of having that
15  dialogue, because I think the language is the language of
16  the art to use, the language of the law to use, I make no
17  judgment and I have no inclination.
18                 Let me say this as well, and perhaps I
19  should have done this earlier than now:  To the extent
20  that it is appropriate for a special master and for
21  somebody sitting in my chair to give an inclination as to
22  what a finding and recommendation is going to be, and
23  particularly to give an inclination as to a finding and
24  recommendation that has not only implications in this

                                                          19

1   case but perhaps implications in other cases, even though
2   I know what I do is merely a finding and recommendation,
3   it's not adopted by the Court, it is -- the words are --
4   they are on the paper, hopefully, they have some worth,
5   but it's the court's word that is count.
6                  But to the extent that it's important to
7   give an inclination on the issue of accused/unaccused, I
8   think the best way to describe that is you know that I
9   have not filed a finding and recommendation on that
10  issue, and you also know that discovery is proceeding --
11  I am no going to characterize how it's proceeding -- on
12  accused product.  You all know that.
13                 You can expect, and I said it to you
14  last week, but, quite frankly, I wasn't able to turn to
15  it and get to it this week, you will get a finding and

Exh A- Rough Transcript of Hearing.txt

16  recommendation.  It's important that it be as careful --

17  they all should be careful -- but in more depth in terms

18  of its analysis of dealing with the issue of

19  accused/unaccused.  But by virtue of what has been going

20  on, I am telling you that the discovery is going to be,

21  absent something earth shattering that I consider in the

22  next number of days, it's going to be limited to accused

23  products.

24              Now, perhaps I should have done that

20

1  earlier, and I will even go so far as to suggest, by

2  perhaps doing it earlier in terms of giving you an

3  indication or an inclination on the record, you would

4  have been able to, perhaps, discussed the issue in a meet

5  and confer more meaningfully, and you would have had the

6  opportunity and you now may have that opportunity to

7  share a special Master's inclination with other

8  jurisdictions that you will be working in.

9              Now, having said that, Mr. Christenson.

10             MR. CHRISTENSON:  Yes, Your Honor.

11  Thank you.  I don't know if there is anything else that

12  you would like me to address concerning the third-party

13  issue.  I think -- I think we all understand your view on

14  that and it sounds like that's an issue to be addressed

15  at another time, if I understood you correctly.

16             SPECIAL MASTER POPPITI:  That's correct.

17  I only want to be looking at the extension of time.  And,

18  again, it seems to me that there should be -- discovery

19  itself occurring in a face for whatever reason.  There

Page 17

20  will be hearings in other jurisdictions as they relate to

21  certain third parties.

22              If it's important to discuss the number

23  of days for the extension, then let's do it now because I

24  intend to grant an extension.  If it's better to wait

21

1  until the universe of dispute has narrowed or completely

2  evaporated, then we should wait.

3              MS. KLEVENS:  May I address that?

4              SPECIAL MASTER POPPITI:  Yes, please.

5              MS. KLEVENS:  Our view is that it is

6  important to discuss this at least on an interim basis

7  now, and the reason for that is that we currently have

8  depositions of these third parties scheduled throughout

9  the next several weeks and we have had to adjourn some of

10  the depositions temporarily over the last week and a half

11  because of the third-parties' positions with respect to

12  these motions.

13              And, so, as a result, we have, right

14  now, quite a few depositions and third parties who are

15  requesting to have those depositions scheduled prior to

16  March 30th.  And until the discovery deadline is

17  extended, I have no authority to extend these deposition

18  dates past March 30th.

19              THE ARBITRATOR:  I understand.

20              MS. KLEVENS:  The hearing dates, as

21  well, will be affected by that date because the judges in

22  the other jurisdiction, I believe, are setting these

23  expedited hearing dates based, in part, on the dates for

24  the deposition.

Page 18

Exh A- Rough Transcript of Hearing.txt

22

```
 1          SPECIAL MASTER POPPITI:  Well, and that
 2  was one of the expectations that -- I mean, I certainly
 3  understood that by virtue of the papers that you have
 4  filed, and I certainly don't want to -- well, let me say
 5  it carefully:  If you have got the March 30th date that
 6  you are presently working with and it's important to have
 7  these hearings sooner than later and the other
 8  jurisdictions are looking at the March 30 target and they
 9  are, therefore, giving you expedited hearings, isn't it
10  important to have those hearings completed so that after
11  the hearings are over, we then can look at realistic
12  dates?
13          I mean, my concern is that it's -- it's
14  one that you kind of put a magnifying glass over by
15  virtue of your comment.
16          If I extend the date and have a date
17  certain, it may very well be that the other jurisdictions
18  will feel more relaxed in their approach to scheduling.
19  With the March 30 date, they may honor the request that
20  has been made to expedite, you will have decisions with
21  respect to most, if not all of these, and you will be in
22  a better position to work without the specter of having
23  three, four, five, six, eight, nine out there that still
24  haven't been decided.  That's the only concern I have
```

23

```
 1  about setting a date now.
```

Exh  A- Rough Transcript of Hearing.txt

2          MS. KLEVENS:  I understand, Your Honor.
3  And we essential search share that concern that while we
4  did object to that expedited schedules, the reason we did
5  so was merely for scheduling purposes with some of our
6  attorneys out in depositions out in other locations,
7  there are only so many of us that can handle these
8  hearings and unfortunately we were getting notice from
9  the Courts that we were having up to four hearings a day
10  in these other jurisdictions.  It's not that we weren't
11  interested in an expedited schedule.  Having said, that,
12  you know, I do still have a strong concern that, from
13  today, there is only two weeks remaining during which I
14  have scheduled depositions, roughly two a day, between
15  now and then, and no ability to reschedule past that
16  date.  I know I have said that and I apologize for
17  repeating myself.
18          SPECIAL MASTER POPPITI:  I understand.
19          MS. KLEVENS:  I just have a strong
20  concern that if the defendants will somehow, you know,
21  agree not to object to our scheduling of depositions past
22  March 30th, that would give us a little bit of leeway, at
23  least temporarily, until such time as we have ruling from
24  the other jurisdictions and can discuss a more permanent

24

1  extension of the discovery deadline.
2          SPECIAL MASTER POPPITI:  Mr. Merideth.
3          MR. CHRISTENSON:
4          MR. MERIDETH:  I have no problem
5  discussing, on a case-by-case basis, new dates.  I agree
6  with Your Honor's view that if we extend the dates, the

Exh A- Rough Transcript of Hearing.txt

7   Courts are more likely to take a relaxed position.

8   Furthermore, as Ms. Klevens has conceded, LPL, I believe

9   in every case, has requested additional time with respect

10  to these hearings, and, of course, that's going to delay

11  it even further.

12              I understand exactly what the problem

13  is.  Once there is a ruling, we still have to take the

14  deposition.  On the other hand, I believe that, from what

15  I have been told, there are third-party witnesses who are

16  prepared to go ahead with documents document production

17  and with depositions on accused products.  So, we could

18  do that.  There is no reason why we could not do that at

19  this time.

20              MS. KLEVENS:  If I may just make one

21  point, Your Honor, the only limitation there is just with

22  respect to there being, again, you know, only so many

23  people in our offices.  We are trying to simultaneously

24  field multiple hearings and multiple discussions with

25

1   these courts every day and respond to the motions that

2   were filed, and, at the same time, prepare for and take

3   depositions.  So even if there are parties that are

4   prepared to go forward today, frankly, in whole effort by

5   the defendants have derailed our ability to prepare for

6   those depositions.  And we also need some time to prepare

7   for the depositions of these parties once they produce

8   their documents.  The original subpoenas allowed for the

9   third parties to produce their documents and their

10  depositions were scheduled no less than one week after we

Page 21

Exh A- Rough Transcript of Hearing.txt

11    have received the documents.

12              MR. MERIDETH:  May comment, Your Honor?

13              SPECIAL MASTER POPPITI:  Absolutely.

14              MR. MERIDETH:  I must say that the

15    problem Miss Klevens is describing is one that was self

16    inflicted.  They waited until the end of February to

17    notice 23 depositions, and that taxes the resources of

18    all of the firms that are involved.

19              SPECIAL MASTER POPPITI:  It does.

20              MR. MERIDETH:  That delay is not a

21    reason to continue the Court established deadline.

22              I agree that if the Courts are putting

23    off these depositions until there is a decision, that's a

24    different thing, but the -- we are all under the same


                                                      26


1     burden when someone serves 23 deposition notices with

2     only 30 days left to go in the case, it's going to be a

3     real difficult logistical problem.

4               SPECIAL MASTER POPPITI:  I am willing to

5     make -- to literally sit down with the calendar and start

6     going through your scheduled depositions of third

7     parties.  I don't think that that's going to be very

8     productive for anyone.  I think it makes a great deal of

9     sense for me to expect that between now and somebody pick

10    a date in the new week, that you all have the opportunity

11    to sit down, discuss the parameters of what you would

12    expect to be a reasonable extension, make some

13    determination as to what depositions need to be

14    forestalled, and if any can go forward, make that

15    judgment as well, because I certainly can't do that for

Exh  A- Rough Transcript of Hearing.txt

16    you on this record.

17            You are going to, notwithstanding the --

18    and Mr. Merideth, I note in your papers and I note your

19    argument that these depositions were scheduled when they

20    were, but my view of expecting that you are going to be

21    getting an extension has more to do with where we are as

22    a result of the third-party practice in terms of these

23    other applications in the other districts than it is a

24    function of when the depositions were noticed.

                                                    27

1            MR. MERIDETH:  I would be happy to

2    discuss those dates with counsel for LG Phillips.

3            SPECIAL MASTER POPPITI:  Is it important

4    to discuss outside limits on this -- in this conversation

5    or can you all do that as well?

6            MR. MERIDETH:  I think we can all do it.

7    I think, you know, theres are a number of third-party

8    witnesses that we also have subpoenaed and there are also

9    some issues with regard to objections that have been made

10    to some of those subpoenas.  I think it would be

11    worthwhile for us to sit down and talk about a schedule

12    for all of the third-party discovery, and, hopefully, we

13    can get it completed during the month of April.  I just

14    don't want to have an open-ended extension with respect

15    to everything, and I think if we sat down and tried to

16    work with the third parties and work between ourselves,

17    that we can come up with a reasonable schedule.

18            SPECIAL MASTER POPPITI:  Well, and you

19    and everybody on this phone call understands where we

Exh A- Rough Transcript of Hearing.txt
20   have been with the history of this and understands where

21   we have been with my two visits to Judge Farnan's chamber

22   to tweak the scheduling order, and each of those times

23   resulted in the Court issuing a scheduling order that did

24   not extend the time for third-party discovery.

                                                                28

1             We are in a different environment right

2    now.  It seems to me it needs to be extended.  It makes a

3    great deal of sense to do it globally.  And it will not

4    affect any of the other -- any of the other dates, so you

5    are still working within the time frames, the critical

6    time frames of hearings that have already been

7    established, hearings and ultimate trial.

8             And can you all wrap this up by the

9    teleconference that's presently scheduled for 6:30 on

10   Monday?

11            MR. CONNOR:  Yes.  We will do our best

12   to do that.

13            MR. MERIDETH:  Yes, Your Honor.

14            SPECIAL MASTER POPPITI:  So, no

15   discussion about an outside limit?  Wouldn't that help

16   frame the discussion or no?

17            MR. MERIDETH:  I think that there are

18   other things that we need to take into account, and,

19   specifically, the schedule with respect to some of the

20   third-party witnesses, who are the ones who, frankly, are

21   also bearing a considerable burden with respect to having

22   to produce all of this data on a very short time period,

23   and it would probably be wise for us to touch base with

24   them and see what their schedules are and make sure that
                         Page 24

Exh A- Rough Transcript of Hearing.txt

⬚

29

1    we have the proper places and the proper times and the
2    proper people.
3                    SPECIAL MASTER POPPITI:  Can you do all
4    that by Monday or do you need --
5                    MR. MERIDETH:  Probably Monday may be
6    too ambitious.  Maybe by Tuesday or Wednesday, I would
7    think we, would and I am not sure it's going to make any
8    difference whether it's Monday or Wednesday, frankly.
9                    SPECIAL MASTER POPPITI:  Anyone want to
10   speak from the other side.
11                   MR. CONNOR:  I guess I am just not
12   hearing a response as to a global extension for
13   deposition time.
14                   SPECIAL MASTER POPPITI:  I think I heard
15   Mr. Merideth say, rather than discuss it now, it really
16   is more important to have your discussion off-line,
17   permit each of you to discuss issues with respect to
18   third parties so that when we -- when we reconvene on
19   this issue to discuss whether you arrived at an agreement
20   on the closure of third party discovery or whether you
21   submit to me your ultimate dispute on a date, you will be
22   much better informed, and, therefore, I will be better
23   informed.  I think that's what I heard him say.
24                   MR. MERIDETH:  Yes, sir.  By way of

⬚

30

1    example, I know that tie company has filed objections and
                              Page 25

Exh A- Rough Transcript of Hearing.txt
2  -- of its own and has issues with regard to the timing.

3  If we were to call tie company and try to work out those

4  objections and try to set a time that's convenient with

5  tie company, then we'd know where tie company is and we

6  can go forward.  I think we can do that -- I mean, there

7  are a number of these, but we could and should do this

8  with everyone.  I think to the extent that there are

9  agreed deadlines as opposed to imposed deadlines, it's

10  always easier to get compliance.

11           SPECIAL MASTER POPPITI:  I agree.  I'd

12  like to proceed in that fashion.  Just tell me, if it's

13  not going to be doable by Monday, do you all want to

14  schedule another time Tuesday or Wednesday?

15           MR. MERIDETH:  I would suggest

16  Wednesday, Your Honor.

17           MS. KLEVENS:  Obviously, Your Honor, we

18  would rather do it sooner rather than later.  We would do

19  it Monday.  Tuesday is even better.

20           SPECIAL MASTER POPPITI:  I don't want to

21  be in a position of having to hear, We weren't able to

22  accomplish all we intended to because we are busy doing

23  other things.  I don't think we are going to lose much

24  time by virtue of doing it on Wednesday.  So we will do

31

1  it Wednesdays, I don't have your deposition schedule

2  right in hand -- will we have to do it at five?  We can

3  if we need to, or if we have to do it later.

4           MR. MERIDETH:  I am going to be in

5  Washington D.C. for Mr. Kim's deposition so, 5:00 would

6  be fine where me.

Exh  A- Rough Transcript of Hearing.txt

7              SPECIAL MASTER POPPITI:  Do you expect
8    to conclude with him at five?  We can start at five.  We
9    can start at 5:15.
10             MR. MERIDETH:  5:15 would be even
11   better.
12             SPECIAL MASTER POPPITI:  Does that work
13   for everyone?
14             MS. KLEVENS:  Is that Wednesday, Your
15   Honor?
16             SPECIAL MASTER POPPITI:  It is.
17             MS. KLEVENS:  That's fine.
18             SPECIAL MASTER POPPITI:  May I ask madam
19   court reporter, does that work for you:
20             MR. HEISMAN:  This is gym Heisman on
21   behalf of ViewSonic.  I was wondering if you could
22   provide some clarification when you are talking about a
23   global extension of third-party discovery, it's my
24   understanding that that would be limited to discovery

                                                    32

1    that's already been propounded and on the table at this
2    point and would not spawn additional third-party
3    discovery requests.
4              SPECIAL MASTER POPPITI:  No new
5    mushrooms.
6              MR. HEISMAN:  Thank you, Your Honor R
7    thank you, Your Honor.
8              SPECIAL MASTER POPPITI:  Next, please.
9              MR. CHRISTENSON:  We had a letter that
10   we had submitted to you with respect to some outstanding

```
                Exh  A- Rough Transcript of Hearing.txt
11   issues --
12               MR. KIRK:  Your Honor, excuse me, may I
13   suggest that, at some point, representatives of the third
14   parties be excused because this is now turning to
15   information that may be confidential?
16               MR. JOHNSON:  Thank you, Dick.  I was
17   trying to figure out how to do that myself.  I will hang
18   up if that's okay.
19               SPECIAL MASTER POPPITI:  Thank you, sir.
20   Thank you for joining us.  Okay.  Okay.
21               MR. CHRISTENSON:  Thank you, Your Honor.
22   We submitted a letter on March 14 concerning issues that
23   we had raised with you during the March 9 hearing related
24   to Tatung's document productions, and the reason we are
```

⬜

                                                                    33

```
1    raising it is, as we have stated, is because we need to
2    make sure that now is the time for us to get all of the
3    relevant and necessary discovery that we need to use when
4    we depose Tatung Company's Rule 30(b)6 witness starting
5    on Tuesdays, Mr. Shea.  And there are some issues that I
6    think remain in dispute and it would be helpful if we
7    could raise those wishes you today briefly to see if we
8    could resolve them before the deposition.
9                We have summarized in our March 14
10   letter the types of documents that we understand have to
11   exist but not to have been produced.  Tatung has
12   responded to that with a March 15 letter, and we
13   supplemented, very briefly to you today, you may not have
14   seen it yet, but we supplemented very briefly waved on a
15   deposition this week where there was some additional
```

Exh A- Rough Transcript of Hearing.txt

16   documents that were identified that we felt should have

17   been produced.

18          SPECIAL MASTER POPPITI:  Yes.  I have

19   the 14th, I have the response of the 15th, and Mr. Kirk's

20   letter came in at 2:38, so I can tell you that I haven't

21   had an opportunity to read other than the letter.

22          MR. CHRISTENSON:  I understand, Your

23   Honor.

24          The March 15 letter suggested that it

34

1   would make sense for a further meet and confers to occur,

2   and I respectfully disagree with that because this is

3   discovery that we have been trying to get for many, many

4   months.  We have had many meet and confers that resulted

5   ultimately in motions in December and hearings and

6   agreements during the course of the hearings before you

7   in January and the idea was we should have had all

8   appropriate discovery by the end of January.  You

9   required a certification from Tatung, as of March 9, that

10   discovery had been completed.

11          So, I don't I think it makes any sense

12   for us to try to meet and confer any further.  The

13   question is:  Is there any additional discovery that

14   should be produced?  And with respect to the issue of

15   accused products, and I understand your indication as you

16   provided, and I do think that it was useful for you to

17   provide that and I appreciate that, I think that there

18   are, however, two types of documents, two types of

19   discovery that relate to accused product, and those two

Exh_A- Rough Transcript of Hearing.txt
20  types are, first, documents that refer expressly or

21  solely to accused products, which, of course, I think we

22  all agree are relevant, and then there are also

23  documents, Your Honor, that relate to accused products

24  more generally but may not be limited to accused products

35

1   specifically or may not refer specifically to accused

2   products but are just as relevant because they equally

3   relate to accused products.  And I will talk about that a

4   little bit more in a moment.

5           But both of those categories are

6   documents that Tatung has agreed to produce, that are

7   more general and not limited to accused products, Tatung

8   has agreed to produce, to the extent they relate, to the

9   U.S. market, and that makes sense because, for

10  inducement, Tatung's conduct in attempt to go sell

11  products to its customers in the U.S. market is directly

12  relevant and tends to prove inducement.

13          So, just to run through, briefly, the

14  issues as summarized in our March 14 letter, Your Honor,

15  the first issue relates to sales reports, and during the

16  prior hearing on March 2nd, you had ordered that Tatung

17  defendants should produce all sales related reports

18  concerning accused products which had been agreed to by

19  Mr. Merideth previously, and we are not aware of those

20  reports having been produced, and as I understand the

21  March 15 letter from Tatung, they don't represent that

22  they have, in fact, produced those reports.

23          So the first question, I think, is:  Why

24  haven't we received those reports and when can we get

Page 30

Exh A- Rough Transcript of Hearing.txt

36

1   those reports?  And, as an example, we cite global
2   monthly sales reports that Tatung Company has on a
3   regular basis that relate to its U.S. customers, and,
4   again, they have agreed to provide discovery generally
5   related to the U.S. market.
6                   So, those are reports that we feel
7   should have already been produced.
8                   I don't know if you want me to go
9   through all of the issues or if you prefer to have me
10  stop and then address these issues separately after a
11  response from Mr. Merideth?
12                  SPECIAL MASTER POPPITI:  Let's do one at
13  a time, please.
14                  MR. MERIDETH:  With respect to the
15  global sales reports, Your Honor.
16                  SPECIAL MASTER POPPITI:  Yes, please.
17                  MR. MERIDETH:  Those are by type of
18  product, i.e., television, monitor, worldwide, i.e.,
19  global reports, and they give numbers.  They do not refer
20  to any product by number.  They do not refer to any of
21  the accused products, and they are a global report.
22                  We have provided quarterly -- now
23  provided quarterly summaries.  We have provided summaries
24  that identified sales on a day-to-day basis.

37

1                   There are customers who buy from us

Page 31

Exh A- Rough Transcript of Hearing.txt

2    globally, and those customers' information, unrelated to

3    the U.S. market, are not, to use the vernacular, any of

4    LG Phillips' business, and we are not going to give them,

5    or we shouldn't be required to give them our global sales

6    reports that don't even identify a product but would

7    identify for them, for their competitive purposes, the

8    worldwide volume that we may be doing with a particular

9    customer or with a particular type of product, i.e.,

10   television or monitor.

11          It has no specificity to any accused

12   product or to the U.S. market in general.

13          SPECIAL MASTER POPPITI:

14   Mr. Christenson.

15          MR. CHRISTENSON:  Yes, Your Honor.

16   A.    What Mr. Merideth failed to mention there was

17   that the sales summaries that they have provided to us

18   have no customer information; hour however, the global

19   monthly sales reports do have customer information and

20   many of those customers are major U.S. customers of

21   Tatung according to the testimony.  For example, gate

22   way, as another example, Tatung sells substantial

23   quantities to HP, those products are specifically

24   intended for the U.S. market.

38

1          The sales reports may not specify a

2    model number, but they do, according to the witness,

3    specify sizes of products and types of products by

4    customer, including for U.S. customers.  So, clearly, I

5    think we are entitled to show that they are -- what types

6    of products they are selling to the U.S. customers as

Exh  A- Rough Transcript of Hearing.txt

7    part of our inducement case.

8                        MR. MERIDETH:  If I could respond?

9                        SPECIAL MASTER POPPITI:  Yes, please.

10                       MR. MERIDETH:  Gateway is a perfect

11   example.  Gateway does not purchase, in the United

12   States, any products that have been accused.  They want

13   to have our sales data with respect to gateway.  They

14   sell no accused products in the United States.  They sell

15   no accused products worldwide, as far as I am aware, and,

16   yet, they want our detailed global report with respect to

17   gateway.  They are not entitled to it.  It has absolutely

18   no bearing in this case whatsoever other than to give

19   them competitive information that they are not entitled

20   to.

21                       SPECIAL MASTER POPPITI:  I will use

22   gateway as an example.  I see no foundation to expect

23   that gateway information should be provided.  It's, I

24   gather, worldwide information?

                                                          39

1                        MR. MERIDETH:  Yes, sir.

2                        SPECIAL MASTER POPPITI:  It's not U.S.

3    information.

4                        MR. MERIDETH:  It would include U.S.

5    information.

6                        SPECIAL MASTER POPPITI:  And does not

7    have --

8                        MR. MERIDETH:  It doesn't break it out

9    by Europe shall after can a, whatever.

10                       SPECIAL MASTER POPPITI:  I am -- if the

Exh A- Rough Transcript of Hearing.txt

```
11    gateway example is representative of the rest of the

12    universe that's being requested here, then the

13    application is denied.  If it's important for me, because

14    I haven't had the opportunity to have you point at

15    Mr. Ho's deposition, which you do in the March 16

16    correspondence, and there is a different template than

17    gateway, I am certainly happy to look at that.

18              MR. MERIDETH:  May I add one other

19    additional thing?

20              SPECIAL MASTER POPPITI:  Sure.  Those

21    remarks were for Mr. Christenson, certainly.

22              MR. MERIDETH:  Yes.  The other thing is

23    Mr. Christenson says that our quarterly summaries do not

24    include customer data, and he is absolutely right.  And
```

40

```
1     the reason they don't include customer data is because

2     they didn't ask for customer data.  And I think it's

3     quite unfair, at this stage of the game, for them to say,

4     Oh, we wished we would have asked for customer

5     information.  We have provided, however, for the accused

6     products' customer-related data, so the only thing that

7     we have not provided customer-related data for are

8     unaccused products.

9               So, while the quarterly reports are

10    generally -- generally address all product, with respect

11    to the accused product, we have only -- we have provided

12    them with all of the information including customer

13    information.

14              SPECIAL MASTER POPPITI:  Thank you.

15              MR. CHRISTENSON:  Your Honor, to respond
```

Exh  A- Rough Transcript of Hearing.txt

16    briefly, we have, indeed, asked specifically for customer

17    information.  I don't know what the basis is for

18    Mr. Merideth to say that.  I can point to you, I believe,

19    in a transcript, where this came up, and perhaps

20    Mr. Merideth is willing to then provide with us the

21    customer information if I can provide that citation; is

22    that agreeable?

23                    MR. MERIDETH:  I don't know what you are

24    referring to.  What kind of information do you want?

                                                                41

1                     SPECIAL MASTER POPPITI:  I didn't hear,

2     you were speaking over each other.

3                     MR. CHRISTENSON:  What I am saying; Your

4     Honor, if I could point Mr. Merideth to where we have

5     specifically requested his customer information, he would

6     be willing to produce it.

7                     MR. MERIDETH:  If you have requested it

8     in the discovery request -- I mean, if you just called me

9     up on the phone or said in a deposition, "I want it,"

10    that's not a discovery request.

11                    MR. CHRISTENSON:  We will follow-up with

12    that among counsel, Your Honor, too.

13                    SPECIAL MASTER POPPITI:  I understand

14    that there have been beyond -- it may be fair to say

15    this, and if it isn't, I know you will make a record --

16    that there have been agreements that you have made during

17    the course of our teleconferences that are transcribed.

18    If it's pursuant to an agreement of that nature, I would

19    expect, Mr. Merideth, you would agree that, if it was an

Exh A- Rough Transcript of Hearing.txt

20    agreement in the context, it was an accommodation dealing

21    with discovery requests, that you should be bound by that

22    agreement.

23                    MR. MERIDETH:  Yes, sir.  Absolutely.

24                    SPECIAL MASTER POPPITI:  Thank you.


                                                        42


1                     MR. CHRISTENSON:  And, Your Honor, just

2     to put a final point on that, do you happen to have

3     access to the January 22nd hearing transcript?

4                     SPECIAL MASTER POPPITI:  Just a second.

5     Give me one minute.  Thank you.  Okay.  I do.  Give me a

6     moment to get to it.  January 22.  Okay.

7                     MR. CHRISTENSON:  And this is with

8     respect to Mr. Merideth's comment that customer

9     information has never been requested, before it reminds

10    me, Your Honor, of the March 9 hearing we had to talk

11    about --

12                    SPECIAL MASTER POPPITI:  This is in

13    January 22?

14                    MR. CHRISTENSON:  Yes.  If you would

15    please take a look at page 13 of the transcript.

16                    SPECIAL MASTER POPPITI:  Line?

17                    MR. CHRISTENSON:  Starting at line

18    eight.

19                    SPECIAL MASTER POPPITI:  Why don't you

20    read it, please, for the record.

21                    MR. CHRISTENSON:  Yes, Your Honor.  I

22    will start with line 10, where it starts by stating, "The

23    one page sales summary that we have so far that I

24    discussed on Friday, which relates to the L17 AMTN, the

Exh  A- Rough Transcript of Hearing.txt

43

1    customer, there is a customer heading in that document,
2    but all the customer names are redacted.  That's an
3    accused product, Your Honor.  And it sounded to me like
4    Mr. Merideth was just saying that, very similarly, do not
5    plan to include the customer information in the summaries
6    to be produced shortly.  And I know that we have
7    discussed already that the protective order does not
8    contemplate redaction of customer information, so I am
9    hoping we could maybe get an agreement to include the
10   customer information.  Mr. Merideth:  We will include the
11   customer information with respect to accused products.
12   We will not provide customer information regarding
13   products that are not accused.  Your Honor states:  I
14   think that's perhaps the clarification you were looking,
15   you weren't looking for to be that narrow, but, in any
16   event, that is a clarification.  I state yes, thank you,
17   Your Honor.  I then state:  We also discussed on Friday,
18   Your Honor, that we are seeking documents concerning
19   indirect infringement and relationships between Tatung
20   Company and U.S. brands or customers as well as products
21   that enter the market and are sold through and to those
22   customers and brands in the U.S. and we, for example, I
23   won't re-plow the discussion, but, as an example, we had
24   requested correspondence between Tatung and ViewSonic or

44

1    correspondence between Tatung and others related to the
Page 37

Exh A- Rough Transcript of Hearing.txt

2  U.S. market.  Those were document request numbers 62 and
3  63, for example.
4                      And then I talk about, paraphrasing now,
5  Your Honor, I talk about our concern that they don't do
6  business just on an accused product basis so that there
7  are certainly relevant documents concerning production
8  that are marketed to U.S. customers and efforts by Tatung
9  to generally market to customer nurse the U.S. by both
10 accused products and other products, Tatung generally
11 markets all those products in certain ways and targets
12 the U.S. when it does so.
13                     And Mr. Merideth responds:  I thought we
14 covered this Friday.  My specific recollection was that,
15 to the extent that there was general correspondence or
16 sales and marketing in the United States generally, for
17 example, was discussed, without any particular model
18 number being referenced, that, you know, I accepted you
19 were entitled to discovery of that.
20                     And he is goes on to say this is
21 something that relates only to non-accused products, then
22 he thinks that should be provided.
23                     SPECIAL MASTER POPPITI:  Right.
24                     MR. CHRISTENSON:  And you then say

                                                      45


1  that's what I understood to be the question.
2                      So, No. 1, I submit, Your Honor, that we
3  not only have requested customer information, it was
4  supposed to have been provided, and No. 2, there is also
5  clearly an agreement and understanding that we are
6  entitled to discovery generally showing efforts to market
                          Page 38

Exh A- Rough Transcript of Hearing.txt

7    display products to the U.S.

8                    So, I think that's, us know, for

9    Mr. Merideth to say to you that it's just too bad we

10   never asked for that information is just not correct.

11                   MR. MERIDETH:  I think you had

12   misconstrued what I was saying.  I said, with respect to

13   our quarterly summaries, you did not ask us to include

14   customer information.  We have provided you with customer

15   information respecting accused products.  We have

16   provided you with marketing information generally in the

17   United States.  We have provided you that information.

18                   We did not include it, however, on the

19   quarterly summaries because you didn't ask for it on the

20   quarterly summaries.  That's the only statement that I

21   made.

22                   MR. CHRISTENSON:  And that's another

23   cite, I don't have that side sight in front of me, but we

24   can talk about that further and we can raise it again if

                                                        46

1    necessary.

2                    MR. MERIDETH:  If we agreed to provide

3    it on the quarterly summaries, we will provide it on the

4    quarterly summaries.  If you can point that out to me, we

5    don't need to go into a big argument here.  I don't

6    believe that's the case.

7                    MR. CHRISTENSON:  The point is:  We

8    requested it specifically and you did not agree to

9    provide it.  We did ask it.

10                   MR. MERIDETH:  Yes, I agree.  I did not

                        Page 39

Exh A- Rough Transcript of Hearing.txt

11    agree to provide it and we didn't provide it because it

12    was never requested in a discovery request, and,

13    therefore, we didn't provide it.  That's the only point

14    that I made.

15                    I have been completely consistent and we

16    have been completely consistent with respect to our

17    production of documents and we have produced what we said

18    we would produce.

19                    SPECIAL MASTER POPPITI:  If I understand

20    the record that I have, there really is nothing for me to

21    deal with other than if Mr. Christenson can point to a --

22    any transcript that said that you would -- that you agree

23    to provide, in the quarterly summaries, customer

24    information than you will be required to do so and you

                                                        47

1     just indicated that you would do so.

2                     Absent that, if it was not requested, I

3     have -- I certainly am not going to order it.

4                     MR. CHRISTENSON:  I understand what you

5     just said, Your Honor.  I can tell you my recollection is

6     I did request it, there was no agreement to provide it,

7     and, so, it's a dispute.  If I understand what you just

8     said, you have -- you are not going to require them to

9     produce the --

10                    SPECIAL MASTER POPPITI:  Not unless

11    there is an underlying request specifically dealing with

12    the quarterly summaries.

13                    MR. CHRISTENSON:  Okay.  I do think

14    there is a request that would call to that, Your Honor,

15    but I don't have that in front of me right now.

Exh A- Rough Transcript of Hearing.txt

16          SPECIAL MASTER POPPITI:  Let's deal with
17   it at another point.
18          MR. CHRISTENSON:  Going back to the
19   March 14 letter if I may, Your Honor.
20          SPECIAL MASTER POPPITI:  Yes.
21          MR. CHRISTENSON:  The second point
22   relates to -- well, I guess before we move off the first
23   topic, the question; and this is really a question, I
24   guess, for counsel, but there is no question that you had

                                                      48

1    ordered that regularly created sales related reports
2    concerning accused products needed to be produced, and
3    there is nothing in the letter that says one way or the
4    other whether those products exist or whether they have
5    been produced.  So I think we need that clarification,
6    Your Honor.
7           SPECIAL MASTER POPPITI:  Mr. Merideth.
8           MR. MERIDETH:  To the extent there are
9    regularly generated reports respecting accused products,
10   we have produced them.
11          MR. CHRISTENSON:  Your Honor, I don't
12   know what that means.  Either they exist or they don't.
13   I don't know.
14          SPECIAL MASTER POPPITI:  He said they
15   produced them.  To the extent they exists, they produced
16   them.
17          MR. CHRISTENSON:  I haven't seen they
18   will so, does that mean they don't exist.
19          SPECIAL MASTER POPPITI:  Mr. Merideth.

20          MR. MERIDETH:  No.  It means that you

21 haven't gone through the stuff that we produced

22 thoroughly.

23          SPECIAL MASTER POPPITI:  So, if I

24 understood what you just said, Mr. Merideth, you respect

                                                    49

1 that there is production that falls in that category;

2 correct, sir?

3          MR. MERIDETH:  Yes.  I don't think it's

4 incumbent upon me to go through and --

5          SPECIAL MASTER POPPITI:  No, it isn't.

6 You have answered the question.

7          MR. CHRISTENSON:  Thank you.

8          Your Honor, the second point, which is

9 on page 2 of our March 14 letter, relates to profit

10 information for accused products.

11          SPECIAL MASTER POPPITI:  I see it.

12          MR. CHRISTENSON:  And my understanding

13 from the March 15 response letter is that Tatung Company

14 does not have that information available and that Tatung

15 America hasn't produced that information.  So, if that's

16 the case, I don't think we need to discuss that issue

17 further.

18          MR. MERIDETH:  Tatung Company does not

19 maintain profit and loss data by product, so it does not,

20 for example, take a, what is the profit they make an on

21 a.m. T M monitor 17 inch, they do not maintain that

22 profit and loss information.  They don't maintain their

23 records in that fashion.

24          The Tatung America records do allow you
                        Page 42

Exh  A- Rough Transcript of Hearing.txt

50

1    to determine gross margin on products and we have

2    provided that information.  We do not have profit and

3    loss information from Tatung Company with respect to

4    products.

5              MR. CHRISTENSON:  I will move on, then,

6    to the third topic.

7              SPECIAL MASTER POPPITI:  Okay.

8              MR. CHRISTENSON:  Which is product plans

9    and road maps.

10              We have received one document that's

11    titled a "2007 product plan," and it's a very useful

12    document, I think it shows a lot of information about

13    Tatung's efforts to market specifically to customers in

14    the U.S.

15              My concern is that it's the only such

16    document that I have seen, and we'd like to get

17    additional similar documents from Tatung.

18              MR. MERIDETH:  As I indicated in the

19    letter, we -- this format that you received with regard

20    to the 2007 plan is a new format, it was not used during

21    prior periods.  To the extent that there was any

22    information for prior periods of this type, we have

23    produced it.  However, what we have provided you,

24    starting at T E -- PD E 017921 is not a client

51

1    presentation.  It's an internal document.

Page 43

Exh A- Rough Transcript of Hearing.txt
2          MR. CHRISTENSON:  I am just trying to
3   understand if there are any such internal documents that
4   are related to the time period before 2007?
5          MR. MERIDETH:  There are other
6   documents, internal documents that have been produced,
7   but they are not in this format, as my letter clearly
8   states.
9          SPECIAL MASTER POPPITI:  That's what it
10  says and that's what Mr. Merideth just said.
11         MR. CHRISTENSON:  Okay.  I understand
12  what he just said, Your Honor.  I don't think that's what
13  it says in the letter, but I understand what he just
14  said.
15         SPECIAL MASTER POPPITI:  Okay.
16         MR. CHRISTENSON:  Going then to topic
17  four, then, if I may, this is presentations to customers
18  in the U.S. market, and this is an issue that arose based
19  on our deposition of Mr. Jackson Chang on Monday, Your
20  Honor.
21         During that deposition, Mr. Chang
22  identified several different meetings he's had with many
23  customers in the U.S., and he further specifically
24  testified that during those meetings, he makes sales and

                                           52

1   marketing presentations to the U.S. customers, and we
2   have requested, as a result, copies of those
3   presentations.  The response, as I understand it, is that
4   Tatung Company is searching for those presentations.
5          SPECIAL MASTER POPPITI:  That's what it
6   says.
                    Page 44

Exh A- Rough Transcript of Hearing.txt

7            MR. CHRISTENSON: And will produce them,

8   and, so, I think the question becomes: When will they

9   produce them? Because as Your Honor has instructed, we

10  need to proceed with the deposition on March 20, which is

11  Tuesday.

12           MR. MERIDETH: Let me say two things.

13  No. 1, Mr. Chang was not asked whether or not the power

14  point presentation to which he made reference was related

15  to an accused product. And, indeed, he was not even

16  asked whether or not the power point presentation that he

17  saw or that he prepared was as to a product that was

18  intended to be sold in the United States.

19            If that question had been asked, he

20  would have answered that it was not.

21            I looked at the presentation on his

22  computer. He showed it to me when you raised this

23  question, Mr. Christenson, and it is a presentation to HP

24  for Europe, the Middle East, and after can a.

53

1            Now, there may be other power point

2  presentations that are related to the U.S. market. We

3  are trying to determine whether any sales representatives

4  have such programs on their PCs. And as soon as we -- if

5  we find out that they do and they have something to do

6  with accused products, then we will produce them. But

7  this business with respect to Mr. Chang's deposition is a

8  red herring.

9           MR. CHRISTENSON: Your Honor, it's not a

10  red herring.

Exh A- Rough Transcript of Hearing.txt

11                MR. MERIDETH:  I mean, you didn't ask

12    him --

13                MR. CHRISTENSON:  Excuse me.  May I

14    finish.

15                MR. MERIDETH:  For the accused product.

16                SPECIAL MASTER POPPITI:  Mr. Merideth,

17    you had said that already.  Mr. Christenson.

18                MR. CHRISTENSON:  Thank you.  I wasn't

19    referring to a specific single power point presentation,

20    Your Honor.  These are multiple presentations given to as

21    customers and this goes directly back to --

22                SPECIAL MASTER POPPITI:  Well, Mr.

23    Merideth acknowledged that.

24                MR. CHRISTENSON:  And this goes back to

54

1    what I referenced earlier.  Mr. Merideth just said, They

2    are going to see if it relates to products that we have

3    already identified as accused, my point is, Your Honor,

4    going back to the discussion we had on January 22nd,

5    before you, where it's very clear that documents,

6    discovery related to sales and marketing in the United

7    States generally is something that they have agreed to

8    produce.  And that's on page 15 of the January 20 -- of

9    the January 22nd transcript.  And now he is back tack

10    tracking and saying they are going to see if it relates

11    specifically to accused products.

12                SPECIAL MASTER POPPITI:  Mr. Merideth.

13    Do you have the transcript in front of you, sir?

14                MR. MERIDETH:  I do not.  I agree that

15    if it relates to U.S. sales and it's a power point

Exh  A- Rough Transcript of Hearing.txt

16    presentation, that's what we are searching for right now.

17    And we will produce it.  But the power point presentation

18    that he asked the witness about is for Europe, Africa,

19    and the Middle East.

20              SPECIAL MASTER POPPITI:  I understand

21    that.  Mr. Christenson, did you get a clarification,

22    then, with Mr. Merideth's last statement?

23              MR. CHRISTENSON:  Yeah.  As I understand

24    it now we are back to where we started, which is they are

                                                              55

1     going to produce the documents and then my question, Your

2     Honor, is --

3               MR. MERIDETH:  Well, that's not what I

4     said.  Please, lists tone what I said.  I said we are

5     searching to determine whether there are any such

6     documents in existence.  That's the first step.

7               Once we are able to identify that there

8     are any documents that exist, we are going to gather them

9     up and we are going to see what they are and if they

10    relate to U.S. products, we will produce them.  And I

11    think we already have produced power point presentations

12    with respect to presentations that have been made and

13    they include the product road maps and we are looking for

14    additional ones and we haven't found them, but we are

15    continuing to look.  It may be that the surgery that was

16    done should have gone to each individual person, we

17    thought that had been done, be said, What do you have on

18    your PC, and that's what we are doing right now.  And if

19    we have U.S. presentations for U.S. products, we will

Exh A- Rough Transcript of Hearing.txt
20  produce it.  But we haven't found it yet.

21                  MR. CHRISTENSON:  Again, back to my

22  question is whether or not I can have that for my

23  depositions on Tuesday.

24                  MR. MERIDETH:  Yes, if we find it.  I

                                                    56

1   can't guarantee that we will find anything.  In fact, I

2   suspect we will not find anything, but we are looking,

3   again.

4                   MR. CHRISTENSON:  And, Your Honor, my

5   only comment, this is going to be my last comment on this

6   point, but it would be rather surprising to me to find

7   out that, during all the presentations by Tatung's sales

8   representatives to U.S. customers, those presentations

9   never addressed products for the U.S. market.

10                  SPECIAL MASTER POPPITI:  You have made

11  your point for the record.  If Mr. Merideth has made a

12  commitment that they are still looking and that he will

13  produce, to the extent that they find anything before the

14  deposition, there is an ongoing obligation to supplement

15  if information is discovered later than the deposition,

16  and if that's the case, and it's important for me to look

17  at an application that something was later filed, then I

18  will look at it.

19                  MR. CHRISTENSON:  Your Honor, if I may,

20  I will proceed to the next topic.

21                  SPECIAL MASTER POPPITI:  Please.

22                  MR. CHRISTENSON:  Thank you.  Topic

23  five, which deals with documents showing compliance with

24  U.S. regulations.  I think the testimony, at least from

Exh A- Rough Transcript of Hearing.txt

57

1    my perspective so far, has been somewhat inconsistent
2    concerning whether Tatung makes documents specifically to
3    comply with U.S. regulations.
4              To the extent there is any evidence of
5    that, I think it is relevant to our inducement case.  I
6    think I have seen some U.L. certifications that were
7    issued from U.L. where the relevant authority concerning
8    U.S., to I believe, Tatung America, but I don't think I
9    have seen anything from either Tatung Company, most
10   importantly, or Tatung America directed from the
11   defendant to the U.S. compliance authority.  And, so, I'd
12   like to know if those documents exist and can be
13   produced?
14             MR. MERIDETH:  We have produced U.L.
15   documents for both companies, Tatung Company and Tatung
16   America.  There is no U.S. authority.  There is no FCC
17   for our monitor products.  There are some voluntary
18   information data that is provided, but they don't have
19   anything to do with clearance of products by the FCC.
20   And perhaps you are confusing the Federal Communications
21   Commission with an entity in Taiwan called FCC which
22   doesn't have anything to do with the Federal
23   Communications Commission.
24             I don't think that the Federal

58

1    Communications Commission has an office in tie pay that
                        Page 49

Exh A- Rough Transcript of Hearing.txt
2   has a logo that looks like this one, and it has nothing

3   to do with the United States federal communications

4   commission.

5           To the extent that we have U.L.

6   approvals, we provided those for both companies.

7           MR. CHRISTENSON: Your Honor, my point

8   is that we may have a final approval document, but I

9   think that we should be able to get the correspondence

10  from Tatung to the regulatory authority in the U.S.   I

11  don't know if U.L. authority is the only one.   I

12  understand Mr. Merideth's representation the FCC is not

13  one, but whichever ones there are, I think we are

14  entitled to get those communications.

15          MR. MERIDETH: Well, you made a flat out

16  representation that there were file wings the FCC and I'd

17  like to see the support for that.

18          SPECIAL MASTER POPPITI: Well, let's

19  focus not on the FCC because I expect that if the

20  products do not require FCC approval, then I expect there

21  are no documents related to FCC.

22          MR. MERIDETH: May I say one other thing

23  about the U.L.? The U.L. approval, underwriters

24  laboratory, is an approval for electrical wiring.   It

                                                    59

1   doesn't have anything to do with mounting technology.

2   This lawsuit and these patents have to do with mounting

3   technology.   We are going far, far afield to now get into

4   the data that was provided to U.L. to provide the

5   certification.   They asked us for the U.L. certifications

6   and we provided them.   What more could conceivably be

                        Page 50

Exh A- Rough Transcript of Hearing.txt

7   relevant?

8           SPECIAL MASTER POPPITI:

9   Mr. Christenson.

10          MR. CHRISTENSON:  I guess that's sort of

11  the issue.  I just don't know what they have and what

12  they don't have.  If they don't have anything, then --

13          SPECIAL MASTER POPPITI:  Let me --

14          MR. MERIDETH:  That wasn't the question.

15          SPECIAL MASTER POPPITI:  I think the

16  application was provide all communication as it relates

17  to U.L. compliance, and I certainly have the question:

18  What does U.L. compliance have to do with mounting?  I

19  don't expect that you are looking to or expecting to look

20  that U.L. related documents for the purpose of making

21  your judgment as to whether a product is

22  accused/unaccused; correct?

23          MR. CHRISTENSON:  That's true, Your

24  Honor.

▯

                                                    60


1           SPECIAL MASTER POPPITI:  Why would it

2   have anything to do with this litigation.

3           MR. CHRISTENSON:  I can explain.  And

4   just to clarify, on topic five, as we set forth in the

5   March 14th letter, relates generally to documents showing

6   with compliance with federal regulations.

7           SPECIAL MASTER POPPITI:  I understand

8   that.

9           MR. CHRISTENSON:  The relevance is this:

10  If Tatung Company makes an accused product and

Exh  A- Rough Transcript of Hearing.txt

11    specifically seeks U.S. regulatory approval so that that

12    product can be sold to customers for the U.S. market

13    specifically, that triggers the -- that triggers the

14    relevant patent statutes and results in infringement for

15    which we are entitled to a royalty.

16             SPECIAL MASTER POPPITI:  I understand

17    that, but you have -- you have a -- if I understand this

18    correctly, you, in your submittal, say, Tatung has

19    produced documents from U.L. which show compliance.  Why

20    isn't that document sufficient to give you what you need?

21             MR. CHRISTENSON:  Well, if we have got

22    what they have to produce, then that, maybe that's

23    sufficient.  I guess that's what I --

24             SPECIAL MASTER POPPITI:  Mr. Merideth.

                                                    61

1              MR. MERIDETH:  Well, the discovery

2     requests that we complied with ask for documents that

3     evidenced compliance, and we have provided that.  And I

4     don't -- I am not sure what the purpose is that they want

5     it for, but we have provided what they asked for.  And I

6     don't think that we should provide -- that we are

7     required to provide anything more than what they asked

8     for.

9              SPECIAL MASTER POPPITI:  I am not going

10    to require anything more unless you direct me more

11    specifically to the request.

12             So let's move on, please.

13             MR. CHRISTENSON:  Yes, Your Honor, topic

14    six refers to license agreements.

15             SPECIAL MASTER POPPITI:  Yes.

Exh  A- Rough Transcript of Hearing.txt

16          MR. CHRISTENSON:  And the it's a

17     question of completeness, I don't know whether there is

18     any dispute we are entitle told you the license

19     agreements.  I think we have received only two, certainly

20     not many more than two license agreements from Tatung

21     Company, and just from looking at case law, and I cite a

22     case in our letter to you, we know that there appear to

23     be at least one other license, and as I understand it,

24     Tatung is agreeing to produce another license --

                                                       62

1      hopefully we will have that before the deposition on

2      Tuesday -- and I just want to make sure we are not in a

3      situation where the witness tells me on Tuesday that

4      there are additional licenses but those are not been

5      produced.

6              SPECIAL MASTER POPPITI:  Mr. Merideth.

7              MR. MERIDETH:  We are attempting to get

8      that license.  We anticipate receiving it this evening

9      when business opens in Taiwan.  And we will provide it.

10             It doesn't have anything to do with

11     mounting technology or even anything to do with monitor

12     products, but we will produce it.

13             MR. CHRISTENSON:  And, Your Honor, the

14     only other thing I would need to know is whether there

15     are any additional license agreements related to liquid

16     crystal display technology that have not been produced?

17             MR. MERIDETH:  Well, then, if that's

18     what the criteria is, this other license that you

19     referred to is not responsive, but we have done our very

                            Page 53

Exh A- Rough Transcript of Hearing.txt

20  best to find licenses that relate to liquid crystal

21  display devices, and we have produced what we have, and

22  you can ask the 30(b)(6) witness about what he knows

23  about it and what he did to ensure that we have provided

24  all of those documents.

63

1                SPECIAL MASTER POPPITI:  Thank you.

2                MR. CHRISTENSON:  Well, as I understand

3   it, then, Your Honor, we do have whatever Tatung knows

4   of.

5                SPECIAL MASTER POPPITI:  That's what I

6   understand.  If you walk into a deposition and you start

7   uncovering other information, I expect I will hear from

8   you.

9                MR. CHRISTENSON:  Okay.  The last topic

10  in our letter, Your Honor, is topic seven on page 3,

11  relevant communications with customers, and we refer

12  there to certain categories of communications, all

13  targeting or focused on the U.S. market or U.S.

14  customers.  And we have got very little correspondence

15  that we have seen, and, so, we would want to know if

16  there is additional correspondence that's relevant to

17  U.S. customers and the U.S. market.  Tatung's response,

18  as I read it, on page three of their March 15 letter, is

19  that they have produced documents that reference accused

20  products, and as I, again, going back to the January 22nd

21  transcript, the agreement previously was they wouldn't

22  limit it just to references to accused products because,

23  again, they agreed to produce, and it's relevant for us

24  to get it, documents showing the transactions and efforts

Page 54

64

1    to market to U.S. customers for various product lines
2    that would also include and encompass accused products
3    even if that model number is not referenced in the
4    correspondence.
5              So I think we are entitled to something
6    broader.  They have agreed to produce something broader,
7    and I just want to find out if we can get that discovery
8    before the deposition?
9              SPECIAL MASTER POPPITI:  Mr. Merideth.
10             MR. MERIDETH:  I disagree that we agreed
11   to provide anything broader.  We agreed to provide sales
12   presentations, that's what they asked for, and we agreed
13   that we would produce it.  I believe we have produced it.
14   Now they are -- they didn't -- they are expanding that,
15   the scope of that.  It was not our understanding that we
16   were agreeing to produce customer information.  It has
17   all kinds of detailed stuff about products that are not
18   accused, pricing information, quantities, production
19   times, none of which has anything to do with the accused
20   products.  We have produced the correspondence with
21   respect to the accused products.
22             And general correspondence or
23   correspondence regarding unaccused products was not
24   agreed to be produced and has not been produced.

65

1              MR. CHRISTENSON:  Your Honor, in

Exh  A- Rough Transcript of Hearing.txt
2    response, I will just quote briefly Mr. Merideth one more

3    time from the January 22nd transcript, page 15.

4                    SPECIAL MASTER POPPITI:  Just a second,

5    please.

6                    I know I have looked at it before but

7    I'd rather have the page in front of me.

8                    MR. CHRISTENSON:  Yes, Your Honor.

9                    SPECIAL MASTER POPPITI:  Page 15.

10                   MR. CHRISTENSON:  Line seven.

11                   SPECIAL MASTER POPPITI:  Right.

12                   MR. CHRISTENSON:  Mrs. Mr. Merideth

13   quote, My specific recollection was to the extent that

14   there was general correspondence where sales and

15   marketing in the United States, generally, for example,

16   was discussed without any particular model number being

17   referenced, that, you know, I accepted you were entitled

18   to discovery of that.  The limitation is where there is

19   communications between Tatung and ViewSonic about

20   products that are specifically about products that are

21   not accused.  And that information should not be

22   provided.

23                   So, if it's just related to a

24   non-accused product, we understand they are not producing

66

1    that.  If it's related to products generally, which would

2    include accused products, obviously, we need, that and

3    they have agreed to produce it.

4                    MR. MERIDETH:  Sales and marketing

5    information.

6                    MR. CHRISTENSON:  No.  This is
                    Page 56

Exh  A- Rough Transcript of Hearing.txt

7   correspondence.

8              MR. MERIDETH:  No.  The agreement was
9   the sales and marketing information.

10             SPECIAL MASTER POPPITI:  It does say --
11  let's read it again.  I thought we covered this Friday.
12  My specific recollection was that, to the extent that
13  there was general correspondence where sales and
14  marketing in the United States generally, for example,
15  was discussed, without any particular model number being
16  referenced, that, you know, I accepted you are entitled
17  to discovery of that.

18             MR. CHRISTENSON:  That's right, Your
19  Honor.  That's not limited to accused products and that's
20  the type of discovery we have asked for in our March 14
21  letter to you and we clearly should have had it a long
22  time ago.

23             SPECIAL MASTER POPPITI:  Mr. Merideth.

24             MR. MERIDETH:  I agree that general --

                                                      67

1   if there is a letter that talks about general sales and
2   marketing that we are required to produce it, and I will
3   go through what we have and make sure that there is
4   nothing of that nature that has not been produced.

5              There is other correspondence that has
6   to do with specific other products and other issues, for
7   example, like pricing, don't have to do with general
8   sales and marketing in the United States, and we are not
9   going to produce it.  We shouldn't be required to produce
10  it.

                     Page 57

Exh A- Rough Transcript of Hearing.txt
11              SPECIAL MASTER POPPITI:  And you didn't
12   agree to produce it.
13              MR. MERIDETH:  That's correct.
14              MR. CHRISTENSON:  Your Honor, if I can
15   speak to that:  I don't understand how you separate out
16   pricing from sales and marketing.  I mean, pricing is --
17   it could be an offer for sale which is directly
18   infringing under the patent statute.
19              MR. MERIDETH:  I said, "Sales and
20   marketing generally." I am not talking about specific
21   product data a that is unaccused product.
22              MR. CHRISTENSON:  Your Honor, just to
23   make had clear, if you look at the March 15 response from
24   them, they say, "Tatung Company has produced the

                                                    68


 1   documents in these categories that reference accused
 2   products".
 3              SPECIAL MASTER POPPITI:  Well, then
 4   maybe, Mr. Merideth, would you look at that sentence,
 5   please.
 6              MR. MERIDETH:  Yes, sir.  I have it.
 7   And I agree.  I will go back and look and see if there is
 8   anything else that relates generally to sales and
 9   marketing and make sure that we have produced all of that
10   information.
11              SPECIAL MASTER POPPITI:  So, will you
12   accept the first sentence in paragraph seven needed to be
13   tweaked a little bit if you measure it against the
14   transcript of page 15?
15              MR. MERIDETH:  Yes, sir.  I think it's
                          Page 58

Exh  A- Rough Transcript of Hearing.txt

16    too narrow.

17                    SPECIAL MASTER POPPITI:  Thank you.

18                    MR. CHRISTENSON:  Thank you, Your Honor.

19    I guess my understanding is then we would get whatever

20    additional discovery there is in time to use it for the

21    deposition on Tuesday.

22                    SPECIAL MASTER POPPITI:  Mr. Merideth.

23                    MR. MERIDETH:  Yes.

24                    MR. CHRISTENSON:  Your Honor, that

                                                         69

1    covers the issues raised in the March 14 letter.  There

2    are just a couple of supplemental issues that arose --

3                    SPECIAL MASTER POPPITI:  Have you all

4    discussed those?  And I realize -- and Ms. Gas's letter

5    to me, the concern was raised about how we were going to

6    go about this agenda, if you will.  I believe that I

7    invited that there be this kind of a session, and I think

8    the purpose of it, I hope, was well served even though

9    you did not go through all the normal formal meet and

10    confers.  I said to you before that it's important to

11    follow that process, but I invited you to deviate from

12    that for purposes of gathering, if you will, around the

13    production that's already been made.

14                    MR. CHRISTENSON:  Yes, Your Honor.  I

15    appreciate your indulgence given the timing and the

16    circumstances that we are facing.

17                    SPECIAL MASTER POPPITI:  I understand

18    that.  But I am about to say, with respect to any other

19    items that you want to add to the agenda that was

Exh A- Rough Transcript of Hearing.txt
20 developed by both Ms. Gasses and Mr. Kirk and perhaps
21 others were involved with it, that I want to make sure
22 that there is agreement that I should be dealing with it
23 today.
24                    MR. CHRISTENSON:  That's fine, Your

                                                         70

1 Honor.  I will, obviously, let the defendant speak to
2 that.  From my perspective, we have discussed it during
3 the deposition.  I think we are at an I am past.  There
4 is clearly -- clearly, the response was that these
5 documents either were not requested or would not be
6 produced for some other reason, and the only way for us
7 to try to get them before the deposition on Tuesday is to
8 raise it now.  If the defendants, you know, if you decide
9 not to entertain it now, we will do the best we can at
10 the deposition and we will have to address it at another
11 time.
12                    SPECIAL MASTER POPPITI:  Can we address
13 it Monday night?
14                    MR. CHRISTENSON:  Yes, Your Honor.
15                    SPECIAL MASTER POPPITI:  Today, why
16 don't you outline what the issue is.
17                    MR. CHRISTENSON:  There are three
18 discrete issues, Your Honor, and they are issues that we
19 learned of during the deposition of Mr. Calvin Ho.
20                    SPECIAL MASTER POPPITI:  I don't have a
21 writing on this; correct?
22                    MR. CHRISTENSON:  The only thing we
23 have, Your Honor, we didn't submit argument on it
24 because, obviously, you weren't going to have time to get
                              Page 60

Exh A- Rough Transcript of Hearing.txt

71

1  full submissions from either party, so this is an email
2  that we just briefly summarized, pointed you to pages in
3  the transcript where the three issues arose.
4          SPECIAL MASTER POPPITI:  And, you are
5  right, I don't have that.  You know when it came in?
6          MR. CHRISTENSON:  I do not have the time
7  in front of me, Your Honor.
8          SPECIAL MASTER POPPITI:  Just outline
9  the issues and see if there is agreement that --
10          MR. MERIDETH:  That was from today,
11  Cass?
12          MR. CHRISTENSON:  Yes, it is.
13          MR. MERIDETH:  That was about 2:30, Your
14  Honor, and it was a very lengthy.
15          SPECIAL MASTER POPPITI:  Is it your
16  letter, Mr. Kirk, with -- it begins, "I write to
17  supplement the record for the teleconference "?
18          MR. KIRK:  Yes.
19          MR. CHRISTENSON:  I think that's the
20  one.
21          MR. MERIDETH:  It was about Mr. Ho's
22  deposition.
23          SPECIAL MASTER POPPITI:  Yes.  Then I do
24  have it in front of me.

72

1      A.  You are right, I have looked at the letter,

Exh A- Rough Transcript of Hearing.txt

2    itself, but I have not drilled through the deposition

3    testimony.

4                MR. CHRISTENSON:  The first of the three

5    issues, Your Honor, relates to pricing quotations that we

6    understand have been provided to U.S. customers from

7    Tatung, and we feel that that is directly relevant to,

8    for example, what would constitute an offer for sale for

9    purposes of direct infringement and also it would go to

10   inducing customers to purchase and import products into

11   the U.S. which could constitute indirect infringement as

12   well.  And that was discussed on pages 43 and 44 of the

13   rough transcript.

14                On page 44, line one, I asked the

15   witness:  When you said --

16                SPECIAL MASTER POPPITI:  Let's do it

17   this way, Mr. Christenson.

18                MR. CHRISTENSON:  Yes.

19                SPECIAL MASTER POPPITI:  Merideth, I

20   don't know whether you or anyone on your team has

21   reviewed the correspondence that was filed by email at

22   2:38, and if you have, whether you are in a position to

23   deal with these issues now or whether it's something that

24   has to be dealt with once you have had an opportunity to

                                                    73

1    look at it and respond?

2                MR. MERIDETH:  I am searching for that

3    -- I have the transcript but I am searching for it now.

4    I think it would be better to look at it, then to address

5    it once we have had an opportunity to look at it.  I have

6    a copy of his letter on my computer right now and I am

Exh  A- Rough Transcript of Hearing.txt

7    looking for the transcript.

8                     SPECIAL MASTER POPPITI:  When did this

9    deposition -- is this for purposes of -- it's for

10   purposes of Mr. Shea's deposition on Tuesday; correct?

11                    MR. CHRISTENSON:  Yes, Your Honor.

12                    SPECIAL MASTER POPPITI:  Can this be

13   something that we can deal with on Monday?

14                    MR. CHRISTENSON:  I suppose we could,

15   Your Honor.  My concern would be whether that would lead

16   Tatung with sufficient time to produce anything

17   additional to the extent that became appropriate.  Tatung

18   has made it very clear they don't want to bring Mr. Shea

19   back again.

20                    SPECIAL MASTER POPPITI:  I understand

21   that.

22                    MR. CHRISTENSON:  Obviously, my position

23   is I would like to have the documents that we feel are

24   relevant for the deposition.  We are probably going to

                                                            74

1    take him for a second day, so I think his deposition is

2    likely to continue and spill over to Wednesday, so maybe

3    that impacts things.

4                     MR. MERIDETH:  I don't believe that you

5    are entitled to more than seven hours with the witness,

6    and I fully expect to start and complete on Tuesday

7    because I have to be in Washington, D.C. on Wednesday for

8    Mr. Kim's depositions.

9                     MR. CHRISTENSON:  I was told the witness

10   would need an interpreter, and as I understand it, we

                            Page 63

```
                    Exh  A- Rough Transcript of Hearing.txt
11   have 10.5 hours of time, and I can't take 10.5 hours in

12   one day.

13                 MR. MERIDETH:  He is going to give his

14   testimony in English.

15                 MR. CHRISTENSON:  I think that makes it

16   all the more urgent, Your Honor.

17                 MR. MERIDETH:  Well, I now have page --

18   the pages in front of me, so if you give me just one

19   second.  I have read it.  It doesn't show anything

20   related to accused products, and, indeed, you don't each

21   ask him if they are quotes for products in the United

22   States.  All he said was that he has responded to a

23   request for quotation by sending a price to an email

24   site.
```

                                                                75

```
1                  MR. CHRISTENSON:  Your Honor, I can

2    represent to you that Tatung Company sells many, many

3    products to HP for the U.S. market.

4                  MR. MERIDETH:  I know.  You didn't tie

5    that down.  Your questioning was very poor.

6                  MR. CHRISTENSON:  There is nothing to

7    indicate, Your Honor, there are still problems with the

8    witness, and that's another issue for another day, but --

9                  SPECIAL MASTER POPPITI:

10                 MR. MERIDETH:  There were problems with

11   the questions.

12                 MR. CHRISTENSON:  We disagree.

13                 SPECIAL MASTER POPPITI:  Counsel, let's

14   do it this way:  If there is no question in the

15   transcript that ties it to U.S. product, what am I
```
                            Page 64

Exh  A- Rough Transcript of Hearing.txt

16    looking at here?

17                 MR. CHRISTENSON:  I am taking a quick

18    look at the transcript here, Your Honor.

19                 SPECIAL MASTER POPPITI:  Thank you.

20                 MR. CHRISTENSON:  The section that we

21    cited refers to placing quotations for HP regarding

22    display products.  I don't see that it specifies a

23    product.  What I would probably have to do is try to tie

24    that to another part of the deposition, but I am not in a

76

1     position to do that right now.

2                  SPECIAL MASTER POPPITI:  Then I can't

3     address it right now.

4                  MR. MERIDETH:  I just want to say one

5     other thing to put this into context:  There is only one

6     HP product that's accused, and that is a television set,

7     a 22-inch television set, and it seems to me that you are

8     -- he was being asked here about quotes that were being

9     given with respect to monitor products and if you didn't

10    ask the witness, I can tell you because I talked at

11    length with the witness many of his presentation to the

12    United States had to do with products that were sold in

13    other markets other than the United States.

14                 He is a worldwide guy for HP.

15                 /  SPECIAL MASTER POPPITI:  Let's, then,

16    move to the next issue, please.

17                 MR. CHRISTENSON:  Yes, Your Honor.  The

18    next issue relates to communications between Tatung

19    Company and U.S. customers regarding, for example, market

Exh A- Rough Transcript of Hearing.txt
20  trend, and I think this came up at page 45 in the

21  transcript.  And then it continues on for a few pages.

22            SPECIAL MASTER POPPITI:  Okay.  And I am

23  looking at --

24            MR. MERIDETH:  These are discussions

77

1  with gateway.  Gateway does not have any accused product.

2  It's clear the discussions continue questions about R

3  about gateway.

4            MR. CHRISTENSON:  And, Your Honor, just

5  to respond back:  We recently had a discussion about

6  Mr. Shea's deposition, and as I understand it,

7  Mr. Merideth's position this was the deposition should go

8  forward because the witness would be prepared to testify

9  about all accused products not limited to accused

10  products, and, therefore, I didn't need to know all the

11  accused products at the time of the deposition.  And now

12  he is going the other way and saying --

13            SPECIAL MASTER POPPITI:  I think he is

14  just saying that this witness wasn't -- well, Mr.

15  Merideth, you tell me what you were saying, please.

16            MR. MERIDETH:  This witness -- you asked

17  the witness about market surveys with respect to gateway.

18  You have never accused a product with respect to gateway.

19  We -- we have not produced -- we have produced market

20  information generally.  We have produced -- we have

21  market surveys that we have produced.  If you are talking

22  -- and you seem to be asking whether there were any

23  discussions at any meetings about market surveys, and he

24  says, Yes, he had a discussion with gateway.
                    Page 66

Exh   A- Rough Transcript of Hearing.txt

78

1          That doesn't have anything to do with
2   what you are claiming.
3          MR. CHRISTENSON:  It's not limited to
4   gateway.  Your Honor, if you go forward to page 48 --
5          MR. MERIDETH:  That's not what you --
6   okay.
7          MR. CHRISTENSON:  On page 48, I say to
8   him, "Have you provided that type of information to
9   customers during several of your meetings with customers
10   in the U.S.?  And he says, "I think so."  So it's not
11   limited to gateway.  I then say, "Have you provided that
12   type of information to HP in the U.S."?, and he confirms
13   that he has.
14          MR. MERIDETH:  But there is no
15   identification that they are related to accused products.
16   You never asked him.
17          MR. CHRISTENSON:  This witness, Your
18   Honor, is only responsible for certain customers.  There
19   are many other customers for which he is not responsible.
20   I don't think I have to prove the document exists if it's
21   a relevant document, I think we should -- we are entitled
22   to receive it, and Mr. Merideth earlier said, If it
23   relates generally to the sales and marketing of products
24   in the U.S., that that would be produced.

79

1          MR. MERIDETH:  We have given you all the

Exh  A- Rough Transcript of Hearing.txt

2    market research reports that we have.  There aren't very

3    many because they don't do a lot of market research

4    because they don't -- they will sell to other people who

5    do that research, but we provided that to you.  I have

6    seen a full box of them.

7                    MR. CHRISTENSON:  If all the documents

8    --

9                    MR. MERIDETH:  Furthermore, you didn't

10   show any of those documents to the witness.  If you would

11   have shown them to the witness, he could have told you

12   whether that was what he was referring to or not.

13                    It's very unclear -- he could very well

14   have been discussing market surveys that were generated

15   by the client during this discussion.  And we have

16   provided you with a market surveys we have.  And this

17   witness' testimony doesn't indicate that we failed to

18   produce or there is anything that we haven't produced.

19                    MR. CHRISTENSON:  Either you did or did

20   not, and just to respond to that:   The witness clearly

21   says, These are reports prepared and generated by Tatung

22   Company, and his testimony is very clear on that point,

23   and these are communications with the customers to which

24   you agree to produce, we already covered that regarding

                                                          80

1    the January 22nd hearing.  The only question.  Is.  Have

2    we received the documents?  If we have, then this is a

3    moot point.

4                    MR. MERIDETH:  It is a moot point.  I

5    just told you that about three times.  We have produced

6    the marked survey that we have.

Exh A- Rough Transcript of Hearing.txt

7          MR. CHRISTENSON:  That's what I heard
8    you say.

9               Your Honor, the third point relates to
10   sales forecasts, and this arose starting on page 89 of
11   the transcript and continued on through to about page 99.

12              And just to explain briefly, a sales
13   forecast is a communication from the customer in the U.S.
14   concerning the quantity of products that the customer
15   anticipates needing for a specific market, such as the
16   U.S., so that Tatung Company can plan its supply in
17   manufacturing to provide those products giving Tatung
18   some lead time to deliver those products.  It relates
19   specifically to the U.S. market.  Those documents, I
20   don't think, have ever been produced.  And when I tried
21   to ask the witness on page 99, at the end of page 98, if
22   you have the transcript there --

23              SPECIAL MASTER POPPITI:  I am looking at
24   page 98 of the transcript.  What line, please?

81

1               MR. CHRISTENSON:  Yes.  It is line 25, I
2    asked this witness, "As of today, have you not made any
3    effort to look for sales forecasts relating to any
4    specific products that you have sold to gateway or HP"?
5    And the counsel for Tatung says, "Objection.  Irrelevant
6    instruct the witness not to answer based on
7    attorney/client privilege and work product doctrine."

8               And, so, you know, I am criticized here
9    for not making a more specific record, but I don't know
10   what to do.  I ask a question like that about whether

Exh A- Rough Transcript of Hearing.txt
11    they have, you know, so I understand what they have or
12    have not produced continue witness was instructed not to
13    answer that.
14              MR. MERIDETH:  There is only one accused
15    HP product, and it was accused last month -- this month,
16    excuse me.  We are attempting to determine whether there
17    are any forecasts that we received from HP for that
18    product.  If there are, we will produce them.  We are not
19    going to produce forecasts for gateway.  There is no
20    accused products.
21              MR. CHRISTENSON:  Your Honor, this goes
22    directly to the point we just discussed.  He just told us
23    during this call that they would produce sales and
24    marketing discovery related generally to the U.S. market

                                                    82

1     and not limited to accused products and then we are right
2     back to that again.
3               MR. MERIDETH:  No, we are not, because
4     you are asking about a product-specific forecast provided
5     by the customer to us.  That's not sales and marketing
6     information that we provided to a customer.
7               MR. CHRISTENSON:  It's communication
8     between Tatung and the customer related to sales --
9               MR. MERIDETH:  Isn't what we agreed to
10    produce.  We agreed to produce general marketing
11    communications, not specific survey -- not specific
12    product forecasts that were provided to us by our
13    customer as to unaccused products, and, indeed, by our
14    customer, gateway, who does not have any accused
15    products.

Exh  A- Rough Transcript of Hearing.txt

16          MR. CHRISTENSON:  Your Honor, at this

17  point, we don't have those forecasts for accused or

18  unaccused products.

19          SPECIAL MASTER POPPITI:  Mr. Merideth,

20  what about the accused products?

21          MR. MERIDETH:  I think the only one that

22  we are -- that we have been able to identify that may

23  exist is the one with respect to -- is that there may be

24  one with respect to this 22-inch HP product and we are

                                                        83

1   trying to determine whether we have any or not.

2           MR. CHRISTENSON:  And, Your Honor, just

3   to be clear --

4           MR. MERIDETH:  They were just accused

5   this month.  It's not like we are sitting on our hands.

6           MR. CHRISTENSON:  Your Honor, just to be

7   clear, I am not seeking it only as to that product.  I am

8   seeking it -- this is something that generally --

9           MR. MERIDETH:  We are going to produce

10  it generally.

11          MR. CHRISTENSON:  Excuse me.

12          SPECIAL MASTER POPPITI:  Wait just a

13  second.  You are talking over each other and I am not a

14  following.

15          MR. CHRISTENSON:  Your Honor, I am not

16  limiting my request just to the 22-inch product that

17  Mr. Merideth talked about.  We know that Tatung received

18  sales forecasts like this for U.S. products from its

19  customer nurse the U.S. generally so, that's the extent

Exh A- Rough Transcript of Hearing.txt
20   of our request.

21              MR. MERIDETH:  We made an objection to

22   producing such information as to unaccused products.  We

23   are searching to determine if there are any with respect

24   to the accused products.  And if there is, we will

                                                        84


1    produce it.

2               MR. AMBROZY:  If I may be heard on the

3    accused products issue.

4               SPECIAL MASTER POPPITI:  Mr. Ambrozy, I

5    don't think I need a third voice.

6               MR. AMBROZY:  Thank you, Your Honor.

7               SPECIAL MASTER POPPITI:  Just a moment,

8    please.

9               Mr. Merideth, I just, again, and perhaps

10   it should be etched in my memory or at least on my

11   eyeglass lenses, the page 15 of the transcript that we

12   were dealing with, and if I need to go back to see

13   context, I don't see where, in referencing general

14   correspondence where sales and marketing in the United

15   States is referenced that you limit the agreement to

16   Tatung documents as opposed to documents that were

17   provided to customers.

18              So, it seems to me that sales forecasts,

19   why wouldn't they fall under the general description of

20   "general correspondence" where sales and marketing in the

21   United States, etcetera?  Why wouldn't it fall under

22   that?

23              MR. MERIDETH:  Because the forecast is

24   made after the sale has been made with respect to very

Exh  A- Rough Transcript of Hearing.txt

85

1    specific product and it isn't general marketing or sales
2    information.
3                    MR. CHRISTENSON:  Your Honor, first of
4    all, the forecast precedes the say.  It's an indication
5    from the customer of the need of quantity.
6                    MR. MERIDETH:
7                    MR. CHRISTENSON:  They say that's not
8    sales related, Your Honor.  I don't think I need to
9    respond to that.
10                   SPECIAL MASTER POPPITI:  I don't have
11   one in front of me.  I know what you are talking about,
12   but I don't have one in front of me.
13                   So, let me --
14                   MR. MERIDETH:  If I could, Your Honor, I
15   don't believe that anyone could suggest that reasonably
16   that customer forecasts for specific models for a
17   specific period of time for a specific number of product
18   is sales and marketing general correspondence.  It is
19   not.  What they were saying was, Well, gee, you may have
20   some sales literature that's general and doesn't refer to
21   a specific product, a specific accused product, we want
22   that, too, and we said, Okay, we will provide it.  But we
23   didn't say that we will provide specific product sales
24   forecasts.  That cannot fall within that definition.

86

1                    MR. CHRISTENSON:  Your Honor, with all

Page 73

Exh A- Rough Transcript of Hearing.txt

2  due respect to Mr. Merideth, this information -- I really

3  don't understand how we are fighting about whether sales

4  forecasts for U.S. customers is or is not relevant. I

5  think it is clearly within the scope of what was

6  discussed at the January 22nd hearing. It's responsive

7  to our request.

8              SPECIAL MASTER POPPITI: That's what I

9  want to get at. I mean, it is responsive to the request,

10 is it not, Mr. Merideth?

11             MR. MERIDETH: Not as to unaccused

12 products.

13             SPECIAL MASTER POPPITI: No. I

14 understand -- I understand unaccused products.

15             MR. MERIDETH: Right. I have said, We

16 will do our best to produce forecasts, if we have any,

17 with respect to accused products. And we actually set

18 sent out requests last night asking for that information,

19 and we hope to receive it before the weekend is out

20 because Sunday is Monday in Taiwan and we should have

21 that information. But we are not going to produce it

22 with respect to unaccused products.

23             SPECIAL MASTER POPPITI: I am not going

24 to require it for unaccused products.

                                              87

1              MR. MERIDETH: We are doing our best to

2  get the sales forecasts with respect to accused products,

3  and if we have it, we will get it.

4              SPECIAL MASTER POPPITI: Okay.

5              MR. CHRISTENSON: That was the final

6  issue that we had to raise with respect to the Tatung

Exh A- Rough Transcript of Hearing.txt

7   document production for today.  Thank you.

8                     SPECIAL MASTER POPPITI:  Is there

9   anything else, then, please, for today?  If not --

10                    MR. CHRISTENSON:  Mr. Ambrozy may have

11  had one issue, Your Honor, I am not sure.

12                    SPECIAL MASTER POPPITI:  Do you want to

13  check with him.

14                    MR. AMBROZY:  I just wanted to let you

15  know that we have looked through the Tatung production of

16  the CAD CAM drawings and we are sending a letter to

17  Mr. Merideth outlining some pretty severe deficiencies in

18  that production, so we would ask that we be heard on this

19  issue -- if you are going to limit all the discovery to

20  accused products, then I believe that when we were up

21  there on March 9th, that you gave us until April 6th to

22  determine whether it is accused product, so I just want

23  to be clear on the record, Your Honor, that we have until

24  that date to determine the accused product?

                                                        88


1                     SPECIAL MASTER POPPITI:  Whatever date I

2   gave you, and quite frankly, I don't have it in mind, I

3   don't have the document in front of me, but I believe

4   that was the date.

5                     MR. AMBROZY:  So we will get the letter

6   out to Mr. Merideth today to outline those deficiencies

7   and then, if we need, to Your Honor, we'd like to revisit

8   that production to move the along.

9                     SPECIAL MASTER POPPITI:  Okay.  I have a

10  question with respect to Monday.  What are we teed up to

Exh A- Rough Transcript of Hearing.txt

11   do on Monday?

12          MR. CHRISTENSON:  Your Honor, I intend

13   to submit to you some examples of what we feel reflects

14   inappropriate deposition conduct so that we can convene

15   briefly.  It would be very productive and helpful if you

16   could then give us some brief input, I think it will help

17   us next week so we can avoid some of the problems that we

18   have experienced this week.

19          SPECIAL MASTER POPPITI:  I do remember

20   that now.  That's the only thing on for Monday.

21          MR. CHRISTENSON:  I believe it is, Your

22   Honor.

23          SPECIAL MASTER POPPITI:  I think I said

24   in conjunction with that I would expect that my

89

1    colleagues at the local bar will do some heavy lifting in

2    terms of your conferring before we convene at 6:30 on

3    Monday evening.

4           MR. CHRISTENSON:  You did, Your Honor.

5           MS. GAZA:  With respect to the issue

6    that Mr. Ambrozy just raised, I would just like to

7    understand the procedure that we, the parties will be

8    conduct ago meet and confer process before we bring this

9    issue before Your Honor?

10          SPECIAL MASTER POPPITI:  Yes.  I would

11   like that.  And by "meet and confer process," given the

12   time frames, I expect that "meet and confer" may be one,

13   if you will, session, however you all define that.  I

14   don't know whether that means mail to mail, email to

15   email, phone to phone.  It may be several sessions, but I

Page 76

Exh  A- Rough Transcript of Hearing.txt

16    understand it's a short time frame.
17                    MS. GAZA:  Thank you, Your Honor.
18                    MR. AMBROZY:  Thank you, Your Honor.
19                    SPECIAL MASTER POPPITI:  Thank you all.
20    Be careful getting home.  4:58.
21
22
23
24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,

    Plaintiff,

Case No. 04-343-JJF (D. Del.)

**07-80223**
**CIV-RYSKAMP**

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

    Defendants

       THIS MATTER having been opened to the Court on motion by defendants, the

Tatung Co. and the Tatung Company of America, Inc., by their attorneys, for a protective

order pursuant to Fed. R. Civ. P. 26(c), limiting the scope of discovery from third party

Sensormatic, Inc. ("Sensormatic"); and plaintiff L.G.Philips LCD Co., Ltd., by their

attorneys, having opposed the motion; and the Court having considered the papers

submitted and the arguments presented; and for good cause shown:

       **IT IS HEREBY ORDERED THAT:**

    1.    The motion is GRANTED.

    2.    Any deposition testimony taken from third party Sensormatic shall be

limited to the accused products at issue in *L.G. Philips LCD Co., Ltd. v. Tatung*

*Company, et. al.*, C.A. No. 04-343-JJF (United States District Court for the District of

Delaware) (the "Delaware Action"). Such deposition testimony shall be subject to the

provisions of the Stipulated Protective Order dated January 24, 2005 entered in the

Delaware Action.

    3.    Any documents produced in response to the subpoena by third party

Sensormatic shall be limited to those documents relating to the accused products at issue

in the Delaware Action. Additionally, any documents produced shall be stamped


EXHIBIT
3

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER and shall be produced subject

to the Stipulated Protective Order dated January 24, 2005 entered in the Delaware Action,

which is attached hereto as Exhibit 1.

Dated:  March 9, 2007
~~Boca Raton,~~ Florida

United States District Court Judge for the
Southern District of Florida

Copies to:      Richard D. Kirk, Esq. (rkirk@bayardfirm.com)
                Gaspare J. Bono, Esq. (gbono@mckennalong.com)
                Jeffrey B. Bove, Esq. (jbove@cblh.com)
                Tracy R. Roman, Esq. (troman@raskinpeter.com)
                Scott R. Miller, Esq. (smiller@cblh.com)
                Frederick L. Cottrell, III, Esq. (Cottrell@RLF.com)
                Frank E. Merideth, Jr., Esq. (meredith@gtlaw.com)
                Geoffrey M. Cahen, Esq. (caheng@gtlaw.com)

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 JAN 24 AM 9: 45

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG PHILIPS LCD CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 04-343-JJF |
| v. | ) | |
| | ) | |
| TATUNG COMPANY; | ) | |
| TATUNG COMPANY OF AMERICA, | ) | |
| INC. and VIEWSONIC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## STIPULATED PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the parties stipulate to the following Protective Order, subject to the approval of the Court:

1.     Scope of Protection.

1.1     This Protective Order shall govern any record of information, designated pursuant to Paragraph 2 of this Protective Order, produced in this action, including all designated deposition testimony, all designated testimony taken at a hearing or other proceeding, interrogatory answers, documents and other discovery materials, whether produced informally or in response to interrogatories, requests for admissions, requests for production of documents or other formal method of discovery.

1.2     This Protective Order shall also govern any designated record of information produced in this action pursuant to required disclosures under any federal procedural rule or District of Delaware local rule, and any supplementary disclosures thereto.

1.3     This Protective Order shall apply to the parties and any nonparty from whom discovery may be sought and who desires the protection of this Protective Order (collectively herein referred to as a "party" or the "parties").

2     Designation.

2.1     Each party shall have the right to designate as confidential and subject to this Protective Order any information produced by it in this action which contains, reflects, or

EXHIBIT

1

otherwise discloses confidential technical, business or financial information ("CONFIDENTIAL information"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered confidential under this Protective Order. The parties will use reasonable care to avoid designating any documents or information CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER that are generally available to the public.

2.2    Each party shall have the right to designate as restricted to review by those categories of individuals listed in Paragraphs 4.1(a) - 4.1(e) and subject to this Protective Order any information produced in this action which contains, reflects, or otherwise discloses (1) trade secrets, (2) research and development, manufacturing, operational or other highly sensitive technical information, or (3) highly sensitive business related informaton, such as customer, supplier or financial information (collectively, "HIGHLY SENSITIVE CONFIDENTIAL information"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend HIGHLY SENSITIVE CONFIDENTIAL prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered HIGHLY SENSITIVE CONFIDENTIAL under this Protective Order. To the extent that material is marked HIGHLY SENSITIVE CONFIDENTIAL, such material shall be revealed to or used by limited categories of individuals, as provided for in Paragraph 4.2, and shall not be communicated in any manner, either directly or indirectly, to any person or entity not permitted disclosure pursuant to this Protective Order. Any copies of such material, abstracts, summaries or information derived therefrom, and any notes or other records regarding the contents thereof, shall also be deemed HIGHLY SENSITIVE CONFIDENTIAL, and the same terms regarding confidentiality of these materials shall apply as apply to the originals. Use of this highly restrictive designation is limited to information of the highest sensitivity. The parties will use reasonable care to avoid designating any documents or information HIGHLY SENSITIVE CONFIDENTIAL for which the designating party does not have a good faith belief that the documents or information satisfy the criteria set forth in this Paragraph 2.2. HIGHLY SENSITIVE CONFIDENTIAL information shall be used only for purposecs directly related to this action, and for no other purpose whatsoever, except by consent of all of the parties or order of the Court.

2.3    To the extent that any party has, prior to the date that this Order is entered, produced to the other side materials that the producing party has marked with confidentiality designation, all such materials shall be considered to have been designated under this Order as HIGHLY SENSITIVE CONFIDENTIAL unless otherwise agreed by the Parties.

3.    Limit On Use And Disclosure Of Designated Information.

Case 9:07-mc-80223-KLR    Document 2    Entered on FLSD Docket 03/12/2007    Page 5 of 15

3.1    Each party and all persons bound by the terms of this Protective Order shall use any information or document governed by this Protective Order only in connection with the prosecution or defense of this action and for no other purpose, except by consent of the parties or order of the Court. No party or other person shall disclose or release to any person not authorized under this Protective Order any information or document governed by this Protective Order for any purpose, or to any person authorized under this Protective Order for any other purpose.

3.2    It is, however, understood that counsel for a party may give advice and opinions to his or her client in connection with the prosecution or defense of this action based on his or her evaluation of designated confidential information received by the party, provided that such rendering of advice and opinions counsel shall not reveal the content of such information except by prior written agreement with counsel for the producing party.

3.3    The attorneys of record for the parties and other persons receiving information governed by this Protective Order shall exercise reasonable care to ensure that the information and documents governed by this Protective Order are (a) used only for the purposes specified herein, and (b) disclosed only to authorized persons.

4.    Disclosure Of Confidential Material.

4.1    Documents or information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER shall be disclosed by the recipient thereof only to:

(a)    the attorneys who are actively involved in this action that are partners of or employed by the following law firms of record for the parties, and their authorized secretarial, clerical and legal assistant staff: Morris, James, Hitchens & Williams LLP; McKenna, Long & Aldridge LLP; Potter Anderson & Corroon LLP; Bingham McCutchen LLP; Rosethal, Monhait, Gross & Goddess; and Baum & Weems provided that such attorneys shall not be provided access to HIGHLY SENSITIVE CONFIDENTIAL information if such attorneys

(1)    have participated in, directed or supervised any patent prosecution activitiy related to the patents-in-suit or currently participate in, direct or supervise any patent prosecution activity involving (i) flat panel or fllat panel display technology or (ii) technology related or refering to or incorporating flat panels or flat panel displays (collectively, "the Subject Matter"). During the pendency of this litigation and for one year after the full and final conclusion of this litigation, including all appeals, those attorneys at outside counsel for the parties defined above who are provided access to HIGHLY SENSITIVE CONFIDENTIAL materials covered by this order will not participate in, direct or supervise any patent prosecution activity in the United States Patent and Trademark Office or with any patent office outside the United States involving the Subject Matter;

(2)    provide non-legal, business advice or non-legal, business representation or to clients in the flat panel display industry wherein the highly sensitive business-related financial information of any opposing party would be relevant to such non-legal, business advice or non-legal, business representation. During the pendency of this litigation and for one year after the full and final conclusion of this litigation, including all appeals, those attorneys at outside counsel for the parties defined above who are provided access to HIGHLY SENSITIVE CONFIDENTIAL materials covered by this order will not provide non-legal, business advice or non-legal, business representation to clients in the flat panel display industry wherein the highly sensitive business-related information of any opposing party would be relevant to such non-legal, business advice or representation; or

(3)    are related to or have a personal, social relationship with any officer, director or employee of a party

(b)    the Court and Court personnel, as provided in Paragraph 12;

(c)    consultants or experts and their staffs retained by the parties or their attorneys for purposes of this action, who are agreed upon by the parties pursuant to Paragraph 6, who are not employees or otherwise affiliated with any of the parties (except persons scheduled to be deposed by any of the parties pursuant to Rule 30(b)(6), Fed.R.Civ.P.), and who first agree to be bound by the terms of this Protective Order;

(d)    court reporters employed in connection with this action;

(e)    outside copying and computer services necessary for document handling, and other litigation support personnel (e.g., translators, graphic designers and animators);

(f)    One member of LG.Philips LCD, Co., Ltd.'s in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(g)    One member of Viewsonic Corporation's in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(h)    One member of Tatung Company's in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(i)    One attorney of Tatung Company of America, Inc.'s regular out-side counsel, provided that each such individual must first agree to be bound by the terms of this Protective Order;

4.2    Documents or information designated HIGHLY SENSITIVE CONFIDENTIAL shall be disclosed by the recipient thereof only to those categories of individuals listed in Paragraphs 11 4.1(a) - 4.1(e) subject to the restrictions therein.

5.    Redaction

Counsel for a party producing documents may mask ("redact") material deemed exempt
from discovery because it is protected from disclosure under the attorney-client privilege
or work product immunity afforded by Rule 26(b), Fed.R.Civ.P. However, any document
from which material is masked must identify in the masked area that masking or
redaction has occurred. The reason for any such masking must be stated on a log to be
provided within thirty (30) days after the production of the documents. Sufficient
information regarding the masked material must be provided to the other party to enable
it to evaluate the legitimacy of the asserted privilege or immunity. The parties reserve the
right to pursue categories for redaction in addition to those identified above, by either
consent of the parties or order of the Court, to be addressed on a case-by case basis.

6.    Disclosure to Independent Consultants and Identification of Experts.

6.1    If any party desires to disclose information designated CONFIDENTIAL or
HIGHLY SENSITIVE CONFIDENTIAL to any expert or consultant pursuant to
Paragraph 4 above, it must first identify in writing to the attorneys for the producing party
each such expert or consultant. The attorney for the producing party shall have ten (10)
business days from receipt of such notice to object to disclosure of such information to
any of the experts or consultants so identified.

6.2    Such identification shall include the full name and professional address and/or
affiliation of the proposed expert or consultant, an up-to-date curriculum vitae identifying
at least all other present and prior employments or consultancies of the expert or
consultant in the field of flat panel and flat panel display technologies, and a list of the
cases in which the expert or consultant has testified at a deposition, an arbitral hearing or
trial within the last four years. The parties shall attempt to resolve any objections
informally. If the objections cannot be resolved, the party seeking to disclose the
CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information to the expert
or consultant may move the Court for an Order allowing the disclosure. On any motion
challenging the disclosure of such information to an expert or consultant, the burden of
proof shall lie with the party objecting to the disclosure to establish that the information
should not be disclosed to the expert or consultant. In the event objections are made and
not resolved informally, disclosure of information to the expert or consultant shall not be
made except by Order of the Court (or to any limited extent upon which the parties may
agree).

7.    Agreement Of Confidentiality.

In no event shall any information designated CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL be disclosed to any
person authorized pursuant to Paragraph 4, other than (a) the Court and Court personnel,
(b) the parties' attorneys identified in Paragraph 4.1(a) and their authorized secretarial and
legal assistant staffs, (c) court reporters, and (d) outside copying and computer services
necessary for document handling, until such person has executed a written

Confidentiality Undertaking (in the form set forth in Exhibit A hereto) acknowledging and agreeing to be bound by the terms of this Protective Order. Copies of such Confidentiality Undertakings shall be promptly served on the producing party.

8.    Related Documents.

Information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL shall include (a) all documents, copies, extracts, and complete or partial summaries prepared from or containing such information; (b) portions of deposition transcripts and exhibits thereto which contain or reflect the content of any such documents, copies, extracts, or summaries; (c) portions of briefs, memoranda or any other papers filed with the Court and exhibits thereto which contain or reflect the content of any such documents, copies, extracts, or summaries; (d) deposition testimony designated in accordance with Paragraph 9; and (e) testimony taken at a hearing or other proceeding that is designated in accordance with Paragraph 10.

9.    Designation Of Deposition Transcripts.

9.1    Deposition transcripts, or portions thereof, may be designated as subject to this Protective Order either (a) at the time of such deposition, in which case the transcript of the designated testimony shall be marked by the reporter with the appropriate legend (see Paragraph 2.1) as the designating party may direct, or (b) within twenty-one (21) days following the receipt of the transcript of the deposition by providing written notice to the reporter and all counsel of record, in which case all counsel receiving such notice shall mark the copies or portions of the designated transcript in their possession or under their control as directed by the designating party.

9.2    All deposition transcripts not previously designated shall be deemed to be, and shall be treated as, HIGHLY SENSITIVE CONFIDENTIAL until the expiration of the period set forth in Paragraph 9.1, and neither the transcript nor the content of the testimony shall be disclosed by a non-designating party to persons other than those persons named or approved according to Paragraph 4.

9.3    The designating party shall have the right to exclude from a deposition, before the taking of testimony which the designating party designates CONFIDENTIALSUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL and subject to this Protective Order, all persons other than those persons previously qualified to receive such information pursuant to Paragraph 4.

9.4    In addition, to the extent that any document or information that has been designated as either CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL and subject to this Protective Order, such document or information shall not be disclosed to or otherwise used with any witness not currently or previously employed or retained by the producing party during a deposition without at least three (3) calendar days prior notice to the designating party of such potential use in order to permit counsel for the designating party to attend and to take

Case 9:07-mc-80223-KLR   Document 2   Entered on FLSD Docket 03/12/2007   Page 9 of 15

such action as it deems appropriate to protect the confidentiality of the documents and/or information. Counsel for the parties shall attempt to resolve any objection(s) and they will only seek redress to the Court if no resolution can be reached. However, the receiving party shall not use or otherwise disclose the confidential documents or information subject to such objection at such deposition of a witness not currently or previously employed or retained by the producing party until the Court has ruled upon any such objection(s), provided that the producing party submits the matter to the Court within three (3) calendar days of the parties being unable to resolve the objection(s).

10.    Designation Of Hearing Testimony Or Argument.

With respect to testimony elicited during hearings and other proceedings, whenever counsel for any party deems that any question or line of questioning calls for the disclosure of CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL information, counsel may designate on the record prior to such disclosure that the disclosure is subject to confidentiality restrictions. Whenever matter designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL is to be discussed in a hearing or other proceeding, any party claiming such confidentiality may ask the Court to have excluded from the hearing or other proceeding any person who is not entitled under this Order to receive information so designated.

11.    Disclosure To Author Or Recipient.

Notwithstanding any other provisions of this Order, nothing herein shall prohibit counsel for a party from disclosing a document containing information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL to any person which the document clearly identifies as an author, addressee, or carbon copy recipient of such document, or to any current employee of the producing party who by their testimony indicates they have access to the type of information sought to be disclosed. During deposition or trial testimony, counsel may disclose documents produced by a party to current employees and officers of the producing party who by their testimony indicates they have access to the type of information sought to be disclosed. And regardless of such designation pursuant to this Protective Order, if a document or testimony makes reference to the actual or alleged conduct or statements of a person who is a potential witness, counsel may discuss such conduct or statements with such witness without revealing any portion of the document or testimony other than that which specifically refers to such conduct or statement, and such discussion shall not constitute disclosure in violation of this Protective Order

12.    Designation Of Documents Under Seal.

Any information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, if filed with the Court, shall be filed under seal and shall be made available only to the Court and to persons authorized by the terms of this Protective Order. The party filing any paper which reflects, contains or includes

any CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information subject to this Protective Order shall file such paper in a sealed envelope, or other appropriately sealed container, which indicates the title of the action, the party filing the materials, the nature of the materials filed, the appropriate legend (see Paragraph 2.1), and a statement substantially in the following form:

This envelope contains documents subject to a Protective Order of the Court. It should be opened only by the Court. Its contents should not be disclosed, revealed or made public except by Order of the Court or written agreement of the parties.

13.    Confidentiality Of Party's Own Documents.

No person may disclose, in public or private, any designated information of another party except as provided for in this Protective Order, but nothing herein shall affect the right of the designating party to disclose to its officers, directors, employees, attorneys, consultants or experts, or to any other person, its own information. Such disclosure shall not waive the protections of this Protective Order and shall not entitle other parties or their attorneys to disclose such information in violation of it, unless by such disclosure of the designating party the information becomes public knowledge (see Paragraph 16). Similarly, the Protective Order shall not preclude a party from showing its own information to its officers, directors, employees, attorneys, consultants or experts, or to any other person, which information has been filed under seal by the opposing party.

14.    Other Protections.

14.1    No person shall use any CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information, or information derived therefrom, for purposes other than the prosecution or defense of this action, including without limitation, for purposes of preparing, filing or prosecuting any patent application, continuation or divisional patent application, reissue patent application or request for re-examination.

14.2    Any party may mark any document or thing containing CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information as an exhibit to a deposition, hearing or other proceeding and examine any witness thereon qualified under the terms of this Protective Order to have access to such designated material.

15.    Challenge To Confidentiality.

15.1 This Protective Order shall not preclude any party from seeking and obtaining, on an appropriate showing, such additional protection with respect to the confidentiality of documents or other discovery materials as that party may consider appropriate. Nor shall any party be precluded from (a) claiming that any matter designated hereunder is not entitled to the protections of this Protective Order, (b) applying to the Court for an Order permitting the disclosure or use of information or documents otherwise prohibited by this Protective Order, or (c) applying for a further Order modifying this Protective Order in any respect. No party shall be obligated to challenge the propriety of any designation, and

failure to do so shall not preclude a subsequent challenge to the propriety of such designation.

15.2    On any motion challenging the designation of any information, the burden of proof shall lie with the producing party to establish that the information is, in fact, CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information. If a party seeks declassification or removal of particular items from a designation on the ground that such designation is not necessary to protect the interests of the party wishing the designated information, the following procedure shall be utilized:

a. The party seeking such declassification or removal shall give counsel of record for the other party written notice thereof specifying the designated information as to which such removal is sought and the reasons for the request; and

b. If, after conferring, the parties cannot reach agreement concerning the matter, then the party requesting the declassification or removal of particular items may file and serve a motion for a further Order of this Court directing that the designation shall be so removed.

16.    Prior Or Public Knowledge.

This Protective Order shall not apply to information that, prior to disclosure, is public knowledge, and the restrictions contained in this Protective Order shall not apply to information that is, or after disclosure becomes, public knowledge other than by an act or omission of the party to whom such disclosure is made, or that is legitimately and independently acquired from a source not subject to this Protective Order.

17.    Limitation Of Protective Order.

This Protective Order is not intended to address discovery objections to produce, answer, or respond on the grounds of attorney-client privilege or work product doctrine, or to preclude any party from seeking further relief or protective orders from the Court as may be appropriate under the Federal Rules of Civil Procedure.

18    Other Proceedings.

By entering this order and limiting the disclosure of information in this case, the court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who may be subject to a motion to disclose another party's CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information pursuant to this order shall promptly notify that party of the motion so that it may have an opportunity to appear and be heard on whether such information should be disclosed.

19.    Inadvertent Disclosure Of Work Product Or Privileged Information:

Case 9:07-mc-80223-KLR Document 2 Entered on FLSD Docket 03/12/2007 Page 12 of 15

Procedure And Waiver.

19.1  If the producing party at anytime notifies the Non-producing party in writing that it has inadvertently produced documents and/or things that are protected from disclosure under attorney-client privilege, work-product immunity, and/or any other applicable privilege or immunity from disclosure, the non-producing party shall return all copies of such documents and/or things to the producing party within five (5) business days of receipt of such notice and shall not further disclose or use such items for any purpose until further order of the Court. Upon being notified by the producing party pursuant to this section, counsel for the non-producing party shall use his or her best efforts to retrieve all copies of the documents at issue.

19.2  The return of any discovery item to the producing party shall not in any way preclude the non-producing party from moving the Court for a ruling that: (a) the document or thing was never privileged or otherwise immune from disclosure; and/or (b) that any applicable privilege or immunity has been waived.

19.3  Inadvertent or unintentional disclosure of information subject to any privilege or immunity during the course of this litigation without proper designation shall not be deemed a waiver of a claim that disclosed information is in fact subject to a privilege or immunity if so designated within ten (10) business days after the producing party actually learns of the inadvertent or unintentional disclosure.

20.  Non-Party Material.

The terms of this Protective Order, as well as the terms of any protective order that may be entered into between a discovering party and third party for the production of information to the discovering party, are applicable to CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information provided by a non-party Information provided by a non-party in connection with this action and designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, pursuant to the terms of this Protective Order shall be protected by the remedies and relief provided by this Protective Order.

21.  Return Of Designated Information.

Within thirty (30) days of final termination of this action, unless otherwise agreed to in writing by an attorney of record for the designating party, each party shall assemble and return, or certify destruction of, all materials containing information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, including all copies, extracts and summaries thereof, to the party from whom the designated material was obtained, except that (a) any documents or copies which contain, constitute or reflect attorney's work product or attorney-client privilege communications, and (b) archive copies of pleadings, motion papers, deposition transcripts, correspondence and written discovery responses may be retained by counsel.

22.    Waiver Or Termination Of Order.

No part of the restrictions imposed by this Protective Order may be waived or terminated, except by written stipulation executed by counsel of record for each designating party, or by an Order of the Court for good cause shown. The restrictions provided for herein shall not terminate upon the conclusion of this action, but shall continue until further Order of this Court.

23.    Modification Of Order; Prior Agreements.

To the extent the terms of this Protective Order conflict with Local Rule 26.2 or with any agreements between the parties regarding the confidentiality of particular documents or information entered into before the date of this Protective Order, the terms of this Protective Order shall govern, except as to those documents and information produced or disclosed prior to the entry of this Protective Order, which documents and information shall continue to be governed by the terms of such prior agreements or by the provisions of Local Rule 26.2, as applicable.

24.    Section Captions.

The title captions for each section of this Protective Order are for convenience only and are not intended to affect or alter the text of the sections or the substance of the

Order.

Dated: December      , 2004

Case 9:07-mc-80223-KLR Document 2 Entered on FLSD Docket 03/12/2007 Page 14 of 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG PHILIPS LCD CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 04-343-JJF |
| v. | ) | |
| | ) | |
| TATUNG COMPANY; | ) | |
| TATUNG COMPANY OF AMERICA, | ) | |
| INC. and VIEWSONIC CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |

CONFIDENTIALITY UNDERTAKING

I certify that I have read the Protective Order in this action and that I fully understand the terms of the Order. I recognize that I am bound by the terms of that Order, and I agree to comply with those terms. I hereby consent to the personal jurisdiction of the United States District Court, District of Delaware, for any proceedings involving the enforcement of that Order and waive any venue objection with respect to any such proceedings.

EXECUTED this        day of _____, _____.

Name

Affiliation

Business Address

## CERTIFICATE OF SERVICE

I, Jeffrey S. Goddess, hereby certify that on January 24, 2005, I caused two copies of the foregoing document to be served as follows:

(VIA E-MAIL)        Richard D. Kirk, Esquire
                    The Bayard Firm
                    222 Delaware Avenue #900
                    P. O. Box 25130
                    Wilmington, DE 19899
                    Attorneys for Plaintiff L.G. Philips LCD Co., Ltd.

(VIA E-MAIL)        Richard L. Horwitz, Esquire
                    Potter Anderson & Corroon, LLP
                    1313 N. Market Street
                    Hercules Plaza, 6th Floor
                    P. O. Box 951
                    Wilmington, DE 19899

(VIA E-MAIL)        Cass W. Christenson, Esquire
                    McKenna Long & Aldridge LLP
                    1900 K Street, NW
                    Washington, DC 20006

(VIA E-MAIL)        Tracy Roman, Esquire
                    Bingham McCutchen
                    355 S. Grand Ave., 44th Floor
                    Los Angeles, CA 90071

JEFFREY S. GODDESS (No. 630)

# IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF MINNESOTA**

## CIVIL MOTION HEARING

LG Philips LCD Co., Ltd.,
                  Plaintiff,

v.

Tatung Company,
Tatung Company of America, Inc.,and
ViewSonic Corporation,
                  Defendants.

**COURT MINUTES**
BEFORE: Susan Richard Nelson
U.S. Magistrate Judge

| | |
|---|---|
| Case No: | 07-MC-19 JNE/SRN |
| Date: | March 15, 2007 |
| Court Reporter: | Jodi Weisenburger |
| Tape Number: | none |
| Time Commenced: | 3:00 p.m. |
| Time Concluded: | 3:40 p.m. |
| Time in Court: | 40 minutes |

APPEARANCES:

For Plaintiff:                        Daniel Connolly, Shari Klevens, Nicole Balaci
For Defendants Tatung Company, et al.:    Thomas Jensen, Frank Merideth, Deborah Pourapian
For Defendant ViewSonic Corporation:

IF MOTION IS RULED ON PLEASE INCLUDE DOCUMENT NUMBER AND TITLE APPEARING IN CM/ECF.
**ORDER TO BE SUBMITTED BY:** ☐ **COURT** ☐ **PLAINTIFF** ☐ **DEFENDANT**

## Consistent with the Court's ruling from the bench, for the reasons stated in the record:

**The Motion for Protective Order of Defendants Tatung Company and Tatung Company of America, Inc. [Doc. No. 1] is granted in part and denied in part.** There is no dispute among the parties that the documents requested in the Third Party Subpoena to Best Buy, Inc. regarding accused products are relevant and should be produced, commencing immediately. The dispute concerns documents pertaining to unaccused products. The Court orders that Best Buy, Inc. may refrain from producing any documents regarding unaccused products until such time as the Special Master in the pending matter in Delaware rules on a substantially similar discovery motion pending at this time. If the Special Master orders the production of all or certain categories of documents relating to unaccused products, Best Buy, Inc. is hereby ordered to comply with the spirit of the Special Master's Order and produce those documents pursuant to this subpoena. When the Special Master issues the ruling, the parties are instructed to immediately advise Best Buy, Inc. of the ruling. Best Buy, Inc. is to produce such documents even if the time period for discovery set in the Delaware action has expired.

Motions taken under advisement as of:

☐ ORDER TO BE ISSUED    ☒ NO ORDER TO BE ISSUED    ☐ R&R TO BE ISSUED    ☐ NO R&R TO BE ISSUED
☐ Exhibits retained by the Court    ☐ Exhibits returned to counsel

                              s/ Gabriel R. Gervey
                             Signature of Law Clerk

M:\templates\CV Motion Single Prtys.wpt


EXHIBIT
C

# RICHARDS, LAYTON & FINGER

### A PROFESSIONAL ASSOCIATION
### ONE RODNEY SQUARE
### 920 NORTH KING STREET
### WILMINGTON, DELAWARE 19801
### (302) 651-7700
### FAX (302) 651-7701
### WWW.RLF.COM

FREDERICK L. COTTRELL, III
DIRECTOR

DIRECT DIAL
(302) 651-7509
COTTRELL@RLF.COM

March 2, 2007

## CONFIDENTIAL--FILED UNDER SEAL

**BY E-MAIL & HAND DELIVERY**
The Honorable Vincent J. Poppiti
BLANK ROME LLP
Chase Manhattan Center
1201 Market Street, Suite 800
Wilmington, DE 19801

> Re:  *LG.Philips LCD Co., Ltd. v. ViewSonic Corp., et al.,* C.A. No. 04-343-JJF

Dear Special Master Poppiti:

In advance of the telephonic hearing scheduled for 11:00 EST today and in response to Mr. Kirk's letter of March 1, 2007 attaching certain correspondence concerning ongoing discovery discussions between Tatung and LPL, the Tatung Defendants respectfully submit a summary of the documents and information provided to LPL to assist Your Honor in evaluating the Tatung Defendants' compliance with their discovery obligations.

During the period from late January 2007 to the present, the Tatung Defendants have produced close to 10,000 pages of documents which include the following:

- Additional highly confidential Tatung America work instructions for *unaccused products.* Tatung America has produced all of the work instructions it could locate after performing a diligent search, including work instructions for sample products that have never been sold.
- Additional highly confidential Tatung exploded view drawings for *unaccused products.* Tatung has produced all of the exploded view drawings it could locate after performing a diligent search, including drawings for new products from this quarter (quarter 1, 2007).
- Highly confidential sales summaries from 2002 to the present containing model, price and quantity information for all of the visual display products identified in the Tatung Defendants' interrogatory responses.  Notably, most of the sales data pertain to *unaccused products.*

RLF1-3121689-1



The Honorable Vincent J. Poppiti
March 2, 2007
Page 2

- Highly confidential Tatung CAD/CAM drawings of components for certain accused products.
- Additional highly confidential technical documents pertaining to certain accused products.
- Service manuals for certain accused products.
- Bills of materials/parts lists for certain accused products.
- Highly confidential OEM and ODM agreements with Tatung's customers.
- Documents relating to the Tatung Defendants' organizational structure.
- Tatung's annual reports.
- Highly confidential purchase orders, invoices and bills of lading for certain accused products.
- Highly confidential documents sufficient to identify the Tatung Defendants' customers and distributors.
- Highly confidential communications between Tatung and its customers regarding certain accused products.
- Brochures and advertisements.
- A correlation of Tatung model numbers to HP model numbers.
- Additional prior art related documents.

The documents identified above are responsive to a number of LPL Document Requests, including Nos. 6,7, 10, 13, 15, 16, 25, 51, 52, 57, 59, 61, 62, 64, 65, 67, 68, 69 and 70.

In addition, the Tatung Defendants have served amended and supplemental interrogatory responses identifying, among other things, additional products and prior art.

The Tatung Defendants have made available for inspection, and LPL has examined, disassembled and photographed, more than 40 monitor and television products.

Tatung also has provided to LPL an amended chart which identifies the exploded view drawing(s) (by bates number(s)) that cover particular series or groups of products. All of the products identified in Tatung's amended and supplemental interrogatory responses have been categorized. Altogether, Tatung produced at least 66 drawings covering 307 products. (*See* Amended Chart at Exhibit A.) After performing a diligent search, Tatung was unable to locate drawings for three products.

Finally, Tatung will be producing today so-called "Process Flow Charts" for certain accused products.

It is important to remember that what the Tatung Defendants agreed to produce during

The Honorable Vincent J. Poppiti
March 2, 2007
Page 3

the parties' December 2006 meet and confers and during the January 2007 hearing were 1) documents sufficient for LPL to evaluate infringement; 2) sales summaries; and 3) additional documents pertaining to the three previously identified accused products. The Tatung Defendants have lived up to this agreement. Until November 2006, LPL had accused only one Tatung product of infringing the patents-in-suit. In November, LPL identified two additional accused products. *It was not until mid-January 2007 that LPL identified 14 additional accused products.* As a result, the Tatung Defendants have been forced to engage in piecemeal supplementations and are still in the process locating additional responsive documents pertaining to some of the newly identified accused products.

Because LPL now has all of the information it needs to evaluate infringement (including the amended categorization chart, the exploded view drawings and the work instructions for all products), the Tatung Defendants respectfully request that Your Honor set a deadline by which LPL must identify all allegedly infringing Tatung and Tatung America products.

Respectfully,

Frederick L. Cottrell, III

FLC,III/afg
cc:     Clerk of Court (via CM/ECF)
        Richard Kirk, Esquire (via electronic mail)
        Cormac T. Connor, Esquire (via electronic mail)
        Lora Brzezynski, Esquire (via electronic mail)
        Mark Krietzman, Esquire (via electronic mail)
        Scott R. Miller, Esquire (via electronic mail)
        Jeffrey B. Bove, Esquire (via electronic mail)

# EXHIBIT A

# Greenberg Traurig

Valerie W Ho
Tel 310 586 7841
Fax 310 586 7800
HoV@gtlaw.com

March 1, 2007

**Via E-Mail and U.S. Mail**

Rel Ambrozy, Esq.
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006

Re: *LG Philips LCD Co., Ltd. vs. ViewSonic Corporation, et al.*
Delaware District Court, Case No. 04-343 JJF

Dear Rel:

Attached is an updated chart regarding the exploded view drawings that have been produced for Tatung Company's products. This chart includes all of the products identified in Tatung's amended and supplemental responses to LPL's interrogatories nos. 2 and 3. Please note that as previously discussed, only the products ending with a "U" designation are destined for North America. The other products are qualified and destined for other locations such as Europe and Asia. It remains our position that only the products destined for North America could be at issue potentially. However, for the sake of completeness, we have included even the non-North American products in the attached chart. The chart identifies by bates numbers the drawing(s) that corresponds to a particular group of products. The bolded items are the ones that were not included in the first chart provided as an attachment to Mr. Merideth's letter dated January 31, 2007. Tatung has now produced at least 66 drawings covering 307 products. It has produced all of the drawings it could locate after performing a diligent search. A few of the recently produced drawings are for new products from the current quarter (First Quarter of 2007) and will be included in a further supplementation of the interrogatory responses.

Please feel free to call me if you have any questions.

Very truly yours,

Valerie W. Ho

LA 126735232v1 3/1/2007

Greenberg Traurig, LLP | Attorneys at Law | Los Angeles Office | 2450 Colorado Avenue | Suite 400E | Santa Monica, CA 90404 | Tel 310 586 7700 | Fax 310 586 7800 | www.gtlaw.com

Rel Ambrozy, Esq.
March 1, 2007
Page 2

_____

cc:     Cass Christenson (via email)
        Lora Brzezynski (via email)
        Richard Kick (via email)
        Scott Miller (via email)
        Jeffrey Bove (via email)
        James Heisman (via email)
        Tracy Roman (via email)
        Frank Merideth (via email)
        Mark Krietzman (via email)
        Steve Hassid (via email)

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

L15BCVK-U03                                  TDE006371
    L15BCVK-U13

L15CCAE                                      TDE005010
    L15CCAE-U07
    L15CCAE-U17
    L15CCAE-U27
    L15ECAE
    L15ECAE-U27
    L15ECAE-U37

L15CCAT                                      TDE006372
    L15CCAT-U01
    L15CCAT-U05
    L15CCAT-U13
    L15CCAT-U23
    L15CCAT-U32
    L15CCAT-UA3
    L15CCAT-UB3

L15CCQT                                      TDE005012
    L15CCQT-U09
    L15CCQT-U19
    **L15DCAV-U16**

L15FCBT                                      TDE005006
    L15FCBT-U02
    L15FCBT-U09
    L15FCBT-U12

L17ACAE                                      TDE005024
    L17ACAE-U07
    L17ECAE-U07

**L17ACAH-J05 Non-North American product**     **TDE006375**

L17ACLN-U03                                  TDE005116, TDE005117
    L17ACLN-U13
    L17ACLN-UB3
    L17ACTN-U01
    L17ACTN-U23
    L17ACTN-U32
    L17ACTN-UC3
    L17ACTN-UD2

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

L17AMTN-U01                   TDE006385
     L17AMTN-U03
     L17AMTN-U22
     L17AMTN-U23
     L17AMTN-U32

**L17CCAT-U05**            **TDE005026, TDE006376**
     L17CMAT-E05 Non-North American Product
     L17CM(Q)AT-E05 Non-North American Product
     L17CQAT-E05

**L17DSAV-U16**                **TDE013138**

L17FCBT                  TDE005118, TDE005119
     L17FCBT-U02
     L17FCBT-U 12

L17FCMT                 TDE005115
     L17FCMT-U05

L17ECBQ-U08             TDE0013140
     L17KCBQ-U08
     **L17EMBQ-U08**

**L17NCDT-U00**              **TDE006379**

**L17PCAG**                **TDE005120**
     **L17PCAG-U65**
     **L17PCAG-UA5**

L17PCBG                 TDE005121
     L17PCBG-U05
     L17PCBG-U15
     L17PCBG-UA5
     **L17PCBG-U25**
     **L17PCBG-U65**
     **L17PCBG-U75**
     **L17PCBG-UB5**

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **L17UCCT-U01** | **TDE013007, TDE013157** |
| **L17UCCT-U02** | |
| **L17UCCT-U12** | |
| **L17UCCT-U22** | |
| **L17UCCT-U25** | |
| **L17UCCT-U32** | |
| **L17UCCT-U42** | |
| **L17UCCT-U62** | |
| **L17UCCT-U72** | |
| **L17UCCT-U82** | |
| | |
| **L17WCAG-U15** | **TDE013141** |
| | |
| **L17WCBG-U05** | **TDE013142** |
| **L17WCBG-U15** | |
| | |
| L19ACLN | TDE005113 |
| L19ACLN-U13 | |
| | |
| **L19ACTN-U23** | **TDE005112** |
| | |
| **L19AMTN-U32** | **TDE006380** |
| | |
| L19CMAT-U32 | TDE006381 |
| L19CYAT-U05 | |
| | |
| L19FCBT | TDE005114 |
| L19FCBT-U12 | |
| | |
| **L19FCMT-U05** | **TDE005115** |
| | |
| **L19NCDT-U00** | **TDE013668** |
| | |
| **L20WCAQ-U19** | **TDE013143, TDE013144** |
| | |
| **L22YMTT-U09** | **TDE013139** |

*LA 126734849v1 3/1/2007*

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

L5CDS                                          TDE005014, TDE006367

    L5CDSDP-C81 Non-North American Product
    L5CDSDP-D01 Non-North American Product
    L5CDSDP-D02 Non-North American Product
    L5CDSDP-D12 Non-North American Product
    L5CDSDP-J05 Non-North American Product
    L5CDSDP-J15 Non-North American Product
    L5CDSDP-J21 Non-North American Product
    L5CDSDP-J22 Non-North American Product
    L5CDSDP-J25 Non-North American Product
    L5CDSDP-J31 Non-North American Product
    L5CDSDP-J32 Non-North American Product
    L5CDSDP-S03 Non-North American Product
    L5CDSDP-U01
    L5CDSDP-U11
    L5CDSDP-U21
    L5CDSDP-U22
    L5CDSDP-U26
    L5CDSDP-U31
    L5CDSDP-U32
    L5CDSDP-U72
    L5CDSDP-U81
    L5CDSDP-U82
    L5CDSDP-U91
    L5CDSDP-U92
    L5CDTDP-D01 Non-North American Product
    L5CDTDP-D11 Non-North American Product
    L5CDTDP-E01 Non-North American Product
    L5CDTDP-E11 Non-North American Product
    L5CDTDP-E81 Non-North American Product
    L5CDTDP-J05 Non-North American Product
    L5CDTDP-J15 Non-North American Product
    L5TDS
    L5TDSDP-U01
    L5PDS
    L5PDSDP-U01

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**L5CES/T**                                                                  TDE005016
     L5CESDP-U81
     L5CESPP-U12
     L5CESPP-U20
     L5CESPP-U32
     L5CESPP-U41
     L5CESPP-U42
     L5CESPP-D42
     L5CESPP-E11 Non-North American Product
     L5CESPP-S01 Non-North American Product
     L5CESPP-U01
     L5CETPP-E02 Non-North American Product
     L5CETPP-E11 Non-North American Product
     L5CETPP-E22 Non-North American Product
     L5CETPP-E32 Non-North American Product
     L5CETPP-E42 Non-North American Product
     L5CETPP-E82 Non-North American Product
     L5CETPP-E92 Non-North American Product
     L5CETPP-S01 Non-North American Product
     L5PESPP
     L5PESPP-U01

**L5CTSDP**                                                                  TDE005019
     L5CTSDP-D01 Non-North American Product
     L5CTSDP-J05 Non-North American Product
     L5CTSDP-S04 Non-North American Product
     L5CTSDP-U01
     L5CTSDP-U03
     L5CTSDP-U05
     L5CTSDP-U06
     L5CTSDP-U13
     L5CTSDP-U22
     L5CTSDP-U32
     **L5CTSDP-U52**
     L5CTSDP-U62
     L5CTSDP-U81
     **L5CTSDP-U82**
     L5CTSDP-UA3

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

L5PHS                                          TDE005021, TDE013667
    L5PHSDP
    L5PHSDP-D09 Non-North American Product
    L5PHSDP-E09 Non-North American Product
    L5PHSDP-E39 Non-North American Product
    L5PHSDP-E49 Non-North American Product
    L5PHSDP-J09 Non-North American Product
    L5PHSDP-J19 Non-North American Product
    L5PHSDP-J29 Non-North American Product
    L5PHSDP-S09 Non-North American Product
    L5PHSDP-S19 Non-North American Product
    L5PHSDP-U09
    L5PHSDP-U19
    L5PHSDP-U29
    L5PHTDP
    L5PHTDP-E19 Non-North American Product
    L5PHTDP-E29 Non-North American Product

L5PVTPP                                        TDE005023, TDE006369
    L5PVTPP-J15 Non-North American Product
    L5PVTPP-U25
    L5SVTPP-U45

**L5XKTPP-U03**                                **TDE013145**

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

P42HFHH-U05                    TDE015113
     P42HFHH-U06
     P42HFHH-U07
     P42HFHH-U08
     P42HFHH-U09
     P42HFHH-U10
     P42HFHH-U11
     P42HFHH-U12
     P42HFHH-U13
     P42HFHH-U14
     P42HFHH-U15
     P42HFHH-U16
     P42HFHH-U17
     P42HFHH-U18
     P42HFHH-U19
     P42HFHH-U20
     P42HFHH-U21
     P42HFHH-U22
     P42HFHH-U23
     P42HFHH-U24
     P42HFHH-U25
     P42HFHH-U26
     P42HFHH-U27
     P42HFHH-U28
     P42HFHH-U29
     P42HFHH-U30
     P42HFHH-U31
     P42HFHH-U32
     P42HFHH-U33
     P42HFHH-U34
     P42HFHH-U35
     P42HFHH-U36
     P42HFHH-U37
     P42HFHH-U38
     P42HFHH-U39
     P42HFHH-U40
     P42HFHH-U41
     P42HFHH-U42
     P42HFHH-U43
     P42HFHH-UB5
     P42HSHT-U09
     P42HSHT-U09H

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**P46CCWV After a diligent search Tatung Co. has not been able to locate an assembly drawing for this product.**
  **P46CCWV-U01**
  **P46CCWV-U02**

PTAB915DN0 Non-North American Product  TDE006384
  PTAB915DN01 Non-North American Product
  PTAB915DN02 Non-North American Product
  PTAB915DN03 Non-North American Product
  PTAB915DN04 Non-North American Product
  PTAB915DN07 Non-North American Product
  PTAB915DN09 Non-North American Product
  PTAB915DN10 Non-North American Product
  PTAB915DN11 Non-North American Product
  PTAB915DN12 Non-North American Product

TTABB10  TDE006385
  TTABB10N01
  TTAB910N01 Non-North American Product
  **TTAB910N02 Non-North American Product**
  TTAB910N04 Non-North American Product
  RTABB10
  RTABB10S01 Non-North American Product
  TTAB510
  TTAB510N03 Non-North American Product

TTAB910E Non-North American Product  TDE006386
  TTAB910EA01 Non-North American Product
  TTAB910EG01 Non-North American Product
  TTAB910EN01 Non-North American Product
  TTAB910EN02 Non-North American Product

**TTAB915DN01 Non-North American Product After a diligent search Tatung Co. has not been able to locate an assembly drawing for this product.**

*LA 126734849v1 3/1/2007*

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

TTABA12DB Non-North American Product     TDE006387
     TTABA12DB04 Non-North American Product
     TTABA12D Non-North American Product
     TTABA12DF02 Non-North American Product
     TTABA12DN04 Non-North American Product
     TTABA12DN06 Non-North American Product
     TTABB12DB Non-North American Product
     TTABB12DB15 Non-North American Product
     TTABB12DCN1 Non-North American Product
     TTABB12DCN1 Non-North American Product
     TTABB12DDN6 Non-North American Product
     TTABB12DH05 Non-North American Product
     TTABB12DJ06 Non-North American Product
     TTABB12DN0 Non-North American Product
     TTABB12DN01 Non-North American Product
     TTABB12DN02 Non-North American Product
     TTABB12DN03 Non-North American Product
     TTABB12DN04 Non-North American Product
     TTABB12DN07 Non-North American Product
     TTABB12DN10 Non-North American Product
     TTABB12DN12 Non-North American Product
     TTABB12DN14 Non-North American Product
     TTABB12DN15 Non-North American Product
     TTABB12DN16 Non-North American Product
     TTABB12DN18 Non-North American Product
     TWN5213K03V Non-North American Product
     TWN5213K20V Non-North American Product

**V15PCAP-U03**                    **TDE015115**

**V17AFTW**                        TDE006395
     V17AFTW-U01
     V17AFTW-U05

**V17ULAJ**                        **TDE006364**
     **V17ULAJ-U06**

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| V23CLTT | TDE006399, TDE015114, |
|     V23CLTT-U01 | TDE015116, TDE015117 |
|     V23CLTT-U02 | |
|     V23CLTT-U05 | |
|     **V23CLTT-U62** | |
|     V27CMTT-U01 | |
|     V30CMTT-U62 | |
|     **V30CMTT-U01** | |
|     V30CMTT-U03 | |
|     V30CMTT-U05 | |
|     **V23DLWX-U12** | |

**V23ULAJ-U06 After a diligent search Tatung Co. has not been able to locate an assembly drawing for this product.**

| | |
|---|---|
| **V26ALAH-U15** | **TDE013669** |
| **V32ALAH-U15** | **TDE006400** |
| **V32FLBB-U21** | **TDE006402** |
| VTAB830 Non-North American Product | TDE006403 |
|     VTAB830-E01 Non-North American Product | |
|     VTAB830-E02 Non-North American Product | |
|     VTAB830-N01 Non-North American Product | |
|     VTAB830-P05 Non-North American Product | |



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,

     Plaintiff,

vs.

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; and
VIEWSONIC CORPORATION,

     Defendants.

_____/

CASE NO. 07-MC-80223-KLR
CASE NO: 04-343-JJF (D. Del.)

## VERIFIED MOTION FOR ADMISSION *PRO HAC VICE* OF SHARI L. KLEVENS

In accordance with Local Rule 4B of the Special Rules Governing the Admission and

Practice of Attorneys of the United States District Court for the Southern District of Florida, the

undersigned respectfully moves for the admission of Shari L. Klevens of the law firm of

McKenna Long & Aldridge, LLP for purposes of appearing as co-counsel on behalf of LG

Philips LCD Co., Ltd. ("LG Philips") herein, in the above-styled case only. McKenna Long &

Aldridge LLP is located at 1900 K Street, NW, Washington, DC 20006, and Shari L. Klevens

can be reached at (202) 496-7612.

Shari L. Klevens certifies herewith that she has studied the Local Rules of this Court and

is a member in good standing with the District of Columbia and Virginia Bars.

In further support of this motion, it is hereby designated that Marissa D. Kelley is a

member of the bar of this Court and maintains an office in this District for the practice of law.

She is a person to whom the Court and counsel may readily communicate and upon whom papers

may be served. In addition, the law firm of Stearns, Weaver, Miller, Weissler, Alhadeff &

Sitterson, P.A. acts as local counsel in this matter on behalf of LG Philips.

## VERIFICATION OF APPLICANT

I, Shari L. Klevens, hereby verify that the matters set forth above are true and correct, and

are executed under penalty of perjury on the 20th day of March, 2007 at Washington, DC.

_____

Shari L. Klevens

DISTRICT OF COLUMBIA :

ss

~~COUNTY OF~~_____ :

Before me, the undersigned authority, personally appeared Shari L. Klevens who, upon

first being duly cautioned and sworn, acknowledged before me that she has read the foregoing

verified motion and that she has personal knowledge of the facts and matters therein set forth and

that each of these facts and matters is true and correct.

SUBSCRIBED AND SWORN to by me this 20th day of March, 2007, by Shari L.

Klevens, who is personally known to me ~~or who has produced~~_____

as identification.

_____

Notary Public

District of Columbia

Commission Expires: 2/29/2012

## CONSENT TO DESIGNATION

I hereby consent to the foregoing designation.

Dated: 3-21-07

_____

Marissa D. Kelley

Florida Bar No. 379300

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served a copy of the within and foregoing

**Verified Motion For Admission *Pro Hac Vice* Of Shari L. Klevens** on all counsel or parties of

record on the attached service list.

Submitted this 21st day of March, 2007.

Marissa D. Kelley, Esq.
Florida Bar Number: 379300
mkelley@swmwas.com
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: 954-462-9500
Facsimile: 954-462-9567
*Attorney for LG Philips*

# SERVICE LIST

Richard D. Kirk, Esq.
rkirk@bayardfirm.com
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE 19899

Jeffrey B. Bove, Esq.
jbove@cblh.com
James D. Heisman, Esq.
jheisman@cblh.com
Jaclyn M. Mason, Esq.
jmason@cblh.com
Connolly Bove Lodge & Hurtz, LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Tracy R. Roman, Esq.
troman@raskinpeter.com
Raskin Peter Rubin & Simon, LLP
1801 Century Park East
Suite 2300
Los Angeles, CA 90067

Scott R. Miller, Esq.
smiller@cblh.com
Connolly Bove Lodge & Hurtz, LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Frederick L. Cottrell, III, Esq.
Cottrell@RLF.com
Anne Shea Gaza, Esq.
Gaza@RLF.com
Richards Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Frank E. Merideth, Jr., Esq.
meridethf@gtlaw.com
Valerie W. Ho, Esq.
hov@gtlaw.com
Mark H. Krietzman, Esq.
krietzmanm@gtlaw.com
Greenberg Traurig, LLP
2450 Colorado Avenue
Suite 400E
Santa Monica, CA 90404

Geoffrey M. Cohen, Esq.
coheng@gtlaw.com
Greenberg Traurig, LLP
5100 Town Center Circle
Suite 400
Boca Raton, FL 33486

Shari L. Klevens, Esq.
sklevens@mckennalong.com
Lora A. Brzezynski, Esq.
lbrzezynski@mckennalong.com
Cormac T. Connor, Esq.
cconnor@mckennalong.com
McKenna Long & Aldridge, LLP
1900 K. Street, NW
Washington, DC 20006

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

LG.PHILIPS LCD CO., LTD.

       Plaintiff,

                               **Case No. 07-MC-80223-KLR**

TATUNG COMPANY; TATUNG         *D. Delaware Case No. 04-343-JJF*
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION

       Defendants.

REPLY OF PLAINTIFF LG.PHILIPS LCD CO., LTD.
TO TATUNG DEFENDANTS' OPPOSITION
TO MOTION FOR EXPEDITED RELIEF

       Plaintiff LG.Philips LCD Co., Ltd. ("LPL" or "Plaintiff") respectfully submits

this Reply to Defendants Tatung Company and Tatung Company of America, Inc.'s

(collectively, "Tatung") Opposition to LPL's Motion for Expedited Relief From Order

Pursuant to Fed. R. Civ. P. 60(b) and Local Rule 7.1(E) ("LPL's Motion"). **[DE 10.]**

**I.**       **OTHER COURTS HEARING IDENTICAL MOTIONS FOR**
        **PROTECTIVE ORDERS FILED BY TATUNG HAVE DENIED THE**
        **MOTION**

       Tatung's submissions to this Court have been virtually identical to motions it has

submitted in at least 14 other jurisdictions related to 23 other subpoenas across the

country. For that reason, the resolution of those related disputes merits consideration by

this Court. To date, eight separate courts have heard argument regarding 13 Tatung

motions since LPL first filed its emergency Motion in this Court on March 14, 2007. A

majority of these courts have accepted LPL's arguments, by either denying Tatung's

1

motions for protective orders outright or by transferring the dispute to the District of Delaware for resolution as requested by LPL.

Three courts immediately denied the Tatung Defendants' motions upon conclusion of the parties' oral arguments. (*See* Exs. 1-3.) Indeed, the Northern District of California concluded that "Tatung has not articulated any clearly defined and serious injury that would result in the absence of the protective order it seeks." (*See* Ex. 1.) Similarly, the Eastern District of California also denied Tatung's motion and concluded that:

> Plaintiff counters that it properly seeks information about *all* potentially infringing products, not just those that have so far been identified. The court agrees. Under Federal Rule of Civil Procedure 26(b)(1), "the parties may obtain discovery on any matter, not privileged that is relevant to the claims or defenses of any party . . . [and] relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

(*See* Ex. 2.) The Court there also found Tatung's arguments regarding the trade secret or confidential nature of the documents at issue to be unconvincing. (*Id.*) In light of the fact that the court in Main Case entered a protective order governing the use and disclosure of business confidential information, the court failed to understand why the discovery should not be produced. (*See id.*)

In both the Eastern and Northern Districts of California, the Court denied Tatung's motion, in part, because of Tatung's failure to produce the discovery sought by the Plaintiff. In the Eastern District, the court held that "it appears that defendants have been less than forthcoming with information directly sought from it during discovery." Indeed, the court held that because the "plaintiff has had to obtain through third party

discovery information that defendants allegedly denied the existence of" and "[g]iven the difficulty in obtaining information directly from defendants, third party discovery efforts appear to be justified." (Ex. 2; *see also* Ex. 1 (holding by the Northern District court that "[a] party in litigation is not obligated to take the word of an opponent regarding what relevant documents do or do not exist."))

Importantly, the Northern District court also concluded that Tatung's motions were made with a goal of seeking tactical advantage, rather than protecting any substantive rights, and expressed particular concern about Tatung's actions in this jurisdiction:

> Indeed, it appears to the Court that Tatung's pattern of filing 23 motions for protective orders around the country bears all the indicia of a litigation tactic designed to avoid presenting this issue to the Delaware court, which knows the most about this case, and to multiply the cost of litigation. In this regard, the Court also notes that Tatung appears to have engaged in a pattern of questionable conduct in a matter pending in the United States District Court for the Southern District of Florida related to a similar motion for protective order related to another of the 23 subpoenas served in the Main Action.

(*See* Ex. 1.) The courts denying the Tatung Defendants' motions have agreed that the Tatung Defendants have failed to meet their burden to establish good cause for a protective order. (Ex. 1-3.)

Courts in four other jurisdictions granted LPL's request to the have the motions transferred to the District of Delaware. (*See* Ex. 4-6.). Tatung has indicated that it would not oppose such a measure here. **[DE 10 at p. 5.]** Tatung's Opposition implies, however, that transfer is not truly necessary, because an impending ruling is likely to impose restrictions similar to those in the Order at issue here. That is incorrect.

3

Although the parties are waiting for the Special Master's ruling in the main case on the appropriate scope of discovery, the impending ruling will apply solely to exchange of discovery *between the parties to the litigation, not to discovery obtainable from third parties*. LPL expects the court's ruling to permit discovery with respect to additional identified and unidentified accused products, rather than only with respect to those that have already been specifically identified.

Even in Arkansas, New Jersey, and Minnesota, where the courts granted in part and denied in part Tatung's motion, those courts allowed LPL to obtain discovery regarding Tatung generally and also permitted LPL to obtain discovery related to additional products not currently accused if such discovery is later permitted by the Special Master in Delaware. (*See* Exs. 7 and 8.) Contrary to Tatung's position that the motion should be granted, <u>no</u> court that has heard argument on these issues has unconditionally granted Tatung's requested relief.

## II.   THE TATUNG DEFENDANTS' MOTION IS NOTHING MORE THAN AN ATTEMPT TO INTERFERE WITH LPL'S LEGITIMATE THIRD PARTY DISCOVERY

Tatung's interference with valid third party discovery is inappropriate and is nothing more than an attempt to delay the third party discovery until after the March 30, 2007 discovery deadline. As LPL explained at length in its original Motion, Tatung's tactics have been effective with respect to Sensormatic. **[DE 3 p. 8.]** The tactics have been effective with other third parties, as well.[1] Tatung's decision to wait almost one

---

[1] For example, on March 8, 2007, LPL received correspondence from Tyco Electronics Corp. ("Tyco"), who LPL had also served with a Subpoena. (*See* Ex. 9.) Prior to that date, Tyco had also agreed to produce documents in response to the Subpoena. In the correspondence on March 8, however, Tyco stated that, "I understand that [Tatung] intends to file a motion for protective order with regard to this subpoena. In light of this, Tyco will await the disposition of this motion by the court before providing any material in response to the subpoena." (*Id.*) These communications clearly show that Tatung's motions are delaying LPL's legitimate discovery in this action.

4

month to file its motions for protective order and Tatung's disruptive communications with third parties are tactics that Tatung has used before in the Main Case and in at least one prior patent infringement case.

In the Main Case, during the jurisdictional discovery phase, "Tatung failed to appear for depositions on multiple occasions, failed to produce witnesses prepared to testify on noticed and relevant topics, and failed to respond to interrogatories and requests for production of documents," which forced LPL to waste its resources just to prove that Tatung's products are sold in Delaware. (Ex. 10, Report & Recomms. at 9 (Aug. 16, 2005) (imposing sanctions on Tatung).) Ultimately, after the Special Discovery Master in the Main Case reviewed Tatung's pattern of delay and discovery abuse, Tatung withdrew its jurisdictional defense. (*See generally id.*)

Tatung has also taken steps to disrupt third party discovery in at least one other case. *See Safer Display Technology, Ltd. v. Tatung Co.*, 227 F.R.D. 435 (E.D. Va. 2004) (copy attached hereto). In that case, represented by the same counsel as in the Main Case, Tatung engaged in similar delays before it finally withdrew its jurisdictional defense. *See Safer Display*, 227 F.R.D. at 437. Notably, in *Safer Display*, Tatung worked diligently to impede third party discovery by contacting and attempting to dissuade third parties from producing discovery, (*see* Ex. 11 at 9-10), and filing motions for protective orders for which Tatung lacked standing, (*see id.* at 10-11).

Tatung's argument that it has not interfered with legitimate discovery is undermined by the extension of the discovery deadline in the Main Case. Contrary to Tatung's suggestion, the Special Discovery Master in Delaware agreed with LPL's position here regarding the need to extend third party discovery in light of the interference caused by Tatung. Ex. 12 at 26-27. ("I note in [Tatung's] papers and I note [Tatung's] argument that these depositions were scheduled when they were, but my view of expecting that you are going to be getting an extension has more to do with where we are as a result of the third-party practice in terms of these other applications in

the other districts than it is a function of when the depositions were noticed.") Indeed, upon agreement of both LPL and Tatung, the Special Discovery Master extended the deadline for third party discovery until May 11, 2007.

As Tatung is aware, all of these emergency hearings have been scheduled to occur simultaneously with depositions of Tatung's witnesses.[2] Because LPL's lead trial counsel are busy taking and defending depositions this week, it appears that Tatung strategically filed these requests for expedited hearing in an attempt to prevent LPL from obtaining significant and relevant information it needs from the third parties or to divert LPL's focus from the Tatung depositions. Tatung's continuing pattern of dilatory tactics and improper interference with LPL's discovery efforts should not be allowed to continue.

## III. THE SCOPE OF THE SUBPOENA IS REASONABLE, AND IN ANY EVENT, TATUNG'S OBJECTIONS ARE MISPLACED

In its Motion, Tatung argues that any discovery should be limited to the accused products. This, however, is precisely why LPL issued the Subpoenas. In its Complaint, LPL identified to Tatung an example of a product that LPL alleged to infringe the Patents-in-Suit. However, because Tatung makes hundreds of products, most of which are sold under brand names belonging to third parties, LPL has no way to know, without Tatung's assistance, which of Tatung's hundreds of products use infringing technology. LPL's attempts to obtain information regarding Defendants' products has been ongoing since November 2005. However, the Defendants have objected to producing documents that would enable LPL to identify those products, and continue to resist LPL's efforts to this day. In fact, during a hearing on March 12, 2007, Tatung conceded that it has not

---

[2] Tatung argues that they violated no rules by failing to serve LPL with the motion by email even though they were seeking expedited relief. Even if no rules were violated, however, it is clear that Tatung went against the prior practice in this action of serving all counsel by email, even though Tatung served many other documents by email in the same week related to other issues in the Main Case. Tatung's choice not to follow that practice was improper and in bad faith.

produced all such documents and that it would produce additional documents in April 2007, after the deadline for the close of third party discovery.

In light of the Delaware Court's Scheduling Order, requiring that third party discovery be completed by March 30, Tatung's efforts to limit the scope of LPL's subpoena to products that have been accused of infringement will artificially narrow the scope of the subpoena to products that are currently accused, even though that list will likely expand in April, after LPL finally receives Tatung's supplemental document production.

In addition, Tatung's objections to the scope of the Subpoena are misplaced. Specifically, objections based on burden or scope of a Subpoena should be made by the party upon whom the Subpoena is served. As the burden will not be borne by Tatung, Tatung does not have standing to raise that issue. To the extent that Tatung believes that the documents produced by third parties are not relevant to the litigation, or exceed the bounds of admissible evidence, Tatung can raise those arguments in advance of trial. *See Cook v. Rockwell Intern. Corp.*, 935 F.Supp. 1452, 1465 (D.Colo. 1996) ("Defendants had no standing to object to the breadth of the order [with respect to third party subpoena] but were restricted to appropriate objections as to relevance and admissibility before trial.") Notably, Tatung filed the Motions for Protective Order without regard for the fact that several of the third parties had either already produced the requested documents or agreed to produce the requested documents with objection. As the party to whom the Subpoena was served has not filed a Motion for Protective Order with respect to the breadth of the Subpoena, Tatung's objection on that basis should be denied.

## IV.   **CONCLUSION**

It is vitally important that this Court either vacate its Order or transfer the Tatung Defendants' Motion because otherwise, LPL will be unable to obtain the critical discovery it needs from Sensormatic. Because the Tatung Defendants have refused to

provide discovery relating to Sensormatic, if the Court does not vacate its Order or

transfer the Tatung Defendants' Motion, LPL will have no further recourse and will not

ever get access to the discovery it needs from Sensormatic.

Dated: March 22, 2007

Respectfully Submitted,

Martin B. Woods, Esq.
Fla. Bar No. 340294
mwoods@swmwas.com
Marissa D. Kelley, Esq.
Fla. Bar No. 379300
mkelley@swmwas.com
STEARNS WEAVER MILLER
WEISSLER
ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: 954-462-9500
Facsimile: 954-462-9567

OF COUNSEL:
Shari L. Klevens, Esq.
sklevens@mckennalong.com
Lora A. Brzezynski, Esq.
lbrzezynski@mckennalong.com
Cormac T. Connor, Esq.
cconnor@mckennalong.com
McKenna Long & Aldridge, LLP
1900 K Street, NW
Washington, DC 20006
*Attorneys for LG.Philips LCD Co., Ltd.*

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served a copy of the within and

foregoing on all counsel or parties of record on the attached service list by electronic mail

and U.S. Mail.

Submitted this _22d_ day of March, 2007.

Marissa D. Kelley, Esq.
Florida Bar Number: 379300
mkelley@swmwas.com
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: 954-462-9500
Facsimile: 954-462-9567
*Attorney for LG Philips*

## SERVICE LIST

Richard D. Kirk, Esq.
rkirk@bayardfirm.com
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE 19899

Jeffrey B. Bove, Esq.
jbove@cblh.com
James D. Heisman, Esq.
jheisman@cblh.com
Jaclyn M. Mason, Esq.
jmason@cblh.com
Connolly Bove Lodge & Hurtz, LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Tracy R. Roman, Esq.
troman@raskinpeter.com
Raskin Peter Rubin & Simon, LLP
1801 Century Park East
Suite 2300
Los Angeles, CA 90067

Scott R. Miller, Esq.
smiller@cblh.com
Connolly Bove Lodge & Hurtz, LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Frederick L. Cottrell, III, Esq.
Cottrell@RLF.com
Anne Shea Gaza, Esq.
Gaza@RLF.com
Richards Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Frank E. Merideth, Jr., Esq.
meridethf@gtlaw.com
Valerie W. Ho, Esq.
hov@gtlaw.com
Mark H. Krietzman, Esq.
krietzmanm@gtlaw.com
Greenberg Traurig, LLP
2450 Colorado Avenue
Suite 400E
Santa Monica, CA 90404

Geoffrey M. Cahen, Esq.
caheng@gtlaw.com
Greenberg Traurig, LLP
5100 Town Center Circle
Suite 400
Boca Raton, FL 33486

Shari L. Klevens, Esq.
sklevens@mckennalong.com
Lora A. Brzezynski, Esq.
lbrzezynski@mckennalong.com
Cormac T. Connor, Esq.
cconnor@mckennalong.com
McKenna Long & Aldridge, LLP
1900 K. Street, NW
Washington, DC 20006

# EXHIBIT 1

1   ANN G. GRIMALDI (BAR NO. 160893)
    McKENNA LONG & ALDRIDGE LLP
2   101 California Street
    41st Floor
3   San Francisco, CA  94111
    *Telephone:*    (415) 267-4000
4   *Facsimile:*    (415) 267-4198

5   Attorneys for Plaintiff
    L.G. Philips LCD Co., Ltd.

6

7

8                   **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                  **SAN FRANCISCO DIVISION**

11

12  L.G. PHILIPS LCD CO., LTD.,            CASE NO. C 07 80073 WHA

13                  Plaintiffs,            [PROPOSED] **ORDER DENYING
                                           TATUNG'S MOTION FOR PROTECTIVE
14          v.                             ORDER AND SETTING BRIEFING
                                           SCHEDULE FOR LPL'S MOTION TO
15  TATUNG COMPANY, TATUNG CO. OF          COMPEL, IF ANY, AGAINST THIRD
    AMERICA, INC.; AND VIEWSONIC           PARTY SAFEWAY, INC.**
16  CORPORATION,

17                  Defendants.

18

19

20          The Motion for Protective Order Limiting Scope of Third Party Deposition and Subpoena

21  (the "Motion"), brought by Defendants Tatung Company and Tatung Co. of America, Inc.

22  (collectively, "Tatung"), came on for hearing on an expedited basis on March 16, 2007.  Jong P.

23  Hong of Greenberg Traurig appeared for Tatung; Ann G. Grimaldi of McKenna Long & Aldridge

24  LLP appeared for Plaintiff LG. Philips LCD Co., Ltd. ("LPL"); and John Dahlberg of Dillingham

25  & Murphy LLP appeared for third party Safeway, Inc.  The Court, having considered the parties'

26  papers and arguments of counsel (including counsel for third party Safeway, Inc.), and for the

27  reasons set forth below, DENIES Tatung's Motion *in toto.*

28

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

[PROPOSED] ORDER DENYING TATUNG'S MOTION FOR PROTECTIVE ORDER AND SETTING BRIEFING SCHEDULE FOR LPL'S
MOTION TO COMPEL, IF ANY, AGAINST THIRD PARTY SAFEWAY, INC.

## I.     BACKGROUND AND THE PARTIES' CONTENTIONS

1

2          The Motion arises out of a patent infringement lawsuit pending in the United States

3   District Court for the District of Delaware, *LG. Philips LCD Co., Ltd. v. Tatung Company, et al.,*

4   Case No. 04-343-JJF (the "Main Action").  As part of discovery efforts in the Main Action, on or

5   about February 13, 2007, LPL served a subpoena duces tecum and deposition notice in this

6   District on third party Safeway, Inc. (the "Subpoena").  At approximately the same time, LPL

7   served similar subpoenas on 22 other third parties located around the nation.  Tatung has filed

8   motions for protective orders, as to all these subpoenas, in over a dozen jurisdictions.

9          According to the papers filed by the parties, March 30, 2007 is the discovery cut-off date

10  in the Main Action.  Due to the exigent nature of these circumstances, and given that this Court

11  has jurisdiction to make orders associated with subpoenas issued in this District, the Court

12  granted Tatung's request to hear this matter on an expedited basis.

13         In its Motion, made pursuant to Federal Rule of Civil Procedure 26(c), Tatung challenges

14  the scope of the Safeway subpoena on two primary grounds.  First, Tatung contends that the

15  scope the subpoena is overbroad in that it encompasses information related both to products that

16  LPL has accused of infringing the subject patent (the "Accused Products") and to products that

17  (although the proper subject of the complaint) LPL has not accused of infringing the subject

18  patent (the "Non-Accused Products").  Tatung argues that the scope of the Subpoena must be

19  limited to the Accused Products only.  According to both LPL and Tatung, the Special Master in

20  the Main Action soon will be ruling on the issue of whether LPL is entitled to discovery from

21  Tatung with respect to Non-Accused Products.

22         Second, Tatung asserts that the information requested by the Subpoena calls for trade

23  secrets and sensitive and confidential business information.  Tatung purports to establish the need

24  for a protective order on that basis through the Declaration of Jackson Chang, General Manager

25  of Display BU Sales for Tatung Company.

26         For its part, LPL contends that it is entitled to all the requested discovery called for by the

27  Subpoena.  At a minimum, the requested information may assist in establishing claims for

28  inducement to infringe.  Furthermore, according to LPL, Tatung finally has agreed to produce

- 2 -

1   certain technical drawings on April 6, 2007 (*i.e.*, after the March 30 discovery cut-off), through

2   which LPL will determine what other products to accuse of infringement. LPL asserts that it

3   must be free to take full discovery from Safeway now, before the cut-off, for otherwise it may be

4   foreclosed completely from taking necessary discovery as to such new Accused Products. In

5   addition, LPL asserts that third party discovery is necessary in order to determine whether

6   Tatung's prior discovery responses and productions are complete. As to Tatung's claims

7   regarding trade secrets and confidential business information, LPL asserts that a protective order

8   addressing these issues already exists in the Main Action and that Tatung has not made a

9   sufficient showing as to why that protective order is insufficient to protect its interests. With

10  respect to both of Tatung's arguments, LPL asserts that Tatung has not met its burden of

11  demonstrating good cause for a protective order under Federal Rule of Civil Procedure 26(c).

12  ## II.    ANALYSIS AND FINDINGS

13         The legal standard for a motion for protective order under Federal Rule of Civil Procedure

14  26(c) is well established. The burden is on the moving party to establish good cause for such an

15  order. Good cause, in turn, is defined as a demonstration that a clearly defined and serious injury

16  will result in the absence of a protective order. Tatung has failed to meet that standard here.

17         As a threshold matter, the Court holds that Tatung does have standing to challenge the

18  Subpoena through a Rule 26(c) motion, as it has here. The core dispute, however, is between

19  LPL and Tatung, parties in the Main Action; third party Safeway has filed no motion relating to

20  the Subpoena. As a practical matter, this Motion should have been filed in Delaware, before the

21  Delaware judge who has presided over the Main Action since its inception in 2004. Since Tatung

22  has chosen this District in which to make this Motion, and since this Motion has been brought

23  before the discovery cut-off and is therefore timely, this Court will rule fully on the substantive

24  merits.

25         Third party discovery is a time-honored device to get at the truth of a claim or defense. A

26  party in litigation is not obligated to take the word of an opponent regarding what relevant

27  documents do or do not exist. Indeed, it is common experience to find that third parties are in

28  possession of documents that parties to an action have asserted do not exist.

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

- 3 -

[PROPOSED] ORDER DENYING TATUNG'S MOTION FOR PROTECTIVE ORDER AND SETTING BRIEFING SCHEDULE FOR LPL'S
MOTION TO COMPEL, IF ANY, AGAINST THIRD PARTY SAFEWAY, INC.

1    LPL is entitled to take discovery from Safeway. The Court finds that the scope of the

2    Subpoena is reasonable, and the Court will not impose any limitations regarding Accused or Non-

3    Accused Products, or any other limitations, on it. The Court also finds that the deposition notice

4    served on Safeway, and the topics identified therein, are reasonable; the Court will not impose

5    any limitations on the scope of topics to be covered. In sum, the Court concludes that Tatung has

6    not articulated any clearly defined and serious injury that would result in the absence of the

7    protective order it seeks.

8    As to Tatung's claims regarding trade secrets and confidential business information, the

9    Court observes that there is a strong public policy in this District to maintain the transparency of

10    legal proceedings and to deny requests for secrecy absent good cause. The Court concludes that

11    Tatung has failed to make the necessary showing of good cause here. Whether because of

12    unfamiliarity with the requirements and policies of this District, or some other reason, Tatung

13    utterly has failed to meet the required standard with its submission of the Declaration of Jackson

14    Chang, which the Court finds conclusory.

15    Indeed, it appears to the Court that Tatung's pattern of filing 23 motions for protective

16    orders around the country bears all the indicia of a litigation tactic designed to avoid presenting

17    this issue to the Delaware court, which knows the most about this case, and to multiply the cost of

18    litigation. In this regard, the Court also notes that Tatung appears to have engaged in a pattern of

19    questionable conduct in a matter pending in the United States District Court for the Southern

20    District of Florida related to a similar motion for protective order related to another of the 23

21    subpoenas served in the Main Action.

22    Turning now to Safeway's position, the Court makes the following determinations.

23    Because Safeway has failed to move for a protective order with respect to the noticed deposition,

24    it must make its witness available pursuant to the terms of the Subpoena and notice. *See* FRCP

25    26(c), 45. With respect to the document requests, however, the Court understands that Safeway

26    has served objections. Thus, it is LPL's burden to move to compel production. *See* FRCP 45(c).

27

28

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 4 -
[PROPOSED] ORDER DENYING TATUNG'S MOTION FOR PROTECTIVE ORDER AND SETTING BRIEFING SCHEDULE FOR LPL'S
MOTION TO COMPEL, IF ANY, AGAINST THIRD PARTY SAFEWAY, INC.

1

### III. ORDER

2 Tatung's Motion is DENIED *in toto*. The scope of the Subpoena and deposition notice

3 shall not be limited in any respect.

4 The deposition of Safeway shall proceed as per the Subpoena and deposition notice.

5 With respect to the document requests contained in the Subpoena, the Court trusts that

6 counsel for LPL and Safeway will be able to reach agreement regarding Safeway's objections. If

7 they cannot, and if LPL wishes to file a motion to compel, then the Court sets the following

8 briefing schedule for LPL's motion: LPL's opening papers to be filed no later than noon on

9 March 20, 2007; Safeway's response to be filed and served no later than noon on March 21, 2007;

10 hearing on the motion is set for 9:00 a.m. on March 23, 2007.

11 The Court will entertain no further motions in this matter after the Main Action's

12 discovery cut-off date of March 30, 2007.

13 This Order is made without prejudice to Safeway's rights to seek appropriate relief as

14 allowed by the Federal Rules of Civil Procedure, and is made without prejudice to Tatung's rights

15 to seek, consistent with any requirements applicable in the Main Action, protection of documents

16 produced by Safeway.

17

18 **IT IS SO ORDERED.**

19 Date: March 20, 2007.

20



  The Honorable William H. Alsup

21

22

23

24

25

26

27

28

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

[PROPOSED] ORDER DENYING TATUNG'S MOTION FOR PROTECTIVE ORDER AND SETTING BRIEFING SCHEDULE FOR LPL'S
MOTION TO COMPEL, IF ANY, AGAINST THIRD PARTY SAFEWAY, INC.

# EXHIBIT 2

**Timothy R. Sullivan**

| | |
|---|---|
| **From:** | caed_cmecf_helpdesk@caed.uscourts.gov |
| **Sent:** | Wednesday, March 21, 2007 5:33 PM |
| **To:** | caed_cmecf_nef@caed.uscourts.gov |
| **Subject:** | Activity in Case 2:07-mc-00018-FCD-EFB L.G. Phillips LCD CO, LTD. v. Tatung Company, et. al. "Order" |

***NOTE TO PUBLIC ACCESS USERS*** There is no charge for viewing opinions.

**U.S. District Court**

**Eastern District of California - Live System**

Notice of Electronic Filing

The following transaction was received from Hinkle, T entered on 3/21/2007 at 5:32 PM PDT and filed on 3/21/2007

| | |
|---|---|
| **Case Name:** | L.G. Phillips LCD CO, LTD. v. Tatung Company, et. al. |
| **Case Number:** | 2:07-mc-18 |
| **Filer:** | |
| **Document Number:** | 8 |

**Docket Text:**
ORDER signed by Judge Edmund F. Brennan on 3/21/07 in Misc. S-07-0018 FCD/EFB and Misc. F-07-0009 EFB ORDERING: (1) The Tatung Defendants' motion for a protective order is denied; (2) Third-party Pelco's motion to quash or modify the subpoena duces tecum and notice of deposition is denied; (3) nothwithstanding the denial, plaintiff shall limit the use of confidential or sensitive information produced by Pelco (as described in the order); and (4) notwithstanding the denial of defendants' and third-party Pelco's motions, the parties shall comply with any order issued by the Delaware Special Master. (Hinkle, T)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1064943537 [Date=3/21/2007] [FileNumber=1537507-0
] [9a75af84414456f70fe556661c9aca9033066d9bbe92ed2f5c4202545919825f5e1
6e03aca62be95a4692a8c6b9b430de642d0640593781a461cb8bf23b31d34]]

**2:07-mc-18 Electronically filed documents will be served electronically to:**

Marc Bradley Koenigsberg    koenigsbergm@gtlaw.com, brownsh@gtlaw.com

Timothy R. Sullivan    trs@calitigation.com

**2:07-mc-18 Electronically filed documents must be served conventionally by the filer to:**

Richard D. Kirk-CAED NOT ADMITTED
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899

1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10    L.G. PHILIPS LCD CO. LTD.,

11              Plaintiff,                          Misc. F-07-0009 EFB
                                                    Misc. S-07-0018 FCD EFB
12         vs.

13    TATUNG COMPANY, et al.,                       ORDER

14              Defendants.
      _____/

15

16         The above-captioned miscellaneous cases were before the undersigned on Wednesday,

17    March 21, 2007, for hearing on defendant's motion for protective order and third-party Pelco's

18    motion to quash, or alternatively, modify the subpoena duces tecum and notice of deposition.[1]

19    Timothy R. Sullivan appeared as plaintiff's counsel. Marc Koenigsberg appeared as defense

20    counsel, and Donald R. Fischbach appeared as counsel for Pelco.

21    I.    **BACKGROUND**

22         The underlying action is a patent infringement case, which is currently pending in the

23    District of Delaware. Plaintiff, LG Philips LCD Co. Ltd. ("LG"), owns two patents which relate

24    _____

25         [1] Defendants' motion was filed in the Sacramento division of this court, while Pelco's
      motion to quash was filed in the Fresno division. Because both motions sought to limit the scope
      of Pelco's deposition and its production pursuant to a subpoena duces tecum, the matters were
26    deemed related and heard together by the undersigned.

1

1   to mounting systems used in visual display products such as liquid crystal display monitors,

2   laptop computers and televisions. Defendants Tatung Company and Tatung Company of

3   America (collectively referred to as "defendants" and/or "Tatung") are manufacturers and

4   resellers of computer monitors and other visual display products. Plaintiff alleges that

5   defendants have directly infringed its patents with respect to twenty of defendants' products (the

6   "accused products"). Plaintiff also alleges that defendants have induced other parties, including

7   third-party Pelco, to infringe plaintiff's patents. Pelco, a partnership organized under the laws of

8   California, is a Tatung customer.

9         On February 14, 2007, plaintiff noticed the deposition of Pelco for March 28, 2007,

10  which was later rescheduled for March 22, 2007 in Fresno, California.[2] Plaintiff also served

11  Pelco with a subpoena duces tecum identifying documents Pelco was to produce either at or

12  before the deposition. On March 15, 2007, defendants filed with this court a motion for

13  protective order to limit the scope of the Pelco deposition and related document production to the

14  accused products in the underlying Delaware litigation. In support of its motion, defendants

15  argued that the sought-after discovery was irrelevant and unduly burdensome, and that it sought

16  defendants' confidential business and trade information.

17        Both plaintiff and defendants point out that currently pending before the Special Master

18  in Delaware are one or more discovery motions concerning the very issue of whether plaintiff is

19  entitled to conduct discovery on "unaccused" products. As of the March 21, 2007, hearing, the

20  Special Master had not yet issued an order on those motions. The discovery cut-off in this case

21  is March 30, 2007.[3]

22

23       [2] As discussed at the hearing, there was some confusion by the parties and Pelco, as to where and when the deposition was to take place. In documents filed with the court, one

24  deposition notice indicates the deposition is to occur in Sacramento, while another indicates Fresno. The parties indicated that the deposition will occur in Fresno, California.

25

       [3] After the hearing, counsel for plaintiff contacted the court and advised it that the

26  discovery deadline had just been extended to sometime in May 2007. In light of that

1      On March 7, 2007, third-party Pelco filed a motion to quash or modify the scope of the

2  subpoena and scheduled deposition. Pelco sought to limit the scope of plaintiff's discovery,

3  citing concerns that the requested discovery sought confidential, trade-secret information. After

4  determining that the motions filed by Pelco and defendants were inextricably related, Pelco's

5  motion was reassigned to the undersigned for expedited hearing, in light of the impending

6  deposition.

7  **II.    ANALYSIS**

8      Defendants' motion and Pelco's motion mirror each other in many ways as they seek to

9  limit the scope of the third-party discovery served on Pelco.

10     **A. Defendants' Motion**

11     Defendants seek a protective order limiting the scope of discovery aimed at third-party

12  Pelco to the accused products in the underlying suit. Defendants argue that any discovery

13  beyond the accused products is irrelevant. Plaintiff counters that it properly seeks information

14  about *all* potentially infringing products, not just those that have so far been identified. The

15  court agrees. Under Federal Rule of Civil Procedure 26(b)(1), "parties may obtain discovery on

16  any matter, not privileged that is relevant to the claims or defense of any party. . . .[and] relevant

17  information need not be admissible at the trial if the discovery appears reasonably calculated to

18  lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  In the present case,

19  plaintiff represents that it has asserted claims that defendants have induced third-parties to

20  infringe plaintiff's patents. The discovery propounded on Pelco appears to seek information

21  related to that claim insofar as it seeks to identify further incidents of infringement regarding the

22  patents-in-suit.

23     Defendants also seeks to limit Pelco's discovery disclosures based on their claims that

24  such discovery is aimed at obtaining defendants' proprietary trade secret information.

25  _____

development, the parties and Pelco are free to decide among themselves whether the deposition
26  will occur on March 22, 2007, or at some other time agreed upon by all those concerned.

3

1   There is no absolute privilege for trade secrets and similar confidential information.

2   *Chembio Diagnostic Sys. v. Saliva Diagnostic Sys.*, 236 F.R.D. 129, 136 (E.D.N.Y. 2006).

3   However, Federal Rule of Civil Procedure 26(c)(7) provides that a district court, "for good

4   cause shown," may order "that a trade secret or other confidential research, development, or

5   commercial information not be revealed or be revealed only in a designated way." *Id.* (citations

6   omitted). To demonstrate good cause under this provision, a party is required to establish a

7   "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory

8   statements." *Bank of New York v. Meridien Biao Bank Tanz, Ltd.*, 171 F.R.D. 135, 143

9   (S.D.N.Y. 1997) (citations omitted). "Broad allegations of harm, unsubstantiated by specific

10  examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id.* The party seeking the

11  protective order must also show that the harm caused by its disclosure outweighs the need of the

12  party seeking the disclosure. *Id.*

13      As discussed in more detail in the following section, defendants have not made a

14  sufficient showing that the requested information qualifies as a trade secret or other confidential

15  information. Furthermore, they have not indicated how any harm in disclosure is not adequately

16  mitigated by the protective order already in place in the Delaware action.

17      **B. Pelco's Motion**

18      The court is similarly unpersuaded by Pelco's assertion the requested discovery threatens

19  to expose highly confidential business information and trade secrets. First, the court finds that

20  Pelco has failed to demonstrate that the requested information constitutes trade secret or highly

21  confidential business information.

22      "Trade secret or commercially sensitive information must be important proprietary

23  information and the party challenging the subpoena must make a strong showing that it has

24  historically sought to maintain the confidentiality of this information." *Gonzales v. Google, Inc.*,

25  234 F.R.D. 674, 684 (N.D. Cal. 2006) (citations omitted).

26  *////*

4

1       Pelco's declaration supporting its motion merely asserts that it is not a publicly traded

2    company, i.e., that it is a partnership. Pelco makes no declarations with respect to safeguards it

3    uses or has historically used to protect the requested information. Pelco makes no showing that

4    the communications between it and defendants concerning the sale, manufacturing, marketing

5    and distribution of visual display products are protected by any privilege, or are otherwise

6    subject to confidentiality agreements. Furthermore, in a letter dated February 27, 2007, from

7    Pelco's counsel to plaintiff's counsel, Pelco indicates its willingness to produce several

8    categories of requested information including: "all contracts, supply agreements, licenses or

9    distribution agreements between Pelco and Tatung or ViewSonic; documents related to technical

10    specifications, manufacturing or assembly of Tatung and ViewSonic Products;" and, "documents

11    relating to the marketing of products to Pelco including brochures, etc." Pelco's very recently

12    demonstrated willingness to produce such information undercuts its current claims that this and

13    similar information are protected trade secrets.

14       The court also notes that in defendants' motion for a protective order, defendants claim

15    some of the information sought by plaintiff from Pelco are *defendants'* proprietary trade secret

16    information. Neither Pelco nor Tatung has suggested that a confidentiality agreement is in place

17    to govern their business relationship. Absent such an arrangement between Pelco and Tatung, it

18    remains unclear how Pelco – a third party not in privity with Tatung – can have in its possession

19    *Tatung's* proprietary trade secret information.

20       Further, neither Tatung nor Pelco have provided a convincing explanation as to how the

21    protective order currently in place in the Delaware action fails to protect the allegedly sensitive

22    information. That order applies to and protects confidential information produced by parties and

23    non-parties alike.  Under the provisions of that order, trade secret and highly sensitive business

24    information may be designated as "highly sensitive confidential information." Such a

25    designation limits the disclosure of such information to the parties' attorneys only. Thus, the

26    provisions of the protective order appear to obviate Tatung's and Pelco's concerns about plaintiff

5

1  obtaining a competitive advantage through Pelco's disclosure of the requested information.

2  Finally, based on plaintiff's representations in its opposition to defendants' motion for

3  protective order, it appears that defendants have been less than forthcoming with information

4  directly sought from it during discovery. *See, e.g.*, Plaintiff's Opposition to Tatung's Motion for

5  Protective Order, at 4:23-27 (noting that plaintiff has had to obtain through third party discovery

6  information that defendants allegedly denied the existence of). Given the difficulty in obtaining

7  information directly from defendants, third party discovery efforts appear to be justified.

8  Further, the protective order already in place accounts for and appears to adequately protect

9  defendants and Pelco alike from further disclosure of confidential information beyond the

10  parties' attorneys.

11  **III.    CONCLUSION**

12  In accordance with the foregoing, IT IS HEREBY ORDERED that:

13  1. Defendants' motion for a protective order is denied;

14  2. Pelco's motion to quash or modify the subpoena duces tecum and notice of deposition

15  is denied;

16  3. Notwithstanding the denial of Pelco's motion, plaintiff shall limit the use of any

17  confidential or sensitive information produced by Pelco (at the deposition or in response to the

18  subpoena) in accordance with the terms regarding the handling of "highly sensitive confidential

19  information" set forth in the protective order in place in the District of Delaware;

20  4. Notwithstanding the denial of defendants' and Pelco's motions, if the Special Master

21  in the District of Delaware issues an order prior to Pelco's scheduled deposition that limits

22  plaintiff's discovery to the accused products, the parties shall comply with the terms of any such

23  order or ruling.

24  IT IS SO ORDERED.

25  DATED: March 21, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

6

# EXHIBIT 3

## Balaci, Nicole

| | |
|---|---|
| **From:** | Klevens, Shari |
| **Sent:** | Wednesday, March 21, 2007 2:30 PM |
| **To:** | REARMOUNT-MLA |
| **Cc:** | Balaci, Nicole |
| **Subject:** | FW: Activity in Case 1:07-mc-10056-JLT LG Philips LCD CO., v. Tatung Co. et al "Order on Motion for Protective Order" |

FYI

**From:** John Commisso [mailto:jcommisso@klhboston.com]
**Sent:** Wednesday, March 21, 2007 2:38 PM
**To:** Klevens, Shari; Balaci, Nicole
**Subject:** FW: Activity in Case 1:07-mc-10056-JLT LG Philips LCD CO., v. Tatung Co. et al "Order on Motion for Protective Order"

---- Original Message ----
From: "ECFnotice@mad.uscourts.gov" <ECFnotice@mad.uscourts.gov>
Date: 3/21/07 2:31 pm
To: "CourtCopy@mad.uscourts.gov" <CourtCopy@mad.uscourts.gov>
Subj: Activity in Case 1:07-mc-10056-JLT LG Philips LCD CO., v. Tatung Co. et al "Order on Motion for Protective Order"
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

United States District Court

District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Bowler, Marianne entered on 3/21/2007 at 2:21 PM EDT and filed on 3/21/2007

Case Name:  LG Philips LCD CO., v. Tatung Co. et al
Case Number:  1:07-mc-10056 <https://ecf.mad.uscourts.gov/cgi-bin/DktRpt.pl?108256>
Filer:
Document Number:

Docket Text:
Judge Marianne B. Bowler: Electronic ORDER entered denying [2] Motion for Protective Order, after hearing, because the matter at issue is currently being addressed by the discovery master in the Delaware action. (Bowler, Marianne)

The following document(s) are associated with this transaction:

1:07-mc-10056 Notice will be electronically mailed to:

John J. Commisso    jcommisso@klhboston.com

Andrew D. Kang    kanga@gtlaw.com

3/21/2007

Annapoorni R. Sankaran    sankarana@gtlaw.com, martink@gtlaw.com; watersj@gtlaw.com

1:07-mc-10056 Notice will not be electronically mailed to:

Lora A. Brzezynski
McKenna Long & Aldridge LLO
1900 K Street, NW
Washington, DC 20006

Cormac T. Connor
McKenna Long & Aldridge LLO
1900 K Street, NW
Washington, DC 20006

Valaric Ho
Greenberg Traurig
2450 Colorado Blvd
Santa Monica, CA 90404

Shari L. Klevens
McKenna Long & Aldridge, LLO
1900 K Street, NW
Washington, DC 20006

Frank Meredith , Jr
Greenberg Traurig
2450 Colorado Blvd
Santa Monica, CA 90404

Charlene Oh
Greenberg Traurig
2450 Colorado Blvd
Santa Monica, CA 90404

# EXHIBIT 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

L.G. PHILIPS LCD CO., LTD.,

                    Plaintiff,

v.

TATUNG CO., et al.,

                    Defendants.

No. C07-398 MJP

ORDER

      This matter comes before the Court on Defendant Tatung Company and Tatung Company of America, Inc.'s motion for a protective order limiting the scope of a third-party deposition and subpoena and request for an expedited hearing. (Dkt. No. 1).

      This dispute involves a deposition notice and subpoena issued in this district and served on third-party Amazon.com in connection with a patent infringement lawsuit pending in the United States District Court for the District of Delaware. Defendants filed a motion for protective order limiting discovery from Amazon.com. Plaintiff has requested that the Court formally transfer this dispute to the District of Delaware.. (Dkt. No. 3 at 6-7). In their Reply, Defendants state that they do not oppose the transfer. (Dkt. No. 5 at 3).

      The Court has the authority to transfer this matter to the court where the main action is pending. See In re Digital Equipment Corp., 949 F.2d 228, 231 (8th Cir. 1991); Fed. R. Civ. P. 26(c) advisory committee's note ("The court in the district where the deposition is being taken may, and frequently will, remit the deponent or party to the court where the action is pending."). Because the Delaware Court is in a better position to evaluate this dispute in light of the history of the discovery disputes between these parties and the facts at issue in the main case, and because neither party

ORDER - 1

1   opposes the transfer, the Court orders that this case be transferred to the United States District Court

2   for the District of Delaware.

3        The Clerk is directed to prepare all necessary materials and transfer them as expeditiously as

4   possible to the United States District Court for the District of Delaware.  The Clerk is also directed to

5   send copies of this order to all counsel of record.

6        Dated this 20th day of March, 2007.

7

8                           Marsha J. Pechman

9                           United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER - 2

# EXHIBIT 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.G. PHILIPS LCD CO., LTD.,<br><br>                                    Plaintiff,<br><br>          v.<br><br>TATUNG COMPANY; TATUNG COMPANY<br>OF AMERICA, INC.; and VIEWSONIC<br>CORPORATION,<br><br>                                    Defendants. | Civil No.    07cv0450-H (CAB)<br><br>**ORDER REGARDING DEFENDANT'S<br>MOTION FOR A PROTECTIVE ORDER** |

On March 20, 2007, the Court held a telephonic discovery conference on Defendant Tatung Company's Motion for a Protective Order Limiting Scope of Third Party Deposition and Subpoena. Shari Klevens, Esq., and Ross Hyslop, Esq., appeared for Plaintiff LG Philips LCD ("LG"). Charlene Oh, Esq., and Nadia Bermudez, Esq., appeared for Defendant Tatung Company ("Tatung"). Thomas Kovach, Esq., appeared for American Dynamics, the subpoenaed third party.

LG sued Tatung in the District of Delaware for patent infringement, Civil Action No. 04-343 (JJF) ("Delaware case"). On or about February 13, 2007, LG served 23 third-party subpoenas for documents and depositions on Tatung customers in 15 different judicial districts, including service on American Dynamics in the Southern District of California. Tatung moved for a Protective Order in this district arguing the subpoena was overly broad and harassing and required the disclosure of highly sensitive business information that was not relevant to the patent infringement case. LG opposed the motion, arguing that the discovery is relevant to its infringement claims and investigation, Tatung's

1

1  confidentiality concerns were adequately addressed by the protective order in place in the Delaware case,

2  and Tatung had no standing to argue the subpoena was overly burdensome, since it was not Tatung's

3  burden to respond.  American Dynamics neither moved for a protective order itself, nor joined Tatung's

4  written motion, although counsel for American Dynamics represented in the telephonic conference that

5  his client would seek to narrow the scope of the subpoena.

6          The issues raised in Tatung's motion are not limited to the American Dynamics subpoena.

7  Similar issues are being addressed with regard to many, if not all, of the other 22 third-party subpoenas

8  issued by LG.  LG, therefore, requested this Court exercise its discretion to transfer Tatung's motion to

9  the District of Delaware, to be heard in the Delaware case.  Tatung and American Dynamics joined in

10  that request indicating that it is the parties' intention to have all the related motions transferred to

11  Delaware for a uniform decision by the court in which the Delaware case is pending.  There being no

12  objection to the request to transfer the motion, and in fact, the request having been made by all parties,

13  including the subpoenaed party, **IT IS HEREBY ORDERED** that Tatung's Motion for a Protective

14  Order Limiting the Scope of the Third Party Deposition and Subpoena served on American Dynamics be

15  transferred to the District of Delaware.  The discovery sought from American Dynamics is stayed

16  pending a decision on Tatung's motion by the Delaware District Court.

17  DATED:  March 21, 2007

18

19                                                    _____

20                                                    **CATHY ANN BENCIVENGO**
                                                     United States Magistrate Judge

21

22  cc:     Thomas H. Kovach
23          Pepper Hamilton LLP
            Hercules Plaza, Suite 5100
24          1313 Market Street
            P.O. Box 1709
            Wilmington, DE 19899-1709

25

26

27

28

07cv0450

# EXHIBIT 6

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAR 2 1 2007

CLERK, U.S. DISTRICT COURT
By _____
       Deputy

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

LG.PHILIPS LCD CO., LTD., PLAINTIFF

v.

TATUNG COMPANY, *et al*, DEFENDANTS

**3-07 mc 0018-P-BD**
**ECF**
Referred to the U.S. Magistrate Judge

## AGREED ORDER TRANSFERRING CASE TO UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

Defendants Tatung Company and Tatung Company of America, Inc. filed motions for protective orders relating to deposition subpoenas in this case and in case 3-07-mc 0017-N-BD. Plaintiff LG.Philips LCD Co., Ltd responded and requested, *inter alia,* transfer of the pending motions to the United States District Court for the District of Delaware where the main case is pending as case number 1:04-cv-00343-JJF. The parties agree that this Court has discretion to transfer the case as requested and additionally have agreed to the transfer and entry of this order. Based on the agreements of the parties as evidenced by their signatures below, the Court is of the opinion that the case should be transferred. Accordingly, this case is

ORDERED TRANSFERRED to the United States District Court for the District of Delaware.

Signed *March 21, 2007*

UNITED STATES MAGISTRATE JUDGE

**AGREED:**

Frank L. Broyles by Penelope Blackwell with permission

Attorney for Respondent: LG.Philips LCD Co., Ltd.

Penelope Brobst Blackwell

Attorney for Movants: Tatung Company and Tatung Company of America, Inc.

Page Solo

## Lori Powell

**From:** ecf_txnd@txnd.uscourts.gov
**Sent:** Wednesday, March 21, 2007 4:03 PM
**To:** Courtmail@txnd.uscourts.gov
**Subject:** Activity in Case 3:07-mc-00018 In Re Subpoena issued to Radio Shack Corporation Order Transferring to Another District

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Northern District of Texas

### Notice of Electronic Filing

The following transaction was entered on 3/21/2007 at 4:02 PM CDT and filed on 3/21/2007
**Case Name:** In Re Subpoena issued to Radio Shack Corporation
**Case Number:** 3:07-mc-18
**Filer:**
**Document Number:** 14

**Docket Text:**
Agreed Order Transferring case to United States District Court for the District of Delaware. (Signed by Judge Barbara M. G. Lynn on March 21, 2007) (mfw)

**3:07-mc-18 Notice has been electronically mailed to:**
Franklin L Broyles frankb@gucl.com, carak@gucl.com, lorip@gucl.com
Penelope Brobst Blackwell blackwellp@gtlaw.com, shepardsona@gtlaw.com

**3:07-mc-18 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1004035775 [Date=3/21/2007] [FileNumber=3037678-0
] [d2d3b53a2eb7af476ad00c9559b47094ba92c260f3ceb673321bc21311ceed86f6e
b3c69c3a41e9b3531d8f1140574e196c33e81f31bf0d40f3138851a6fd79d]]

## Lori Powell

| | |
|---|---|
| **From:** | ecf_txnd@txnd.uscourts.gov |
| **Sent:** | Wednesday, March 21, 2007 4:05 PM |
| **To:** | Courtmail@txnd.uscourts.gov |
| **Subject:** | Activity in Case 3:07-mc-00018 In Re Subpoena issued to Radio Shack Corporation Case Transferred Out - District Transfer |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Northern District of Texas

## Notice of Electronic Filing

The following transaction was entered on 3/21/2007 at 4:04 PM CDT and filed on 3/21/2007
**Case Name:**      In Re Subpoena issued to Radio Shack Corporation
**Case Number:**      3:07-mc-18
**Filer:**
**WARNING: CASE CLOSED on 03/21/2007**
**Document Number:** No document attached

**Docket Text:**
Interdistrict Transfer to District of Delaware. (mfw)

**3:07-mc-18 Notice has been electronically mailed to:**
Franklin L Broyles frankb@gucl.com, carak@gucl.com, lorip@gucl.com
Penelope Brobst Blackwell blackwellp@gtlaw.com, shepardsona@gtlaw.com

**3:07-mc-18 Notice will not be electronically mailed to:**

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

TATUNG COMPANY, ET AL                                     PLAINTIFF

V.                         NO. 5:07-MC-0005-RTD

L.G. PHILLIPS LCD, CO., LTD.                              DEFENDANT

### O R D E R

Before the court is the Motion for Protective Order (Doc. 1) filed March 9, 2007 by the

Petitioner, TATUNG COMPANY and TATUNG COMPANY OF AMERICA seeking to limit

third party discovery from Wal-Mart Stores, Inc. and Sam's Club. The matter was referred to the

undersigned by Order (Doc. 3) entered March 12, 2007.

The Court did schedule a telephone conference on March 19, 2007 and the Petitioner,

TATUNG Company and TATUNG Company of America did appear by its attorneys Marshall

Ney and Frank Meredith and the Defendant, L.G. PHILLIPS LCD, CO., LTD. did appear by its

attorneys Stephen Schrantz and Shari Klevens.

This discovery dispute arises from an action pending in the United States District Court in

Delaware case number 04-343 and, at the current time, concerns 23 accused products. The

parties agree that discovery should be controlled by the District Court in Delaware. The parties

further agree that on March 16, 2007 the Special Master in Delaware did indicate that the

discovery, at this time, should be limited to the 23 accused products at issue in L.G. Phillips LCD

Co., Ltd. v. TATUNG Company, C.A. No. 04-343-JJF.

The Court having considered the papers submitted and the arguments presented, and for

good cause shown finds:

The third parties, Wal-Mart Stores, Inc. and Sam's Club, are instructed that the discovery

sought by L.G. PHILLIPS LCD, CO., LTD. is hereby limited to the information concerning the

23 accused products at issue in L.G. Phillips LCD Co., Ltd v. TATUNG Company, C.A. No. 04-

343-JJF or such other relevant information that does not disclose specific data or information

concerning any un-accused products.

Any documents produced in response to the subpoena by third party Wal-Mart Stores,

Inc. or Sam's Club shall be stamped CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

and shall be produced subject to the Stipulated Protective Order dated January 24, 2005 entered

in the Delaware Action.

The Court may reconsider or modify this Order upon a showing by either party that the

order is no longer consistent with the discovery orders entered by the United States District Court

in Delaware.


IT IS SO ORDERED this 19th day of March, 2007.


_____     /s/ J. Marschewski _____

                                    HONORABLE JAMES R. MARSCHEWSKI
                                    UNITED STATES DISTRICT JUDGE

# EXHIBIT 8

**Balaci, Nicole**

| | |
|---|---|
| **From:** | Klevens, Shari |
| **Sent:** | Tuesday, March 20, 2007 3:07 PM |
| **To:** | Balaci, Nicole |
| **Subject:** | FW: Activity in Case 0:07-mc-00019-JNE-SRN LG Philips LCD Co., Ltd v. Tatung Company et al "Order on Motion for Protective Order" |

FYI

**From:** ecf-notice@mnd.uscourts.gov [mailto:ecf-notice@mnd.uscourts.gov]
**Sent:** Friday, March 16, 2007 12:34 PM
**To:** ecf-notice@mnd.uscourts.gov
**Subject:** Activity in Case 0:07-mc-00019-JNE-SRN LG Philips LCD Co., Ltd v. Tatung Company et al "Order on Motion for Protective Order"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

## U.S. District Court

### District of Minnesota

Notice of Electronic Filing

The following transaction was received on 3/16/2007 at 11:34 AM CDT and filed on 3/15/2007
**Case Name:** LG Philips LCD Co., Ltd v. Tatung Company et al
**Case Number:** 0:07-mc-19
**Filer:**
**Document Number:** 24

**Docket Text:**
Minute Entry for proceedings held before Magistrate Judge Susan R. Nelson : The Motion for Protective Order of Defendants Tatung Company and Tatung Company of America, Inc. [1] is granted in part and denied in part. There is no dispute among the parties that the documents requested in the Third Party Subpoena to Best Buy, Inc. regarding accused products are relevant and should be produced, commencing immediately. The dispute concerns documents pertaining to unaccused products. The Court orders that Best Buy, Inc. may refrain from producing any documents regarding unaccused products until such time as the Special Master in the pending matter in Delaware rules on a substantially similar discovery motion pending at this time. If the Special Master orders the production of all or certain categories of documents relating to unaccused products, Best Buy, Inc. is hereby ordered to comply with the spirit of the Special Master's Order and produce those documents pursuant to this subp! oena. When the Special Master issues the ruling, the parties are instructed to immediately advise Best Buy, Inc. of the ruling. Best Buy, Inc. is to produce such documents even if the time period for discovery set in the Delaware action has expired. No Order will be issued.(Court Reporter Jodi Weisenburger) (jc)

The following document(s) are associated with this transaction:

3/21/2007

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1051215216 [Date=3/16/2007] [FileNumber=1336955-0
] [ac2c86ca040d9d46c8c73c3d2303afe1d141b289ad7fa69c7df36114e3477e93664
af4334194cf9d42507c179073a61da5600c838e7b56c70438d84171271524]]
**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1051215216 [Date=3/16/2007] [FileNumber=1336955-1
] [7c31c0e4db38b4710ed02ca1071828a89102ec334ef00aaf75331ae4afe2dc3ddbe
022098266f4fb919d90e518fb095675c86a06e89beae409175e9237b57475]]
**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1051215216 [Date=3/16/2007] [FileNumber=1336955-2
] [a6ebc1e11ac45de85efded75afa53879421b93740e1f36e038d251dbab91ab866e6
e71dda738fd9949c66ebcb75cdff9e3b9059aa8f277d8f29c18410b4ddd83]]

**0:07-mc-19 Notice will be electronically mailed to:**

Lora A Brzezynski     lbrzezynski@mckennalong.com

Daniel J Connolly     dconnolly@faegre.com, dboehme@faegre.com

Cormac T Connor     cconnor@mckennalong.com

William L Davidson     wld@lindjensen.com, jennifer.gordon@lindjensen.com;
lisa.neu@lindjensen.com

Thomas D Jensen     thomas.jensen@lindjensen.com, carol.ahrens@lindjensen.com

Shari L Klevens     sklevens@mckennalong.com

Sara J Lathrop     sara.lathrop@lindjensen.com, jennifer.green@lindjensen.com

Krisann Kleibacker C Lee     kklee@faegre.com, dybarra@faegre.c! om

Frank E Merideth , Jr     meridethf@gtlaw.com

Charlene Oh     ohc@gtlaw.com

Ted E Sullivan     ted.sullivan@lindjensen.com

**0:07-mc-19 Notice will be delivered by other means to:**

Rel-NA S Ambrozy
Not Admitted
,

Gaspare-NA J Bono

3/21/2007

`
Not Admitted
,

Cass-NA W Christenson
,

Richard-NA D Kirk
Not Admitted
,

# EXHIBIT 9

**Klevens, Shari**

| | |
|---|---|
| **From:** | Piraino, Russ [russ.piraino@tycoelectronics.com] |
| **Sent:** | Thursday, March 08, 2007 3:06 PM |
| **To:** | Klevens, Shari |
| **Subject:** | RE: LG.Philips LCD Co., Ltd. v. Tatung, et al., C.A. No. 04-343-JJF |

Shari:

I understand that Phillips intends to file a motion for protective order with regard to this subpoena. In light of this, Tyco will await the disposition of this motion by the court before providing any material in response to the subpoena. Thank you.

Russ Piraino

-----Original Message-----
From: Klevens, Shari [mailto:sklevens@mckennalong.com]
Sent: Thursday, March 01, 2007 3:27 PM
To: Piraino, Russ
Subject: LG.Philips LCD Co., Ltd. v. Tatung, et al., C.A. No. 04-343-JJF

Dear Russ:
This email is a follow up to our discussion this afternoon regarding Plaintiff LG.Philips LCD Co., Ltd.'s ("LG") third party subpoena ("Subpoena") to Tyco International, Ltd. ("Tyco") in the referenced action. I understand that your investigation related to the Subpoena has revealed that Tyco does not merely resell products purchased from Tatung and ViewSonic, but rather that any Tatung and/or ViewSonic products are incorporated into a limited number of custom-made products manufactured and sold by Tyco. I further understand that such purchases account for less than 1% of Tyco's overall products sold.
In light of the above, LG is willing to limit its document requests if Tyco is willing to fully comply with the Subpoena as limited to the following:
1. A sales summary consisting of a printout from Tyco's sales database. The summary should reflect the purchase price, brand name, model number, quantity, and sales price of the products sold by Tyco and a sales summary showing all of this information for the products purchased by Tyco from each defendant. These documents should also show the correlation between the Tatung or ViewSonic model number and Tyco's model numbers.
2. All contracts, supply agreements, and licenses between Tyco and Tatung or ViewSonic.
3. Documents related to the technical specifications, manufacturing, or assembly of Tatung and ViewSonic products, including any drawings and/or narrative descriptions of same.
4. Documents sufficient to identify OEMs or ODMs that manufactured Tyco's products incorporating visual display products manufactured by Tatung or Viewsonic, agreements or other documents that mention Tatung or ViewSonic between Tyco and any OEMs, and documents sufficient to show that Tatung or ViewSonic had knowledge of such agreements (such as correspondence with Tatung or ViewSonic).
5. Documents relating to product support or service on Tyco's visual display products provided by Tatung or ViewSonic through a warranty or

1

otherwise, including documents reflecting warranties provided by Tatung or
ViewSonic, and documents reflecting any type of repair assistance or help
desk assistance, including setting up repair centers in the US.
As we discussed, we agree to extend Tyco's deadline for producing the
requested documents until March 12, 2007.  Further, after a review of the
documents produced by Tyco in response to the Subpoena, we will determine
whether a deposition, currently scheduled on March 19, will be necessary.
We are hopeful that a deposition will not be required, especially if we can
obtain an affidavit from Tyco in lieu of deposition testimony.
Please contact me if you have any further questions.
Regards,
Shari


Shari L. Klevens
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
tel 202.496.7612
fax 202.496.7756


CONFIDENTIALITY NOTICE:
This e-mail and any attachments contain information from
the law firm of McKenna Long & Aldridge LLP, and are
intended solely for the use of the named recipient or
recipients. This e-mail may contain privileged
attorney/client communications or work product. Any
dissemination of this e-mail by anyone other than an
intended recipient is strictly prohibited. If you are not a
named recipient, you are prohibited from any further
viewing of the e-mail or any attachments or from making any
use of the e-mail or attachments. If you believe you have
received this e-mail in error, notify the sender
immediately and permanently delete the e-mail, any
attachments, and all copies thereof from any drives or
storage media and destroy any printouts of the e-mail or
attachments.

# EXHIBIT 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,            :
                                     :
                Plaintiff,           :
                                     :
        v.                           :    Civil Action No. 04-343 JJF
                                     :
TATUNG CO., TATUNG COMPANY           :
OF AMERICA, INC.,                    :
                                     :
                Defendants.          :

### SPECIAL MASTER'S REPORT AND RECOMMENDATIONS
### ON MOTION OF LG.PHILIPS LCD CO., LTD. FOR DISCOVERY
### SANCTIONS AGAINST THE TATUNG DEFENDANTS;

### SANCTIONS RECOMMENDED

This matter comes before me, as Special Master, on the motion of plaintiff LG.Philips

LCD Co., Ltd. ("LPL") for the imposition of sanctions against defendants Tatung Co. ("Tatung

Taiwan") and the Tatung Company of America, Inc. ("Tatung America" and, together with

Tatung Taiwan, "Tatung" or the "Tatung Defendants") in connection with certain jurisdictional

discovery ordered by the Court.

The Special Master recommends that LPL's motion for sanctions be **GRANTED,** as set

forth herein.

### BACKGROUND

This is a patent infringement case brought by LPL against, *inter alia*, the Tatung

Defendants alleging infringement of United States Patent Nos. 6,498,718 and 6,501,641 that

relate to assembly mountings for flat panel display monitors used in such products as liquid

crystal display ("LCD") and plasma televisions, and computer monitors. D.I. 1. The complaint

asserts grounds for jurisdiction over the Tatung Defendants on the basis of actual purchases in Delaware of equipment manufactured by Tatung that allegedly infringe the patents-in-suit. *Id.*

In lieu of answering the complaint, the Tatung Defendants jointly moved to dismiss for lack of personal jurisdiction, insufficient process and insufficient service of process and, in the alternative, to quash service. D.I. 16-17. Tatung's joint motion (the "Tatung Motion") was supported by the declaration of Tatung's counsel, Robert C. Weems, D.I. 19, as well as by the sworn declarations of David Shan-Juh Chang on behalf of Tatung Taiwan, D.I. 20, and Robin Tsou and Edward Chen on behalf of Tatung America, D.I. 19 at Exh. 3 and D.I. 21.

In response to the Tatung Motion, LPL moved for leave to conduct jurisdictional discovery of the Tatung Defendants. D. I. 34-35. On November 17, 2004 the Court granted LPL's request for jurisdictional discovery, set a 90-day deadline of February 15, 2005 for its completion, and reset the original Scheduling Order deadlines. D.I. 88. The Court also issued orders (i) providing that no further motions could be filed by the parties until the Court resolved the Tatung Motion, D.I. 93; and (ii) reserving the Court's decision on the Tatung Motion until after completion of the jurisdictional discovery, D.I. 94. Shortly thereafter, LPL served jurisdictional discovery upon each of the Tatung Defendants, in the form of interrogatories, requests for production of documents, and notices of depositions. D.I. 98, 99, 102-103.

**Jurisdictional Discovery Disputes Before the Court**

Notwithstanding the Court's order that no further motions be filed by the parties until the Court resolved the Tatung Motion, the record discloses that the parties sought the Court's attention with numerous discovery disputes following entry of that order. For example, on December 20, 2004, Tatung America sent a letter to the Court seeking leave to file a motion for a protective order to quash deposition notices issued on December 2, 2004 by LPL for depositions

2

scheduled for December 22, 2004 and mid-January 2005. Tatung America refused to appear for

the Rule 30(b)(6) deposition scheduled in two days, arguing that its request to file a motion for a

protective order had the same effect as an actual motion and therefore excused its requirement to

appear, pursuant to Local Rule 30.2. D.I. 128 at 1, n.1. A volley of letters followed, D.I. 107-

108, prompting the Court to schedule *sua sponte* a date to hear what the Court deemed would be

LPL's motion to compel and request for sanctions, and to require additional briefing. D.I. 126-

30.

At the hearing held on January 24, 2005, the Court took steps to get the jurisdictional

discovery back on track. The record of that hearing establishes that – although almost 60 days

had elapsed since LPL propounded its jurisdictional discovery -- the Tatung Defendants had yet

to respond to outstanding interrogatory requests, had failed to produce any responsive documents

whatsoever, and had refused to appear at scheduled depositions. In the words of LPL's counsel:

> [D]efendant Tatung Company of America has refused to appear for
> four depositions in this matter on two separate occasions. As a
> result of that, Your Honor, and as a result of their inadequate
> responses to interrogatories and document requests, **we really**
> **have no jurisdictional discovery at this point** two months after
> this Court ordered Tatung Company of America and Tatung
> Company to provide jurisdictional discovery.

D.I. 132 at 4:9-19 (emphasis added).

The tack taken by the Tatung Defendants has been to object to and seek to quash all of

the jurisdictional discovery sought by LPL, arguing primarily that the scope of LPL's discovery

exceeded the permissible scope of jurisdictional discovery and that neither the provisions of

Local Rule 26.2 nor the protective order proposed by LPL were adequate to protect Tatung's

confidential information. In the words of Tatung's counsel:

> There are two fundamental problems with plaintiff's discovery.
> They are: (1) plaintiff's refusal of a confidentiality order, such as
> the one approved by Judge Jordan [in another case] and (2)

3

> plaintiff's refusal to specify with some reasonable particularity its
> 30(b)(6) deposition categories, so that the designee(s) can be
> identified and prepared to testify [on behalf of] the company with
> answers other than an embarrassing (and potentially damaging) "I
> don't know."

D.I. 128 at pp. 1-2.

The Court first addressed and resolved the parties' impasse over the proposed terms of a

protective order to protect confidential information disclosed during discovery, by obtaining

LPL's agreement that it could live with the terms proposed by Tatung for the limited period of

jurisdictional discovery.[1]  D.I. 132 at pp. 10-22.  The Court rejected Tatung's objections to the

scope of discovery, by expressly determining that the deposition topics listed in the Rule

30(b)(6) deposition notices issued by LPL were within the permissible scope of jurisdictional

discovery and were specific enough to permit Tatung to designate corporate designee(s).  D.I.

132 at 38:4-8 and 42:2-5.

The Court then directed that the noticed depositions go forward, and attempted to provide

reassurance to Tatung that the deposition questioning would stay within the scope of the noticed

topics by providing a mechanism for handling objections by the Tatung Defendants to any

deposition questioning that may exceed the permissible scope.  D.I. 132 at 36:12-24; 37:1-24;

and 38:1-3.  The Court also directed that "all the documents relative to the declarations that you

---

[1]  The impasse between the parties centered on Tatung's demand that certain of LPL's counsel be restricted from
prosecuting patents during the pendency of this litigation, to avoid risk to confidential information that Tatung might
disclose during discovery.  In the Special Master's view, the provisions of Local Rule 26.2 adequately address this
concern prior to the entry of a tailored protective order, especially given the narrow focus of jurisdictional discovery.
Local Rule 26.2 provides as follows:

> If any documents are deemed confidential by the producing party and the parties
> have not been able to agree on an appropriate protective order, until a protective
> order is in effect, disclosure should be limited to members and employees of the
> firm of trial counsel who have entered an appearance, and, where appropriate,
> have been admitted *pro hac vice*.  **Such persons are under an obligation to
> keep such documents confidential and to use them only for the purposes of
> litigating the case.**  (Emphasis added).

Simply stated, jurisdictional discovery should not have been delayed in order to await the entry of a tailored
protective order.

4

cited and answers to interrogatories that are incomplete ought to . . . be given over [by Tatung]

by the end of this week, the very first part of next week." D.I. 132 at 56:17-21. The Court

addressed LPL's request for sanctions with a clear cautionary note:

> I'm going to monitor what we have to do to keep this case moving.
> And at some point if I make a judgment that one side is recalcitrant
> and the other is acting in good faith, then **I [will] go all the way
> back and award fees and costs.**

D.I. 132 at 61:5-15 (emphasis added).

Following the hearing, the Court issued written orders that provided (i) for entry of the

restrictive form of protective order requested by the Tatung Defendants, but modified to limit its

duration to the jurisdictional discovery period; and (ii) that the depositions related to

jurisdictional discovery go forward, with instruction that "If [the Tatung] Defendants believe

[LPL's] examination exceeds the issues of jurisdiction, [Tatung] may object and instruct the

witness not to answer. [LPL] may then file a motion to compel on the objected-to question."

D.I. 133.

Within a few weeks, LPL found it necessary to again burden the Court when Tatung

Taiwan also refused to appear for noticed depositions. LPL moved for leave to file an expedited

motion to compel jurisdictional discovery from the Tatung Defendants and for a third extension

of the jurisdictional discovery period. D.I. 154. This prompted an additional round of letters and

email to the Court, D.I. 163-64, 166-67. The Tatung Defendants then filed a request for the

appointment of a special master, together with a motion for a protective order. D.I. 168. LPL

opposed the appointment of a special master and renewed its request for sanctions. D.I. 169.

By order dated February 17, 2005, the Court referred the pending discovery issues to the

Special Master Panel for assignment of a special master, with the Honorable Joseph J. Farnan, Jr.

noting:

5

> I believed that the rulings and instructions I provided to the parties at the January 24, 2005 hearing would avoid further conflict on the pending discovery matters. I apparently was wrong. As explained at the January 24 hearing, **this Court lacks the resources to manage overly contentious discovery disputes** effectively. Therefore, in the circumstances presented in this case, I find appointment of a special master pursuant to Federal Rule of Civil Procedure 53(a)(1)(c) to be warranted. Absent an appropriate finding by the master or me, the costs shall be shared equally.

D.I. 174 (emphasis added). By order dated February 25, 2005, I was appointed Special Master in this matter. D.I. 178.

**Jurisdictional Discovery Disputes Before Special Master**

The additional submissions to and proceedings before the Special Master were not docketed as part of the official record in this case and, therefore, merit summarization and explication for the Court's and parties' consideration of the Special Master's Report and Recommendations.

On March 9, 2005, the Special Master conducted a teleconference with counsel for all parties, including defendant Viewsonic Corporation ("Viewsonic"), to discuss the procedural steps for bringing discovery disputes before the Special Master.[2] The teleconference then turned to the outstanding jurisdictional discovery issues, and Viewsonic was excused from the remainder of the teleconference. The Special Master continued the teleconference with LPL and Tatung to specifically discuss the outstanding jurisdictional discovery disputes. A hearing date on the discovery issues was set for March 30, 2005, and a schedule was set for written submissions by the parties prior to the hearing.

---

[2] The procedures agreed upon during the teleconference were later memorialized in the Special Master's March 11, 2005 Order for Initial Discovery Disputes.

After reviewing the parties' respective written submissions,[3] the Special Master conducted a lengthy hearing on March 30, 2005 to consider the arguments of LPL and the Tatung Defendants on the outstanding discovery disputes. At that hearing, the Special Master made rulings primarily with respect to the dispute over the counting of interrogatories.[4]

Because time constraints prevented the Special Master from fully addressing the parties' arguments as to the other categories of discovery during the March 30, 2005 hearing, the Special Master and parties agreed to continue the hearing to a later date. Following a teleconference with the parties on April 4, 2005, the Special Master set April 20, 2005 as the date for continuing the hearing and clarified that the hearing would address the remaining disputes as they related to depositions, answers to interrogatories, document production, extension of the jurisdictional discovery period, and sanctions.

On April 19, 2005, one day before the continued hearing date with the Special Master, Tatung America and Tatung Taiwan filed their respective answers to LPL's Complaint, in which each contested the jurisdiction of this Court. D.I. 186-187. One day later – at the start of the April 20, 2005 continued hearing before the Special Master – the Tatung Defendants consented by stipulation to the jurisdiction of this Court, D.I. 188, thereby mooting further consideration of Tatung's objections to the remaining jurisdictional discovery and LPL's motion to extend the period for jurisdictional discovery.

---

[3] As a preliminary matter, the Special Master notes that the parties collectively submitted to the Special Master thousands of pages of materials on their jurisdictional discovery disputes, most without correlation to the case docket, and many as mere attachments from which the Special Master had to glean and organize the facts. In *Brown v. SAP America, Inc.*, C.A. No. 98-507 at *1 (D. Del., March 3, 2004) (Robinson, C. J.) [available as 2004 WL 502221], this Court declined to address discovery motion submissions that totaled 1939 pages as too "voluminous [a] record in connection with motions ostensibly devoid of any material issues of fact."

However, in an attempt to keep the jurisdictional discovery on track and to properly consider the parties' positions on the issue of sanctions, the Special Master has reviewed and considered the complete submissions of both parties, requiring a considerable investment of time. The Court's inclination that sanctions should "go all the way back," if appropriate, necessitated review of select docket items including D.I. 16-17, 19-21, 25, 23-40, 47, 62, 93-94, 98-99, 105, 107-09, 123-26, 128-133, 144, 154, 163-64, 168-89, 174, 178, and 186-88.

[4] The Special Master's rulings with respect to the interrogatories are summarized *infra* at pages 19 to 28.

Accordingly, the Special Master turns to, and addresses herein, LPL's motions for sanctions.

## DISCUSSION

*Our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principles of gamesmanship and deception in which [the party] who hides the ball most effectively wins the case.* Abrahamsen v. Tran-State Express, Inc., 92 F.3d 425, 428-29 (6th Cir. 1996).

### I.    **Analysis – Imposition of Sanctions**

Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 37(d) provides, in pertinent part:

> If a party . . . or a person designated under Rule 30(b)(6) . . . to testify on behalf of a party fails (1) to appear before the officer who is to take the deposition, after being served with a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just, **and among others it may take any action [for sanctions] authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of [Rule 37] . . . In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified** or that other circumstances make an award of expenses unjust.
>
> **The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable** unless the party failing to act has a pending motion for a protective order as provided by Rule 26(c).

Fed. R. Civ. P. 37(d) (emphasis added).

On November 17, 2004, this Court granted LPL's request for jurisdictional discovery and set a 90-day deadline for its completion. At the hearing held on January 24, 2005 on what the Court deemed to be LPL's motion to compel, the Court determined that the categories of

8

discovery identified by LPL in its 30(b)(6) deposition notices to the Tatung Defendants were within the permissible scope of the jurisdictional discovery previously ordered by the Court.

Based on the written submissions of the parties and the conduct of the March 30, 2005 hearing before the Special Master, the Special Master concluded then, and concludes now, that throughout the jurisdictional discovery period LPL exercised good faith and extraordinary effort in attempting to "meet and confer" to resolve Tatung's objections to the discovery sought. In this regard, the record before the Special Master discloses numerous efforts by LPL to support its positions to Tatung with relevant authority, and to address Tatung's objections – including, at times, with offers of compromise and to narrow the discovery sought – each and all vain attempts to persuade Tatung that discovery should go forward.

The record also discloses that, in contrast, the Tatung Defendants demanded capitulation instead of compromise. Tatung unilaterally blocked discovery by asserting layers of objections not supportable under relevant law. Notwithstanding the Court's express findings and prior orders, the Tatung Defendants continued to obstruct LPL from taking jurisdictional discovery through the March 30, 2005 hearing before the Special Master. Specifically, Tatung failed to appear for depositions on multiple occasions, failed to produce witnesses prepared to testify on noticed and relevant topics, and failed to respond to interrogatories and requests for production of documents on the same and/or similar topics.[5]

---

[5] In their briefing before the Special Master, the Tatung Defendants repeatedly attempt to excuse their actions by recharacterizing the jurisdictional discovery dispute:

> Although necessarily framed as a jurisdictional issue, in practicality the entire dispute was completely avoidable by a change of venue from Delaware to California.

See, e.g., May 20, 2005 Letter Brief from Jeffrey S. Goddess, Esquire, to Special Master at p. 1. This characterization is curious given that the Tatung Defendants never filed motions to transfer venue; they filed only motions to dismiss for lack of jurisdiction. D.I. 16-17. Consequently, the Special Master finds it difficult to ascribe any other motive to the Tatung Defendants' recalcitrance other than their hope that the period set by Court order for jurisdictional discovery would expire and operate to deprive LPL of an opportunity to obtain evidence needed to support a finding of personal jurisdiction.

The Special Master therefore concludes, for the reasons discussed below, that sanctions are just and appropriate pursuant to Fed. R. Civ. P. 37 where, as here, LPL made good faith efforts to obtain the discovery without court action and where the Tatung Defendants' failed to comply with their discovery obligations without substantial justification.

## A.    **Failure to Appear for Depositions**

### 1.    **Legal Standard**

This Court's standard for deposition practice under Rule 30(b)(6) of the Federal Rules of Civil Procedure is well settled:

> The Federal Rules of Civil Procedure allow for a broad scope of discovery that is not limited to admissible evidence, but evidence that is reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1). Rule 30(b)(6) provides that after receiving a notice of deposition, the corporation should "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf." Fed. R. Civ. P. 30(b)(6). Additionally, the deponent has a "duty of being knowledgeable on the subject matter identified as the area of inquiry." *Alexander v. Federal Bureau of Investigation*, 186 F.R.D. 148, 151 (D.D.C. 1999).

*Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 203 F.R.D. 159, 162 (D.Del. 2001); *accord, Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, No. Civ. A. 00-083 at *3 (D.Del., Feb. 18, 2005) (Farnan, J.) [available as 2005 WL440621].

### 2.    **Tatung America's Failure to Appear**

On November 17, 2004, the Court ordered a 90-day period of jurisdictional discovery. D.I. 88. Shortly thereafter, LPL noticed a Rule 30(b)(6) deposition of Tatung America, scheduled for December 22, 2004. LPL also noticed additional depositions of Tatung America employees for mid-January. Two days before the noticed Rule 30(b)(6) deposition, Tatung America – under a Court order directed to both sides that they were not to file any motions regarding the jurisdictional discovery – sought leave to file a motion for a protective order and

10

refused to appear for both the Rule 30(b)(6) deposition and the depositions scheduled for mid-January. D.I. 128.

Tatung then failed to appear for properly noticed depositions, relying upon its own assumption that its request for leave to file a protective order had the same effect as an actual motion, and excused its requirement to appear at the depositions pursuant to Local Rule 30.2. D.I. 128 at p.1, n.1. The Court had previously barred both parties from filing any discovery motions until it decided Tatung's motion to dismiss on jurisdictional grounds, D.I. 93, in order to avoid the delay attendant to just such motions and permit the completion of discovery within the 90-day period allotted. In the face of this prohibition, the Special Master concludes that Tatung proceeded at its own peril and should not be permitted the benefit of the safe harbor created by Local Rule 30.2.

Moreover, a motion for a protective order is governed by Rule 26(c) which provides, in pertinent part "[u]pon motion by a party . . . **for good cause shown** . . . the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c) (emphasis added). Good cause requires a specific showing that, absent the protective order, the movant would suffer "a clearly defined and serious injury." *Glenmede Trust Company v. Thompson*, 56 F. 3d 476, 483 (3d Cir. 1995); *accord Emory v. AstraZeneca Pharmaceuticals*, Civ. A. No. 02-1466 at *1 (D. Del. Sept. 4, 2003) (Farnan, J.) [available as 2003 WL 22136301]; and *Visx Inc. v. LazerSight Inc.*, Civ. A. No. 99-789 at *1-2 (D. Del. Jan. 20, 2001) (Farnan, J.) [available as 2001 WL 34367297].

At the January 24, 2005 hearing on LPL's motion to compel, the Tatung Defendants were clearly unable to show the clearly defined and serious injury necessary to meet the requisite showing of good cause. In addressing Tatung's objections, the Court expressly determined that

11

all of the deposition topics noticed by LPL were within the permissible scope of jurisdictional discovery, D.I. 132 at 38:4-8, and each of them provided the requisite specificity. *Id.* at 42:2-5 ("I think the topics are specific enough that it should be readily apparent what type of person has to come as a designee.").

The Court also flatly rejected Tatung's arguments that depositions of certain of its senior management – so called "apex" depositions – should not go forward. Since an order barring a litigant from taking a deposition would constitute extraordinary relief, the party seeking such a protective order bears the burden of proving that the proposed deponent has nothing to contribute. *See, e.g., Speadmark, Inc. v. Federated Department Stores, Inc.*, 176 F. R. D. 116, 118 (S.D.N.Y. 1997). This is true even if the proposed deponent is a busy person. *Naftchi v. New York University Medical Center*, 172 F.R.D. 130, 132 (S.D.N.Y. 1997).

Tatung's argument that its executives lacked knowledge relating to jurisdiction was, in the Special Master's view, nothing short of specious in light of the fact that several of them – namely David Shan-Juh Chang on behalf of Tatung Taiwan and Robin Tsou and Edward Chen on behalf of Tatung America – had submitted sworn declarations in support of the Tatung Defendants' respective motions to dismiss on jurisdictional grounds. Accordingly, the Court directed that the depositions go forward. D.I. 132 at 56:22-23 ("these depositions ought to be rescheduled"); *See also, Scutellaro v. Walt Disney World Co., Inc.*, Civ. A. No. 92-671, *slip op.* at 6 (D.Del. July 14, 1993) (holding that if a senior executive "has knowledge of matters relevant to the instant suit, his position will not protect him from being deposed").

Following the January 24, 2005 hearing, and consistent with the Court's guidance and rulings, LPL renoticed the Rule 30(b)(6) and other depositions of Tatung America witnesses. Three depositions went forward on February 7-9, 2005. The deposition excerpts submitted to the

Special Master disclose, in the Special Master's view, a pattern by Tatung's counsel to disrupt, obfuscate and avoid proper discovery during those depositions.[6] The Special Master offers just a few examples:

(a) Tatung America failed to produce a Rule 30(b)(6) designee prepared to respond to certain information within the noticed deposition topics:

> Q:  What other retail distribution centers – to what other retail distribution centers does Tatung America ship Hewlett Packard and Compaq products from Compton?
> A:  Other than the fact that I can place a couple of them in Texas, **I don't know.**
> Q:  You can't identify any others then?
> A.  I'm **unable to identify any.**
> Q.  Do you know if there are any other retail distribution centers, besides the Wal-Mart and Sam's Club?
> A.  I think **it's easy to speculate that there are many others.**
> Q.  But do you know whether there are additional ones that you just can't identify?
> A.  Yeah **I know there are others**, sure.
> Q.  Do you have any idea how many, whether it's 10, more than 10, less that 10?  Can you give me any range?
> A.  I'm pretty sure it's more than 10.
> Q.  Do you know if it's more than 20?
> A.  No, **I don't know** for sure.
> Q.  Do you know in what states any of the other retail distribution centers are located, besides Texas?
> A.  I'm sorry, **I don't know** any other specific locations.
> LPL COUNSEL:  Mr. Weems, I assume that for information Mr. Sun is not able to provide, Tatung America will provide another witness as soon as Mr. Sun is finished testifying to provide that information.
> TATUNG COUNSEL:  No, Mr. Sun has been prepared on all these topics and as to what he can remember today and what he can't remember today.
> LPL COUNSEL:  Well does Tatung America intend to produce documents then that would provide this information?
> TATUNG COUNSEL:  I'm not here to be interrogated, Mr. Christenson.  You can spend your time asking questions of the witness.
> LPL COUNSEL: Okay.  I'll take that as a "no."

---

[6]  Although Tatung has designated these deposition transcripts as "Highly Confidential," the Special Master does not consider any of the information in the deposition excerpts contained herein to warrant a "confidential" designation.

Transcript of February 9, 2005 Deposition of Andrew Sun ("Sun Deposition") at 25:5-25 to 26:1-19 (emphasis added).

**(b)**    Tatung's counsel disrupted the flow of depositions with frequent requests for recess (some within minutes of the start of depositions)[7] and by inserting frequent and improper objections, such as the following:

> Q.   What is the Rancho Dominguez facility called?  Or what type
>        of facility does Tatung America have in Rancho Dominguez?
> TATUNG COUNSEL:  **Objection, vague.**
> Q.   You can answer.
> A.   It's called – we call it C plant.

Sun Deposition at 17:5-11.

> Q.   So all of the Hewlett Packard and Compaq personal computers
>        served at that facility are manufactured by Tatung Company?
> TATUNG COUNSEL:  **Objection, calls for speculation**.
> LPL COUNSEL:  I'm just trying to clarify, I think that's what he
>        said.  But you tell me.
> A.   Yeah, essentially all of them.

Sun Deposition at 18:10-17 (emphasis added).

> Q.   In 2004 were all of the computer monitors distributed out of
>        that facility LCD monitors?
> A.   No.  Some of them were CRT.
> Q.   Approximately what percentage in 2004 were LCD monitors?
> A.   I couldn't give you a good estimate.  I'd say the majority of
>        them are LCDs.
> Q.   So more than 50 percent?
> TATUNG COUNSEL:  **Objection. Asked and answered.**
> THE DEPONENT:   Yeah, I think more than half of them are
>        LCDs.

Sun Deposition at 37:7-17 (emphasis added).

> Q.   Mr. Sun, do you agree that the distribution center in Arlington
>        distributes products?
> A.   It prepares products for distribution.

---

[7]  The "need to break" was asserted by both attorneys representing Tatung and, thus, appears to be tactical rather than motivated by any other need.

> Q. And specifically for distribution to retail distribution centers. Right?
> TATUNG COUNSEL: **Objection. Argumentative.**
> Q. You can answer
> TATUNG COUNSEL: **And calls for speculation.**

Sun Deposition at 38:5-13 (emphasis added).

> Q. What type of operation does Tatung Company have in El Paso?
> TATUNG COUNSEL: **Objection. Calls for speculation.**

Sun Deposition at 89:23-25 to 90:1 (emphasis added).

> Q. For 2004 how much revenue did Tatung America derive from LCD products sold or delivered in Delaware?
> TATUNG COUNSEL: **Objection.** Scope, post complaint sales **aren't relevant** for the jurisdictional inquiry.
> THE DEPONENT:    I'm afraid I don't know.
> Q. Since January 1, 2000 how much revenue has Tatung America derived from L17AMTN monitors sold or delivered in Delaware?
> TATUNG COUNSEL: **Objection,** time, and times prior to the issuance of the patent, prior to the filing of the complaint **are not relevant.**

Sun Deposition at 108:25 to 109:1-11 (emphasis added).

**(c)**    Tatung counsel also engaged in an abusive "tag team" approach, with more than one

attorney asserting objections:

> Q. And my understanding at that time was you told me there were no such operations. And I want to be very sure I understand whether Tatung Company has any other operations in the United States beside [t]he El Paso Texas facility that you just mentioned.
> TATUNG COUNSEL (#1):    Could we have the question read back?
> TATUNG COUNSEL (#2): **Objection.**
> LPL COUNSEL:  Well, actually that wasn't a question. I was leading up to a question.
> But the question is, does Tatung Company have any business locations in the United States other than El Paso Texas.
> TATUNG COUNSEL (#1):  Now let's have the full question read back with its pre-preamble.
> (Record read)

15

> TATUNG COUNSEL (#2): And I **object** to the extent it mischaracterizes prior testimony. I'm going to **object** that the prior record speaks for itself. I'm going to **object** that the question is unintelligible and confused.
> And subject to that, you can answer, if you can.
> THE DEPONENT: Other than the El Paso warehouse, I don't know of any other Tatung Company operations in the United States.

Sun Deposition at 94:24-25 to 95:1-24 (emphasis added).

> Q: Do you know whether Tatung Company has manufactured LCD products for ViewSonic Corporation since January 1, 2000.
> TATUNG COUNSEL (#1): **Asked and Answered.** You can answer again, sir.
> TATUNG COUNSEL (#2): And I just want to further note . . . Mr. Baum may not be aware of it, **ViewSonic counsel has specifically objected to the subpoenas issued to it.** Or actually I guess the notice or document request, something of that sort that was issued to it within the last 24, 48 hours. **So based on Viewsonic's objection, I think we have an obligation to instruct.**
> TATUNG COUNSEL (#1): And we'll consider your questions as you ask them and keep that objection in mind.
> So can we have the last question read back, please?
> (The reporter reads back the question as follows:
> "Q. Do you know whether Tatung Company has manufactured LCD products for Viewsonic Corporation since January 1, 2000?")
> THE DEPONENT: I don't know.

Sun Deposition at 134:18-25 to 135:1-14 (emphasis added).

**(d)**    Tatung's counsel used objections to improperly coach deponents during their testimony:

> Q. If you wanted to find out where those retail distribution centers for those various companies are located, how would you do that? Are there documents that you would be able to review that would give you that information?
> TATUNG COUNSEL: **Objection. Argumentative.** The witness has already testified they don't do the distribution part. They do the boxing.
> LPL COUNSEL: I object to speaking objections that coach the witness. That's improper. The record will reflect whatever the testimony was. And there's a question pending.

Sun Deposition at 40:21-25 to 41:1-7 (emphasis added).

> Q.  Does Tatung America keep copies of the monthly sales reports?
> A.  We can always get the number from the computer.
>
> **TATUNG COUNSEL:  Listen to the question, Robin.  He asked you if Tatung keeps copies.  He didn't ask if you can you always get --**

Transcript of February 7, 2005 Deposition of Robin Tsou ("Tsou Deposition") at 39:17-22.

> Q.  Does Tatung America have lists of customers, for computer monitors?
> TATUNG COUNSEL:  Asked and answered.
> THE DEPONENT:  We don't have a customer list, but we can trace –
> **TATUNG COUNSEL:  He asked you if you have a customer list.**

Tsou Deposition at 41:4-10 (emphasis added).

Finally, the Special Master notes that the February 2005 depositions of Tatung America had to be conducted without benefit of Tatung America's response to the interrogatories and document production propounded by LPL more than two months earlier.  Although the Court had directed both Tatung Defendants at the January 24, 2005 hearing that responses to the interrogatories and responsive documents should be produced before any depositions went forward, Tatung America stood on its objection to the interrogatory count and did not provide further interrogatory responses.  Tatung America produced only 46 pages of responsive documents although, as will be discussed later herein, deposition testimony disclosed that other responsive documents clearly existed.

### 3.    Tatung Taiwan's Failure to Appear

On January 20, 2005, LPL noticed seven depositions of Tatung Taiwan, namely: one pursuant to Fed. R. Civ. P. 30(b)(6); one of David Shan-Juhn Chang, whose declaration supported Tatung Taiwan's jurisdictional challenge; one of Wen Yen K. Lin, President of Tatung

17

Taiwan and an officer of Tatung America, who had spoken publicly about Tatung's global operations; and four of other employees of Tatung Taiwan. The depositions were noticed for Taipei, Taiwan during the period of February 15-18, with four short depositions scheduled for one day.

LPL's counsel confirmed the depositions by letter dated January 21, 2005, stating:

> **These foreign depositions will require us to incur substantial pre-paid, non-refundable expense.** Already, [Taiwan America] has caused substantial inconvenience and costs to be incurred (including, for example, attorney fees and travel costs). We will ask the Court for relief at the appropriate time, including, but not limited to, full reimbursement. Similarly, we expect [Tatung Taiwan] to fulfill its obligation to attend these depositions and, if necessary, we will look to you and/or [Tatung Taiwan] to reimburse us for any expense that we incur as a result of further misconduct.

January 21, 2005 Letter from Cass W. Christenson, Esquire, to Robert C. Weems, Esquire (emphasis added). By letter dated January 27, 2005, LPL's counsel confirmed Tatung Taiwan's request for interpreters fluent in Mandarin Taiwanese for these depositions.

The record before the Special Master reflects that Tatung requested that LPL postpone the Taiwan depositions during a conversation with LPL's counsel on February 9, 2005. In a February 10, 2005 letter from LPL's counsel to Tatung's counsel, LPL declined to postpone the depositions, but suggested a compromise that might avoid the need for "apex" depositions:

> [W]e cannot accommodate your request to postpone the depositions considering Tatung's unjustified refusal to produce any documents. Additionally, we are convinced that the only way we will ever obtain the information we need (and you are required to produce) is to depose the individuals we have noticed, just like we had to do with Tatung America. As you know, these depositions have been noticed since January 20 and the document requests and interrogatories to Tatung were served at the end of November, 2004. Moreover, we have already purchased airplane tickets, contracted with a court reporter and an interpreter, and booked conference rooms and hotel rooms. All of those have strict cancellation policies. **In the spirit of cooperation, however, we**

18

> are willing to reschedule the depositions of W.S. Lin, K.Y.
> Lang, and A.C. Wang [the three "apex" deponents], currently
> scheduled for Tuesday, February 15, to Saturday February 19,
> if Tatung Company agrees to produce the documents
> referenced in our motion to compel on Tuesday, February 15
> at 9:00 a.m. at our counsel's hotel where they will be staying in
> Taiwan.  Depending on the content of the documents and
> whether the deponents for the remaining depositions noticed
> for next week are forthright, including whether Tatung's
> 30(b)(6) witness is adequately prepared, we may be in a
> position to decide that the depositions of these three individuals
> are unnecessary.

February 10, 2005 Letter from Lora A. Brzezynski, Esquire, to Robert C. Weems, Esquire

(emphasis added).

Approximately 20 days after the depositions had been renoticed, counsel for the Tatung

Defendants advised LPL's counsel by letter dated February 11, 2005 – the day before LPL's

counsel was set to depart for Taiwan for the depositions – that Tatung Taiwan and its employees

would not appear for the depositions:

> Due to the present unresolved discovery issues, [LPL's] changing
> position on document production, and your refusal to defer
> overseas deposition until such matters have been worked out, we
> have been compelled to move for a protective order and to ask the
> Court to appoint a special master.  Accordingly, we will not be
> producing deponents in Taiwan until such matters are resolved
> either by agreement or with the involvement of the Court.[8]

February 11, 2005 Letter from Robert C. Weems, Esquire to Lora A. Brzezynski, Esquire

(emphasis added).  As of the date of the March 30, 2005 hearing with the Special Master, Tatung

Taiwan had not made any deponents available to LPL.

The Special Master finds that, against this backdrop, the claims by the Tatung Defendants

of good cause and substantial justification ring hollow, and the Special Master concludes that,

---

[8] According to counsel for LPL: "Tatung never objected to the location or dates of these depositions.  Tatung also did not object to the Rule 30(b)(6) topics (the same topics that the Court had approved for Tatung America's deposition) until after refusing to appear for the depositions."  March 18, 2005 Letter from Richard D. Kirk, Esquire, to Vincent J. Poppiti, Special Master (emphasis in original).

19

pursuant to Fed. R. Civ. P. 37(d), sanctions are appropriate for the repeated failure of the Tatung

Defendants to appear for depositions, and for obstructive tactics at the depositions at which they

did appear. In this regard, the Special Master finds that Tatung wielded its unilateral and last

minute refusals to appear at depositions like the tactical weapons of delay the Special Master

determines them to be. The Special Master therefore recommends that Tatung pay LPL's

reasonable expenses caused by its failure to appear for and its obstruction of depositions,

including attorney fees and Special Master fees. Fed. R. Civ. P. 37(d); *Haraway v. NASCAR,*

*Inc.*, 213 F.R.D. 161, 165-66 (D.Del. 2003) (awarding defendants attorneys' fees and costs for

plaintiff's failure to appear at deposition).

**B.    Failure to Respond to Interrogatories**

    **1.    Legal Standard**

Pursuant to Federal Rule of Civil Procedure 33(b):

> **Each interrogatory shall be answered separately and fully in writing under oath**, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable . . . **All grounds for and objection to an interrogatory shall be stated with specifity. Any ground not stated in a timely objection is waived** unless the party's failure to object is excused by the court for good cause shown.

Fed. R. Civ. P. 33(b)(1)(4) (emphasis added). Under Rule 37, "an evasive or incomplete

disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." Fed.

R. Civ. P. 37(a)(3). When a party fails to comply with the provisions of Rule 33, "the court . . .

may make such orders in regard to the failure as are just." *Woulard v. Brown*, No. Civ. A. 01-

350 JJF at *1-2 (D.Del. Feb. 24, 2004) (Farnan, J.) [available at 2004 WL 758358] (quoting Fed.

R. Civ. P. 37(d)).

2.    **The Tatung Defendants' Failure to Respond**

On November 29, 2004, LPL served twenty (20) interrogatories upon each of the Tatung Defendants. D.I. 98. Although there are a few differences between the interrogatories served on Tatung Taiwan and Tatung America, the parties agree that the sets of interrogatories propounded on each Tatung defendant are substantially similar in substance. *See, e.g.,* March 30, 2005 Transcript at 58:17-18 (Counsel for Tatung Defendants: "they're almost certainly identical").

The Tatung Defendants responded respectively to the interrogatories propounded by LPL on or about January 5, 2005. D.I. 113. Their responses are noteworthy in their similarities and by their stunning lack of response. Each Tatung Defendant objected to every interrogatory, asserting primarily boilerplate objections. Additionally, the Tatung Defendants argued that, when subparts are counted, LPL's interrogatories exceeded the maximum of 50 interrogatories permitted under Local Rule 26.1. Each Tatung Defendant renumbered the interrogatories posed by LPL's first four interrogatories into more than 50 subparts, and thereafter rested on its objection to count in refusing to further respond to interrogatories 5-20. Relying upon its boilerplate objections and its objections as to count, Tatung Taiwan did not answer any interrogatories. Tatung America partially answered only two interrogatories (Nos. 2 and 4), relying upon the selfsame objections.

At the January 24, 2005 hearing before Judge Farnan, the Court had made clear that the Tatung Defendants should respond to LPL's interrogatories before LPL's depositions of Tatung America and Tatung Taiwan – then scheduled for February 15 to 18 – took place:

> Interrogatories and documents, you're absolutely correct, should be resolved before deposition practice occurs. And we're focused on [late] February . . . **That's material that the party seeking deposition wants to have before they start the deposition . . . if there [are] interrogatories that are properly served, they need to be responded to,** and the same with documents.

21

D.I. 132 at 49:14-19 and 50:6-11 (emphasis added). The Court directed that "all . . . answers to interrogatories ought to . . . be given over by the end of this week, the very first part of next week." D.I. 132 at 56:17-21.

By directing Tatung to respond to LPL's interrogatories, the Court – in the Special Master's view – impliedly rejected Tatung's argument, suggested by *Moore's Federal Practice,* that it could preserve its objections to supernumerary interrogatories by answering (or objecting) up to the numerical limit and asserting boilerplate objections to the remainder without answering.[9] Notwithstanding the Court's direction, the Tatung Defendants did not supplement or further respond to LPL's interrogatories, and stood on their boilerplate objections and objections to count. On February 7, 2005, LPL requested leave to file an expedited motion to compel jurisdictional discovery, D.I. 154, and the issues involving several discovery disputes – including the disputed interrogatory count – were ultimately brought before the Special Master.

In this regard, the Special Master examined the primary authority relied upon by the Tatung Defendants in challenging LPL's interrogatory count, that being *Kendall v. GES Exposition Services, Inc.,* 174 F.R.D. 684 (D. Nev. 1997). According to the *Kendall* court:

> The Court therefore holds that **interrogatory subparts are to be counted as part of but one interrogatory for the purpose of [Local Rule 33-1(b)] if they are logically or factually subsumed within and necessarily related to the primary question** . . . [T]he more difficult question is determining whether the subparts are "logically or factually subsumed within and necessarily related to the primary question." . . . Probably the best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to **examine whether the first question is primary and subsequent questions are secondary to the primary question.** Or, can the subsequent question stand alone? Is it independent of the first question? **Genuine subparts should not be counted as separate interrogatories. However, discrete or separate questions should be counted as separate**

---

[9]  7 Moore's Federal Practice § 33.30[1]. *But see, id.* at § 33.171 ("Unstated grounds for objections normally are waived.").

> **interrogatories, notwithstanding that they are joined by a conjunctive word and may be related.**

174 F.R.D. at 685-86 (emphasis added).

After reviewing the interrogatory count urged by Tatung against the standard articulated in Tatung's own authority, the Special Master concluded that the position of the Tatung Defendants on the disputed interrogatory count was not supported by *Kendall*. Accordingly, at the hearing held on March 30, 2005, the Special Master ruled as follows with respect to the disputed interrogatory count:

> First interrogatory [,] I need not read it. The first is counted as two by both Tatung defendants. I consider it to be **one** seeking the identity of those individuals who assisted with the Tatung defendants' discovery responses.

March 30, 2005 Transcript at 58:22-24 and 59:1-2 (emphasis added).

> Interrogatory No. 2, Tatung counts No. 2 as 12 interrogatories. I'm satisfied that it is legitimately considered to be **one** interrogatory requesting information on products manufactured, imported into, purchased, offered for sale and/or sold by Tatung in Delaware or [,] as to the Tatung company [,] in the United States.

*Id.* at 58:17-23 (emphasis added).

> Interrogatory No. 3 Tatung counts as 12. I'm also satisfied that that is legitimately **one** seeking information on Tatung's manufacture, importation, purchase, offer for sale, and/or sale of a particular line that is visual display products in the United States.

*Id.* at 59:1 and 60:1-5 (emphasis added).

> [Interrogatory] No. 4 Tatung counts as 32 interrogatories. The Tatung defendants. I'm satisfied it is legitimately considered to be **one** seeking information on the amount of money made by the defendant[s] from the sale of its products and/or services in Delaware.

*Id.* at 60:6-10 (emphasis added).

> [Interrogatory] No. 5, I would note that No. 5 was neither answered nor counted by Tatung because the interrogatories that I

23

> have just discussed with you have exceeded 25 by Tatung's count. I'm satisfied No. 5 is **one** aimed at determining how much money each Tatung defendant realized from the import, sale, or shipment of products intended for the United States market.

*Id*. at 60:11-17 (emphasis added).

> [Interrogatory] No. 6, I'm satisfied that that is also legitimately **one** aimed at identifying each work location in the United States where Tatung has employed people since January the 1st 2000.

*Id*. at 60:18-21 (emphasis added).

> [Interrogatory No.] 7 is **one** requesting information for each work location identified by Tatung's response to interrogatory No. 6.

*Id*. at 60:24 and 61:1-2 (emphasis added).

> [Interrogatory No.] 8 is **one** aimed at quantifying Tatung's revenues from the United States.

*Id*. at 61:3-4 (emphasis added).

> [Interrogatory No. 9] is legitimately **one** aimed at identifying Tatung customers of visual display products in the U.S. as to Tatung America and related information.

*Id*. at 61:9-11 (emphasis added).

> [Interrogatory No.] 10 is legitimately **one** aimed at identifying shipments of Tatung visual display products to the U.S. as to Tatung America and related information.

*Id*. at 61:12-14 (emphasis added).

> [Interrogatory No.] 11 is **one** aimed at identifying, including by person as to Tatung America, Tatung's shipments and delivery of products or services in Delaware and related information.

*Id*. at 61:15-18 (emphasis added).

> [Interrogatory No.] 12 is **one** aimed at identifying Tatung's U.S. distributors.

*Id*. at 61:19-20 (emphasis added).

> [Interrogatory No.] 13 is **one** seeking the identity of Tatung's distribution network and channels through which its visual display

products are distributed throughout the United States or to the
United States or to Delaware.

*Id.* at 61:21-24 (emphasis added).

Interrogatory No. 14 I consider to be **four** separate interrogatories
seeking information concerning the chain of distribution as to four
discrete products, all of which were offered or purchased through
different retail channels.

*Id.* at 62:1-5 (emphasis added).

[Interrogatory No.] 15 I consider to be **four** in that it seeks each
step in the chain of distribution by which four separate discrete
pieces of equipment arrived in Delaware.

*Id.* at 62:6-9 (emphasis added).

[Interrogatory No.] 16 I consider to be **two** in that it seeks, first, all
of Tatung's products available for purchase through the Internet
and, second, the identity of Web site vendors authorized to sell
Tatung's visual display products.

*Id.* at 62:10-14 (emphasis added).

[Interrogatory No.] 17 is **one** seeking reports generated by Tatung
with respect to the distribution, shipment, and sale of its visual
display products in or to the United States.

*Id.* at 62:15-18 (emphasis added).

[Interrogatory No.] 18 is **one** asking that Tatung delineate its
contacts with Delaware.

*Id.* at 62:19-20 (emphasis added).

[Interrogatory No.] 19 is **one** asking Tatung to identify any
affirmative steps it's taken to prevent its products from reaching
the Delaware market.

*Id.* at 62:21-23 (emphasis added).

[Interrogatory No.] 20 is **one** requesting the brand names and
related information for Tatung visual display products
manufactured, marketed, imported, distributed and/or sold in the
United States.

*Id.* at 62:24 and 63:103 (emphasis added).

25

Accordingly, the Special Master concluded that the interrogatories propounded by LPL to each Tatung Defendant totaled 27, well within the 50 interrogatories permitted under Local Rule 26.1(b). LPL then pressed for an order requiring the Tatung Defendants to respond to the interrogatories within a two-week period.

Having lost on the count issue, the Tatung Defendants requested that the Special Master proceed to consider their other objections to the interrogatories. In Tatung's view, it couldn't object with specifity to certain of the interrogatories until the primary issue of count was resolved. March 30, 2005 Transcript at 72:1-6 ("until we have a resolution of the issue of the counting, again, it's not possible because we don't know exactly where and how we have to be looking.").

LPL argued, with supporting authority, that to the extent other specific objections had not been raised in the Tatung Defendants' responses, those objections had been waived. March 30, 2005 Transcript at pp. 64-70, and 90:16-19. Tatung requested an opportunity to submit contrary authority, *Id.* at 92:2-7, and the Special Master set a schedule for written submissions. *Id.* at 96:13-22. Thereafter, the Special Master received a March 31, 2005 submission from Tatung's counsel stating he had been mistaken about the legal support for Tatung's position. On April 1, 2005, LPL renewed its request to compel the Tatung Defendants to respond to the outstanding interrogatories. However, the Special Master's further consideration of discovery issues relating to the interrogatories was mooted by the April 20, 2005 stipulation by the Tatung Defendants that, *inter alia*, consents to the jurisdiction of this Court. D.I. 188.

In turning to the issue of sanctions, the Special Master concludes that sanctions are appropriate for the unjustified failure of the Tatung Defendants to respond to interrogatories. It is undisputed that the Court ordered jurisdictional discovery on November 17, 2004 and set a 90-

26

day period (until February 15, 2005) for its completion. It is also undisputed that LPL

propounded jurisdictional interrogatories upon the Tatung Defendants on or about November 29,

2005. Finally, it is undisputed that the Tatung Defendants refused to respond to interrogatories

on the basis of boilerplate objections and/or their objections as to count.

Tatung participated in the January 24, 2005 hearing before the Court with the knowledge

that the Court considered it to be a hearing on a motion by LPL to compel discovery responses

from Tatung. At that hearing, the Court directed that any incomplete responses to interrogatories

should be submitted by Tatung to LPL within a week. It also cautioned Tatung that it was

subject to sanctions if it mistakenly relied upon its objections to interrogatory count:

> [T]hat rule has been around so long, lawyers ought to be able to
> count . . . but **if it's a counting problem, you better be sure
> you're going to win it** by a standard beyond a reasonable doubt,
> . . . and if you're arguing over whether [their] subparts are really
> questions, just think about that for a minute. That's even kind of a
> waste of a special master's time, **unless they're really playing
> with you. And then they're going to get sanctioned.** Not [just
> Tatung], but anybody that's fighting that kind of a thing on that
> kind of basis, you know, they're not going to do well.

D.I. 132 at 51:7-12; 52:10-24, and 53:1 (emphasis added). The Special Master concluded at the

March 30, 2005 hearing that Tatung's position – of counting the first four interrogatories

propounded by LPL as numbering in excess of 50 interrogatories – was not an argument

supported by even Tatung's own authority.

Pursuant to Rule 33, a party's answers or objections to interrogatories must be served

within 30 days. Fed. R. Civ. P. 33(b)(3). Objections to interrogatories must be stated

specifically and with particularity so that the objection can be reviewed and understood by both

the opposing party and the Court. Fed. R. Civ. P. 33(b)(4); *Josephs v. Harris Corp.*, 677 F. 2d

985, 992 (3d Cir. 1982) ("[T]he mere statement by a party that the interrogatory was 'overly

broad, burdensome, oppressive and irrelevant' is not adequate to voice a successful objection to

an interrogatory. On the contrary, the party resisting discovery 'must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive'") (citation omitted). *See also, Walker v. Lakewood Condo. Owners Assoc.,* 186 F.R.D. 584, 587 (C.D. Cal. 1999) ("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all"). The Special Master concludes that the Tatung Defendants' objections to interrogatories were classic boilerplate and completely fail to meet the specificity test.

Having considered the parties' written submissions on the issue of sanctions, the Special Master concludes that sanctions are appropriate, pursuant to Fed. R. Civ. P. 37(d), where the failure of the Tatung Defendants to properly respond to interrogatories was neither substantially justified nor supported by relevant authority. The Special Master therefore recommends that Tatung pay LPL's reasonable expenses caused by its failure to respond to LPL's interrogatories, including attorney fees and Special Master fees. Fed. R. Civ. P. 37(d); *see also, Haraway,* 213 F.R.D. at 165-66 (noting "courts have readily awarded sanctions against individuals who have in some measure complied with Rule 37(d) but have violated the basic requirement of the Rule to cooperate in discovery."); *Woulard,* 2004 WL758358 at *1-2 (applying Rule 37(d) to sanction plaintiff who failed to respond to interrogatories or produce discovery).

**C.    Failure to Produce Requested Documents**

  **1.    Legal Standard**

Pursuant to Federal Rule of Civil Procedure 34(b):

> **The party upon whom the request is served shall serve a written response within 30 days after the service of the request . . . The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated. If objection is made to part of an item or category, the part shall be specified and inspection**

28

**permitted of the remaining parts.** The party submitting the request may move for an order under Rule 37(a) with respect to any objection to or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested.

**A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.**

Fed. R. Civ. P. 34(b) (emphasis added). Under Rule 37 "an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(3). When a party fails to comply with the provisions of Rule 34, "the court . . . may make such orders in regard to the failure as are just." *Woulard*, 2004 WL 758358 at *1-2 (quoting Fed. R. Civ. P. 37(d)).

### 2.    The Tatung Defendants' Failure to Produce

On November 29, 2004, LPL served requests for production of documents upon each of the Tatung Defendants. D.I. 98. The Tatung Defendants responded only by asserting boilerplate objections to the production requests, and failed to produce any documents when they served their objections to LPL on or about January 5, 2005. D.I. 113.

At the January 24, 2005 hearing with the Court, counsel for LPL – emphasizing the importance of certain of those documents to scheduled depositions – urged the Court to compel the production of responsive documents:

> *LPL Counsel*:  [W]e have served interrogatories, and we also served document requests in early December. And as of today, Your Honor, we haven't received a single document. Obviously, it would facilitate the deposition if I had in advance some of the documents. For example, Your Honor, one of the reasons I gave you [copies of the declarations submitted in support of Tatung's jurisdictional challenge] is that they refer in their declarations to records that they relied upon to put forth the facts, which include things like they are selling $132 million of product in the U.S. . . . that's in their own papers. So they've put those numbers in the

29

papers. They have also said those are based on specific records that they've reviewed, yet I don't have those records.

Your Honor, I would like to have those records before I take these depositions.

*Tatung Counsel*: Sounds like it's something he should have. . . He should have those documents.

*The Court*: Interrogatories and documents, you['re] absolutely correct, should be resolved before deposition practice occurs. And we're focused on [late] February . . . That's material that the parties seeking deposition wants to have before they start the deposition . . . If there's interrogatories that are properly served, they need to be responded to, **and the same with documents. . . . You've got to give them up.**

*Tatung's Counsel*: **We'll absolutely give them up.**

D.I. 132 at pp. 48-50 (emphasis added). The Court concluded with the following direction to Tatung: "It seems to me that all the documents relative to the declarations that [LPL] cited . . . ought to be able to be given over by the end of this week, the very first part of next week." *Id.* at 56:17-21.

On January 27, 2005, counsel for LPL confirmed that Tatung's counsel had agreed to forward to LPL by January 31 "all of the documents that the Tatung defendants agreed to produce and their responses to the request for documents and all of the documents discussed at the January 24, 2005 hearing." January 27, 2005 letter from Cass W. Christenson, Esquire to Robert C. Weems, Esquire. Tatung America subsequently produced only 46 pages of documents; Tatung Taiwan produced nothing. By letter dated February 3, 2005, LPL's counsel confirmed that he had been advised that counsel for Tatung was "not aware of any intention to produce further documents." In response, LPL advised that it would file a motion to compel unless it received assurance that all responsive documents would be produced. February 3, 2005 letter from Cass W. Christenson, Esquire to Robert C. Weems, Esquire. Roadblocked again,

LPL moved on February 7, 2005 for leave to file an expedited motion to compel jurisdictional discovery from the Tatung Defendants, including a request to compel the production of documents. D.I. 154.

While LPL's second motion to compel was pending, the re-noticed depositions of Tatung America proceeded without any further document production by either of the Tatung Defendants. During those depositions, witnesses identified the existence of documents that had not been produced, and that clearly appear to be responsive to LPL's requests for production. For example:

> Q: So is it your understanding that the document marked TUS 36 and TUS 37 does not include any sales or shipments to Delaware for any time after December 31, 2003?
> A: That's how it appears to me.
> Q. And is it your testimony that you've reviewed a **sales tax report that shows sales and shipments of products to Delaware for the period that includes 2004**?
> TATUNG COUNSEL: Objection. Asked and answered.
> THE DEPONENT: Yeah, my recollection is not that clear but that's what I recall.
> LPL COUNSEL:    And [addressing Tatung counsel], as I understand Tatung America's position, Tatung America does not intend to provide that document during this deposition. Is that right?
> TATUNG COUNSEL:    You can ask your [next] questions, counsel.

Sun Deposition at 107:24-25 to 108:1-15 (emphasis added).

> Q. Let's talk about the records that Tatung America keeps with respect to product sales.
> Does Tatung America have documents that show how many LCD monitors it sells each month?
> A. Yes.
> Q. What are those documents called?
> A. **Mon[th]ly sales report**.
> Q. Who prepares the monthly sales report?
> A. I.T. room.
> Q. Did you say I.T. room?
> A. Yes.

Q. And is that based on information in Tatung America's database?
A. Yes.
Q. Does the report then go to you, Mr. Tsou, as manager?
A. Yes, I will have the report.
Q. You receive the monthly sales reports?
A. Yes.

Tsou Deposition at 38:18-25 to 39:1-11 (emphasis added).

Q. What **information is included in the monthly sales report**?
A. The **models** and the **customers** and the **quantity**.
Q. Does it give a **dollar amount**?
A. Yes.
Q. When you say "models," would an example of a model be the L17AMTN?
A. That's one of the models.
Q. So from the monthly sales report can you determine how many of a particular model were sold each month?
A. Yes.
Q. How far back do the monthly sales reports go?
A. I don't know.
Q. Since the time that you have been a Sales Manager, have there always been monthly sales reports?
A. Yes.

Tsou Deposition at 44:1-17 (emphasis added).

Q. How can you trace customers, of monitors?
A. Through the computer system.
Q. Does Tatung America have documents that show where products were shipped?
Let me ask it again. Let me ask it again, more specifically. Does Tatung America have **documents showing where computer monitors are shipped**?
A. Yes.

Tsou Deposition at 41:17-24 (emphasis added).

Q. Are you familiar with any documents called inventory reports?
A. Our inventory report?
Q. Yes, at Tatung America.
A. Yes.
Q. What is an inventory report?
A. To show the products we have on hand.
Q. Would that include computer monitor products?
A. Yes.

> Q. So **inventory reports would show the computer monitor products that Tatung America has available in its inventory for sale**?
> A. Yes.
> Q. Who prepares inventory reports? Well, first of all, are inventory reports prepared on a regular basis at Tatung America?
> A. Yes.
> Q. How often?
> A. Every week.

Tsou Deposition at 65:19-22 to 66:1-12 (emphasis added).

As of the March 30, 2005 hearing held before the Special Master, Tatung Taiwan had still not produced any documents whatsoever. Tatung America had not produced any additional documents to supplement its 46 page production. According to counsel for LPL, although additional responsive documents were identified during depositions of Tatung America employees, these responsive documents were never produced:

> **The depositions went forward with essentially – I was essentially in the dark without documents or interrogatory responses.** [I] proceeded with the depositions which I had to do because we were unable to obtain an agreement from [Tatung's] counsel to extend our discovery period. So we had a February 22 cutoff. Again, there was a sense of urgency to try to complete all this discovery. **[Tatung] would agree neither to provide additional time for discovery, nor to provide additional discovery.**
>
> We proceeded with the depositions and during the three depositions, which were on consecutive dates, February 7th, 8th, and 9th, I repeatedly asked during those depositions when **witnesses would identify documents that were on-site,** that [could we] take a break and the witness be permitted to obtain documents. I was consistently rebuked and **no further documents were produced during those depositions.**

March 30, 2005 Transcript at 23:10-15, 20-24 and 24:1-3 (emphasis added).

LPL's counsel further represented that, while its motion to compel was pending, LPL sought to revolve the impasse by voluntarily paring down the categories of their document

requests from approximately 42 categories to approximately 18 categories of documents "just to get the most minimum necessary information as quickly and efficiently as we could." March 30, 2005 Transcript at p. 24. In response to this offer, Tatung countered that it would agree only to create a special report that produced information with respect to only those models of Tatung equipment that LPL accused of infringement. However, Tatung's counteroffer was conditional on LPL's agreement to severely restrict or forego all other jurisdictional discovery, including depositions. The "catch 22" of Tatung's counteroffer was that, without the additional discovery from Tatung, LPL could not identify for Tatung all of the accused products necessary to permit the creation of a meaningful report. *Id.* at pp. 27-31. The impasse manufactured by the Tatung Defendants therefore continued unabated, with LPL counsel representing to the Special Master at the March 30, 2005 hearing:

> We are now four months into jurisdictional discovery. We have **essentially no interrogatory answers, we have 46 pages of documents from Tatung America, zero documents from Tatung Company, and we have got no deposition testimony from Tatung Company**.

March 30, 2005 Transcript at 34:7-10 (emphasis added).

Pursuant to Rule 34, a party must produce documents for inspection within 30 days after the service of the request. Fed. R. Civ. P. 34(b). It is undisputed that throughout the pendency of the jurisdictional discovery period, Tatung Taiwan refused to produce any documents whatsoever responsive to LPL's document request. Tatung America produced only 46 pages of responsive documents. It is clear from the transcript of the parties' January 24, 2005 hearing before the Court that the Court did not expressly excuse the Tatung Defendants' duty to produce documents for inspection. To the contrary, the Court expressly instructed Tatung:

> That's material that the party seeking deposition wants to have before they start the deposition. So as a general matter if [there

34

> are] interrogatories that are properly served, they need to be responded to, and **the same with documents**. And we all agree.

D.I. 132 at 50:6-12 ((emphasis added).

In addition to those documents the Special Master ordered produced at the March 30, 2005 hearing, it is clear to the Special Master that, at a minimum, the documents reviewed by those who submitted declarations in support of Tatung Taiwan's motion to dismiss on jurisdictional grounds would have been within a subset of documents responsive to LPL's document production requests. *See* D.I. 20. It is also clear from the Special Master's review of the transcripts of the depositions of Tatung America and its employees that certain documents reviewed by declarants – as well as other documents responsive to LPL's document requests – exist, but were not produced. *See supra* at pp. 29-31 (citing, e.g., sales tax report that shows sales and shipments of product to Delaware for period including 2004; monthly sales reports, computer shipment reports, inventory reports, and reports of transactions with third party vendors).

Therefore, having considered the parties' written submission on the issue of sanctions, the Special Master concludes that sanctions are appropriate, pursuant to Fed. R. Civ. P. 37(d), where the failure of the Tatung Defendants to properly produce documents for inspection was neither substantially justified nor supported by relevant authority.[10] The Special Master therefore recommends that Tatung pay LPL's reasonable expenses caused by its failure to respond to LPL's document requests, including attorney fees and Special Master fees. Fed. R. Civ. P. 37(d); *Haraway*, 213 F.R.D. at 165, 66 (noting "courts have readily awarded sanctions against individuals who have in some measure complied with Rule 37(d) but have violated the basic

---

[10] The Special Master does not pause in this regard even though several of the document requests were "fine tuned" during the course of the March 30, 2005 hearing. The effort in this regard is something that the Tatung Defendants could have forestalled had they made a good faith effort to meet and confer. In this regard, the Special Master concludes they did not.

requirement of the Rule to cooperate in discovery"); *Novartis Pharmaceuticals*, 203 F.R.D. at 164 (finding production of only domestic sales and marketing documents to be "inadequate to satisfy burden under Rule 26(b) to produce all relevant, non-privileged documents); *Woulard*, 2004 WL 758358 at *1-2 (applying Rule 37(d) to sanction plaintiff who failed to respond to interrogatories or produce discovery); and *Liafail, Inc. v. Learning 2000, Inc.*, C.A. Nos. 01-599, 01-678 at *3 (D.Del. Dec. 23, 2002) (Sleet, J.) [available as 2002 WL 31954396] ("where the nature of the alleged breach of a discovery obligation is the non-production of evidence, the court has broad discretion in fashioning an appropriate sanction.").

**D.     Sanctions are Warranted**

For the foregoing reasons, the Special Master concludes that the persistent failures of the Tatung Defendants to comply with their discovery obligations – without substantial justification and unsupported by relevant legal authority – has unfairly burdened judicial resources, including this Court's scheduling orders for both jurisdictional discovery and the management of this case. Additionally, the Tatung Defendants' failures to appear at depositions, failures to respond to interrogatories, and failures to produce documents responsive to document requests have prejudiced LPL by forcing it to incur unnecessary attorney fees, expenses and delay.   The Special Master therefore recommends:

**(1)**     that sanctions be assessed against the Tatung Defendants, jointly and severally, for the unreimbursed expenses and reasonable costs, including attorney fees, incurred by LPL in (i) preparing for any noticed deposition for which a deponent did not appear; (ii) preparing papers in support of its motions to compel and/or for sanctions; (iii) preparing papers in opposition to motions by the Tatung Defendants for protective orders; (iv) preparing for and attendance at the January 24, 2005 hearing before the Court; (v) preparing papers submitted to the Special Master on the jurisdictional discovery disputes; (vi) preparing for and attendance at

the March 30, 2005 hearing before the Special Master; (vii) preparing for and participation in the April 4, 2005 teleconference with the Special Master; (viii) preparing for and attendance at the April 20, 2005 aborted hearing before the Special Master; and (ix) upon application, such other and further costs and expenses as may be reasonable and just;

(2)    that LPL **not later than August 26, 2005** submit to the Special Master, by affidavit, a summary of the unreimbursed expenses and costs for which it seeks reimbursement pursuant to subparagraph (1) above, with detail sufficient to permit assessment of the reasonableness of such costs (detail that would implicate either the attorney-client or work product privilege may be submitted for *in camera* review);

(3)    that the Tatung Defendants, jointly and severally, pay all amounts due as sanctions to LPL within thirty (30) days of a determination by the Special Master that the amounts for which LPL seeks reimbursement are reasonable; and

(4)    that sanctions be imposed against the Tatung Defendants, jointly and severally, in the amount of LPL's *pro rata* share of the costs for the Special Master's services in connection with the jurisdictional discovery phase, so that the Tatung Defendants will pay 100% of such costs.

**These findings and recommendations will become a final order of the Court after the Special Master has ruled on the reasonableness of the amount of sanctions, unless objection is timely taken in accordance with the provisions of Fed. R. Civ. P. 53(g)(2).**

**II.     Analysis – Assessment of Sanctions**

Having concluded that the imposition of sanctions is warranted, the Special Master turns to the issue of whether the recommended sanctions should be imposed against the Tatung Defendants, their counsel or both. Fed. R. Civ. P. 37(d). In this regard, the Special Master is mindful of the opinion issued in *Safer Display Technology, Ltd. v. Tatung Company and Tatung*

*Co. of America, Inc.*, No. Civ. A. 2:04CV154 (E.D. Va. Dec. 29, 2004) (Doumar, D. J.) [available as 2004 WL 3330838], and the underlying case record (herein after, the "Virginia Action"). LPL has referenced the Virginia Action for judicial notice in several of its motions before the Court and submissions to the Special Master.

This Court, where appropriate, has taken judicial notice of facts in the public record. *See, e.g., In re Delmarva Securities Litigation*, 794 F. Supp. 1293, 1299 (D.Del. 1992) ("this Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the parties seeking to have them considered"); *accord, PHP Liquidating, LLC v. Robbins PHP Liquidating*, 291 B.R. 592, 602 n. 7 (D.Del. 2003).

Facts of the type contained in judicial case records and opinions are particularly appropriate for judicial notice. As reasoned by Judge Stapleton of the Third Circuit: "it is not seriously questioned that that filing of documents in the case record provides competent evidence of certain facts – that a specific document was filed, that a party took a certain position, that certain judicial findings, allegations, or admissions were made." *Nantucket Investors II v. California Federal Bank (In re Indian Palms Associates, Ltd.)*, 61 F. 3d 197, 205 (3d Cir. 1995). *See also, Furnari v. Warden, Allenwood Federal Correctional Institution*, 218 F. 3d 250, 255 (3d. Cir. 2000) (taking judicial notice of affidavit submitted by government attorney in an unrelated trial that described a witness as unreliable); and *Capital City & Trust v. Kroh (In re George P. Kroh)*, 88 B.R. 987, 988-89 (Bankr. W. D. Mo. 1988) (taking judicial notice of findings of fact and conclusions of law entered in adversary actions against other parties by the same debtor as "highly relevant evidence of [debtor's] plan and scheme to obtain loans using false financial statements," as well as of the debtor's intent).

38

Accordingly, the Special Master takes judicial notice of certain of the findings of facts and conclusions of law made by the presiding judge in the Virginia Action on the basis that the opinion is a matter of public record that is available and verifiable in the public records of the United States District Court for the Eastern District of Virginia, as well as by computer through the Westlaw and other legal research databases. Judicial notice of the Virginia Action is taken solely for the purpose of determining against whom sanctions should properly be imposed.

In the Virginia Action, a patentee (Safer Display Technology, Ltd.) brought an infringement action against the same corporate entities referenced as Tatung Taiwan and Tatung America in the instant case. The similarities do not end there:

- In both the Virginia Action and the instant action, Tatung Taiwan filed motions to dismiss for lack of personal jurisdiction.[11]

- In both the Virginia Action and the instant case, declarations by David Shan-Juh Chang supported the motions of Tatung Taiwan to dismiss the litigations on jurisdictional grounds.[12]

- In both the Virginia Action and the instant case, declarations by Robin Tsou also supported motions to dismiss litigations on jurisdictional grounds.[13]

- In both the Virginia Action and the instant case, the Courts ordered a limited period of jurisdictional discovery.[14]

---

[11] In the Virginia Action, *see* 2004 WL 3330838 at *1. In the Delaware action, *see* D.I. 16.

[12] In the Virginia Action, *see* D.I. 8, 10 and 16 on civil docket for case 2:04-CV-00154-RGD (E.D. Va.). In the Delaware action, *see* D.I. 20.

[13] In the Virginia Action, *see* D.I. 105 on civil docket for case 2:04-CV-00154-RGD (E.D. Va.). In the Delaware action, *see* D.I. 19, Exh. 3.

[14] In the Virginia Action, *see* 2004 WL 3330838 at **1-2 (60-day period of jurisdictional discovery). In the Delaware action, *see* D.I. 88 (ordering a 90-day period of jurisdictional discovery, scheduled to end on February 15, 2005).

- In both cases, the limited periods for jurisdictional discovery were prolonged by multiple discovery objections and/or disputes.[15]

- In both cases, the "meet and confer" communications between counsel did not further resolution of the discovery disputes but, rather, served to prolong the jurisdictional discovery period.[16]

- In both cases, the patent holders were forced to file motions to compel Tatung Defendants to respond to basic discovery.[17]

- In both cases, Tatung Taiwan insisted that depositions of its employees be noticed for Taiwan, but allowed none of the noticed depositions to go forward.[18]

- In both cases, Tatung Taiwan refused to go forward with the noticed deposition of David Shan-Juh Chang, whose declaration supported its motions to dismiss on jurisdictional grounds.[19]

- In both cases, the Tatung Defendants avoided going forward with noticed depositions just days before they were scheduled, by filing motions for protective orders.[20]

- In both cases, jurisdictional discovery went nowhere as the close of the jurisdictional discovery periods approached.[21]

---

[15] In the Virginia Action, *see* 2004 WL 3330838 at *2. In the Delaware action, *see supra* at pp. 2-7.

[16] In the Virginia Action, *see* 2004 WL 3330838 at *2 ("amicability and communication between counsel for the parties has deteriorated significantly, which has also prolonged the jurisdictional discovery period"). In the Delaware action, *see infra* at p. 41.

[17] In the Virginia Action, *see* D.I. 116 *passim*. In the Delaware Action, *see supra* at pp. 3-7.

[18] In the Virginia Action, *see* D.I. 116 at pp. 12-14. In the Delaware Action, see supra at pp. 17-19.

[19] In the Virginia Action, *see* D.I. 116 at pp. 12-13. In the Delaware Action, *see supra* at pp. 17-19.

[20] In the Virginia Action, *see* D.I. 116 at pp. 13-14. In the Delaware Action, *see* pp. 2-7.

[21] In the Virginia Action, *see* D.I. 116 at p. 13. In the Delaware Action, *see* D.I. 132 at p. 4:13-19.

- In both cases – after burdening the Court and patent holders with substantial costs and delays – Tatung Taiwan belatedly agreed to consent to the jurisdiction of the courts.[22]

There is, however, at least one significant difference between the Virginia Action and the instant case. In the instant case, the Tatung Defendants are jointly represented by entirely different counsel than represented the Tatung Defendants in the Virginia Action.[23] It does not appear from the docket sheets in either action that any individual attorney appeared for the Tatung Defendants in both cases.

The marked similarity in the conduct of the Tatung Defendants during jurisdictional discovery in both cases cannot, in the Special Master's view, be attributed to advice of counsel. For that reason, the Special Master concludes that the Tatung Defendants are the architects of their own ill-conceived discovery strategy. It is particularly disappointing that the Tatung Defendants determined to follow that strategy in this case, even after similar conduct had been subject to the consideration of sanctions in the Virginia Action. As succinctly noted by the Honorable Robert G. Doumar in the Virginia Action:

> The Stalingrad Defense, in which the proponent tries to wear down the adversary until he succumbs to the depths of a longsome, frigid winter, cannot be implemented without severe costs to the proponent himself.

2004 WL 3330838 at *1. The Special Master agrees. Accordingly, the Special Master concludes that the sanctions recommended herein be assessed against – and only against – the Tatung Defendants, jointly and severally.

---

[22] In the Virginia Action, see D.I. 110 on docket 2:04-cv-00154 and 2004 WL 3330838 at **5-11. In the Delaware action, see D.I. 188.

[23] In the Virginia Action, the Tatung Defendants were represented by attorneys from various offices of the law firm of Greenberg & Traurig LLP. In the Delaware action, the Tatung Defendants are represented by lead counsel Robert C. Weems, Esquire, of the Law Offices of Baum & Weems and by Delaware co-counsel Jeffrey S. Goddess, Esquire, of the law firm Rosenthal Monhait Gross & Goddess, P.A.

41

## **END NOTE**

The Special Master would be remiss at the close of this chapter if several observations with respect to the course of jurisdictional discovery were not made.

**First**, it is clear to the Special Master that the discovery disputes between the parties were capable of reasonable resolution in accordance with controlling law and without burdening the Court's time. It is fair to say that the "meet and confer" process between counsel was an abject failure in moving issues towards resolution. Rather, the process served to further entrench the parties in their respective positions and to unnecessarily prolong jurisdictional discovery. Primary among the reasons for this failure was an abrogation of the duty to comply with the rules that govern litigation in this Court, coupled with a breakdown in the civility and professionalism in the communications between counsel.

**Second**, it is a privilege for an attorney to be admitted to practice *pro hac vice* before the Delaware District Court. In the opinion of the Special Master, it is a privilege that can and should be withdrawn if attorneys so admitted fail to comply with the applicable rules of the Court, and to conduct themselves with the civility and professionalism required of members of the Delaware bar.

**Third**, going forward – to avoid the risk of sanctions in a form beyond mere monetary sanctions – the Special Master cautions counsel to rethink their game plan and resolve not to engage in the conduct that so tainted the jurisdictional discovery in this case.

ENTERED this 16th day of August, 2005.

_____
Vincent J. Poppiti (DSBA No. 100614)
Special Master

42

# EXHIBIT 11

RECEIVED

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### (Norfolk Division)

FILED

DEC 23 2004

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

SAFER DISPLAY TECHNOLOGY, LTD.,  )
                                                  )
        Plaintiff,                   )  Civil Action No.: 2:04cv154
         v.                      )  Judge Robert G. Doumar
                                                    )
TATUNG COMPANY and              )  Pursuant to Local Rule 5 and the Protective
TATUNG CO. OF AMERICA, INC.     )  Order Entered on September 28, 2004, the
                                                      )  Declaration of Douglas Weinstein and
        Defendants.             )  Attachments Thereto are Filed Under Seal.
                                                      )
                                                      )

## PLAINTIFF SAFER'S SUBMISSION REGARDING COURT'S HEARING FOR DECEMBER 29, 2004 ON TATUNG'S MOTION FOR LEAVE TO WITHDRAW ITS JURISDICTIONAL CHALLENGE

**I.    Introduction**

    Tatung's litigation tactics have needlessly driven up litigation costs since July. It should be sanctioned for its tactics and ordered to pay Safer's attorney fees.

    In attempting to have this case dismissed for lack of personal jurisdiction, Tatung never denied that its accused computer monitors were sold in Virginia. Instead, it put Safer to the burden of proving sales of Tatung monitors in Virginia—sales that would be expected from a multibillion-dollar company that annually sells hundreds of millions of dollars of products in the United States.

    In refusing to submit to the jurisdiction of this court, Tatung forced Safer to pursue jurisdictional discovery from defendants and from third party distributors and sellers, and then Tatung obstructed Safer's efforts to collect that discovery. While Tatung did finally submit to the jurisdiction of this Court, it did so only after consuming significant resources of the Court

116

and the parties, and on the eve of depositions ordered by the Court.  In a final display of hubris, Tatung has attempted to shift blame to Safer for the unnecessary wheel spinning and litigation costs that resulted directly from Tatung's litigation tactics.

On December 22, 2004, Safer discovered evidence indicating that Tatung-Taiwan was the exclusive manufacturer for North America for at least two different monitors for a national computer vendor whose monitors are undeniably sold in Virginia, which means that Tatung's jurisdictional challenge was apparently not brought in good faith.[1]  Judge Doumar explicitly warned Tatung that "if all they are doing is running up the costs" with their jurisdictional challenge, "then they're going to pay for it."  That is precisely what Tatung has done, despite the Court's express warning, and despite its exclusive North American supply contract with the nationwide computer vendor.  Accordingly, Tatung should be ordered to pay Safer's attorneys' fees.

## II.    Background

### A.    The Parties

Plaintiff Safer Display Technology, Ltd. ("Safer") is the owner of U.S. Patent No. 4,270,145 ("the '145 patent") which covers, *inter alia,* computer monitors with on-screen display features.  (Complaint (Dkt. No. 1) ¶ 13.)  At least 28 corporations have taken a license to practice the valuable on-screen display features covered by the '145 patent, including Sony, Toshiba, Samsung, Sharp, NEC, JVC, LG Electronics, and Phillips Magnavox.  In its Complaint, Safer alleges that Tatung Company ("Tatung-Taiwan") and Tatung Company of America, Inc. ("Tatung-U.S.") infringed, or induced others to infringe, the '145 patent by selling and importing

---

[1] Safer has no reason or evidence to believe that this manufacturing contract was cancelled and/or not fulfilled.  Safer thus concludes that the exclusive manufacturing relationship indeed existed.  In fact, confidential discovery from Tatung-Taiwan and third parties all indicates that Safer is entirely correct in this conclusion.  (See Weinstein Decl. ¶¶ 3-17.)

2

into the U.S. Tatung-Taiwan's computer monitors with on-screen display features during 1998 and 1999. (*Id.* ¶¶ 11, 13.)

Defendant Tatung-Taiwan is a multibillion-dollar manufacturer and self-described "worldwide leader in the design and manufacturing of a vast array of digital consumer products." (www.tatung.com.) Tatung-Taiwan's website lists its subsidiary, Tatung-U.S., as one of its worldwide business locations. (Neal Decl. Supporting Safer's Opposition to Tatung-Taiwan's Motion to Dismiss ("Neal Decl.") (Dkt. No. 11), ¶ 8.) Tatung-Taiwan is a 50% owner of Tatung-U.S., and Tatung-Taiwan's General Manager is also one of the four directors of Tatung-U.S. (*Id.* ¶ 6.) During the years 1998 and 1999 at issue in this lawsuit, Tatung-Taiwan sold over $498,000,000 and $380,000,000 in products into the United States. (*Id.* ¶ 11.) Furthermore, Tatung-Taiwan has sold and continues to sell large numbers of monitors to computer distributors, including Compaq and Hewlett-Packard. (Weinstein Decl. ¶¶ 8, 10, 17.). These computer distributors place their names and model numbers on the monitors and then sell them nationwide, including in Virginia, through national distribution channels.

A large part of Tatung-Taiwan's jurisdictional challenge has been its assertion that, although it admittedly sells its monitors to national computer vendors such as Compaq and Hewlett-Packard, it supposedly did not know whether its monitors were sold in Virginia because it was possible that there were additional monitors made by other manufacturers that were similarly rebranded and resold by Compaq and Hewlett-Packard. Indeed, counsel for Tatung-Taiwan specifically argued that to Judge Bradberry on December 1, 2004 (Weinstein Decl. Tab 33, at 16:9-13 ("we don't know how many manufacturers Hewlett-Packard or Compaq have other than Tatung").) That statement is contradicted by evidence indicating that Tatung-Taiwan

3

was the exclusive North American manufacturer for a national computer distributor in 1998. (This confidential relationship is discussed in the Weinstein Decl. ¶¶ 3-17, submitted under seal.)

### B.  Tatung's- Taiwan's Sales of Infringing Monitors in the U.S. is Evident From its Application For FCC Authorization

In addition, according to the Federal Communications Commission ("FCC"), the U.S. agency responsible for regulating electronic devices including monitors, Tatung-Taiwan applied for and obtained FCC authorization for certain of its monitors. (Weinstein Decl. ¶ 18.)  There would be no reason for Tatung-Taiwan to seek FCC approval for its monitors if Tatung-Taiwan did not intend for its monitors to be sold in the U.S. (*Id.*)

Furthermore, Safer has recently learned from information from the FCC that Tatung-Taiwan applied for authorization to sell Compaq MV700 color monitors with on-screen display functions during the applicable time period (1998-99). (Weinstein Decl. ¶¶ 18-23.)  Safer has further learned from documents recently produced by Circuit City, Ingram Micro, and Office Depot that these companies had significant sales of Compaq MV700 monitors in Virginia during the applicable period.  (The specific numbers of monitors sold by these companies are confidential and discussed in the supporting Weinstein Declaration (¶¶ 10-16), submitted under seal.)

Safer was on the brink of taking depositions to prove that these Compaq MV700 monitors were manufactured by Tatung-Taiwan, and was pursuing similar jurisdictional information from Hewlett-Packard, when Tatung-Taiwan abruptly moved to withdraw its jurisdictional challenge on December 9, 2004. (Dkt. No. 108.)  And as explained above, approximately two weeks later, Safer discovered evidence that Tatung-Taiwan was an exclusive manufacturer for North America for at least two monitors sold nationally and in Virginia.

4

### C. Tatung-Taiwan's Challenge to Personal Jurisdiction Lacked a Good Faith Basis

Tatung-Taiwan's deadline to respond to Safer's complaint was extended by a stipulated order to July 15, 2004. (Dkt. No. 4). On that date, Tatung-Taiwan filed its Motion to Dismiss, contending—despite its exclusive manufacturing relationship for North America with a national computer vendor, sales of hundreds of million dollars of its consumer electronics products in the U.S., its sales to nationwide vendors like Compaq and Hewlett-Packard, and its 50% ownership and managerial control over Tatung-U.S.—that this Court supposedly lacks personal jurisdiction over Tatung-Taiwan. (Dkt. Nos. 6 and 7.) Tellingly, Tatung-Taiwan did not argue in its papers that its monitors were *not* sold in Virginia, even though Tatung-Taiwan was legally obligated to reasonably investigate whether its defense was valid (see Argument at pp. 17-18 below). Furthermore, Tatung-Taiwan could not argue in good faith that its monitors were not sold in Virginia because it knows, at a bare minimum, that (1) it was the exclusive manufacturer for North America for a national computer vendor in 1998, and (2) that its monitors were sold by Compaq and Hewlett-Packard in nationwide distribution channels to retailers such as Circuit City, Best Buy, and Office Depot, who sell monitors in Virginia. Finally, it defies reason that a sophisticated, global, multi-billion dollar company like Tatung-Taiwan would not know where its monitors and other products are sold in the United States.

Despite its duty to investigate its jurisdictional defense, Tatung-Taiwan argued instead that this action should be dismissed because Safer, without the benefit of any discovery, could not yet prove that accused monitors had been sold in Virginia.[2] Tatung-Taiwan's motion to

---

[2] In opposing Tatung-Taiwan's motion to dismiss for alleged lack of personal jurisdiction, which was filed prior to jurisdictional discovery, Safer explained that this Court has personal jurisdiction over Tatung-Taiwan for at least two reasons summarized very briefly here. First, the exercise of personal jurisdiction comports with traditional notions of fair play and

dismiss was heard by Judge Doumar on August 25, 2004. The Court rejected Tatung-Taiwan's argument that this case should be dismissed without discovery, noting that "defendant really knows what they're doing, what they're selling, not the plaintiff." (Weinstein Decl. Tab 32 at 33:21-22.) Judge Doumar similarly noted that "the facts establishing jurisdiction are mostly in the knowledge of the defendant, not in the knowledge of the plaintiff." (*Id.* at 16:22-24.) Accordingly, the Court deferred deciding Tatung-Taiwan's motion and granted Safer a limited 60 day period to take jurisdictional discovery. The Court stated that, under the Federal Circuit's *Beverly Hills Fan* decision, Tatung-Taiwan would be found subject to personal jurisdiction if its allegedly infringing monitors had been sold in Virginia. (*Id.* at 33:10-12; 37:15-18.) Judge Doumar warned Tatung-Taiwan that a "Stalingrad defense" would be unacceptable (*Id.* at 40:3-11) and that the Court wanted to "get to what is the real issue in the case." (*Id.* at 9:9-10.)

Judge Doumar also warned Tatung-Taiwan as follows: "Let me be very frank with you. If all [Tatung-Taiwan is] doing is running up the costs, then they're going to have to pay for it." (*Id.* at 26:3-4.) Endeavoring to focus on the "real issues," the Court asked Tatung-Taiwan's counsel whether he was wasting time with jurisdictional discovery because "the fact of the matter is [Safer] could find out how many products were being sold by each of your defendants here, and they could find out which products were sold to whom. It just -- if they're going to turn up with the same answer, *aren't we wasting our time*?" (*Id.* at 11:24-12:3, emphasis added.) Four months later, the answer is a resounding "Yes." Tatung-Taiwan's jurisdictional challenge

---

substantial justice under a "stream of commerce" analysis. (S. Opp. to Mot. Dismiss at 5-9 (Dkt. 11), citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994).) Second, Safer explained that this Court has personal jurisdiction over Tatung-Taiwan because Tatung-U.S. is the agent of Tatung-Taiwan, Tatung-Taiwan exerts control over Tatung-U.S., and the conceded jurisdiction over Tatung-U.S. in Virginia for selling products in Virginia, including those made by Tatung-Taiwan. (*Id.* at 9-11; Tatung's Rebuttal Brief in Support of Defendant's Motion for Protective Order (Dkt. No. 42) at 3 ("Tatung U.S. submitted to personal jurisdiction in Virginia as it conducts business in Virginia.").)

has been a colossal and completely unnecessary waste of time and resources for the Court, Safer, and at least nine third parties.

### D. Tatung-Taiwan Repeatedly Attempted to Obstruct Jurisdictional Discovery and Depositions of Witnesses From Taiwan

As Safer previously explained to the Court, finding proof that Tatung-Taiwan monitors were sold in Virginia from third party documents was originally a difficult, multi-step process for Safer because Tatung-Taiwan sells its monitors to branded computer vendors, such as Compaq, who place their own names and model numbers on the monitors before they are sold by retailers such as Office Depot. For Safer to prove that sales of Compaq monitors by Office Depot in Virginia were in fact sales of Tatung-Taiwan manufactured monitors required it to "connect the links" and compare various records from Tatung-Taiwan to the branded vendor to the retailer, which was complicated by the fact that, prior to the date that Tatung-Taiwan withdrew its motion to dismiss, none of the documents received from third party monitor vendors and retailers have specifically identified or tracked Tatung-Taiwan as the manufacturer of rebranded monitors sold in Virginia. Indeed, Tatung-Taiwan acknowledged the difficulty of this task at the time, going so far as to argue that "connecting the links is a hopeless endeavor" because the third party documents produced so far do not contain Tatung-Taiwan's own product numbers. (Tatung-Taiwan's Mem. Supporting to Withdraw its Motion to Dismiss (Dkt. 108) at 6.)

For this reason, and also because Safer had not yet received sufficient documents from third parties to take their depositions (Weinstein Decl. Tab 33 at 10:17-11:2; 17:23-19:1), Safer had for months been trying to schedule depositions with knowledgeable witnesses from Tatung-Taiwan. Safer has always believed that people in charge of Tatung-Taiwan's sales and marketing—as opposed to the manager of personnel who was selected to submit a terse

7

declaration supporting Tatung-Taiwan's motion to dismiss—*must* know where the monitors rebranded by Compaq and others are being sold throughout the U.S.[3]  Given that Safer had only one 60 day shot at taking jurisdictional discovery, however, it had no choice but to pursue information from third parties as well, including Viewsonic, Compaq, Hewlett-Packard, Best Buy, Office Depot, and Wal-Mart.  As explained more fully below, Tatung-Taiwan's counsel have repeatedly stalled and refused to produce witnesses from Taiwan, and once they were ordered by Judge Bradberry to promptly produce witnesses from Taiwan, Tatung-Taiwan withdrew its jurisdictional challenge.  Tatung-Taiwan's counsel have also impeded and delayed discovery from third parties, including Safer's attempts to obtain from Compaq its contracts with Tatung-Taiwan.  All the while, Tatung-Taiwan has tried to take advantage of the very delays it caused by arguing that personal jurisdiction must not exist because of the time it has taken Safer to collect the evidence.  The Court should see this gameplaying for what it is.

On August 27, 2004, two days after the hearing on Tatung-Taiwan's motion to dismiss, Safer served jurisdictional document requests and interrogatories on Tatung-Taiwan and Tatung-U.S.  On August 31, 2004, Safer served third party subpoenas seeking relevant jurisdictional documents and testimony from third parties designed to uncover Tatung-Taiwan's distribution network and sales into Virginia.  These subpoenas generally sought documents and testimony in mid- to late-September and early October (i.e., well within the 60 day frame).[4]  Specifically,

---

[3] The same is apparently not true for employees of Tatung-U.S. because they claim that they do not sell to HP, and presumably other branded vendors.  (Supp. Decl. of D. S. J. Chang Supporting Tatung Co.'s Mtn. to Dismiss (Dkt. No. 10), ¶ 5.)  Indeed, it appears from discovery from Tatung-U.S. that it sells to much smaller vendors, including in Virginia, than the national vendors like Compaq, Hewlett-Packard, and Viewsonic.

[4] Because Judge Doumar also ordered at the August 25 hearing that Safer could take merits discovery as well as jurisdictional discovery, Safer also pursued merits discovery during this time frame from both defendants and third parties.  (Weinstein Decl. Tab 33 at 33:3-5.)  Judge Bradberry reviewed that transcript and confirmed that that was the order on October 27,

Safer initially served third party subpoenas on Best Buy, Wal-Mart, eMachines, Office Depot, CompUSA, Circuit City, and Viewsonic.

### 1. Tatung-Taiwan Acted to Dissuade Third Parties From Producing Subpoenas From Discovery

Tatung-Taiwan moved quickly to block these discovery efforts by Safer. First, on September 9 and 10, 2004, Tatung-Taiwan wrote individually to the third parties subpoenaed by Safer and falsely told them that there were "ongoing negotiations with plaintiff's counsel concerning the scope and propriety of the subpoenas" (Weinstein Decl. Tab 16), an obvious attempt to dissuade the third parties from producing any discovery. Tatung-Taiwan's letters further attempted to obstruct discovery by stating that there was an "increasing likelihood" that Tatung-Taiwan would move for a protective order. (*Id.*) Safer promptly admonished Tatung-Taiwan that (1) there had been no negotiations regarding the third party subpoenas, (2) Tatung-Taiwan had no standing to challenge the subpoenas, and (3) "your letters have impeded the progress of discovery, and we request that you cease further actions that delay our rightful discovery of these documents." (Weinstein Decl. Tab 17.)

Unfortunately, however, the damage had been done. For example, although Compaq located some contracts with Tatung-Taiwan, counsel for Tatung-Taiwan first instructed Compaq that they should not be produced because Tatung-Taiwan had filed a (meritless) motion seeking to limit discovery to televisions, even though monitors and not televisions were specifically

---

2004. (*Id.* Tab 34 at 39:12-23.) Although the Court subsequently limited discovery to jurisdictional issues on November 16 (*Id.* Tab 35 at 27:13-19), before that date the Court had expressly permitted Safer and defendants to pursue merits discovery. Accordingly, rather than have to take jurisdictional discovery now and merits discovery later from the same witnesses, Safer originally sought merits discovery from the same witnesses from whom Safer was also seeking jurisdictional discovery. Although Tatung-Taiwan has repeatedly tried to make an issue out of this, Tatung-Taiwan has no basis for complaint given the two express orders from the Court, and given that Tatung-Taiwan inundated Safer with merits interrogatories, document requests, and requests for admissions during the same time period.

accused of infringing in the complaint (discussed in section D.2 below).  Later, apparently after its meritless motion was denied, Tatung-Taiwan instructed Compaq that the contracts were supposedly not responsive to the subpoena because they were executed prior to 1998.  (Ottinger Decl. ¶ 6.)  In subsequent follow-up efforts by Safer's counsel, however, Compaq advised that the contracts were automatically renewed or renewable on an annual basis, and that they were apparently operative during the relevant 1998-99 timeframe.  (*Id.*)  Still later, Tatung-Taiwan told Compaq that the contracts should not be produced because Tatung-Taiwan was withdrawing its jurisdictional challenge.  (*Id.* ¶ 7.)  (Despite these admonitions from Tatung-Taiwan's counsel, Compaq eventually produced these contracts on December 22, 2004, nearly two weeks after Tatung-Taiwan moved to withdraw its jurisdictional challenge.  The content of these confidential documents is discussed in the Weinstein Declaration at ¶¶ 6-8.)

In addition, in its letter to Wal-Mart, Tatung-Taiwan's counsel went so far as to say that one of his partners "will be in your offices next week on another matter but will touch base with you."  (Weinstein Decl. Tab 16.)  Very soon thereafter, Wal-Mart sent Safer a certification that it had no responsive documents.  (Weinstein Decl. Tab 18.)  Interestingly, Wal-Mart later retracted that certification and, in late November, produced responsive documents after Safer sent a second deposition subpoena seeking testimony regarding Wal-Mart's efforts to locate responsive documents.  (*Id.* Tabs 20 and 21.)

### 2. Tatung-Taiwan Also Blocked Third Party Discovery By Filing a Meritless Motion for a Protective Order

Tatung-Taiwan's letters and communications with the subpoenaed third parties also delayed jurisdictional discovery because the third parties delayed producing documents until after the resolution of Tatung-Taiwan's motion for protective order.  (Weinstein Decl. Tab 33 at 17:23-19:1.)  On September 17, 2004, soon after it wrote to the third parties, Tatung-Taiwan

10

filed a motion for protective order asking the Court to, *inter alia,* completely preclude third party

depositions until further notice.  (Mem. Supporting Tatung's Motion for Protective Order (Dkt.

No. 27) at 2.)  Tatung-Taiwan also moved to block discovery regarding accused products.  That

is, Tatung-Taiwan tried to completely prevent discovery of monitors and limit discovery to

televisions, even though monitors are expressly accused of infringing in Safer's complaint and

televisions are not.  (*Id.*)  The Court predictably denied these meritless requests when the motion

was finally heard on October 27,[5] but during the pendency of that motion, Tatung-Taiwan

blocked discovery for approximately two months because the subpoenaed third parties delayed

producing their documents until after the resolution of the motion.  (Weinstein Decl. Tab 33 at

17:23-19:1.)  For instance, as of November 10, the only documents received from third parties

was a single spreadsheet from Office Depot, and these were produced only after Office Depot

was informed of the denial of Tatung-Taiwan's meritless motion.  (*Id.* Tab 22.)  On December 1,

just eight days before Tatung-Taiwan dropped its jurisdictional challenge, Safer's counsel

reported to the Court that, finally, "we're getting documents from those third parties now" and

that Safer had also received documents from Wal-Mart.  (*Id.* Tab 33 at 10:20-23.)

### 3.    Tatung-Taiwan's Inadequate Document Production

Tatung-Taiwan blocked jurisdictional discovery on other fronts as well.  For instance, as

of October 5, 2004, Tatung-Taiwan had produced only 14 documents, and none of them

sufficiently identified all of the sales and shipments of Tatung-Taiwan video monitors or

customers of Tatung-Taiwan, among other deficiencies.  (Weinstein Decl. Tab 23.)  On October

---

[5] Tatung-Taiwan disingenuously tries to give the impression that it prevailed in its first
motion for a protective order because the Court slightly narrowed the time frame from which
documents would be produced in discovery.  Given that the Court rejected Tatung-Taiwan's
primary tactical requests to block discovery from third parties and discovery regarding monitors
(the accused products), the motion can only be viewed as a failure.

15, Safer was forced to file a motion for an expedited hearing on its motion to compel because

defendants had failed and refused to comply with even the most basic discovery requests (e.g.,

sales and import records, and the manuals and technical documents relating to on-screen

display). (Dkt. No. 48.) Although Tatung-Taiwan later produced summary documents showing

sales to certain computer vendors at a high level (Weinstein Decl. ¶ 17 and Tab 10), these are

insufficient because they lack the underlying documents' detail regarding key internal numbers

for tracking models such as serial numbers. Although Defendants also subsequently produced

approximately 7000 pages of documents, nearly all of these were asserted prior art that had

absolutely no relevance to jurisdiction. (Weinstein Decl. Tab 24 at 2.)

### 4. Tatung-Taiwan Refused to Produce Knowledgeable Witnesses from Taiwan

Tatung-Taiwan also repeatedly stalled and refused to produce Tatung-Taiwan witnesses

for deposition. On September 23, Safer served notices for depositions in early October of David

Shun-Juh Chang, the Tatung-Taiwan employee who submitted two declarations supporting its

motion to dismiss, as well as a notice for a Rule 30(b)(6) deposition of Tatung-Taiwan. These

depositions were set in October in the offices of Safer's counsel in Washington, D.C. Tatung-

Taiwan objected and demanded that the depositions proceed in Taiwan. Safer's counsel

promptly agreed to travel to Taiwan but, because only two inches of documents had been

received from Tatung-Taiwan, Safer suggested pushing the depositions back approximately one

week to October 20. (Weinstein Decl. Tab 25.) Tatung-Taiwan's counsel, apparently surprised

by Safer's agreement to travel to Taiwan and in search of another excuse, refused to produce the

witnesses in Taiwan on October 20. (*Id.* Tab 26.) Tatung-Taiwan now complained that it would

be too expensive to take the depositions in Taiwan until after defendants' document production

was completed, and that the depositions should not be heard until the Court had ruled on

defendants' motion for a protective order (which was denied two weeks later, as explained above). (*Id.* at 2.) Tatung-Taiwan's counsel requested that the depositions be pushed back a "few weeks" into November. (*Id.*)

Thus, by mid-October, Safer's attempts to obtain jurisdictional discovery were going nowhere, thanks to Tatung-Taiwan. The 60 day period ordered by Judge Doumar would close in less than two weeks. Safer kept trying, however, and on October 14 it noticed depositions in Taiwan for five Tatung-Taiwan witnesses recently identified as knowledgeable in Tatung-Taiwan's responses to Safer's interrogatories. Specifically, Safer noticed the depositions of (1) O. Shaih and Jerry Huang (each identified by Tatung-Taiwan as responsible for sales, marketing, and distribution, and relevant to the stream of commerce jurisdiction analysis); and (2) W.S. Lin, K.Y. Lang, and A.C. Wang (each identified by Tatung-Taiwan as serving on the board of management of Tatung-Taiwan and Tatung-U.S., and relevant to the agency jurisdiction analysis). On October 22, Tatung-Taiwan refused to produce these individuals. (Weinstein Decl. Tab 27.) Although Tatung-Taiwan stated that it would "attempt" to provide a corporate designee to testify regarding a handful of the topics requested by Safer (*id.* at 2), Tatung-Taiwan offered no dates for any depositions. Instead, Tatung-Taiwan filed a second motion for protective order on October 26 (Tatung's Motion to Limit Depositions (Dkt. 57)), and counsel for Tatung-Taiwan refused to schedule depositions in Taiwan until after Tatung-Taiwan's second motion for protective order was heard. (Weinstein Decl. Tab 28 at 2 ("We will not travel to Taiwan until after our motion has been heard.").) This was the same stall tactic that counsel had used while Tatung-Taiwan's first motion for protective order was pending.

Tatung-Taiwan's counsel also insisted that third party depositions be taken before the Tatung-Taiwan witnesses (Weinstein Decl. Tab 29), even though Tatung-Taiwan knew (1) that it

had blocked discovery from third parties with its earlier letters and communications, so that Safer was not yet in a position depose the third parties, and (2) that linking sales of Tatung-Taiwan's monitors with the third party documents alone is an extremely difficult task. Tatung-Taiwan also stated that it would not make any Tatung-Taiwan witnesses available until January or February of 2005 (*id.*), which Safer explained was unacceptable, particularly given that the deposition notices had been pending for months and the Court's admonition to speed the pace of jurisdictional discovery. (*Id.* Tab 30.)

Tatung-Taiwan continued to refuse to produce any witnesses from Taiwan until Magistrate Judge Bradberry's December 1, 2004, order that Tatung-Taiwan witnesses must appear for deposition within the month of December. (Weinstein Decl. Tab 33 at 30:3-4.) Eight days later, Tatung-Taiwan filed a motion seeking leave to withdraw its motion to dismiss. (Dkt. No. 107.) Tatung-Taiwan's stated reasons for moving to withdraw its jurisdictional challenge were clearly pretextual and not supported by the record, as evidenced by the Court's subsequent order that Tatung-Taiwan support its motion by citations to the record. (Dkt. No. 109.)

It is plain that Tatung-Taiwan moved to withdraw the challenge because Safer, after months of effort, was finally getting an opportunity to depose witnesses from Taiwan and was on the verge of proving that Tatung-Taiwan's monitors had been sold in Virginia. For instance, Safer was planning to extensively question Tatung-Taiwan witnesses regarding, *inter alia*, the Compaq MV700 monitor it manufactured for Compaq and its warranty and return records from retailers in Virginia. Safer was also corresponding with Compaq and requesting that its contracts with Tatung-Taiwan be produced when Tatung-Taiwan moved to withdraw its challenge.

14

### E.    Defendant's Allegations that Safer Was Driving Up Costs Are Baseless

Defendants have repeatedly but baselessly argued that Safer has attempted to drive up costs in this litigation.  Nothing could be further from the truth.  Safer, as the plaintiff in this case, has every interest in achieving a prompt and cost-effective resolution of defendants' infringement.  Indeed, Safer has agreed upon licenses with 28 parties, including former co-defendant Jean.  Tatung-Taiwan, on the other hand, has an incentive to delay and complicate these proceedings as it did with its jurisdictional challenge.

As explained in Safer's opposition to defendants' second motion for a protective order (Dkt. 72 at 1-4), until November 16, the Court had *twice* expressly stated that both parties could take merits discovery along with jurisdictional discovery, and defendants themselves had served Safer with interrogatories, document requests, and requests for admissions directed to the merits of this case.  Once Judge Doumar subsequently limited discovery to jurisdictional issues, however, Safer obviously agreed to abide by that Order (Weinstein Decl. Tab 33 at 19:19-23), yet Tatung-Taiwan is still arguing about Safer's earlier efforts to obtain merits discovery as a red herring.  Furthermore, Safer did not set 27 or 28 depositions in this case as defendants have alleged, as explained in our papers.  (Dkt. 72 at 1.)  Defendants double dipped in arriving at that number by including depositions noticed in other consolidated cases, including the now settled case against Jean.  In truth, Safer noticed seven depositions for Tatung-Taiwan (one 30(b)(6), five individuals identified by Tatung-Taiwan as knowledgeable in response to interrogatories, and a Tatung-Taiwan employee relevant to the agency analysis), and two for Tatung-U.S. (one 30(b)(6) and one individual identified by Tatung-U.S. as knowledgeable in response to interrogatories).  In addition, Safer noticed six potential depositions of third parties in the event that they would be needed to prove sales in Virginia, but Safer has not yet received sufficient

documents from those third parties and is not ready to take their depositions now. (Weinstein Decl. Tab 33 at 10:17-11:2; 17:23-19:1.)

Importantly, Safer has always told defendants that it might not need to take all of these noticed depositions, and that it would stop once it discovered proof of sales in Virginia, as Safer's counsel confirmed to the Court. (Weinstein Decl. Tab 33 at 4:14-5:3; 10:17-11:2.) As Judge Bradberry pointed out, there were really no more than eight depositions at issue in early December (*Id.* at 11:3-8), and Safer has always needed to proceed with the Tatung-Taiwan witnesses first.

It was also made clear by Judge Bradberry that jurisdictional depositions and discovery would not proceed endlessly as Tatung-Taiwan pretends, but rather that jurisdictional discovery would stop once solid evidence of jurisdiction was discovered. (Weinstein Decl. Tab 33 at 25:1-26:7; 30:3-10; 31:16-25; 39:14-25.) But given the tight time constraints and Tatung-Taiwan's efforts to stymie discovery, Safer had no choice but to notice these potential depositions up front and proceed until it uncovered undisputable evidence of sales in Virginia.

Furthermore, Tatung-Taiwan has driven up the costs in this case with extensive motion practice. In addition to the meritless motions to block discovery of third parties and of accused monitors described above, it also filed a motion for summary judgment asserting that Safer did not own the patent-in-suit. Although the motion was unfounded and summarily denied by Judge Doumar, Safer nevertheless was forced to respond to this theoretically dispositive motion in writing and in Court. Tatung-Taiwan also filed another motion to "correct" an already correct order that was summarily denied by Magistrate Judge Bradberry, but Safer again had to respond and appear in Court to oppose that motion.

16

### III.    Argument

#### A.    Tatung-Taiwan Should be Sanctioned for Unreasonably and Vexatiously Multiplying These Proceedings

As explained above, Tatung-Taiwan has wasted an enormous amount of time and money by raising its unsupported jurisdictional challenge and by continuously interfering with Safer's attempts to obtain jurisdictional discovery from defendants and third parties.  This Court has multiple sources of authority to sanction Tatung-Taiwan's unsupported, dilatory, vexatious, and wasteful litigation tactics, including (1) its inherent authority (*Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 45-46 (1991) (courts have inherent authority to sanction attorneys and parties who have shown "bad faith by delaying or disrupting the litigation" or who have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons")); (2) Rule 11 of the Federal Rule of Civil Procedure; and (3) 28 U.S.C. § 1927 (party's attorney may be ordered to pay opposing party's attorneys' fees if he "multiplies the proceedings in any case so unreasonably and vexatiously").

Although the Court may *sua sponte* order sanctions against a party or attorney under Rule 11 (Fed. R. Civ. P. 11(c)(1)(B)), Safer is apparently precluded from moving for sanctions under that Rule because Tatung-Taiwan has withdrawn its jurisdictional challenge, even though the evidence indicates that the defense was unsupported (Weinstein Decl. at ¶¶ 4-23) and after so much time and money has been wasted over the issue. Fed. R. Civ. P. 11(C)(1)(A).  Regardless, Safer may and does move for sanctions, including attorneys' fees, under the Court's inherent power and § 1927, for the many reasons explained above.

Moreover, Tatung-Taiwan had an affirmative duty to reasonably investigate its allegation of no personal jurisdiction before wasting months of time and money litigating the issue, and failure to do so is itself a basis for sanctions. *Continental Air Lines, Inc. v. Group Sys. Int'l Far East, Ltd.,* 109 F.R.D. 594, 597-600 (C.D. Cal. 1986); *Ortho Pharm. Corp. v. Sona Dist., Inc.,*

17

117 F.R.D. 170, 171-72 (S.D. Fla. 1986). Thus, even if Tatung-Taiwan can somehow explain the newly discovered evidence indicating that Tatung-Taiwan was the exclusive manufacturer for North America for at least two different monitors for a national computer vendor whose monitors are undeniably sold in Virginia, Tatung-Taiwan should nevertheless be sanctioned for failing to investigate its asserted defense.

## IV.    Conclusion

Safer respectfully requests that the Court sanction Tatung-Taiwan by, among other things, an award of attorneys' fees incurred in opposing Tatung-Taiwan's motion to dismiss for lack of jurisdiction and all of the related discovery disputes, motion practice, and hearings that have flowed therefrom. Safer conservatively estimates and represents that Tatung-Taiwan's tactics have cost many tens of thousands of dollars of attorney time. Safer respectfully requests that, if deemed necessary, the Court allow Safer a reasonable period of time to make an evidentiary showing to support its request for attorneys' fees. Safer also suggests that the Court should order that Tatung-Taiwan pay a sanction to the Court due to the considerable time and effort that the Court has had to expend over Tatung-Taiwan's unreasonably duplicative litigation tactics.

Dated: December 23, 2004

Respectfully submitted,

_[signature]_

John M. Ryan (Va. Bar No. 4301)
Richard H. Ottinger (Va. Bar No. 38842)
VANDEVENTER BLANK LLP
500 World Trade Center
Norfolk, VA 23510
(757) 446-8600

Laura P. Masurovsky (Va. Bar. No. 32379)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C. 20005-3315
(202) 408-4000

Roger D. Taylor
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
3200 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, GA 30308
(404) 653-6400

Attorneys for Plaintiff,
Safer Display Technology, Ltd.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that as of the date noted below the original or a true copy of the foregoing pleading was served in the manner indicated upon all parties herein, or their counsel of record, as follows:

Stephen E. Noona
Kristan B. Burch
Kaufman & Canoles, PC
150 W. Main Street
Norfolk, VA 23510
*Counsel for Tatung Company, Tatung Co. of*
*America, Inc..*

Manner of Service:
_____    First Class US Mail
_____ Overnight Delivery
_____ Facsimile
_____ Electronically
__X__ Hand Delivery
_____ Other: _____

19

Mark L. Hogge
Kathryn L. Clune
Greenberg Traurig, LLP
800 Connecticut Avenue, Suite 500
Washington, D.C. 20006
*Counsel for Tatung Company, Tatung Co. of America, Inc..*

Manner of Service:
__X__ First Class US Mail
_____ Overnight Delivery
_____ Facsimile
__X__ Electronically (w/o attachments)
_____ Hand Delivery
_____ Other: _____

Mark Krietzman
Greenberg Traurig LLP
2450 Colorado Ave., Suite 400 E
Santa Monica, CA 90404
(310) 586-7700
*Counsel for Tatung Company, Tatung Co. of America, Inc..*

Manner of Service:
__X__ First Class US Mail
_____ Overnight Delivery
_____ Facsimile
__X__ Electronically (w/o attachments)
_____ Hand Delivery
_____ Other: _____

Rolf Marshall
Preston Gates Ellis & Rouvelas Meeds, LLP
1735 New York Avenue, N.W., Suite 500
Washington, D.C. 20006
*Counsel for Envision Peripherals, Inc.*

Manner of Service:
__X__ First Class US Mail
_____ Overnight Delivery
_____ Facsimile
_____ Electronically
_____ Hand Delivery
_____ Other: _____

Michael J. Bettinger
Ralph Alldredge
Preston Gates & Ellis, LLP
55 Second Street, Suite 1700
San Francisco, California 94105
*Counsel for Envision Peripherals, Inc.*

Manner of Service:
__X__ First Class US Mail
_____ Overnight Delivery
_____ Facsimile
_____ Electronically
_____ Hand Delivery
_____ Other: _____

Done this date: December 23, 2004

_____
Of Counsel

20

# EXHIBIT 12

Hearing

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD, )
 )
   Plaintiffs, ) C.A. No. 04-343(JJF)
 )
v. )
 )
TATUNG CO., TATUNG COMPANY OF )
AMERICA, INC., and VIEWSONIC )
CORPORATION, )
 )
   Defendants. )

  Hearing of above matter taken pursuant to
notice before Renee A. Meyers, Registered Professional
Reporter and Notary Public, in the law offices of BLANK
ROME, LLP, 1201 North Market Street, Wilmington,
Delaware, on Friday, March 16, 2007, beginning at
approximately 3:00 p.m., there being present:

BEFORE: VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

   THE BAYARD FIRM
   RICHARD D. KIRK, ESQ.
    222 Delaware Avenue, Suite 900
    Wilmington, Delaware  19899
    for Plaintiffs

     CORBETT & WILCOX
   Registered Professional Reporters
 230 North Market Street  Wilmington, DE 19899
    (302) 571-0510
   www.corbettreporting.com
  Corbett & Wilcox is not affiliated
 with Wilcox & Fetzer, Court Reporters

Hearing

| Page 26 | Page 28 |
|---|---|
| 1      MR. MERIDETH: That delay is not a<br>2 reason to continue the Court established deadline.<br>3      I agree that if the Courts are putting<br>4 off these depositions until there is a decision, that's a<br>5 different thing, but the -- we are all under the same<br>6 burden when someone serves 23 deposition notices, with<br>7 only 30 days left to go in the case, it's going to be a<br>8 real difficult logistical problem.<br>9      SPECIAL MASTER POPPITI: I am willing to<br>10 make -- to literally sit down with the calendar and start<br>11 going through your scheduled depositions of third<br>12 parties. I don't think that that's going to be very<br>13 productive for anyone.<br>14      I think it makes a great deal of sense<br>15 for me to expect that between now and, somebody pick a<br>16 date in the new week, that you all have the opportunity<br>17 to sit down, discuss the parameters of what you would<br>18 expect to be a reasonable extension, make some<br>19 determination as to what depositions need to be<br>20 forestalled, and if any can go forward, make that<br>21 judgment as well, because I certainly can't do that for<br>22 you on this record.<br>23      You are going to, notwithstanding the --<br>24 and, Mr. Merideth, I note in your papers and I note your | 1 and everybody on this phone call understands where we<br>2 have been with the history of this and understands where<br>3 we have been with my two visits to Judge Farnan's chamber<br>4 to tweak the scheduling order, and each of those times<br>5 resulted in the Court issuing a scheduling order that did<br>6 not extend the time for third-party discovery.<br>7      We are in a different environment right<br>8 now. It seems to me it needs to be extended. It makes a<br>9 great deal of sense to do it globally, and it will not<br>10 affect any of the other -- any of the other dates, so you<br>11 are still working within the time frames, the critical<br>12 time frames of hearings that have already been<br>13 established, hearings and ultimate trial.<br>14      And can you all wrap this up by the<br>15 teleconference that's presently scheduled for 6:30 on<br>16 Monday?<br>17      MR. CONNOR: Yes. We will do our best<br>18 to do that.<br>19      MR. MERIDETH: Yes, Your Honor.<br>20      SPECIAL MASTER POPPITI: So, no<br>21 discussion about an outside limit? Wouldn't that help<br>22 frame the discussion or no?<br>23      MR. MERIDETH: I think that there are<br>24 other things that we need to take into account, and, |

| Page 27 | Page 29 |
|---|---|
| 1 argument that these depositions were scheduled when they<br>2 were, but my view of expecting that you are going to be<br>3 getting an extension has more to do with where we are as<br>4 a result of the third-party practice in terms of these<br>5 other applications in the other districts than it is a<br>6 function of when the depositions were noticed.<br>7      MR. MERIDETH: I would be happy to<br>8 discuss those dates with counsel for LG Phillips.<br>9      SPECIAL MASTER POPPITI: Is it important<br>10 to discuss outside limits in this conversation, or can<br>11 you all do that as well?<br>12      MR. MERIDETH: I think we can all do it.<br>13 I think, you know, there are a number of third-party<br>14 witnesses that we also have subpoenaed and there are also<br>15 some issues with regard to objections that have been made<br>16 to some of those subpoenas. I think it would be<br>17 worthwhile for us to sit down and talk about a schedule<br>18 for all of the third-party discovery, and, hopefully, we<br>19 can get it completed during the month of April. I just<br>20 don't want to have an open-ended extension with respect<br>21 to everything, and I think if we sat down and tried to<br>22 work with the third parties and work between ourselves,<br>23 that we can come up with a reasonable schedule.<br>24      SPECIAL MASTER POPPITI: Well, and you | 1 specifically, the schedule with respect to some of the<br>2 third-party witnesses who are the ones who, frankly, are<br>3 also bearing a considerable burden with respect to having<br>4 to produce all of this data on a very short time period,<br>5 and it would probably be wise for us to touch base with<br>6 them and see what their schedules are and make sure that<br>7 we have the proper places and the proper times and the<br>8 proper people.<br>9      SPECIAL MASTER POPPITI: Can you do all<br>10 that by Monday or do you need --<br>11      MR. MERIDETH: Probably Monday may be<br>12 too ambitious. Maybe by Tuesday or Wednesday, I would<br>13 think we would, and I am not sure it's going to make any<br>14 difference whether it's Monday or Wednesday, frankly.<br>15      SPECIAL MASTER POPPITI: Anyone want to<br>16 speak from the other side?<br>17      MR. CONNOR: I guess I am just not<br>18 hearing a response as to a global extension for<br>19 deposition time.<br>20      SPECIAL MASTER POPPITI: I think I heard<br>21 Mr. Merideth say, rather than discuss it now, it really<br>22 is more important to have your discussion off-line,<br>23 permit each of you to discuss issues with respect to<br>24 third parties so that when we reconvene on this issue to |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# CIVIL MOTIONS HEARD IN OPEN COURT

Date: 3/23/07

Start Time: 9:05          End Time: 9:15

**JUDGE: KENNETH L. RYSKAMP**     REPORTER: Vicky Miller-Official
                                  DEPUTY CLERK: IRENE RIVERA

Case # 07-80223-CV

LG Philips                        Scharlene Oh
_____           Geoffrey M. Cahen
Plaintiff                         _____
                                  Plaintiff's Attorney      Marisa Kelly

Tatung Co.                        Shari Clevens
_____           Tom Kovach
Defendant                         _____
                                  Defendant's Attorney

**DESCRIPTION OF MOTION** _Motion hearing_

Motion:     _____ Granted
            _____ Denied
            _____ Granted in part\denied in part
            _____ Withdrawn
            __X__ Ruling reserved

_____

_____

_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 07-MC-80223-KLR

LG.PHILIPS LCD CO., LTD.

      Plaintiff,

v.

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

      Defendants.

_____/

## ORDER GRANTING MOTION OF SHARI L. KLEVENS
## TO APPEAR PRO HAC VICE

THIS MATTER, before the Court on the Verified Motion for Admission Pro Hac Vice of

Shari L. Klevens filed on March 21, 2007. Having considered the motion and being fully

advised in the premises, it is hereby

ORDERED that the Verified Motion for Admission Pro Hac Vice of Shari L. Klevens is

GRANTED.

DONE AND ORDERED in Chambers at West Palm Beach, Florida this 23 day of

March, 2007.

                                  _/s/ Kenneth L. Ryskmap_____
                                  KENNETH L. RYSKAMP
                                  UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 07-80223-CIV-RYSKAMP/VITUNAC

LG. PHILIPS LCD CO., LTD.,

        Plaintiff,

v.

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC,,
AND VIEWSONIC CORPORATION

        Defendants.

_____/

### ORDER DIRECTING TRANSFER TO UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE AND STAYING DISCOVERY

**THIS CAUSE** is before the court upon Plaintiff's motion for reconsideration **[DE 3]** filed March 14, 2007. Defendants' responded **[DE 10]** on March 21, 2007. Plaintiff replied **[DE 13]** on March 22, 2007. The Court heard oral argument from the parties on March 23, 2007.

In the motion and responses, the Parties agree that transferring this matter to the District of Delaware, where the bulk of this litigation has taken place and is currently pending, is appropriate. The Delaware action is styled, *L.G. Philips LCD Co., v. Tatung Company, et al.*, 04-CV-343-JJF. It is hereby,

**ORDERED AND ADJUDGED**:

1. This case is hereby **TRANSFERRED** to the United States District Court for the District of Delaware. The clerk of court is directed to **TRANSMIT** this action and all records pertaining to it to the Clerk of the Court of the District of Delaware.

1

2.  Discovery in this action is stayed until the Delaware Court reaches its decision.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 23 day of March, 2007.

                                                    __/s/ Kenneth L. Ryskamp_____
                                                    Kenneth L. Ryskamp
                                                    United States District Judge

Copies provided to:
All counsel of record

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 07-80223-CV-RYSKAMP

**LG. Philips LCD Co., LTD.**,

      Plaintiff(s),

v.

**Tatung Company et al.**,

      Defendant(s),

---

FILED by _____ D.C.

**Mar 26, 2007**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

---

### CLERK'S NOTICE OF TRANSFER TO OTHER DISTRICT

Pursuant to the Order of Transfer entered on **03/23/2007**, the above-styled case is hereby transferred to the **District of Delaware**. Enclosed are certified copies of the Order of Transfer and the Court's docket sheet. The case record is **[ ] a combined paper and electronic file or [ x ] an electronic file** and the imaged documents can be accessed at the following web address:

### PACER.FLSD.USCOURTS.GOV

DONE at the Federal Courthouse Square, Miami, Florida, this 26 day of March 2007.

CLARENCE MADDOX,
Court Administrator • Clerk of Court

s/Barbara Sohn

By: _____
      Barbara Sohn
      Deputy Clerk

---

**Please acknowledge receipt of this transfer by returning a time-stamped copy of this Notice to:**

United States District Court
Southern District of Florida
301 N Miami Avenue, RM 150
Miami, FL 33128-7788

**Received By:** _____

**New Case No.** _____