# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,

       Plaintiff,

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

       Defendants.

_____/

Case No. 04-343-JJF (D. Del.)

## **Declaration of Charlene L. Oh**

I, Charlene L. Oh, declare as follows:

1.     I am an attorney at the law firm of Greenberg Traurig, LLP, and I am counsel for Defendants Tatung Company and Tatung Company of America (collectively, "the Tatung Defendants") in the lawsuit styled *L.G. Philips LCD Co., Ltd. v. Tatung Company, et al.*, Civil Action No. 04-343-JJF, in the United States District Court for the District of Delaware (the "Delaware Action").

2.     Attached hereto as Exhibit A is a true and correct copy of the Rough Transcript of the March 16, 2007 telephonic hearing before Vincent J. Poppiti, Special Master in the lawsuit styled *L.G. Philips LCD Co., Ltd. v. Tatung Company, et al.*, Civil Action No. 04-343-JJF.

3.     Attached hereto as Exhibit B is a true and correct copy of the Court's Order granting the Tatung Defendants' Motion for Protective Order, dated March 12, 2007.

4.     Attached hereto as Exhibit C is a true and correct copy of the District of Minnesota's Order, dated March 15, 2007.

5.     On March 15, 2007, the District of New Jersey ruled that LPL's subpoena to Tyco International should be limited to accused products only. The Court has not yet issued an order.

6.      Attached hereto as Exhibit D is a true and correct copy of the Tatung Defendants'

Letter to the Special Master, dated March 2, 2007.

I declare under penalty of perjury under the laws of the United States of America that the

forgoing is true and correct.  Executed on March 19, 2007 in Los Angeles, California.


Charlene L. Oh

Exh  A- Rough Transcript of Hearing.txt

1

1          UNEDITED UNCERTIFIED ROUGH DRAFT

2

3          IN THE UNITED STATES DISTRICT COURT

4              FOR THE DISTRICT OF DELAWARE

5

PHILLIPS, L.G., LCD CO., LTD,  )
6                              )
        Plaintiffs,            )   C.A. No. 04-343(JJF)
7                              )
v.                             )
8                              )
TATUNG CO., TATUNG COMPANY OF  )
9  AMERICA, INC., and VIEWSONIC   )
CORPORATION,                   )
10                              )
        Defendants.            )
11

12       Hearing of above matter taken pursuant to
notice before Renee A. Meyers, Registered Professional
Reporter and Notary Public, in the law offices of BLANK
13  ROME, LLP, 1201 North Market Street, Wilmington,
Delaware, on Friday, March 16, 2007, beginning at
14  approximately 3:00 p.m., there being present:

15  BEFORE:  VINCENT J. POPPITI, SPECIAL MASTER

16  APPEARANCES:

17       THE BAYARD FIRM
         RICHARD D. KIRK, ESQ.
18          222 Delaware Avenue, Suite 900
            Wilmington, Delaware  19899
19          for Plaintiffs

20          CORBETT & WILCOX
         Registered Professional Reporters
21  230 North Market Street     Wilmington, DE 19899
            (302) 571-0510
22          www.corbettreporting.com
         Corbett & Wilcox is not affiliated
23      with Wilcox & Fetzer, Court Reporters

24

2

1


EXHIBIT
A

Exh A- Rough Transcript of Hearing.txt

2

3    APPEARANCES (Continued):

4          MCKENNA, LONG & ALDRIDGE, LLP
           CASS W. CHRISTENSON, ESQ.
5          CORMAC CONNOR, ESQ.
           SHERI KLEVINS, ESQ.
6          REL AMBROZY, ESQ.
             1900 K Street, N.W.
7            Washington, D.C.  20006
             for Plaintiffs
8
           RICHARDS LAYTON & FINGER
9          ANNE SHEA GAZA, ESQ
             One Rodney Square
10           Wilmington, Delaware  19801
             for Defendant Tatung Co.
11
           GREENBERG TRAURIG LLP
12         FRANK MERIDETH, ESQ.
           VALERIE HO, ESQ.
13         CHARLENE OWE, ESQ.
           MARK KREISMAN, ESQ.
14           2450 Colorado Avenue, Suite 400E
             Santa Monica, California  90404
15           for Defendant Tatung Company of America, Inc.

16         CONNOLLY BOVE LODGE & HUTZ LLP
           JAMES D. HEISMAN, ESQ.
17           1007 North Orange Street
             Wilmington, Delaware  19899
18           for Defendant Viewsonic Corporation

19   ALSO PRESENT:  Edmond Johnson, Esq.

20

21

22

23

24

                                        3

1

2

3              SPECIAL MASTER POPPITI:  Mr. Kirk.

4              MR. KIRK:  Yes, Your Honor.  Richard

5    Kirk from The Bayard Firm for the plaintiff, LG Phillips,

6    LCD Company, Ltd.  With me on the line, from various
                    Page 2

Exh A- Rough Transcript of Hearing.txt

7   locales, are my colleagues from McKenna, Long & Aldridge,
8   courtroom acknowledge corner, I think Shari Klevens is
9   on; is that correct, Cormac?
10              MR. CONNOR:  That's correct.
11              MR. KIRK:  And Cass Christenson.
12              SPECIAL MASTER POPPITI:  Thank you.
13              MR. HEISMAN:  Good afternoon, Your
14   Honor, Jim Heisman on behalf of ViewSonic Corporation.
15              SPECIAL MASTER POPPITI:  Good afternoon.
16              MS. GAZA:  Good afternoon, Your Honor.
17   It's Anne Gaza again from Richards, Layton & Finger on
18   behalf of the Tatung defendants.  I believe with me on
19   the phone are Charlene Owe, Frank Merideth, Mark
20   Kresiman, and Valerie Ho, but I may have one too many or
21   one too few.
22              SPECIAL MASTER POPPITI:  Good afternoon.
23   I am really amazed at how you are on the phone and I just
24   got some new mail from you.  But in any event --

                                                    4


1              MR. CHRISTENSON:  We are mid deposition,
2   Your Honor.
3              SPECIAL MASTER POPPITI:  I understand.
4   Mid air.
5              Next, please.
6              MR. JOHNSON:  This is Edmond Johnson
7   from Pepper Hamilton.  I represent, the Tyco entities
8   which are the three of the -- subject of the three of the
9   subpoenas of third parties in this matter.
10              SPECIAL MASTER POPPITI:  Thank you, sir.

Exh A- Rough Transcript of Hearing.txt
11   Is that it?  I think it is.
12              Okay.  Let's start with some -- the
13   March 9 filing, some correspondence from Mr. Kirk dated
14   March 9.
15              MR. CONNOR:  Your Honor, I believe you
16   are referring to LPL's request for third-party discovery
17   extension and relief?
18              SPECIAL MASTER POPPITI:  Yes, that's
19   correct.
20              MR. CONNOR:  Well, Your Honor, our
21   position has really not changed very much.  What we are
22   concerned about is that this -- these barrage of motions
23   that Tatung has filed against all of our subpoenas has
24   impeded our ability to proceed with third-party discovery

5

1    against the various third parties upon whom we have
2    served subpoenas.
3               We have had three of those motions go to
4    hearing in the last three days, and in no case has any of
5    the courts -- any of the Courts that have heard both
6    sides of the story granted Tatung's motion.
7               Notably, this morning, the Northern
8    District of California took Tatung to task for filing
9    motions all over the country, saying that LPL's subpoenas
10   are reasonable and that it is reasonable to request
11   30(b)(6) testimony on the topics listed in the subpoena.
12              The other two court -- and in doing so,
13   the northern district of California denied Tatung's
14   motion outright.
15              The other two courts were the district

Exh  A- Rough Transcript of Hearing.txt

16   of Minnesota and the district of New Jersey, and in both

17   cases there, the courts entered a middle ground

18   provisional order that allowed LPL to proceed with

19   discovery against specifically accused products, but

20   recognized that, as I am sure Your Honor is aware, the

21   components of that category are likely to change, than if

22   Your Honor permits additional discovery beyond March

23   30th, than those orders will be automatically modified to

24   allow LPL to proceed.

6

1          MR. MERIDETH:  The Court in any location

2   never said anything about --

3          SPECIAL MASTER POPPITI:  You will have

4   an opportunity, sir.  I am going to either have to rely

5   on what I am hearing and hopefully there is going to be

6   no dispute; if there is a dispute, I am going to need a

7   document to show me what the Court said, and I will have

8   to do my best.

9          MR. CONNOR:  Thank you, Your Honor.

10   What our concern is, Your Honor, is that those motions

11   have ground to a halt our efforts to get third-party

12   discovery, and, notably, as we explained earlier in the

13   week, we were on the verge of getting discovery

14   production from several of these third parties, and it

15   was only after Tatung contacted those third parties and

16   advised them of Tatung's intent to file these motion that

17   is the third parties pulled up and did not produce

18   discovery, and we have been forced to put all of that on

19   hold.

Exh A- Rough Transcript of Hearing.txt

20                  SPECIAL MASTER POPPITI: Let me ask this

21 question: You have just described a number of

22 jurisdictions where there have been hearings on the

23 respective applications. And there may be some dispute

24 as to what ultimately occurred in each of those

7

1 jurisdictions.

2                  How many more hearings are expected to

3 occur? And how long -- and I expect that it will take to

4 have that process come to completion.

5                  MR. CONNOR: Your Honor, by may count,

6 we have got as many as a dozen different jurisdictions

7 that have not held hearings yet, and, notably, at least

8 one of them, I see the northern district of Illinois, has

9 set a briefing schedule by which it is imposed upon

10 itself an April 5 deadline to issue an order.

11                  Further, the Southern District district

12 of Florida, we raised this issue with Your Honor on

13 Monday, the Southern District of Florida granted Tatung's

14 motion before hearing any response from LPL. LPL has

15 since filed a motion for reconsideration and then Tatung

16 has requested that the briefing schedule run through the

17 end of March.

18                  So, we have got at least two courts that

19 potentially won't even issue rulings until well after

20 March 30th. And we, frankly, aren't entirely sure about

21 what the briefing schedules or rulings will be from any

22 of the other courts because we haven't had hearings yet,

23 or, in some cases, have not yet had briefing schedule

24 orders hearings set.

Exh  A- Rough Transcript of Hearing.txt

⬜

8

1           SPECIAL MASTER POPPITI:  Let's focus on
2    that response for just a moment.
3           I don't expect, and certainly, in none
4    of your papers, No. 1, you are not asking me to do
5    anything with respect to those applications and with
6    respect to those hearings, and I expect the reason for
7    that is I don't have -- and tell me whether you agree
8    with this -- I don't have the authority to direct Tatung
9    to stand down; do you agree with that?
10          MR. CONNOR:  Not necessarily, Your
11   Honor.
12          SPECIAL MASTER POPPITI:  Tell me why you
13   don't think.
14          MR. CONNOR:  Well, we believe that these
15   motions could have, and Mr. Merideth raised this on
16   Monday, we did discuss it, and, at the time, LPL didn't
17   see how what it understood to be Tatung's plan could be
18   heard before Your Honor, but as it's now taken shape,
19   these issues could be raised with Your Honor if they are
20   going to be raised.  And what we are asking for is that
21   Your Honor issue an order on one hand that extends the
22   time by which LPL can complete its third-party discovery,
23   and we would submit that a reasonable time would be 60
24   days, and then we also; Your Honor, direct Tatung to stop

⬜

9

1    interfering and throwing up road blocks in front of LPL's

Exh  A- Rough Transcript of Hearing.txt

2   third-party discovery efforts.

3            SPECIAL MASTER POPPITI:  Let me take the

4   second part of that first.  I know, whether it's from a

5   special Master's desk or from the bench of the Court,

6   that the Court has a wide range of opportunities in its

7   arsenal, if you will, to help to direct, to help to

8   ensure that discovery in any case proceeds as the rules

9   expect it to proceed.  I understand that.

10           At the same time -- and I understand

11   that the Court has, in that same arsenal, when

12   appropriate, a broad range of remedies/sanctions that can

13   be issued against a party that is violating the rules of

14   discovery, violating orders with respect to those rules.

15   I mean, I understand that.  And the remedies are broad

16   ranged, I don't think anyone would disagree with that,

17   even during the discovery phase of litigation.

18           At the same time, I am not informed, by

19   virtue of your papers, of any authority in this district

20   and this circuit that says to -- that says a court/a

21   special master has the authority to forestall Tatung from

22   doing what it is doing.

23           At the same time, I understand that, at

24   the back end of this process, if there is an application

                                              10

1   to do more than just extend the opportunity to do

2   third-party discovery, if there is an application later

3   on, then I know I have got the authority to look at what

4   Tatung has -- look at what Tatung did and make some

5   informed judgment based on how other -- how the -- how

6   the Courts that have jurisdiction to deal with these

Exh A- Rough Transcript of Hearing.txt

7  applications view Tatung's efforts.

8                    So, I mean, it seems to me that the

9  second application, if you will, comes -- first of all, I

10  don't believe I have the authority to say, "Stand down,"

11  and if you are expecting that you want me to exercise

12  authority with respect to remedy, it comes jurisdiction

13  by jurisdiction or it comes at the end of this process.

14                    Now, make no bones about it, I would --

15  a special master and a court certainly has the right, and

16  by virtue of the right, I expect the authority, to say, I

17  encourage everyone to make good faith efforts to complete

18  discovery and to permit discovery that is appropriate to

19  be completed.  Make no bones about that.

20                    MR. MERIDETH:  May I now address the

21  Court?

22                    SPECIAL MASTER POPPITI:  Well, I have

23  one more question.

24                    MR. MERIDETH:  Yes, sir.

11

1                    SPECIAL MASTER POPPITI:  Is there any

2  authority, from this district or from the circuit, which

3  stands for the proposition that, in a circumstance

4  similar to what you have described in your papers, that I

5  have the authority to say, "Stand down."

6                    MR. CONNOR:  Your Honor, I am afraid

7  that I may have gotten us a little bit off track.  We are

8  not asking -- I need to clarify.  What we are trying to

9  get is confirmation or a determination from Your Honor

10  that gets Tatung to stop its communications, really, with

Exh A- Rough Transcript of Hearing.txt

11  these -- with the third parties because what we are

12  talking about is, well, they filed these motions, but in

13  advance of these motions, communicated with the third

14  parties to say that the third parties need not tender

15  their production because Tatung was going to be filing a

16  motion.

17            SPECIAL MASTER POPPITI:  Let me make

18  some observation business that.  No. 1, I understand what

19  you represented they have said to individuals that, in

20  turn, contacted you to tell you what they have said.  And

21  I understand that trail.  I don't have -- I am not

22  convinced it would matter anyway -- but I don't have any

23  declaration that permits me to view those precise words

24  coming from the individual that you said used those

                                                    12

1  words.  That's the first observation.

2            The second is if, in fact, what they

3  said was, We have had communication from Tatung, Tatung

4  said that they intended to file a motion for a protective

5  order or motion to quash or however all of these

6  applications are framed in the respective district where

7  is they have been filed, and would they please not do

8  anything until that application is heard, my question is:

9  Aside from the impact that it has on discovery and aside

10  from any ultimate argument you may want to make with

11  respect to Tatung's design from your perspective to

12  frustrate discovery, what can I do, at this juncture, to

13  say to them, You are not permitted to have conversations

14  with third parties?  Where is the authority for that?

15            MR. CONNOR:  Your Honor, I understand

Exh A- Rough Transcript of Hearing.txt

16  what you are telling us.
17           SPECIAL MASTER POPPITI:  The record that
18  I have, and please help me if this is not the record, it
19  is not a record where a party is saying to each of its
20  third-party customers, Do not, under any circumstances,
21  comply with the subpoena, ignore it, under pain of we are
22  not going to do business with you anymore, for example.
23           I think were you to be bringing an issue
24  like that before me or before the Court, I think the

                                                13

1   Court has the right to say, Well, you know, wait a
2   minute, discovery is supposed to proceed unimpeded in all
3   good faith in compliance the rules, but I can't, on this
4   record, make a judgment that Tatung is proceeding in, if
5   you will, in bad faith and in an effort to frustrate the
6   discovery process.
7            Is it frustrating?  I am sure it is.
8            MR. CHRISTENSON:  Just as one point with
9   respect to developing the record, and I understand what
10  you just said, we had requested, from Tatung, copies of
11  their communications with the third parties, which we
12  think would be appropriate for us to see as part of
13  developing this record in case of a need for a later
14  determination by you along these lines, and, so, we would
15  like to see that correspondence.
16           SPECIAL MASTER POPPITI:  Well, I am --
17  Mr. Merideth, why don't you speak to that, please, and
18  then we will -- if you would just speak to that so I can
19  bring you back to your speaking about the whole subject

Exh  A- Rough Transcript of Hearing.txt

20    area, please.

21                MR. MERIDETH:  We would be happy to

22    provide that correspondences and I assume they will

23    provide with us their correspondence with their third

24    parties as well.  Charlene -- from Tatung.


                                                    14


1                 SPECIAL MASTER POPPITI:  Just one

2     moment, Ms. Owe, if you don't mind.  Mr. Christenson, did

3     you understand Mr. Merideth's agreement?  And I gather

4     his agreement was conditional.

5                 MR. CHRISTENSON:  Yes, Your Honor,

6     that's fine.

7                 SPECIAL MASTER POPPITI:  So you agree

8     that you will provide your communication with third

9     parties as well?

10                MR. CHRISTENSON:  Yes, Your Honor.

11                MR. MERIDETH:  And if I could now

12    address the Court, and I am sure this is what miss owe is

13    also itching to say --

14                SPECIAL MASTER POPPITI:  Do you want to

15    make sure you are --

16                MR. MERIDETH:  These statements and

17    accusations that are being made are completely and

18    totally ground less.  Many of these customers that they

19    are referring to have filed objections to the subpoena,

20    and, indeed, in some cases, have filed their own motions

21    to quash.  They have not been encouraged by us to do so.

22    We have filed for very limited relief.  That limited

23    relief relates to data respecting unaccused products.  We

24    have never said or suggested, in the motions or

                         Page 12

Exh A- Rough Transcript of Hearing.txt

15

1  otherwise, that there not be full comply answer with the
2  subpoena. We have signed a protective order of very
3  limited scope, which is that -- the same argument that we
4  have made consistently in this case, information that we
5  consider to be an important trade secret not be
6  communicated to our competitor as relates to unaccused
7  product. That is all we have asked for. That's what the
8  Courts in New Jersey and Minnesota have granted.
9          I don't think that the Court in San
10 Francisco quite grasped that and suggested that we should
11 have gone to the Court in Delaware first, we disagree
12 with that, but that's the issue there.
13         What we are concerned about here is that
14 ground less statements are being made. If there are
15 customers who think they have been told not to comply
16 with the subpoenas, they are mistaken, I don't think
17 there are any such customers, and I challenge LG Phillips
18 to produce declarations from those customers suggesting
19 that we have done anything other than inform them that we
20 are filing a motion for a protective order seeking very
21 limited relief.
22         We are not attempting to interfere with
23 the process. And let me go back, and, having said that,
24 miss owe has submitted a letter to you, which you just --

16

1  which is the document that you just received from Ms.

Page 13

Exh A- Rough Transcript of Hearing.txt

2              MS. GAZA: When we started this

3 discussion, so I am sure you have not had a chance to

4 review it -- but it does say --

5              SPECIAL MASTER POPPITI: It is sitting

6 here, but you are right, I have had not had chance to

7 review it.

8              MR. MERIDETH: Before any judgment is

9 made on anything, that letter needs to be read. But in

10 any event, let me say this: We approached the LG

11 Phillips attorneys when we received the third-party

12 subpoenas to attempt to meet and confer and limit the

13 scope to accused products. We were rebuffed.

14              We sought to suggest that we present the

15 matter to the special master, and we were rebuffed. They

16 told us that you had no jurisdiction, that whatever

17 ruling that you might have made would be unenforceable

18 against third parties, and that we could pound sand.

19              MR. CHRISTENSON: Your Honor.

20              MR. MERIDETH: Excuse me, let me finish.

21              SPECIAL MASTER POPPITI: Let

22 Mr. Merideth finish, please.

23              MR. MERIDETH: We were left with

24 absolutely no alternative to file these motions in these

17

1 different jurisdictions to prevent an end run around the

2 motion that we had presented to Your Honor which is to

3 sustain our objections and to grant us a protective order

4 with regard to the production of confidential information

5 concerning unaccused products. And there is -- there is

6 absolutely nothing improper about what we have done.

Page 14

Exh A- Rough Transcript of Hearing.txt

7   It's exceedingly important to our client, as we have said
8   on numerous occasions, that information about unaccused
9   products not be shared with our competitor. There is
10  absolutely no reason to do that. That very issue is
11  under consideration by Your Honor. We would have been
12  happy and we asked that the issue be presented to you in
13  some normal that would have precluded having to do this.
14          We don't enjoy going to 13 different
15  jurisdictions and filing these motions.
16          Second, we have asked for emergency
17  consideration of these motions because we want to get the
18  decisions made right away. So, if a decision is that the
19  information should be produced, then it can be produced
20  by these third-party witnesses. And we have -- that
21  effort to try to expedite a determination of the issue
22  has been resisted by LG Phillips.
23          So, to suggest somehow or another that
24  we are trying to impede the process is just flat out

                                                        18

1   wrong. And it's -- well, that's the end of it. I won't
2   --
3           SPECIAL MASTER POPPITI: Let me do this
4   before Mr. Christenson says anything: I hope, if nothing
5   else, over the time that we have -- that I have had an
6   opportunity to be working with all of you, I hope one of
7   the things that you have learned is, when I say I have
8   not made a judgment one way or the other, when I do not
9   have any inclination one way or the other, that you can
10  take me at my word.

                        Page 15

Exh A- Rough Transcript of Hearing.txt
11          So, the dialogue that I was having
12   earlier about the papers that have been put before me and
13   what, if any, authority I have, notwithstanding the
14   language that I used for purposes of having that
15   dialogue, because I think the language is the language of
16   the art to use, the language of the law to use, I make no
17   judgment and I have no inclination.
18          Let me say this as well, and perhaps I
19   should have done this earlier than now:  To the extent
20   that it is appropriate for a special master and for
21   somebody sitting in my chair to give an inclination as to
22   what a finding and recommendation is going to be, and
23   particularly to give an inclination as to a finding and
24   recommendation that has not only implications in this

19

1    case but perhaps implications in other cases, even though
2    I know what I do is merely a finding and recommendation,
3    it's not adopted by the Court, it is -- the words are --
4    they are on the paper, hopefully, they have some worth,
5    but it's the court's word that is count.
6          But to the extent that it's important to
7    give an inclination on the issue of accused/unaccused, I
8    think the best way to describe that is you know that I
9    have not filed a finding and recommendation on that
10   issue, and you also know that discovery is proceeding --
11   I am no going to characterize how it's proceeding -- on
12   accused product.  You all know that.
13          You can expect, and I said it to you
14   last week, but, quite frankly, I wasn't able to turn to
15   it and get to it this week, you will get a finding and
                    Page 16

Exh  A- Rough Transcript of Hearing.txt

16  recommendation.  It's important that it be as careful --
17  they all should be careful -- but in more depth in terms
18  of its analysis of dealing with the issue of
19  accused/unaccused.  But by virtue of what has been going
20  on, I am telling you that the discovery is going to be,
21  absent something earth shattering that I consider in the
22  next number of days, it's going to be limited to accused
23  products.
24          Now, perhaps I should have done that

                                          20

1  earlier, and I will even go so far as to suggest, by
2  perhaps doing it earlier in terms of giving you an
3  indication or an inclination on the record, you would
4  have been able to, perhaps, discussed the issue in a meet
5  and confer more meaningfully, and you would have had the
6  opportunity and you now may have that opportunity to
7  share a special Master's inclination with other
8  jurisdictions that you will be working in.
9          Now, having said that, Mr. Christenson.
10          MR. CHRISTENSON:  Yes, Your Honor.
11  Thank you.  I don't know if there is anything else that
12  you would like me to address concerning the third-party
13  issue.  I think -- I think we all understand your view on
14  that and it sounds like that's an issue to be addressed
15  at another time, if I understood you correctly.
16          SPECIAL MASTER POPPITI:  That's correct.
17  I only want to be looking at the extension of time.  And,
18  again, it seems to me that there should be -- discovery
19  itself occurring in a face for whatever reason.  There

```
                    Exh  A- Rough Transcript of Hearing.txt
20   will be hearings in other jurisdictions as they relate to

21   certain third parties.

22                    If it's important to discuss the number

23   of days for the extension, then let's do it now because I

24   intend to grant an extension.  If it's better to wait


                                                          21


1    until the universe of dispute has narrowed or completely

2    evaporated, then we should wait.

3                    MS. KLEVENS:  May I address that?

4                    SPECIAL MASTER POPPITI:  Yes, please.

5                    MS. KLEVENS:  Our view is that it is

6    important to discuss this at least on an interim basis

7    now, and the reason for that is that we currently have

8    depositions of these third parties scheduled throughout

9    the next several weeks and we have had to adjourn some of

10   the depositions temporarily over the last week and a half

11   because of the third-parties' positions with respect to

12   these motions.

13                    And, so, as a result, we have, right

14   now, quite a few depositions and third parties who are

15   requesting to have those depositions scheduled prior to

16   March 30th.  And until the discovery deadline is

17   extended, I have no authority to extend these deposition

18   dates past March 30th.

19                    THE ARBITRATOR:  I understand.

20                    MS. KLEVENS:  The hearing dates, as

21   well, will be affected by that date because the judges in

22   the other jurisdiction, I believe, are setting these

23   expedited hearing dates based, in part, on the dates for

24   the deposition.
```

Exh A- Rough Transcript of Hearing.txt

22

```
 1              SPECIAL MASTER POPPITI:  Well, and that
 2    was one of the expectations that -- I mean, I certainly
 3    understood that by virtue of the papers that you have
 4    filed, and I certainly don't want to -- well, let me say
 5    it carefully:  If you have got the March 30th date that
 6    you are presently working with and it's important to have
 7    these hearings sooner than later and the other
 8    jurisdictions are looking at the March 30 target and they
 9    are, therefore, giving you expedited hearings, isn't it
10    important to have those hearings completed so that after
11    the hearings are over, we then can look at realistic
12    dates?
13              I mean, my concern is that it's -- it's
14    one that you kind of put a magnifying glass over by
15    virtue of your comment.
16              If I extend the date and have a date
17    certain, it may very well be that the other jurisdictions
18    will feel more relaxed in their approach to scheduling.
19    With the March 30 date, they may honor the request that
20    has been made to expedite, you will have decisions with
21    respect to most, if not all of these, and you will be in
22    a better position to work without the specter of having
23    three, four, five, six, eight, nine out there that still
24    haven't been decided.  That's the only concern I have
```

23

```
 1    about setting a date now.
```

Exh  A- Rough Transcript of Hearing.txt
2           MS. KLEVENS:  I understand, Your Honor.
3   And we essential search share that concern that while we
4   did object to that expedited schedules, the reason we did
5   so was merely for scheduling purposes with some of our
6   attorneys out in depositions out in other locations,
7   there are only so many of us that can handle these
8   hearings and unfortunately we were getting notice from
9   the Courts that we were having up to four hearings a day
10  in these other jurisdictions.  It's not that we weren't
11  interested in an expedited schedule.  Having said, that,
12  you know, I do still have a strong concern that, from
13  today, there is only two weeks remaining during which I
14  have scheduled depositions, roughly two a day, between
15  now and then, and no ability to reschedule past that
16  date.  I know I have said that and I apologize for
17  repeating myself.
18           SPECIAL MASTER POPPITI:  I understand.
19           MS. KLEVENS:  I just have a strong
20  concern that if the defendants will somehow, you know,
21  agree not to object to our scheduling of depositions past
22  March 30th, that would give us a little bit of leeway, at
23  least temporarily, until such time as we have ruling from
24  the other jurisdictions and can discuss a more permanent

                                                        24

1   extension of the discovery deadline.
2           SPECIAL MASTER POPPITI:  Mr. Merideth.
3           MR. CHRISTENSON:
4           MR. MERIDETH:  I have no problem
5   discussing, on a case-by-case basis, new dates.  I agree
6   with Your Honor's view that if we extend the dates, the
                     Page 20

Exh A- Rough Transcript of Hearing.txt

7   Courts are more likely to take a relaxed position.

8   Furthermore, as Ms. Klevens has conceded, LPL, I believe

9   in every case, has requested additional time with respect

10  to these hearings, and, of course, that's going to delay

11  it even further.

12              I understand exactly what the problem

13  is.  Once there is a ruling, we still have to take the

14  deposition.  On the other hand, I believe that, from what

15  I have been told, there are third-party witnesses who are

16  prepared to go ahead with documents document production

17  and with depositions on accused products.  So, we could

18  do that.  There is no reason why we could not do that at

19  this time.

20              MS. KLEVENS:  If I may just make one

21  point, Your Honor, the only limitation there is just with

22  respect to there being, again, you know, only so many

23  people in our offices.  We are trying to simultaneously

24  field multiple hearings and multiple discussions with

25

1   these courts every day and respond to the motions that

2   were filed, and, at the same time, prepare for and take

3   depositions.  So even if there are parties that are

4   prepared to go forward today, frankly, in whole effort by

5   the defendants have derailed our ability to prepare for

6   those depositions.  And we also need some time to prepare

7   for the depositions of these parties once they produce

8   their documents.  The original subpoenas allowed for the

9   third parties to produce their documents and their

10  depositions were scheduled no less than one week after we

Page 21

Exh A- Rough Transcript of Hearing.txt

11  have received the documents.

12          MR. MERIDETH:  May comment, Your Honor?

13          SPECIAL MASTER POPPITI:  Absolutely.

14          MR. MERIDETH:  I must say that the

15  problem Miss Klevens is describing is one that was self

16  inflicted.  They waited until the end of February to

17  notice 23 depositions, and that taxes the resources of

18  all of the firms that are involved.

19          SPECIAL MASTER POPPITI:  It does.

20          MR. MERIDETH:  That delay is not a

21  reason to continue the Court established deadline.

22          I agree that if the Courts are putting

23  off these depositions until there is a decision, that's a

24  different thing, but the -- we are all under the same

        26

1  burden when someone serves 23 deposition notices with

2  only 30 days left to go in the case, it's going to be a

3  real difficult logistical problem.

4          SPECIAL MASTER POPPITI:  I am willing to

5  make -- to literally sit down with the calendar and start

6  going through your scheduled depositions of third

7  parties.  I don't think that that's going to be very

8  productive for anyone.  I think it makes a great deal of

9  sense for me to expect that between now and somebody pick

10  a date in the new week, that you all have the opportunity

11  to sit down, discuss the parameters of what you would

12  expect to be a reasonable extension, make some

13  determination as to what depositions need to be

14  forestalled, and if any can go forward, make that

15  judgment as well, because I certainly can't do that for

Exh  A- Rough Transcript of Hearing.txt

16    you on this record.

17            You are going to, notwithstanding the --

18    and Mr. Merideth, I note in your papers and I note your

19    argument that these depositions were scheduled when they

20    were, but my view of expecting that you are going to be

21    getting an extension has more to do with where we are as

22    a result of the third-party practice in terms of these

23    other applications in the other districts than it is a

24    function of when the depositions were noticed.

                                                    27

1            MR. MERIDETH:  I would be happy to

2    discuss those dates with counsel for LG Phillips.

3            SPECIAL MASTER POPPITI:  Is it important

4    to discuss outside limits on this -- in this conversation

5    or can you all do that as well?

6            MR. MERIDETH:  I think we can all do it.

7    I think, you know, theres are a number of third-party

8    witnesses that we also have subpoenaed and there are also

9    some issues with regard to objections that have been made

10   to some of those subpoenas.  I think it would be

11   worthwhile for us to sit down and talk about a schedule

12   for all of the third-party discovery, and, hopefully, we

13   can get it completed during the month of April.  I just

14   don't want to have an open-ended extension with respect

15   to everything, and I think if we sat down and tried to

16   work with the third parties and work between ourselves,

17   that we can come up with a reasonable schedule.

18           SPECIAL MASTER POPPITI:  Well, and you

19   and everybody on this phone call understands where we

Exh A- Rough Transcript of Hearing.txt

20    have been with the history of this and understands where
21    we have been with my two visits to Judge Farnan's chamber
22    to tweak the scheduling order, and each of those times
23    resulted in the Court issuing a scheduling order that did
24    not extend the time for third-party discovery.

28

1              We are in a different environment right
2     now.  It seems to me it needs to be extended.  It makes a
3     great deal of sense to do it globally.  And it will not
4     affect any of the other -- any of the other dates, so you
5     are still working within the time frames, the critical
6     time frames of hearings that have already been
7     established, hearings and ultimate trial.
8              And can you all wrap this up by the
9     teleconference that's presently scheduled for 6:30 on
10    Monday?
11             MR. CONNOR:  Yes.  We will do our best
12    to do that.
13             MR. MERIDETH:  Yes, Your Honor.
14             SPECIAL MASTER POPPITI:  So, no
15    discussion about an outside limit?  Wouldn't that help
16    frame the discussion or no?
17             MR. MERIDETH:  I think that there are
18    other things that we need to take into account, and,
19    specifically, the schedule with respect to some of the
20    third-party witnesses, who are the ones who, frankly, are
21    also bearing a considerable burden with respect to having
22    to produce all of this data on a very short time period,
23    and it would probably be wise for us to touch base with
24    them and see what their schedules are and make sure that

Exh  A- Rough Transcript of Hearing.txt

1  we have the proper places and the proper times and the
2  proper people.
3              SPECIAL MASTER POPPITI:  Can you do all
4  that by Monday or do you need --
5              MR. MERIDETH:  Probably Monday may be
6  too ambitious.  Maybe by Tuesday or Wednesday, I would
7  think we, would and I am not sure it's going to make any
8  difference whether it's Monday or Wednesday, frankly.
9              SPECIAL MASTER POPPITI:  Anyone want to
10  speak from the other side.
11             MR. CONNOR:  I guess I am just not
12  hearing a response as to a global extension for
13  deposition time.
14             SPECIAL MASTER POPPITI:  I think I heard
15  Mr. Merideth say, rather than discuss it now, it really
16  is more important to have your discussion off-line,
17  permit each of you to discuss issues with respect to
18  third parties so that when we -- when we reconvene on
19  this issue to discuss whether you arrived at an agreement
20  on the closure of third party discovery or whether you
21  submit to me your ultimate dispute on a date, you will be
22  much better informed, and, therefore, I will be better
23  informed.  I think that's what I heard him say.
24             MR. MERIDETH:  Yes, sir.  By way of

1  example, I know that tie company has filed objections and

Exh A- Rough Transcript of Hearing.txt
2   -- of its own and has issues with regard to the timing.
3   If we were to call tie company and try to work out those
4   objections and try to set a time that's convenient with
5   tie company, then we'd know where tie company is and we
6   can go forward. I think we can do that -- I mean, there
7   are a number of these, but we could and should do this
8   with everyone. I think to the extent that there are
9   agreed deadlines as opposed to imposed deadlines, it's
10  always easier to get compliance.
11              SPECIAL MASTER POPPITI: I agree. I'd
12  like to proceed in that fashion. Just tell me, if it's
13  not going to be doable by Monday, do you all want to
14  schedule another time Tuesday or Wednesday?
15              MR. MERIDETH: I would suggest
16  Wednesday, Your Honor.
17              MS. KLEVENS: Obviously, Your Honor, we
18  would rather do it sooner rather than later. We would do
19  it Monday. Tuesday is even better.
20              SPECIAL MASTER POPPITI: I don't want to
21  be in a position of having to hear, We weren't able to
22  accomplish all we intended to because we are busy doing
23  other things. I don't think we are going to lose much
24  time by virtue of doing it on Wednesday. So we will do

                                                    31


1   it Wednesdays, I don't have your deposition schedule
2   right in hand -- will we have to do it at five? We can
3   if we need to, or if we have to do it later.
4               MR. MERIDETH: I am going to be in
5   Washington D.C. for Mr. Kim's deposition so, 5:00 would
6   be fine where me.

Exh  A- Rough Transcript of Hearing.txt

7           SPECIAL MASTER POPPITI:  Do you expect
8    to conclude with him at five?  We can start at five.  We
9    can start at 5:15.
10           MR. MERIDETH:  5:15 would be even
11    better.
12           SPECIAL MASTER POPPITI:  Does that work
13    for everyone?
14           MS. KLEVENS:  Is that Wednesday, Your
15    Honor?
16           SPECIAL MASTER POPPITI:  It is.
17           MS. KLEVENS:  That's fine.
18           SPECIAL MASTER POPPITI:  May I ask madam
19    court reporter, does that work for you:
20           MR. HEISMAN:  This is gym Heisman on
21    behalf of ViewSonic.  I was wondering if you could
22    provide some clarification when you are talking about a
23    global extension of third-party discovery, it's my
24    understanding that that would be limited to discovery

32

1    that's already been propounded and on the table at this
2    point and would not spawn additional third-party
3    discovery requests.
4           SPECIAL MASTER POPPITI:  No new
5    mushrooms.
6           MR. HEISMAN:  Thank you, Your Honor R
7    thank you, Your Honor.
8           SPECIAL MASTER POPPITI:  Next, please.
9           MR. CHRISTENSON:  We had a letter that
10    we had submitted to you with respect to some outstanding

Exh  A- Rough Transcript of Hearing.txt

11    issues --

12              MR. KIRK:  Your Honor, excuse me, may I

13    suggest that, at some point, representatives of the third

14    parties be excused because this is now turning to

15    information that may be confidential?

16              MR. JOHNSON:  Thank you, Dick.  I was

17    trying to figure out how to do that myself.  I will hang

18    up if that's okay.

19              SPECIAL MASTER POPPITI:  Thank you, sir.

20    Thank you for joining us.  Okay.  Okay.

21              MR. CHRISTENSON:  Thank you, Your Honor.

22    We submitted a letter on March 14 concerning issues that

23    we had raised with you during the March 9 hearing related

24    to Tatung's document productions, and the reason we are

33

1    raising it is, as we have stated, is because we need to

2    make sure that now is the time for us to get all of the

3    relevant and necessary discovery that we need to use when

4    we depose Tatung Company's Rule 30(b)6 witness starting

5    on Tuesdays, Mr. Shea.  And there are some issues that I

6    think remain in dispute and it would be helpful if we

7    could raise those wishes you today briefly to see if we

8    could resolve them before the deposition.

9              We have summarized in our March 14

10    letter the types of documents that we understand have to

11    exist but not to have been produced.  Tatung has

12    responded to that with a March 15 letter, and we

13    supplemented, very briefly to you today, you may not have

14    seen it yet, but we supplemented very briefly waved on a

15    deposition this week where there was some additional

Exh A- Rough Transcript of Hearing.txt

16  documents that were identified that we felt should have

17  been produced.

18          SPECIAL MASTER POPPITI:  Yes.  I have

19  the 14th, I have the response of the 15th, and Mr. Kirk's

20  letter came in at 2:38, so I can tell you that I haven't

21  had an opportunity to read other than the letter.

22          MR. CHRISTENSON:  I understand, Your

23  Honor.

24          The March 15 letter suggested that it

                                                    34

1   would make sense for a further meet and confers to occur,

2   and I respectfully disagree with that because this is

3   discovery that we have been trying to get for many, many

4   months.  We have had many meet and confers that resulted

5   ultimately in motions in December and hearings and

6   agreements during the course of the hearings before you

7   in January and the idea was we should have had all

8   appropriate discovery by the end of January.  You

9   required a certification from Tatung, as of March 9, that

10  discovery had been completed.

11          So, I don't I think it makes any sense

12  for us to try to meet and confer any further.  The

13  question is:  Is there any additional discovery that

14  should be produced?  And with respect to the issue of

15  accused products, and I understand your indication as you

16  provided, and I do think that it was useful for you to

17  provide that and I appreciate that, I think that there

18  are, however, two types of documents, two types of

19  discovery that relate to accused product, and those two

Exh_A- Rough Transcript of Hearing.txt
20    types are, first, documents that refer expressly or

21    solely to accused products, which, of course, I think we

22    all agree are relevant, and then there are also

23    documents, Your Honor, that relate to accused products

24    more generally but may not be limited to accused products

35

1     specifically or may not refer specifically to accused

2     products but are just as relevant because they equally

3     relate to accused products. And I will talk about that a

4     little bit more in a moment.

5             But both of those categories are

6     documents that Tatung has agreed to produce, that are

7     more general and not limited to accused products, Tatung

8     has agreed to produce, to the extent they relate, to the

9     U.S. market, and that makes sense because, for

10    inducement, Tatung's conduct in attempt to go sell

11    products to its customers in the U.S. market is directly

12    relevant and tends to prove inducement.

13            So, just to run through, briefly, the

14    issues as summarized in our March 14 letter, Your Honor,

15    the first issue relates to sales reports, and during the

16    prior hearing on March 2nd, you had ordered that Tatung

17    defendants should produce all sales related reports

18    concerning accused products which had been agreed to by

19    Mr. Merideth previously, and we are not aware of those

20    reports having been produced, and as I understand the

21    March 15 letter from Tatung, they don't represent that

22    they have, in fact, produced those reports.

23            So the first question, I think, is: Why

24    haven't we received those reports and when can we get

Page 30

Exh  A- Rough Transcript of Hearing.txt

36

1      those reports?  And, as an example, we cite global

2      monthly sales reports that Tatung Company has on a

3      regular basis that relate to its U.S. customers, and,

4      again, they have agreed to provide discovery generally

5      related to the U.S. market.

6                    So, those are reports that we feel

7      should have already been produced.

8                    I don't know if you want me to go

9      through all of the issues or if you prefer to have me

10     stop and then address these issues separately after a

11     response from Mr. Merideth?

12                   SPECIAL MASTER POPPITI:  Let's do one at

13     a time, please.

14                   MR. MERIDETH:  With respect to the

15     global sales reports, Your Honor.

16                   SPECIAL MASTER POPPITI:  Yes, please.

17                   MR. MERIDETH:  Those are by type of

18     product, i.e., television, monitor, worldwide, i.e.,

19     global reports, and they give numbers.  They do not refer

20     to any product by number.  They do not refer to any of

21     the accused products, and they are a global report.

22                   We have provided quarterly -- now

23     provided quarterly summaries.  We have provided summaries

24     that identified sales on a day-to-day basis.

37

1                    There are customers who buy from us

Exh A- Rough Transcript of Hearing.txt

2  globally, and those customers' information, unrelated to

3  the U.S. market, are not, to use the vernacular, any of

4  LG Phillips' business, and we are not going to give them,

5  or we shouldn't be required to give them our global sales

6  reports that don't even identify a product but would

7  identify for them, for their competitive purposes, the

8  worldwide volume that we may be doing with a particular

9  customer or with a particular type of product, i.e.,

10  television or monitor.

11          It has no specificity to any accused

12  product or to the U.S. market in general.

13          SPECIAL MASTER POPPITI:

14  Mr. Christenson.

15          MR. CHRISTENSON:  Yes, Your Honor.

16      A.   What Mr. Merideth failed to mention there was

17  that the sales summaries that they have provided to us

18  have no customer information; hour however, the global

19  monthly sales reports do have customer information and

20  many of those customers are major U.S. customers of

21  Tatung according to the testimony.  For example, gate

22  way, as another example, Tatung sells substantial

23  quantities to HP, those products are specifically

24  intended for the U.S. market.

                                                    38

1          The sales reports may not specify a

2  model number, but they do, according to the witness,

3  specify sizes of products and types of products by

4  customer, including for U.S. customers.  So, clearly, I

5  think we are entitled to show that they are -- what types

6  of products they are selling to the U.S. customers as

Exh A- Rough Transcript of Hearing.txt

```
7    part of our inducement case.
8                   MR. MERIDETH:  If I could respond?
9                   SPECIAL MASTER POPPITI:  Yes, please.
10                  MR. MERIDETH:  Gateway is a perfect
11   example.  Gateway does not purchase, in the United
12   States, any products that have been accused.  They want
13   to have our sales data with respect to gateway.  They
14   sell no accused products in the United States.  They sell
15   no accused products worldwide, as far as I am aware, and,
16   yet, they want our detailed global report with respect to
17   gateway.  They are not entitled to it.  It has absolutely
18   no bearing in this case whatsoever other than to give
19   them competitive information that they are not entitled
20   to.
21                  SPECIAL MASTER POPPITI:  I will use
22   gateway as an example.  I see no foundation to expect
23   that gateway information should be provided.  It's, I
24   gather, worldwide information?
```

39

```
1                   MR. MERIDETH:  Yes, sir.
2                   SPECIAL MASTER POPPITI:  It's not U.S.
3    information.
4                   MR. MERIDETH:  It would include U.S.
5    information.
6                   SPECIAL MASTER POPPITI:  And does not
7    have --
8                   MR. MERIDETH:  It doesn't break it out
9    by Europe shall after can a, whatever.
10                  SPECIAL MASTER POPPITI:  I am -- if the
```

Page 33

Exh A- Rough Transcript of Hearing.txt

11  gateway example is representative of the rest of the

12  universe that's being requested here, then the

13  application is denied.  If it's important for me, because

14  I haven't had the opportunity to have you point at

15  Mr. Ho's deposition, which you do in the March 16

16  correspondence, and there is a different template than

17  gateway, I am certainly happy to look at that.

18          MR. MERIDETH:  May I add one other

19  additional thing?

20          SPECIAL MASTER POPPITI:  Sure.  Those

21  remarks were for Mr. Christenson, certainly.

22          MR. MERIDETH:  Yes.  The other thing is

23  Mr. Christenson says that our quarterly summaries do not

24  include customer data, and he is absolutely right.  And

40

1  the reason they don't include customer data is because

2  they didn't ask for customer data.  And I think it's

3  quite unfair, at this stage of the game, for them to say,

4  Oh, we wished we would have asked for customer

5  information.  We have provided, however, for the accused

6  products' customer-related data, so the only thing that

7  we have not provided customer-related data for are

8  unaccused products.

9          So, while the quarterly reports are

10  generally -- generally address all product, with respect

11  to the accused product, we have only -- we have provided

12  them with all of the information including customer

13  information.

14          SPECIAL MASTER POPPITI:  Thank you.

15          MR. CHRISTENSON:  Your Honor, to respond

Page 34

Exh A- Rough Transcript of Hearing.txt

16    briefly, we have, indeed, asked specifically for customer
17    information.  I don't know what the basis is for
18    Mr. Merideth to say that.  I can point to you, I believe,
19    in a transcript, where this came up, and perhaps
20    Mr. Merideth is willing to then provide with us the
21    customer information if I can provide that citation; is
22    that agreeable?
23                    MR. MERIDETH:  I don't know what you are
24    referring to.  What kind of information do you want?

                                                    41

1                    SPECIAL MASTER POPPITI:  I didn't hear,
2     you were speaking over each other.
3                    MR. CHRISTENSON:  What I am saying; Your
4     Honor, if I could point Mr. Merideth to where we have
5     specifically requested his customer information, he would
6     be willing to produce it.
7                    MR. MERIDETH:  If you have requested it
8     in the discovery request -- I mean, if you just called me
9     up on the phone or said in a deposition, "I want it,"
10    that's not a discovery request.
11                    MR. CHRISTENSON:  We will follow-up with
12    that among counsel, Your Honor, too.
13                    SPECIAL MASTER POPPITI:  I understand
14    that there have been beyond -- it may be fair to say
15    this, and if it isn't, I know you will make a record --
16    that there have been agreements that you have made during
17    the course of our teleconferences that are transcribed.
18    If it's pursuant to an agreement of that nature, I would
19    expect, Mr. Merideth, you would agree that, if it was an

                          Page 35

Exh A- Rough Transcript of Hearing.txt

20    agreement in the context, it was an accommodation dealing

21    with discovery requests, that you should be bound by that

22    agreement.

23                    MR. MERIDETH:  Yes, sir.  Absolutely.

24                    SPECIAL MASTER POPPITI:  Thank you.


                                                              42


 1                    MR. CHRISTENSON:  And, Your Honor, just

 2    to put a final point on that, do you happen to have

 3    access to the January 22nd hearing transcript?

 4                    SPECIAL MASTER POPPITI:  Just a second.

 5    Give me one minute.  Thank you.  Okay.  I do.  Give me a

 6    moment to get to it.  January 22.  Okay.

 7                    MR. CHRISTENSON:  And this is with

 8    respect to Mr. Merideth's comment that customer

 9    information has never been requested, before it reminds

10    me, Your Honor, of the March 9 hearing we had to talk

11    about --

12                    SPECIAL MASTER POPPITI:  This is in

13    January 22?

14                    MR. CHRISTENSON:  Yes.  If you would

15    please take a look at page 13 of the transcript.

16                    SPECIAL MASTER POPPITI:  Line?

17                    MR. CHRISTENSON:  Starting at line

18    eight.

19                    SPECIAL MASTER POPPITI:  Why don't you

20    read it, please, for the record.

21                    MR. CHRISTENSON:  Yes, Your Honor.  I

22    will start with line 10, where it starts by stating, "The

23    one page sales summary that we have so far that I

24    discussed on Friday, which relates to the L17 AMTN, the

Exh  A- Rough Transcript of Hearing.txt

43

1    customer, there is a customer heading in that document,
2    but all the customer names are redacted.  That's an
3    accused product, Your Honor.  And it sounded to me like
4    Mr. Merideth was just saying that, very similarly, do not
5    plan to include the customer information in the summaries
6    to be produced shortly.  And I know that we have
7    discussed already that the protective order does not
8    contemplate redaction of customer information, so I am
9    hoping we could maybe get an agreement to include the
10   customer information.  Mr. Merideth:  We will include the
11   customer information with respect to accused products.
12   We will not provide customer information regarding
13   products that are not accused.  Your Honor states:  I
14   think that's perhaps the clarification you were looking,
15   you weren't looking for to be that narrow, but, in any
16   event, that is a clarification.  I state yes, thank you,
17   Your Honor.  I then state:  We also discussed on Friday,
18   Your Honor, that we are seeking documents concerning
19   indirect infringement and relationships between Tatung
20   Company and U.S. brands or customers as well as products
21   that enter the market and are sold through and to those
22   customers and brands in the U.S.  and we, for example, I
23   won't re-plow the discussion, but, as an example, we had
24   requested correspondence between Tatung and ViewSonic or

44

1    correspondence between Tatung and others related to the
Page 37

Exh  A- Rough Transcript of Hearing.txt

2  U.S. market.  Those were document request numbers 62 and

3  63, for example.

4                   And then I talk about, paraphrasing now,

5  Your Honor, I talk about our concern that they don't do

6  business just on an accused product basis so that there

7  are certainly relevant documents concerning production

8  that are marketed to U.S. customers and efforts by Tatung

9  to generally market to customer nurse the U.S. by both

10  accused products and other products, Tatung generally

11  markets all those products in certain ways and targets

12  the U.S. when it does so.

13                  And Mr. Merideth responds:  I thought we

14  covered this Friday.  My specific recollection was that,

15  to the extent that there was general correspondence or

16  sales and marketing in the United States generally, for

17  example, was discussed, without any particular model

18  number being referenced, that, you know, I accepted you

19  were entitled to discovery of that.

20                  And he is goes on to say this is

21  something that relates only to non-accused products, then

22  he thinks that should be provided.

23                  SPECIAL MASTER POPPITI:  Right.

24                  MR. CHRISTENSON:  And you then say

                                                         45

1  that's what I understood to be the question.

2                   So, No. 1, I submit, Your Honor, that we

3  not only have requested customer information, it was

4  supposed to have been provided, and No. 2, there is also

5  clearly an agreement and understanding that we are

6  entitled to discovery generally showing efforts to market

                          Page 38

Exh A- Rough Transcript of Hearing.txt

7   display products to the U.S.

8               So, I think that's, us know, for

9   Mr. Merideth to say to you that it's just too bad we

10  never asked for that information is just not correct.

11               MR. MERIDETH:  I think you had

12  misconstrued what I was saying.  I said, with respect to

13  our quarterly summaries, you did not ask us to include

14  customer information.  We have provided you with customer

15  information respecting accused products.  We have

16  provided you with marketing information generally in the

17  United States.  We have provided you that information.

18               We did not include it, however, on the

19  quarterly summaries because you didn't ask for it on the

20  quarterly summaries.  That's the only statement that I

21  made.

22               MR. CHRISTENSON:  And that's another

23  cite, I don't have that side sight in front of me, but we

24  can talk about that further and we can raise it again if

46

1   necessary.

2               MR. MERIDETH:  If we agreed to provide

3   it on the quarterly summaries, we will provide it on the

4   quarterly summaries.  If you can point that out to me, we

5   don't need to go into a big argument here.  I don't

6   believe that's the case.

7               MR. CHRISTENSON:  The point is:  We

8   requested it specifically and you did not agree to

9   provide it.  We did ask it.

10               MR. MERIDETH:  Yes, I agree.  I did not

Page 39

Exh A- Rough Transcript of Hearing.txt
11    agree to provide it and we didn't provide it because it
12    was never requested in a discovery request, and,
13    therefore, we didn't provide it.  That's the only point
14    that I made.
15            I have been completely consistent and we
16    have been completely consistent with respect to our
17    production of documents and we have produced what we said
18    we would produce.
19            SPECIAL MASTER POPPITI:  If I understand
20    the record that I have, there really is nothing for me to
21    deal with other than if Mr. Christenson can point to a --
22    any transcript that said that you would -- that you agree
23    to provide, in the quarterly summaries, customer
24    information than you will be required to do so and you

                                                    47

1     just indicated that you would do so.
2             Absent that, if it was not requested, I
3     have -- I certainly am not going to order it.
4             MR. CHRISTENSON:  I understand what you
5     just said, Your Honor.  I can tell you my recollection is
6     I did request it, there was no agreement to provide it,
7     and, so, it's a dispute.  If I understand what you just
8     said, you have -- you are not going to require them to
9     produce the --
10            SPECIAL MASTER POPPITI:  Not unless
11    there is an underlying request specifically dealing with
12    the quarterly summaries.
13            MR. CHRISTENSON:  Okay.  I do think
14    there is a request that would call to that, Your Honor,
15    but I don't have that in front of me right now.
                        Page 40

Exh  A- Rough Transcript of Hearing.txt

16            SPECIAL MASTER POPPITI:  Let's deal with
17    it at another point.
18            MR. CHRISTENSON:  Going back to the
19    March 14 letter if I may, Your Honor.
20            SPECIAL MASTER POPPITI:  Yes.
21            MR. CHRISTENSON:  The second point
22    relates to -- well, I guess before we move off the first
23    topic, the question; and this is really a question, I
24    guess, for counsel, but there is no question that you had

                                                    48

1    ordered that regularly created sales related reports
2    concerning accused products needed to be produced, and
3    there is nothing in the letter that says one way or the
4    other whether those products exist or whether they have
5    been produced.  So I think we need that clarification,
6    Your Honor.
7            SPECIAL MASTER POPPITI:  Mr. Merideth.
8            MR. MERIDETH:  To the extent there are
9    regularly generated reports respecting accused products,
10    we have produced them.
11            MR. CHRISTENSON:  Your Honor, I don't
12    know what that means.  Either they exist or they don't.
13    I don't know.
14            SPECIAL MASTER POPPITI:  He said they
15    produced them.  To the extent they exists, they produced
16    them.
17            MR. CHRISTENSON:  I haven't seen they
18    will so, does that mean they don't exist.
19            SPECIAL MASTER POPPITI:  Mr. Merideth.

Exh A- Rough Transcript of Hearing.txt
```
20              MR. MERIDETH:  No.  It means that you
21   haven't gone through the stuff that we produced
22   thoroughly.
23              SPECIAL MASTER POPPITI:  So, if I
24   understood what you just said, Mr. Merideth, you respect
```

                                                      49


```
1    that there is production that falls in that category;
2    correct, sir?
3               MR. MERIDETH:  Yes.  I don't think it's
4    incumbent upon me to go through and --
5               SPECIAL MASTER POPPITI:  No, it isn't.
6    You have answered the question.
7               MR. CHRISTENSON:  Thank you.
8               Your Honor, the second point, which is
9    on page 2 of our March 14 letter, relates to profit
10   information for accused products.
11              SPECIAL MASTER POPPITI:  I see it.
12              MR. CHRISTENSON:  And my understanding
13   from the March 15 response letter is that Tatung Company
14   does not have that information available and that Tatung
15   America hasn't produced that information.  So, if that's
16   the case, I don't think we need to discuss that issue
17   further.
18              MR. MERIDETH:  Tatung Company does not
19   maintain profit and loss data by product, so it does not,
20   for example, take a, what is the profit they make an on
21   a.m. T M monitor 17 inch, they do not maintain that
22   profit and loss information.  They don't maintain their
23   records in that fashion.
24              The Tatung America records do allow you
```
                          Page 42

Exh A- Rough Transcript of Hearing.txt

50

1    to determine gross margin on products and we have

2    provided that information.  We do not have profit and

3    loss information from Tatung Company with respect to

4    products.

5            MR. CHRISTENSON:  I will move on, then,

6    to the third topic.

7            SPECIAL MASTER POPPITI:  Okay.

8            MR. CHRISTENSON:  Which is product plans

9    and road maps.

10           We have received one document that's

11   titled a "2007 product plan," and it's a very useful

12   document, I think it shows a lot of information about

13   Tatung's efforts to market specifically to customers in

14   the U.S.

15           My concern is that it's the only such

16   document that I have seen, and we'd like to get

17   additional similar documents from Tatung.

18           MR. MERIDETH:  As I indicated in the

19   letter, we -- this format that you received with regard

20   to the 2007 plan is a new format, it was not used during

21   prior periods.  To the extent that there was any

22   information for prior periods of this type, we have

23   produced it.  However, what we have provided you,

24   starting at T E -- PD E 017921 is not a client

51

1    presentation.  It's an internal document.

Page 43

Exh  A- Rough Transcript of Hearing.txt

2          MR. CHRISTENSON:  I am just trying to

3    understand if there are any such internal documents that

4    are related to the time period before 2007?

5          MR. MERIDETH:  There are other

6    documents, internal documents that have been produced,

7    but they are not in this format, as my letter clearly

8    states.

9          SPECIAL MASTER POPPITI:  That's what it

10   says and that's what Mr. Merideth just said.

11          MR. CHRISTENSON:  Okay.  I understand

12   what he just said, Your Honor.  I don't think that's what

13   it says in the letter, but I understand what he just

14   said.

15          SPECIAL MASTER POPPITI:  Okay.

16          MR. CHRISTENSON:  Going then to topic

17   four, then, if I may, this is presentations to customers

18   in the U.S. market, and this is an issue that arose based

19   on our deposition of Mr. Jackson Chang on Monday, Your

20   Honor.

21          During that deposition, Mr. Chang

22   identified several different meetings he's had with many

23   customers in the U.S., and he further specifically

24   testified that during those meetings, he makes sales and

                                                         52

1    marketing presentations to the U.S. customers, and we

2    have requested, as a result, copies of those

3    presentations.  The response, as I understand it, is that

4    Tatung Company is searching for those presentations.

5          SPECIAL MASTER POPPITI:  That's what it

6    says.

Exh  A- Rough Transcript of Hearing.txt

7          MR. CHRISTENSON:  And will produce them,
8     and, so, I think the question becomes:  When will they
9     produce them?  Because as Your Honor has instructed, we
10    need to proceed with the deposition on March 20, which is
11    Tuesday.
12          MR. MERIDETH:  Let me say two things.
13    No. 1, Mr. Chang was not asked whether or not the power
14    point presentation to which he made reference was related
15    to an accused product.  And, indeed, he was not even
16    asked whether or not the power point presentation that he
17    saw or that he prepared was as to a product that was
18    intended to be sold in the United States.
19               If that question had been asked, he
20    would have answered that it was not.
21               I looked at the presentation on his
22    computer.  He showed it to me when you raised this
23    question, Mr. Christenson, and it is a presentation to HP
24    for Europe, the Middle East, and after can a.

                                                           53

1               Now, there may be other power point
2     presentations that are related to the U.S. market.  We
3     are trying to determine whether any sales representatives
4     have such programs on their PCs.  And as soon as we -- if
5     we find out that they do and they have something to do
6     with accused products, then we will produce them.  But
7     this business with respect to Mr. Chang's deposition is a
8     red herring.
9          MR. CHRISTENSON:  Your Honor, it's not a
10    red herring.
                         Page 45

Exh  A- Rough Transcript of Hearing.txt
11          MR. MERIDETH:  I mean, you didn't ask
12   him --
13          MR. CHRISTENSON:  Excuse me.  May I
14   finish.
15          MR. MERIDETH:  For the accused product.
16          SPECIAL MASTER POPPITI:  Mr. Merideth,
17   you had said that already.  Mr. Christenson.
18          MR. CHRISTENSON:  Thank you.  I wasn't
19   referring to a specific single power point presentation,
20   Your Honor.  These are multiple presentations given to as
21   customers and this goes directly back to --
22          SPECIAL MASTER POPPITI:  Well, Mr.
23   Merideth acknowledged that.
24          MR. CHRISTENSON:  And this goes back to


                                                    54


1    what I referenced earlier.  Mr. Merideth just said, They
2    are going to see if it relates to products that we have
3    already identified as accused, my point is, Your Honor,
4    going back to the discussion we had on January 22nd,
5    before you, where it's very clear that documents,
6    discovery related to sales and marketing in the United
7    States generally is something that they have agreed to
8    produce.  And that's on page 15 of the January 20 -- of
9    the January 22nd transcript.  And now he is back tack
10   tracking and saying they are going to see if it relates
11   specifically to accused products.
12          SPECIAL MASTER POPPITI:  Mr. Merideth.
13   Do you have the transcript in front of you, sir?
14          MR. MERIDETH:  I do not.  I agree that
15   if it relates to U.S. sales and it's a power point

Exh A- Rough Transcript of Hearing.txt

16   presentation, that's what we are searching for right now.
17   And we will produce it. But the power point presentation
18   that he asked the witness about is for Europe, Africa,
19   and the Middle East.
20          SPECIAL MASTER POPPITI: I understand
21   that. Mr. Christenson, did you get a clarification,
22   then, with Mr. Merideth's last statement?
23          MR. CHRISTENSON: Yeah. As I understand
24   it now we are back to where we started, which is they are

55

1    going to produce the documents and then my question, Your
2    Honor, is --
3          MR. MERIDETH: Well, that's not what I
4    said. Please, lists tone what I said. I said we are
5    searching to determine whether there are any such
6    documents in existence. That's the first step.
7          Once we are able to identify that there
8    are any documents that exist, we are going to gather them
9    up and we are going to see what they are and if they
10   relate to U.S. products, we will produce them. And I
11   think we already have produced power point presentations
12   with respect to presentations that have been made and
13   they include the product road maps and we are looking for
14   additional ones and we haven't found them, but we are
15   continuing to look. It may be that the surgery that was
16   done should have gone to each individual person, we
17   thought that had been done, be said, What do you have on
18   your PC, and that's what we are doing right now. And if
19   we have U.S. presentations for U.S. products, we will

Exh A- Rough Transcript of Hearing.txt

20    produce it.  But we haven't found it yet.
21            MR. CHRISTENSON:  Again, back to my
22    question is whether or not I can have that for my
23    depositions on Tuesday.
24            MR. MERIDETH:  Yes, if we find it.  I

                                              56

1     can't guarantee that we will find anything.  In fact, I
2     suspect we will not find anything, but we are looking,
3     again.
4             MR. CHRISTENSON:  And, Your Honor, my
5     only comment, this is going to be my last comment on this
6     point, but it would be rather surprising to me to find
7     out that, during all the presentations by Tatung's sales
8     representatives to U.S. customers, those presentations
9     never addressed products for the U.S. market.
10            SPECIAL MASTER POPPITI:  You have made
11    your point for the record.  If Mr. Merideth has made a
12    commitment that they are still looking and that he will
13    produce, to the extent that they find anything before the
14    deposition, there is an ongoing obligation to supplement
15    if information is discovered later than the deposition,
16    and if that's the case, and it's important for me to look
17    at an application that something was later filed, then I
18    will look at it.
19            MR. CHRISTENSON:  Your Honor, if I may,
20    I will proceed to the next topic.
21            SPECIAL MASTER POPPITI:  Please.
22            MR. CHRISTENSON:  Thank you.  Topic
23    five, which deals with documents showing compliance with
24    U.S. regulations.  I think the testimony, at least from

Exh A- Rough Transcript of Hearing.txt

57

1  my perspective so far, has been somewhat inconsistent

2  concerning whether Tatung makes documents specifically to

3  comply with U.S. regulations.

4           To the extent there is any evidence of

5  that, I think it is relevant to our inducement case.  I

6  think I have seen some U.L. certifications that were

7  issued from U.L. where the relevant authority concerning

8  U.S., to I believe, Tatung America, but I don't think I

9  have seen anything from either Tatung Company, most

10  importantly, or Tatung America directed from the

11  defendant to the U.S. compliance authority.  And, so, I'd

12  like to know if those documents exist and can be

13  produced?

14           MR. MERIDETH:  We have produced U.L.

15  documents for both companies, Tatung Company and Tatung

16  America.  There is no U.S. authority.  There is no FCC

17  for our monitor products.  There are some voluntary

18  information data that is provided, but they don't have

19  anything to do with clearance of products by the FCC.

20  And perhaps you are confusing the Federal Communications

21  Commission with an entity in Taiwan called FCC which

22  doesn't have anything to do with the Federal

23  Communications Commission.

24           I don't think that the Federal

58

1  Communications Commission has an office in tie pay that

Page 49

Exh  A- Rough Transcript of Hearing.txt

2    has a logo that looks like this one, and it has nothing

3    to do with the United States federal communications

4    commission.

5                To the extent that we have U.L.

6    approvals, we provided those for both companies.

7                MR. CHRISTENSON:  Your Honor, my point

8    is that we may have a final approval document, but I

9    think that we should be able to get the correspondence

10    from Tatung to the regulatory authority in the U.S.  I

11    don't know if U.L. authority is the only one.  I

12    understand Mr. Merideth's representation the FCC is not

13    one, but whichever ones there are, I think we are

14    entitled to get those communications.

15                MR. MERIDETH:  Well, you made a flat out

16    representation that there were file wings the FCC and I'd

17    like to see the support for that.

18                SPECIAL MASTER POPPITI:  Well, let's

19    focus not on the FCC because I expect that if the

20    products do not require FCC approval, then I expect there

21    are no documents related to FCC.

22                MR. MERIDETH:  May I say one other thing

23    about the U.L.?  The U.L. approval, underwriters

24    laboratory, is an approval for electrical wiring.  It

                                                      59

1    doesn't have anything to do with mounting technology.

2    This lawsuit and these patents have to do with mounting

3    technology.  We are going far, far afield to now get into

4    the data that was provided to U.L. to provide the

5    certification.  They asked us for the U.L. certifications

6    and we provided them.  What more could conceivably be

Exh A- Rough Transcript of Hearing.txt

7   relevant?

8              SPECIAL MASTER POPPITI:

9   Mr. Christenson.

10             MR. CHRISTENSON:  I guess that's sort of

11  the issue.  I just don't know what they have and what

12  they don't have.  If they don't have anything, then --

13             SPECIAL MASTER POPPITI:  Let me --

14             MR. MERIDETH:  That wasn't the question.

15             SPECIAL MASTER POPPITI:  I think the

16  application was provide all communication as it relates

17  to U.L. compliance, and I certainly have the question:

18  What does U.L. compliance have to do with mounting?  I

19  don't expect that you are looking to or expecting to look

20  that U.L. related documents for the purpose of making

21  your judgment as to whether a product is

22  accused/unaccused; correct?

23             MR. CHRISTENSON:  That's true, Your

24  Honor.

                                            60

1              SPECIAL MASTER POPPITI:  Why would it

2   have anything to do with this litigation.

3              MR. CHRISTENSON:  I can explain.  And

4   just to clarify, on topic five, as we set forth in the

5   March 14th letter, relates generally to documents showing

6   with compliance with federal regulations.

7              SPECIAL MASTER POPPITI:  I understand

8   that.

9              MR. CHRISTENSON:  The relevance is this:

10  If Tatung Company makes an accused product and

Exh A- Rough Transcript of Hearing.txt

11  specifically seeks U.S. regulatory approval so that that

12  product can be sold to customers for the U.S. market

13  specifically, that triggers the -- that triggers the

14  relevant patent statutes and results in infringement for

15  which we are entitled to a royalty.

16  SPECIAL MASTER POPPITI:  I understand

17  that, but you have -- you have a -- if I understand this

18  correctly, you, in your submittal, say, Tatung has

19  produced documents from U.L. which show compliance.  Why

20  isn't that document sufficient to give you what you need?

21  MR. CHRISTENSON:  Well, if we have got

22  what they have to produce, then that, maybe that's

23  sufficient.  I guess that's what I --

24  SPECIAL MASTER POPPITI:  Mr. Merideth.

61

1  MR. MERIDETH:  Well, the discovery

2  requests that we complied with ask for documents that

3  evidenced compliance, and we have provided that.  And I

4  don't -- I am not sure what the purpose is that they want

5  it for, but we have provided what they asked for.  And I

6  don't think that we should provide -- that we are

7  required to provide anything more than what they asked

8  for.

9  SPECIAL MASTER POPPITI:  I am not going

10  to require anything more unless you direct me more

11  specifically to the request.

12  So let's move on, please.

13  MR. CHRISTENSON:  Yes, Your Honor, topic

14  six refers to license agreements.

15  SPECIAL MASTER POPPITI:  Yes.

Exh A- Rough Transcript of Hearing.txt

16          MR. CHRISTENSON:  And the it's a
17  question of completeness, I don't know whether there is
18  any dispute we are entitle told you the license
19  agreements.  I think we have received only two, certainly
20  not many more than two license agreements from Tatung
21  Company, and just from looking at case law, and I cite a
22  case in our letter to you, we know that there appear to
23  be at least one other license, and as I understand it,
24  Tatung is agreeing to produce another license --

                                                    62

1   hopefully we will have that before the deposition on
2   Tuesday -- and I just want to make sure we are not in a
3   situation where the witness tells me on Tuesday that
4   there are additional licenses but those are not been
5   produced.
6           SPECIAL MASTER POPPITI:  Mr. Merideth.
7           MR. MERIDETH:  We are attempting to get
8   that license.  We anticipate receiving it this evening
9   when business opens in Taiwan.  And we will provide it.
10          It doesn't have anything to do with
11  mounting technology or even anything to do with monitor
12  products, but we will produce it.
13          MR. CHRISTENSON:  And, Your Honor, the
14  only other thing I would need to know is whether there
15  are any additional license agreements related to liquid
16  crystal display technology that have not been produced?
17          MR. MERIDETH:  Well, then, if that's
18  what the criteria is, this other license that you
19  referred to is not responsive, but we have done our very

Exh A- Rough Transcript of Hearing.txt

20    best to find licenses that relate to liquid crystal

21    display devices, and we have produced what we have, and

22    you can ask the 30(b)(6) witness about what he knows

23    about it and what he did to ensure that we have provided

24    all of those documents.

63

1                SPECIAL MASTER POPPITI: Thank you.

2                MR. CHRISTENSON: Well, as I understand

3    it, then, Your Honor, we do have whatever Tatung knows

4    of.

5                SPECIAL MASTER POPPITI: That's what I

6    understand. If you walk into a deposition and you start

7    uncovering other information, I expect I will hear from

8    you.

9                MR. CHRISTENSON: Okay. The last topic

10    in our letter, Your Honor, is topic seven on page 3,

11    relevant communications with customers, and we refer

12    there to certain categories of communications, all

13    targeting or focused on the U.S. market or U.S.

14    customers. And we have got very little correspondence

15    that we have seen, and, so, we would want to know if

16    there is additional correspondence that's relevant to

17    U.S. customers and the U.S. market. Tatung's response,

18    as I read it, on page three of their March 15 letter, is

19    that they have produced documents that reference accused

20    products, and as I, again, going back to the January 22nd

21    transcript, the agreement previously was they wouldn't

22    limit it just to references to accused products because,

23    again, they agreed to produce, and it's relevant for us

24    to get it, documents showing the transactions and efforts

Page 54

Exh A- Rough Transcript of Hearing.txt

64

1    to market to U.S. customers for various product lines
2    that would also include and encompass accused products
3    even if that model number is not referenced in the
4    correspondence.
5              So I think we are entitled to something
6    broader.  They have agreed to produce something broader,
7    and I just want to find out if we can get that discovery
8    before the deposition?
9              SPECIAL MASTER POPPITI:  Mr. Merideth.
10             MR. MERIDETH:  I disagree that we agreed
11   to provide anything broader.  We agreed to provide sales
12   presentations, that's what they asked for, and we agreed
13   that we would produce it.  I believe we have produced it.
14   Now they are -- they didn't -- they are expanding that,
15   the scope of that.  It was not our understanding that we
16   were agreeing to produce customer information.  It has
17   all kinds of detailed stuff about products that are not
18   accused, pricing information, quantities, production
19   times, none of which has anything to do with the accused
20   products.  We have produced the correspondence with
21   respect to the accused products.
22             And general correspondence or
23   correspondence regarding unaccused products was not
24   agreed to be produced and has not been produced.

65

1              MR. CHRISTENSON:  Your Honor, in
                    Page 55

2  response, I will just quote briefly Mr. Merideth one more

3  time from the January 22nd transcript, page 15.

4         SPECIAL MASTER POPPITI:  Just a second,

5  please.

6         I know I have looked at it before but

7  I'd rather have the page in front of me.

8         MR. CHRISTENSON:  Yes, Your Honor.

9         SPECIAL MASTER POPPITI:  Page 15.

10        MR. CHRISTENSON:  Line seven.

11        SPECIAL MASTER POPPITI:  Right.

12        MR. CHRISTENSON:  Mrs. Mr. Merideth

13  quote, My specific recollection was to the extent that

14  there was general correspondence where sales and

15  marketing in the United States, generally, for example,

16  was discussed without any particular model number being

17  referenced, that, you know, I accepted you were entitled

18  to discovery of that.  The limitation is where there is

19  communications between Tatung and ViewSonic about

20  products that are specifically about products that are

21  not accused.  And that information should not be

22  provided.

23        So, if it's just related to a

24  non-accused product, we understand they are not producing

66

1  that.  If it's related to products generally, which would

2  include accused products, obviously, we need, that and

3  they have agreed to produce it.

4         MR. MERIDETH:  Sales and marketing

5  information.

6         MR. CHRISTENSON:  No.  This is

Page 56

Exh A- Rough Transcript of Hearing.txt

7   correspondence.

8                      MR. MERIDETH:  No.  The agreement was

9   the sales and marketing information.

10                     SPECIAL MASTER POPPITI:  It does say --

11  let's read it again.  I thought we covered this Friday.

12  My specific recollection was that, to the extent that

13  there was general correspondence where sales and

14  marketing in the United States generally, for example,

15  was discussed, without any particular model number being

16  referenced, that, you know, I accepted you are entitled

17  to discovery of that.

18                     MR. CHRISTENSON:  That's right, Your

19  Honor.  That's not limited to accused products and that's

20  the type of discovery we have asked for in our March 14

21  letter to you and we clearly should have had it a long

22  time ago.

23                     SPECIAL MASTER POPPITI:  Mr. Merideth.

24                     MR. MERIDETH:  I agree that general --

                                                              67

1   if there is a letter that talks about general sales and

2   marketing that we are required to produce it, and I will

3   go through what we have and make sure that there is

4   nothing of that nature that has not been produced.

5                      There is other correspondence that has

6   to do with specific other products and other issues, for

7   example, like pricing, don't have to do with general

8   sales and marketing in the United States, and we are not

9   going to produce it.  We shouldn't be required to produce

10  it.

                          Page 57

Exh A- Rough Transcript of Hearing.txt
11              SPECIAL MASTER POPPITI:  And you didn't

12   agree to produce it.

13              MR. MERIDETH:  That's correct.

14              MR. CHRISTENSON:  Your Honor, if I can

15   speak to that:  I don't understand how you separate out

16   pricing from sales and marketing.  I mean, pricing is --

17   it could be an offer for sale which is directly

18   infringing under the patent statute.

19              MR. MERIDETH:  I said, "Sales and

20   marketing generally." I am not talking about specific

21   product data a that is unaccused product.

22              MR. CHRISTENSON:  Your Honor, just to

23   make had clear, if you look at the March 15 response from

24   them, they say, "Tatung Company has produced the

                                                      68


1    documents in these categories that reference accused

2    products".

3              SPECIAL MASTER POPPITI:  Well, then

4    maybe, Mr. Merideth, would you look at that sentence,

5    please.

6              MR. MERIDETH:  Yes, sir.  I have it.

7    And I agree.  I will go back and look and see if there is

8    anything else that relates generally to sales and

9    marketing and make sure that we have produced all of that

10   information.

11              SPECIAL MASTER POPPITI:  So, will you

12   accept the first sentence in paragraph seven needed to be

13   tweaked a little bit if you measure it against the

14   transcript of page 15?

15              MR. MERIDETH:  Yes, sir.  I think it's
                        Page 58

Exh A- Rough Transcript of Hearing.txt

16  too narrow.

17          SPECIAL MASTER POPPITI:  Thank you.

18          MR. CHRISTENSON:  Thank you, Your Honor.

19  I guess my understanding is then we would get whatever

20  additional discovery there is in time to use it for the

21  deposition on Tuesday.

22          SPECIAL MASTER POPPITI:  Mr. Merideth.

23          MR. MERIDETH:  Yes.

24          MR. CHRISTENSON:  Your Honor, that

                                                    69

1   covers the issues raised in the March 14 letter.  There

2   are just a couple of supplemental issues that arose --

3           SPECIAL MASTER POPPITI:  Have you all

4   discussed those?  And I realize -- and Ms. Gas's letter

5   to me, the concern was raised about how we were going to

6   go about this agenda, if you will.  I believe that I

7   invited that there be this kind of a session, and I think

8   the purpose of it, I hope, was well served even though

9   you did not go through all the normal formal meet and

10  confers.  I said to you before that it's important to

11  follow that process, but I invited you to deviate from

12  that for purposes of gathering, if you will, around the

13  production that's already been made.

14          MR. CHRISTENSON:  Yes, Your Honor.  I

15  appreciate your indulgence given the timing and the

16  circumstances that we are facing.

17          SPECIAL MASTER POPPITI:  I understand

18  that.  But I am about to say, with respect to any other

19  items that you want to add to the agenda that was

Exh A- Rough Transcript of Hearing.txt
20    developed by both Ms. Gasses and Mr. Kirk and perhaps

21    others were involved with it, that I want to make sure

22    that there is agreement that I should be dealing with it

23    today.

24                      MR. CHRISTENSON:  That's fine, Your

                                                                      70

1     Honor.  I will, obviously, let the defendant speak to

2     that.  From my perspective, we have discussed it during

3     the deposition.  I think we are at an I am past.  There

4     is clearly -- clearly, the response was that these

5     documents either were not requested or would not be

6     produced for some other reason, and the only way for us

7     to try to get them before the deposition on Tuesday is to

8     raise it now.  If the defendants, you know, if you decide

9     not to entertain it now, we will do the best we can at

10    the deposition and we will have to address it at another

11    time.

12                      SPECIAL MASTER POPPITI:  Can we address

13    it Monday night?

14                      MR. CHRISTENSON:  Yes, Your Honor.

15                      SPECIAL MASTER POPPITI:  Today, why

16    don't you outline what the issue is.

17                      MR. CHRISTENSON:  There are three

18    discrete issues, Your Honor, and they are issues that we

19    learned of during the deposition of Mr. Calvin Ho.

20                      SPECIAL MASTER POPPITI:  I don't have a

21    writing on this; correct?

22                      MR. CHRISTENSON:  The only thing we

23    have, Your Honor, we didn't submit argument on it

24    because, obviously, you weren't going to have time to get
                              Page 60

Exh A- Rough Transcript of Hearing.txt

71

1   full submissions from either party, so this is an email
2   that we just briefly summarized, pointed you to pages in
3   the transcript where the three issues arose.
4                   SPECIAL MASTER POPPITI:  And, you are
5   right, I don't have that.  You know when it came in?
6                   MR. CHRISTENSON:  I do not have the time
7   in front of me, Your Honor.
8                   SPECIAL MASTER POPPITI:  Just outline
9   the issues and see if there is agreement that --
10                  MR. MERIDETH:  That was from today,
11  Cass?
12                  MR. CHRISTENSON:  Yes, it is.
13                  MR. MERIDETH:  That was about 2:30, Your
14  Honor, and it was a very lengthy.
15                  SPECIAL MASTER POPPITI:  Is it your
16  letter, Mr. Kirk, with -- it begins, "I write to
17  supplement the record for the teleconference "?
18                  MR. KIRK:  Yes.
19                  MR. CHRISTENSON:  I think that's the
20  one.
21                  MR. MERIDETH:  It was about Mr. Ho's
22  deposition.
23                  SPECIAL MASTER POPPITI:  Yes.  Then I do
24  have it in front of me.

72

1           A.   You are right, I have looked at the letter,

Exh A- Rough Transcript of Hearing.txt

2  itself, but I have not drilled through the deposition

3  testimony.

4          MR. CHRISTENSON:  The first of the three

5  issues, Your Honor, relates to pricing quotations that we

6  understand have been provided to U.S. customers from

7  Tatung, and we feel that that is directly relevant to,

8  for example, what would constitute an offer for sale for

9  purposes of direct infringement and also it would go to

10  inducing customers to purchase and import products into

11  the U.S. which could constitute indirect infringement as

12  well.  And that was discussed on pages 43 and 44 of the

13  rough transcript.

14          On page 44, line one, I asked the

15  witness:  When you said --

16          SPECIAL MASTER POPPITI:  Let's do it

17  this way, Mr. Christenson.

18          MR. CHRISTENSON:  Yes.

19          SPECIAL MASTER POPPITI:  Merideth, I

20  don't know whether you or anyone on your team has

21  reviewed the correspondence that was filed by email at

22  2:38, and if you have, whether you are in a position to

23  deal with these issues now or whether it's something that

24  has to be dealt with once you have had an opportunity to

73

1  look at it and respond?

2          MR. MERIDETH:  I am searching for that

3  -- I have the transcript but I am searching for it now.

4  I think it would be better to look at it, then to address

5  it once we have had an opportunity to look at it.  I have

6  a copy of his letter on my computer right now and I am

Exh  A- Rough Transcript of Hearing.txt

7  looking for the transcript.

8          SPECIAL MASTER POPPITI:  When did this

9  deposition -- is this for purposes of -- it's for

10  purposes of Mr. Shea's deposition on Tuesday; correct?

11          MR. CHRISTENSON:  Yes, Your Honor.

12          SPECIAL MASTER POPPITI:  Can this be

13  something that we can deal with on Monday?

14          MR. CHRISTENSON:  I suppose we could,

15  Your Honor.  My concern would be whether that would lead

16  Tatung with sufficient time to produce anything

17  additional to the extent that became appropriate.  Tatung

18  has made it very clear they don't want to bring Mr. Shea

19  back again.

20          SPECIAL MASTER POPPITI:  I understand

21  that.

22          MR. CHRISTENSON:  Obviously, my position

23  is I would like to have the documents that we feel are

24  relevant for the deposition.  We are probably going to

74

1  take him for a second day, so I think his deposition is

2  likely to continue and spill over to Wednesday, so maybe

3  that impacts things.

4          MR. MERIDETH:  I don't believe that you

5  are entitled to more than seven hours with the witness,

6  and I fully expect to start and complete on Tuesday

7  because I have to be in Washington, D.C. on Wednesday for

8  Mr. Kim's depositions.

9          MR. CHRISTENSON:  I was told the witness

10  would need an interpreter, and as I understand it, we

Exh A- Rough Transcript of Hearing.txt
11  have 10.5 hours of time, and I can't take 10.5 hours in

12  one day.

13              MR. MERIDETH:  He is going to give his

14  testimony in English.

15              MR. CHRISTENSON:  I think that makes it

16  all the more urgent, Your Honor.

17              MR. MERIDETH:  Well, I now have page --

18  the pages in front of me, so if you give me just one

19  second.  I have read it.  It doesn't show anything

20  related to accused products, and, indeed, you don't each

21  ask him if they are quotes for products in the United

22  States.  All he said was that he has responded to a

23  request for quotation by sending a price to an email

24  site.

                                                    75

1              MR. CHRISTENSON:  Your Honor, I can

2  represent to you that Tatung Company sells many, many

3  products to HP for the U.S. market.

4              MR. MERIDETH:  I know.  You didn't tie

5  that down.  Your questioning was very poor.

6              MR. CHRISTENSON:  There is nothing to

7  indicate, Your Honor, there are still problems with the

8  witness, and that's another issue for another day, but --

9              SPECIAL MASTER POPPITI:

10              MR. MERIDETH:  There were problems with

11  the questions.

12              MR. CHRISTENSON:  We disagree.

13              SPECIAL MASTER POPPITI:  Counsel, let's

14  do it this way:  If there is no question in the

15  transcript that ties it to U.S. product, what am I

Exh A- Rough Transcript of Hearing.txt

16    looking at here?

17              MR. CHRISTENSON:  I am taking a quick

18    look at the transcript here, Your Honor.

19              SPECIAL MASTER POPPITI:  Thank you.

20              MR. CHRISTENSON:  The section that we

21    cited refers to placing quotations for HP regarding

22    display products.  I don't see that it specifies a

23    product.  What I would probably have to do is try to tie

24    that to another part of the deposition, but I am not in a

                                                        76

1     position to do that right now.

2               SPECIAL MASTER POPPITI:  Then I can't

3     address it right now.

4               MR. MERIDETH:  I just want to say one

5     other thing to put this into context:  There is only one

6     HP product that's accused, and that is a television set,

7     a 22-inch television set, and it seems to me that you are

8     -- he was being asked here about quotes that were being

9     given with respect to monitor products and if you didn't

10    ask the witness, I can tell you because I talked at

11    length with the witness many of his presentation to the

12    United States had to do with products that were sold in

13    other markets other than the United States.

14              He is a worldwide guy for HP.

15            ⁄  SPECIAL MASTER POPPITI:  Let's, then,

16    move to the next issue, please.

17              MR. CHRISTENSON:  Yes, Your Honor.  The

18    next issue relates to communications between Tatung

19    Company and U.S. customers regarding, for example, market

                              Page 65

Exh A- Rough Transcript of Hearing.txt
20  trend, and I think this came up at page 45 in the

21  transcript.  And then it continues on for a few pages.

22            SPECIAL MASTER POPPITI:  Okay.  And I am

23  looking at --

24            MR. MERIDETH:  These are discussions

77

1  with gateway.  Gateway does not have any accused product.

2  It's clear the discussions continue questions about R

3  about gateway.

4            MR. CHRISTENSON:  And, Your Honor, just

5  to respond back:  We recently had a discussion about

6  Mr. Shea's deposition, and as I understand it,

7  Mr. Merideth's position this was the deposition should go

8  forward because the witness would be prepared to testify

9  about all accused products not limited to accused

10  products, and, therefore, I didn't need to know all the

11  accused products at the time of the deposition.  And now

12  he is going the other way and saying --

13            SPECIAL MASTER POPPITI:  I think he is

14  just saying that this witness wasn't -- well, Mr.

15  Merideth, you tell me what you were saying, please.

16            MR. MERIDETH:  This witness -- you asked

17  the witness about market surveys with respect to gateway.

18  You have never accused a product with respect to gateway.

19  We -- we have not produced -- we have produced market

20  information generally.  We have produced -- we have

21  market surveys that we have produced.  If you are talking

22  -- and you seem to be asking whether there were any

23  discussions at any meetings about market surveys, and he

24  says, Yes, he had a discussion with gateway.

Exh A- Rough Transcript of Hearing.txt

78

1          That doesn't have anything to do with
2    what you are claiming.
3               MR. CHRISTENSON:  It's not limited to
4    gateway.  Your Honor, if you go forward to page 48 --
5               MR. MERIDETH:  That's not what you --
6    okay.
7               MR. CHRISTENSON:  On page 48, I say to
8    him, "Have you provided that type of information to
9    customers during several of your meetings with customers
10   in the U.S.?  And he says, "I think so."  So it's not
11   limited to gateway.  I then say, "Have you provided that
12   type of information to HP in the U.S."?, and he confirms
13   that he has.
14              MR. MERIDETH:  But there is no
15   identification that they are related to accused products.
16   You never asked him.
17              MR. CHRISTENSON:  This witness, Your
18   Honor, is only responsible for certain customers.  There
19   are many other customers for which he is not responsible.
20   I don't think I have to prove the document exists if it's
21   a relevant document, I think we should -- we are entitled
22   to receive it, and Mr. Merideth earlier said, If it
23   relates generally to the sales and marketing of products
24   in the U.S., that that would be produced.

79

1               MR. MERIDETH:  We have given you all the
                        Page 67

Exh A- Rough Transcript of Hearing.txt

2   market research reports that we have.  There aren't very

3   many because they don't do a lot of market research

4   because they don't -- they will sell to other people who

5   do that research, but we provided that to you.  I have

6   seen a full box of them.

7             MR. CHRISTENSON:  If all the documents

8   --

9             MR. MERIDETH:  Furthermore, you didn't

10  show any of those documents to the witness.  If you would

11  have shown them to the witness, he could have told you

12  whether that was what he was referring to or not.

13            It's very unclear -- he could very well

14  have been discussing market surveys that were generated

15  by the client during this discussion.  And we have

16  provided you with a market surveys we have.  And this

17  witness' testimony doesn't indicate that we failed to

18  produce or there is anything that we haven't produced.

19           MR. CHRISTENSON:  Either you did or did

20  not, and just to respond to that:  The witness clearly

21  says, These are reports prepared and generated by Tatung

22  Company, and his testimony is very clear on that point,

23  and these are communications with the customers to which

24  you agree to produce, we already covered that regarding

80

1   the January 22nd hearing.  The only question. Is.  Have

2   we received the documents?  If we have, then this is a

3   moot point.

4             MR. MERIDETH:  It is a moot point.  I

5   just told you that about three times.  We have produced

6   the marked survey that we have.

Exh  A- Rough Transcript of Hearing.txt

 7                   MR. CHRISTENSON:  That's what I heard
 8    you say.
 9                   Your Honor, the third point relates to
10    sales forecasts, and this arose starting on page 89 of
11    the transcript and continued on through to about page 99.
12                   And just to explain briefly, a sales
13    forecast is a communication from the customer in the U.S.
14    concerning the quantity of products that the customer
15    anticipates needing for a specific market, such as the
16    U.S., so that Tatung Company can plan its supply in
17    manufacturing to provide those products giving Tatung
18    some lead time to deliver those products.  It relates
19    specifically to the U.S. market.  Those documents, I
20    don't think, have ever been produced.  And when I tried
21    to ask the witness on page 99, at the end of page 98, if
22    you have the transcript there --
23                   SPECIAL MASTER POPPITI:  I am looking at
24    page 98 of the transcript.  What line, please?

                                                            81

 1                   MR. CHRISTENSON:  Yes.  It is line 25, I
 2    asked this witness, "As of today, have you not made any
 3    effort to look for sales forecasts relating to any
 4    specific products that you have sold to gateway or HP"?
 5    And the counsel for Tatung says, "Objection.  Irrelevant
 6    instruct the witness not to answer based on
 7    attorney/client privilege and work product doctrine."
 8                   And, so, you know, I am criticized here
 9    for not making a more specific record, but I don't know
10    what to do.  I ask a question like that about whether

Exh A- Rough Transcript of Hearing.txt

11    they have, you know, so I understand what they have or

12    have not produced continue witness was instructed not to

13    answer that.

14            MR. MERIDETH:  There is only one accused

15    HP product, and it was accused last month -- this month,

16    excuse me.  We are attempting to determine whether there

17    are any forecasts that we received from HP for that

18    product.  If there are, we will produce them.  We are not

19    going to produce forecasts for gateway.  There is no

20    accused products.

21            MR. CHRISTENSON:  Your Honor, this goes

22    directly to the point we just discussed.  He just told us

23    during this call that they would produce sales and

24    marketing discovery related generally to the U.S. market

                                                        82


1    and not limited to accused products and then we are right

2    back to that again.

3            MR. MERIDETH:  No, we are not, because

4    you are asking about a product-specific forecast provided

5    by the customer to us.  That's not sales and marketing

6    information that we provided to a customer.

7            MR. CHRISTENSON:  It's communication

8    between Tatung and the customer related to sales --

9            MR. MERIDETH:  Isn't what we agreed to

10    produce.  We agreed to produce general marketing

11    communications, not specific survey -- not specific

12    product forecasts that were provided to us by our

13    customer as to unaccused products, and, indeed, by our

14    customer, gateway, who does not have any accused

15    products.

Exh A- Rough Transcript of Hearing.txt

16            MR. CHRISTENSON: Your Honor, at this

17 point, we don't have those forecasts for accused or

18 unaccused products.

19            SPECIAL MASTER POPPITI: Mr. Merideth,

20 what about the accused products?

21            MR. MERIDETH: I think the only one that

22 we are -- that we have been able to identify that may

23 exist is the one with respect to -- is that there may be

24 one with respect to this 22-inch HP product and we are

83

1 trying to determine whether we have any or not.

2            MR. CHRISTENSON: And, Your Honor, just

3 to be clear --

4            MR. MERIDETH: They were just accused

5 this month. It's not like we are sitting on our hands.

6            MR. CHRISTENSON: Your Honor, just to be

7 clear, I am not seeking it only as to that product. I am

8 seeking it -- this is something that generally --

9            MR. MERIDETH: We are going to produce

10 it generally.

11            MR. CHRISTENSON: Excuse me.

12            SPECIAL MASTER POPPITI: Wait just a

13 second. You are talking over each other and I am not a

14 following.

15            MR. CHRISTENSON: Your Honor, I am not

16 limiting my request just to the 22-inch product that

17 Mr. Merideth talked about. We know that Tatung received

18 sales forecasts like this for U.S. products from its

19 customer nurse the U.S. generally so, that's the extent

Exh A- Rough Transcript of Hearing.txt

20    of our request.

21                    MR. MERIDETH:  We made an objection to

22    producing such information as to unaccused products.  We

23    are searching to determine if there are any with respect

24    to the accused products.  And if there is, we will

84

1    produce it.

2                    MR. AMBROZY:  If I may be heard on the

3    accused products issue.

4                    SPECIAL MASTER POPPITI:  Mr. Ambrozy, I

5    don't think I need a third voice.

6                    MR. AMBROZY:  Thank you, Your Honor.

7                    SPECIAL MASTER POPPITI:  Just a moment,

8    please.

9                    Mr. Merideth, I just, again, and perhaps

10   it should be etched in my memory or at least on my

11   eyeglass lenses, the page 15 of the transcript that we

12   were dealing with, and if I need to go back to see

13   context, I don't see where, in referencing general

14   correspondence where sales and marketing in the United

15   States is referenced that you limit the agreement to

16   Tatung documents as opposed to documents that were

17   provided to customers.

18                    So, it seems to me that sales forecasts,

19   why wouldn't they fall under the general description of

20   "general correspondence" where sales and marketing in the

21   United States, etcetera?  Why wouldn't it fall under

22   that?

23                    MR. MERIDETH:  Because the forecast is

24   made after the sale has been made with respect to very

Exh  A- Rough Transcript of Hearing.txt

85

1    specific product and it isn't general marketing or sales

2    information.

3                    MR. CHRISTENSON:  Your Honor, first of

4    all, the forecast precedes the say.  It's an indication

5    from the customer of the need of quantity.

6                    MR. MERIDETH:

7                    MR. CHRISTENSON:  They say that's not

8    sales related, Your Honor.  I don't think I need to

9    respond to that.

10                    SPECIAL MASTER POPPITI:  I don't have

11    one in front of me.  I know what you are talking about,

12    but I don't have one in front of me.

13                    So, let me --

14                    MR. MERIDETH:  If I could, Your Honor, I

15    don't believe that anyone could suggest that reasonably

16    that customer forecasts for specific models for a

17    specific period of time for a specific number of product

18    is sales and marketing general correspondence.  It is

19    not.  What they were saying was, Well, gee, you may have

20    some sales literature that's general and doesn't refer to

21    a specific product, a specific accused product, we want

22    that, too, and we said, Okay, we will provide it.  But we

23    didn't say that we will provide specific product sales

24    forecasts.  That cannot fall within that definition.

86

1                    MR. CHRISTENSON:  Your Honor, with all

Exh A- Rough Transcript of Hearing.txt

2  due respect to Mr. Merideth, this information -- I really

3  don't understand how we are fighting about whether sales

4  forecasts for U.S. customers is or is not relevant.  I

5  think it is clearly within the scope of what was

6  discussed at the January 22nd hearing.  It's responsive

7  to our request.

8           SPECIAL MASTER POPPITI:  That's what I

9  want to get at.  I mean, it is responsive to the request,

10  is it not, Mr. Merideth?

11           MR. MERIDETH:  Not as to unaccused

12  products.

13           SPECIAL MASTER POPPITI:  No.  I

14  understand -- I understand unaccused products.

15           MR. MERIDETH:  Right.  I have said, We

16  will do our best to produce forecasts, if we have any,

17  with respect to accused products.  And we actually set

18  sent out requests last night asking for that information,

19  and we hope to receive it before the weekend is out

20  because Sunday is Monday in Taiwan and we should have

21  that information.  But we are not going to produce it

22  with respect to unaccused products.

23           SPECIAL MASTER POPPITI:  I am not going

24  to require it for unaccused products.

87

1           MR. MERIDETH:  We are doing our best to

2  get the sales forecasts with respect to accused products,

3  and if we have it, we will get it.

4           SPECIAL MASTER POPPITI:  Okay.

5           MR. CHRISTENSON:  That was the final

6  issue that we had to raise with respect to the Tatung

Exh  A- Rough Transcript of Hearing.txt

7    document production for today.  Thank you.

8                 SPECIAL MASTER POPPITI:  Is there

9    anything else, then, please, for today?  If not --

10                MR. CHRISTENSON:  Mr. Ambrozy may have

11   had one issue, Your Honor, I am not sure.

12                SPECIAL MASTER POPPITI:  Do you want to

13   check with him.

14                MR. AMBROZY:  I just wanted to let you

15   know that we have looked through the Tatung production of

16   the CAD CAM drawings and we are sending a letter to

17   Mr. Merideth outlining some pretty severe deficiencies in

18   that production, so we would ask that we be heard on this

19   issue -- if you are going to limit all the discovery to

20   accused products, then I believe that when we were up

21   there on March 9th, that you gave us until April 6th to

22   determine whether it is accused product, so I just want

23   to be clear on the record, Your Honor, that we have until

24   that date to determine the accused product?

                                              88

1                 SPECIAL MASTER POPPITI:  Whatever date I

2    gave you, and quite frankly, I don't have it in mind, I

3    don't have the document in front of me, but I believe

4    that was the date.

5                 MR. AMBROZY:  So we will get the letter

6    out to Mr. Merideth today to outline those deficiencies

7    and then, if we need, to Your Honor, we'd like to revisit

8    that production to move the along.

9                 SPECIAL MASTER POPPITI:  Okay.  I have a

10   question with respect to Monday.  What are we teed up to

                          Page 75

Exh A- Rough Transcript of Hearing.txt
```
11   do on Monday?
12                MR. CHRISTENSON:  Your Honor, I intend
13   to submit to you some examples of what we feel reflects
14   inappropriate deposition conduct so that we can convene
15   briefly.  It would be very productive and helpful if you
16   could then give us some brief input, I think it will help
17   us next week so we can avoid some of the problems that we
18   have experienced this week.
19                SPECIAL MASTER POPPITI:  I do remember
20   that now.  That's the only thing on for Monday.
21                MR. CHRISTENSON:  I believe it is, Your
22   Honor.
23                SPECIAL MASTER POPPITI:  I think I said
24   in conjunction with that I would expect that my
```

                                                          89

```
1    colleagues at the local bar will do some heavy lifting in
2    terms of your conferring before we convene at 6:30 on
3    Monday evening.
4                MR. CHRISTENSON:  You did, Your Honor.
5                MS. GAZA:  With respect to the issue
6    that Mr. Ambrozy just raised, I would just like to
7    understand the procedure that we, the parties will be
8    conduct ago meet and confer process before we bring this
9    issue before Your Honor?
10               SPECIAL MASTER POPPITI:  Yes.  I would
11   like that.  And by "meet and confer process," given the
12   time frames, I expect that "meet and confer" may be one,
13   if you will, session, however you all define that.  I
14   don't know whether that means mail to mail, email to
15   email, phone to phone.  It may be several sessions, but I
```

Exh A- Rough Transcript of Hearing.txt

16    understand it's a short time frame.

17                    MS. GAZA:  Thank you, Your Honor.

18                    MR. AMBROZY:  Thank you, Your Honor.

19                    SPECIAL MASTER POPPITI:  Thank you all.

20    Be careful getting home.  4:58.

21

22

23

24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

L.G. PHILIPS LCD CO., LTD.,

    Plaintiff,

TATUNG COMPANY; TATUNG
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

    Defendants

Case No. 04-343-JJF (D. Del.)

**07-80223**
**CIV-RYSKAMP**

THIS MATTER having been opened to the Court on motion by defendants, the

Tatung Co. and the Tatung Company of America, Inc., by their attorneys, for a protective

order pursuant to Fed. R. Civ. P. 26(c), limiting the scope of discovery from third party

Sensormatic, Inc. ("Sensormatic"); and plaintiff L.G.Philips LCD Co., Ltd., by their

attorneys, having opposed the motion; and the Court having considered the papers

submitted and the arguments presented; and for good cause shown:

**IT IS HEREBY ORDERED THAT:**

1.    The motion is GRANTED.

2.    Any deposition testimony taken from third party Sensormatic shall be

limited to the accused products at issue in *L.G. Philips LCD Co., Ltd. v. Tatung*

*Company, et. al.*, C.A. No. 04-343-JJF (United States District Court for the District of

Delaware) (the "Delaware Action"). Such deposition testimony shall be subject to the

provisions of the Stipulated Protective Order dated January 24, 2005 entered in the

Delaware Action.

3.    Any documents produced in response to the subpoena by third party

Sensormatic shall be limited to those documents relating to the accused products at issue

in the Delaware Action. Additionally, any documents produced shall be stamped



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER and shall be produced subject

to the Stipulated Protective Order dated January 24, 2005 entered in the Delaware Action,

which is attached hereto as Exhibit 1.

Dated:  March 9, 2007
Boca Raton, Florida

_Kenneth L. Ryskamp_
United States District Court Judge for the
Southern District of Florida

Copies to:      Richard D. Kirk, Esq. (rkirk@bayardfirm.com)
                Gaspare J. Bono, Esq. (gbono@mckennalong.com)
                Jeffrey B. Bove, Esq. (jbove@cblh.com)
                Tracy R. Roman, Esq. (troman@raskinpeter.com)
                Scott R. Miller, Esq. (smiller@cblh.com)
                Frederick L. Cottrell, III, Esq. (Cottrell@RLF.com)
                Frank E. Merideth, Jr., Esq. (meredith@gtlaw.com)
                Geoffrey M. Cahen, Esq. (caheng@gtlaw.com)

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 JAN 24  AM 9: 45

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG PHILIPS LCD CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 04-343-JJF |
| v. | ) | |
| | ) | |
| TATUNG COMPANY; | ) | |
| TATUNG COMPANY OF AMERICA, | ) | |
| INC. and VIEWSONIC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## STIPULATED PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the parties stipulate to the following Protective Order, subject to the approval of the Court:

1.      Scope of Protection.

1.1      This Protective Order shall govern any record of information, designated pursuant to Paragraph 2 of this Protective Order, produced in this action, including all designated deposition testimony, all designated testimony taken at a hearing or other proceeding, interrogatory answers, documents and other discovery materials, whether produced informally or in response to interrogatories, requests for admissions, requests for production of documents or other formal method of discovery.

1.2      This Protective Order shall also govern any designated record of information produced in this action pursuant to required disclosures under any federal procedural rule or District of Delaware local rule, and any supplementary disclosures thereto.

1.3      This Protective Order shall apply to the parties and any nonparty from whom discovery may be sought and who desires the protection of this Protective Order (collectively herein referred to as a "party" or the "parties").

2      Designation.

2.1      Each party shall have the right to designate as confidential and subject to this Protective Order any information produced by it in this action which contains, reflects, or

EXHIBIT

1

Case 9:07-mc-80223-KLR Document 2 Entered on FLSD Docket 03/12/2007 Page 4 of 15

otherwise discloses confidential technical, business or financial information ("CONFIDENTIAL information"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered confidential under this Protective Order. The parties will use reasonable care to avoid designating any documents or information CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER that are generally available to the public.

2.2    Each party shall have the right to designate as restricted to review by those categories of individuals listed in Paragraphs 4.1(a) - 4.1(e) and subject to this Protective Order any information produced in this action which contains, reflects, or otherwise discloses (1) trade secrets, (2) research and development, manufacturing, operational or other highly sensitive technical information, or (3) highly sensitive business related information, such as customer, supplier or financial information (collectively, "HIGHLY SENSITIVE CONFIDENTIAL information"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend HIGHLY SENSITIVE CONFIDENTIAL prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered HIGHLY SENSITIVE CONFIDENTIAL under this Protective Order. To the extent that material is marked HIGHLY SENSITIVE CONFIDENTIAL, such material shall be revealed to or used by limited categories of individuals, as provided for in Paragraph 4.2, and shall not be communicated in any manner, either directly or indirectly, to any person or entity not permitted disclosure pursuant to this Protective Order. Any copies of such material, abstracts, summaries or information derived therefrom, and any notes or other records regarding the contents thereof, shall also be deemed HIGHLY SENSITIVE CONFIDENTIAL, and the same terms regarding confidentiality of these materials shall apply as apply to the originals. Use of this highly restrictive designation is limited to information of the highest sensitivity. The parties will use reasonable care to avoid designating any documents or information HIGHLY SENSITIVE CONFIDENTIAL for which the designating party does not have a good faith belief that the documents or information satisfy the criteria set forth in this Paragraph 2.2. HIGHLY SENSITIVE CONFIDENTIAL information shall be used only for purposees directly related to this action, and for no other purpose whatsoever, except by consent of all of the parties or order of the Court.

2.3    To the extent that any party has, prior to the date that this Order is entered, produced to the other side materials that the producing party has marked with confidentiality designation, all such materials shall be considered to have been designated under this Order as HIGHLY SENSITIVE CONFIDENTIAL unless otherwise agreed by the Parties.

3.    Limit On Use And Disclosure Of Designated Information.

3.1    Each party and all persons bound by the terms of this Protective Order shall use any information or document governed by this Protective Order only in connection with the prosecution or defense of this action and for no other purpose, except by consent of the parties or order of the Court. No party or other person shall disclose or release to any person not authorized under this Protective Order any information or document governed by this Protective Order for any purpose, or to any person authorized under this Protective Order for any other purpose.

3.2    It is, however, understood that counsel for a party may give advice and opinions to his or her client in connection with the prosecution or defense of this action based on his or her evaluation of designated confidential information received by the party, provided that such rendering of advice and opinions counsel shall not reveal the content of such information except by prior written agreement with counsel for the producing party.

3.3    The attorneys of record for the parties and other persons receiving information governed by this Protective Order shall exercise reasonable care to ensure that the information and documents governed by this Protective Order are (a) used only for the purposes specified herein, and (b) disclosed only to authorized persons.

4.    Disclosure Of Confidential Material.

4.1    Documents or information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER shall be disclosed by the recipient thereof only to:

(a)    the attorneys who are actively involved in this action that are partners of or employed by the following law firms of record for the parties, and their authorized secretarial, clerical and legal assistant staff: Morris, James, Hitchens & Williams LLP; McKenna, Long & Aldridge LLP; Potter Anderson & Corroon LLP; Bingham McCutchen LLP; Rosethal, Monhait, Gross & Goddess; and Baum & Weems provided that such attorneys shall not be provided access to HIGHLY SENSITIVE CONFIDENTIAL information if such attorneys

(1)    have participated in, directed or supervised any patent prosecution activitiy related to the patents-in-suit or currently participate in, direct or supervise any patent prosecution activity involving (i) flat panel or fllat panel display technology or (ii) technology related or refering to or incorporating flat panels or flat panel displays (collectively, "the Subject Matter"). During the pendency of this litigation and for one year after the full and final conclusion of this litigation, including all appeals, those attorneys at outside counsel for the parties defined above who are provided access to HIGHLY SENSITIVE CONFIDENTIAL materials covered by this order will not participate in, direct or supervise any patent prosecution activity in the United States Patent and Trademark Office or with any patent office outside the United States involving the Subject Matter;

(2)     provide non-legal, business advice or non-legal, business representation or to clients in the flat panel display industry wherein the highly sensitive business-related financial information of any opposing party would be relevant to such non-legal, business advice or non-legal, business representation. During the pendency of this litigation and for one year after the full and final conclusion of this litigation, including all appeals, those attorneys at outside counsel for the parties defined above who are provided access to HIGHLY SENSITIVE CONFIDENTIAL materials covered by this order will not provide non-legal, business advice or non-legal, business representation to clients in the flat panel display industry wherein the highly sensitive business-related information of any opposing party would be relevant to such non-legal, business advice or representation; or

(3)     are related to or have a personal, social relationship with any officer, director or employee of a party

(b)     the Court and Court personnel, as provided in Paragraph 12;

(c)     consultants or experts and their staffs retained by the parties or their attorneys for purposes of this action, who are agreed upon by the parties pursuant to Paragraph 6, who are not employees or otherwise affiliated with any of the parties (except persons scheduled to be deposed by any of the parties pursuant to Rule 30(b)(6), Fed.R.Civ.P.), and who first agree to be bound by the terms of this Protective Order;

(d)     court reporters employed in connection with this action;

(e)     outside copying and computer services necessary for document handling, and other litigation support personnel (e.g., translators, graphic designers and animators);

(f)     One member of LG.Philips LCD, Co., Ltd.'s in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(g)     One member of Viewsonic Corporation's in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(h)     One member of Tatung Company's in-house legal staff, provided that each such individual must first agree to be bound by the terms of this Protective Order;

(i)     One attorney of Tatung Company of America, Inc.'s regular out-side counsel, provided that each such individual must first agree to be bound by the terms of this Protective Order;

4.2     Documents or information designated HIGHLY SENSITIVE CONFIDENTIAL shall be disclosed by the recipient thereof only to those categories of individuals listed in Paragraphs 11 4.1(a) - 4.1(e) subject to the restrictions therein.

5.      Redaction

Counsel for a party producing documents may mask ("redact") material deemed exempt from discovery because it is protected from disclosure under the attorney-client privilege or work product immunity afforded by Rule 26(b), Fed.R.Civ.P. However, any document from which material is masked must identify in the masked area that masking or redaction has occurred. The reason for any such masking must be stated on a log to be provided within thirty (30) days after the production of the documents. Sufficient information regarding the masked material must be provided to the other party to enable it to evaluate the legitimacy of the asserted privilege or immunity. The parties reserve the right to pursue categories for redaction in addition to those identified above, by either consent of the parties or order of the Court, to be addressed on a case-by case basis.

6.      Disclosure to Independent Consultants and Identification of Experts.

6.1     If any party desires to disclose information designated CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL to any expert or consultant pursuant to Paragraph 4 above, it must first identify in writing to the attorneys for the producing party each such expert or consultant. The attorney for the producing party shall have ten (10) business days from receipt of such notice to object to disclosure of such information to any of the experts or consultants so identified.

6.2     Such identification shall include the full name and professional address and/or affiliation of the proposed expert or consultant, an up-to-date curriculum vitae identifying at least all other present and prior employments or consultancies of the expert or consultant in the field of flat panel and flat panel display technologies, and a list of the cases in which the expert or consultant has testified at a deposition, an arbitral hearing or trial within the last four years. The parties shall attempt to resolve any objections informally. If the objections cannot be resolved, the party seeking to disclose the CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information to the expert or consultant may move the Court for an Order allowing the disclosure. On any motion challenging the disclosure of such information to an expert or consultant, the burden of proof shall lie with the party objecting to the disclosure to establish that the information should not be disclosed to the expert or consultant. In the event objections are made and not resolved informally, disclosure of information to the expert or consultant shall not be made except by Order of the Court (or to any limited extent upon which the parties may agree).

7.      Agreement Of Confidentiality.

In no event shall any information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL be disclosed to any person authorized pursuant to Paragraph 4, other than (a) the Court and Court personnel, (b) the parties' attorneys identified in Paragraph 4.1(a) and their authorized secretarial and legal assistant staffs, (c) court reporters, and (d) outside copying and computer services necessary for document handling, until such person has executed a written

Confidentiality Undertaking (in the form set forth in Exhibit A hereto) acknowledging and agreeing to be bound by the terms of this Protective Order. Copies of such Confidentiality Undertakings shall be promptly served on the producing party.

8.    Related Documents.

Information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL shall include (a) all documents, copies, extracts, and complete or partial summaries prepared from or containing such information; (b) portions of deposition transcripts and exhibits thereto which contain or reflect the content of any such documents, copies, extracts, or summaries; (c) portions of briefs, memoranda or any other papers filed with the Court and exhibits thereto which contain or reflect the content of any such documents, copies, extracts, or summaries; (d) deposition testimony designated in accordance with Paragraph 9; and (e) testimony taken at a hearing or other proceeding that is designated in accordance with Paragraph 10.

9.    Designation Of Deposition Transcripts.

9.1    Deposition transcripts, or portions thereof, may be designated as subject to this Protective Order either (a) at the time of such deposition, in which case the transcript of the designated testimony shall be marked by the reporter with the appropriate legend (see Paragraph 2.1) as the designating party may direct, or (b) within twenty-one (21) days following the receipt of the transcript of the deposition by providing written notice to the reporter and all counsel of record, in which case all counsel receiving such notice shall mark the copies or portions of the designated transcript in their possession or under their control as directed by the designating party.

9.2    All deposition transcripts not previously designated shall be deemed to be, and shall be treated as, HIGHLY SENSITIVE CONFIDENTIAL until the expiration of the period set forth in Paragraph 9.1, and neither the transcript nor the content of the testimony shall be disclosed by a non-designating party to persons other than those persons named or approved according to Paragraph 4.

9.3    The designating party shall have the right to exclude from a deposition, before the taking of testimony which the designating party designates CONFIDENTIALSUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL and subject to this Protective Order, all persons other than those persons previously qualified to receive such information pursuant to Paragraph 4.

9.4    In addition, to the extent that any document or information that has been designated as either CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL and subject to this Protective Order, such document or information shall not be disclosed to or otherwise used with any witness not currently or previously employed or retained by the producing party during a deposition without at least three (3) calendar days prior notice to the designating party of such potential use in order to permit counsel for the designating party to attend and to take

such action as it deems appropriate to protect the confidentiality of the documents and/or information. Counsel for the parties shall attempt to resolve any objection(s) and they will only seek redress to the Court if no resolution can be reached. However, the receiving party shall not use or otherwise disclose the confidential documents or information subject to such objection at such deposition of a witness not currently or previously employed or retained by the producing party until the Court has ruled upon any such objection(s), provided that the producing party submits the matter to the Court within three (3) calendar days of the parties being unable to resolve the objection(s).

10.     Designation Of Hearing Testimony Or Argument.

With respect to testimony elicited during hearings and other proceedings, whenever counsel for any party deems that any question or line of questioning calls for the disclosure of CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL information, counsel may designate on the record prior to such disclosure that the disclosure is subject to confidentiality restrictions. Whenever matter designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL is to be discussed in a hearing or other proceeding, any party claiming such confidentiality may ask the Court to have excluded from the hearing or other proceeding any person who is not entitled under this Order to receive information so designated.

11.     Disclosure To Author Or Recipient.

Notwithstanding any other provisions of this Order, nothing herein shall prohibit counsel for a party from disclosing a document containing information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL to any person which the document clearly identifies as an author, addressee, or carbon copy recipient of such document, or to any current employee of the producing party who by their testimony indicates they have access to the type of information sought to be disclosed. During deposition or trial testimony, counsel may disclose documents produced by a party to current employees and officers of the producing party who by their testimony indicates they have access to the type of information sought to be disclosed. And regardless of such designation pursuant to this Protective Order, if a document or testimony makes reference to the actual or alleged conduct or statements of a person who is a potential witness, counsel may discuss such conduct or statements with such witness without revealing any portion of the document or testimony other than that which specifically refers to such conduct or statement, and such discussion shall not constitute disclosure in violation of this Protective Order.

12.     Designation Of Documents Under Seal.

Any information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, if filed with the Court, shall be filed under seal and shall be made available only to the Court and to persons authorized by the terms of this Protective Order. The party filing any paper which reflects, contains or includes

Case 9:07-mc-80223-KLR Document 2 Entered on FLSD Docket 03/12/2007 Page 10 of 15

any CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information subject to this Protective Order shall file such paper in a sealed envelope, or other appropriately sealed container, which indicates the title of the action, the party filing the materials, the nature of the materials filed, the appropriate legend (see Paragraph 2.1), and a statement substantially in the following form:

This envelope contains documents subject to a Protective Order of the Court. It should be opened only by the Court. Its contents should not be disclosed, revealed or made public except by Order of the Court or written agreement of the parties.

13.    Confidentiality Of Party's Own Documents.

No person may disclose, in public or private, any designated information of another party except as provided for in this Protective Order, but nothing herein shall affect the right of the designating party to disclose to its officers, directors, employees, attorneys, consultants or experts, or to any other person, its own information. Such disclosure shall not waive the protections of this Protective Order and shall not entitle other parties or their attorneys to disclose such information in violation of it, unless by such disclosure of the designating party the information becomes public knowledge (see Paragraph 16). Similarly, the Protective Order shall not preclude a party from showing its own information to its officers, directors, employees, attorneys, consultants or experts, or to any other person, which information has been filed under seal by the opposing party.

14.    Other Protections.

14.1    No person shall use any CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information, or information derived therefrom, for purposes other than the prosecution or defense of this action, including without limitation, for purposes of preparing, filing or prosecuting any patent application, continuation or divisional patent application, reissue patent application or request for re-examination.

14.2    Any party may mark any document or thing containing CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information as an exhibit to a deposition, hearing or other proceeding and examine any witness thereon qualified under the terms of this Protective Order to have access to such designated material.

15.    Challenge To Confidentiality.

15.1 This Protective Order shall not preclude any party from seeking and obtaining, on an appropriate showing, such additional protection with respect to the confidentiality of documents or other discovery materials as that party may consider appropriate. Nor shall any party be precluded from (a) claiming that any matter designated hereunder is not entitled to the protections of this Protective Order, (b) applying to the Court for an Order permitting the disclosure or use of information or documents otherwise prohibited by this Protective Order, or (c) applying for a further Order modifying this Protective Order in any respect. No party shall be obligated to challenge the propriety of any designation, and

Case 9:07-mc-80223-KLR Document 2 Entered on FLSD Docket 03/12/2007 Page 11 of 15

failure to do so shall not preclude a subsequent challenge to the propriety of such designation.

15.2    On any motion challenging the designation of any information, the burden of proof shall lie with the producing party to establish that the information is, in fact, CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information. If a party seeks declassification or removal of particular items from a designation on the ground that such designation is not necessary to protect the interests of the party wishing the designated information, the following procedure shall be utilized:

a. The party seeking such declassification or removal shall give counsel of record for the other party written notice thereof specifying the designated information as to which such removal is sought and the reasons for the request; and

b. If, after conferring, the parties cannot reach agreement concerning the matter, then the party requesting the declassification or removal of particular items may file and serve a motion for a further Order of this Court directing that the designation shall be so removed.

16.    Prior Or Public Knowledge.

This Protective Order shall not apply to information that, prior to disclosure, is public knowledge, and the restrictions contained in this Protective Order shall not apply to information that is, or after disclosure becomes, public knowledge other than by an act or omission of the party to whom such disclosure is made, or that is legitimately and independently acquired from asouree not subject to this Protective Order.

17.    Limitation Of Protective Order.

This Protective Order is not intended to address discovery objections to produce, answer, or respond on the grounds of attorney-client privilege or work product doctrine, or to preclude any party from seeking further relief or protective orders from the Court as may be appropriate under the Federal Rules of Civil Procedure.

18.    Other Proceedings.

By entering this order and limiting the disclosure of information in this case, the court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who may be subject to a motion to disclose another party's CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information pursuant to this order shall promptly notify that party of the motion so that it may have an opportunity to appear and be heard on whether such information should be disclosed.

19.    Inadvertent Disclosure Of Work Product Or Privileged Information:

Procedure And Waiver.

19.1    If the producing party at anytime notifies the Non-producing party in writing that it has inadvertently produced documents and/or things that are protected from disclosure under attorney-client privilege, work-product immunity, and/or any other applicable privilege or immunity from disclosure, the non-producing party shall return all copies of such documents and/or things to the producing party within five (5) business days of receipt of such notice and shall not further disclose or use such items for any purpose until further order of the Court. Upon being notified by the producing party pursuant to this section, counsel for the non-producing party shall use his or her best efforts to retrieve all copies of the documents at issue.

19.2    The return of any discovery item to the producing party shall not in any way preclude the non-producing party from moving the Court for a ruling that: (a) the document or thing was never privileged or otherwise immune from disclosure; and/or (b) that any applicable privilege or immunity has been waived.

19.3    Inadvertent or unintentional disclosure of information subject to any privilege or immunity during the course of this litigation without proper designation shall not be deemed a waiver of a claim that disclosed information is in fact subject to a privilege or immunity if so designated within ten (10) business days after the producing party actually learns of the inadvertent or unintentional disclosure.

20.    Non-Party Material.

The terms of this Protective Order, as well as the terms of any protective order that may be entered into between a discovering party and third party for the production of information to the discovering party, are applicable to CONFIDENTIAL or HIGHLY SENSITIVE CONFIDENTIAL information provided by a non-party  Information provided by a non-party in connection with this action and designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, pursuant to the terms of this Protective Order shall be protected by the remedies and relief provided by this Protective Order.

21.    Return Of Designated Information.

Within thirty (30) days of final termination of this action, unless otherwise agreed to in writing by an attorney of record for the designating party, each party shall assemble and return, or certify destruction of, all materials containing information designated CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER or HIGHLY SENSITIVE CONFIDENTIAL, including all copies, extracts and summaries thereof, to the party from whom the designated material was obtained, except that (a) any documents or copies which contain, constitute or reflect attorney's work product or attorney-client privilege communications, and (b) archive copies of pleadings, motion papers, deposition transcripts, correspondence and written discovery responses may be retained by counsel.

22.    Waiver Or Termination Of Order.

No part of the restrictions imposed by this Protective Order may be waived or terminated, except by written stipulation executed by counsel of record for each designating party, or by an Order of the Court for good cause shown. The restrictions provided for herein shall not terminate upon the conclusion of this action, but shall continue until further Order of this Court.

23.    Modification Of Order; Prior Agreements.

To the extent the terms of this Protective Order conflict with Local Rule 26.2 or with any agreements between the parties regarding the confidentiality of particular documents or information entered into before the date of this Protective Order, the terms of this Protective Order shall govern, except as to those documents and information produced or disclosed prior to the entry of this Protective Order, which documents and information shall continue to be governed by the terms of such prior agreements or by the provisions of Local Rule 26.2, as applicable.

24.    Section Captions.

The title captions for each section of this Protective Order are for convenience only and are not intended to affect or alter the text of the sections or the substance of the

Order.

Dated: December        , 2004

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG PHILIPS LCD CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 04-343-JJF |
| v. | ) | |
| | ) | |
| TATUNG COMPANY; | ) | |
| TATUNG COMPANY OF AMERICA, | ) | |
| INC. and VIEWSONIC CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |

CONFIDENTIALITY UNDERTAKING

I certify that I have read the Protective Order in this action and that I fully understand the terms of the Order. I recognize that I am bound by the terms of that Order, and I agree to comply with those terms. I hereby consent to the personal jurisdiction of the United States District Court, District of Delaware, for any proceedings involving the enforcement of that Order and waive any venue objection with respect to any such proceedings.

EXECUTED this      day of _____, _____.

Name

Affiliation

Business Address

## CERTIFICATE OF SERVICE

I, Jeffrey S. Goddess, hereby certify that on January 24, 2005, I caused two copies of the foregoing document to be served as follows:

(VIA E-MAIL)          Richard D. Kirk, Esquire
                      The Bayard Firm
                      222 Delaware Avenue #900
                      P. O. Box 25130
                      Wilmington, DE 19899
                       Attorneys for Plaintiff L.G. Philips LCD Co., Ltd.

(VIA E-MAIL)          Richard L. Horwitz, Esquire
                      Potter Anderson & Corroon, LLP
                      1313 N. Market Street
                      Hercules Plaza, 6th Floor
                      P. O. Box 951
                      Wilmington, DE 19899

(VIA E-MAIL)          Cass W. Christenson, Esquire
                      McKenna Long & Aldridge LLP
                      1900 K Street, NW
                      Washington, DC 20006

(VIA E-MAIL)          Tracy Roman, Esquire
                      Bingham McCutchen
                      355 S. Grand Ave., 44th Floor
                      Los Angeles, CA 90071

_____
JEFFREY S. GODDESS (No. 630)

# IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF MINNESOTA**

## CIVIL MOTION HEARING

LG Philips LCD Co., Ltd.,
                        Plaintiff,

v.

Tatung Company,
Tatung Company of America, Inc.,and
ViewSonic Corporation,
                        Defendants.

**COURT MINUTES**
BEFORE: Susan Richard Nelson
U.S. Magistrate Judge

| | |
|---|---|
| Case No: | 07-MC-19 JNE/SRN |
| Date: | March 15, 2007 |
| Court Reporter: | Jodi Weisenburger |
| Tape Number: | none |
| Time Commenced: | 3:00 p.m. |
| Time Concluded: | 3:40 p.m. |
| Time in Court: | 40 minutes |

APPEARANCES:

For Plaintiff:                                              Daniel Connolly, Shari Klevens, Nicole Balaci
For Defendants Tatung Company, et al.:    Thomas Jensen, Frank Merideth, Deborah Pourapian
For Defendant ViewSonic Corporation:

IF MOTION IS RULED ON PLEASE INCLUDE DOCUMENT NUMBER AND TITLE APPEARING IN CM/ECF.
**ORDER TO BE SUBMITTED BY:**          ☐ **COURT**     ☐ **PLAINTIFF**     ☐ **DEFENDANT**

## Consistent with the Court's ruling from the bench, for the reasons stated in the record:

**The Motion for Protective Order of Defendants Tatung Company and Tatung Company of America, Inc. [Doc. No. 1] is granted in part and denied in part.** There is no dispute among the parties that the documents requested in the Third Party Subpoena to Best Buy, Inc. regarding accused products are relevant and should be produced, commencing immediately. The dispute concerns documents pertaining to unaccused products. The Court orders that Best Buy, Inc. may refrain from producing any documents regarding unaccused products until such time as the Special Master in the pending matter in Delaware rules on a substantially similar discovery motion pending at this time. If the Special Master orders the production of all or certain categories of documents relating to unaccused products, Best Buy, Inc. is hereby ordered to comply with the spirit of the Special Master's Order and produce those documents pursuant to this subpoena. When the Special Master issues the ruling, the parties are instructed to immediately advise Best Buy, Inc. of the ruling. Best Buy, Inc. is to produce such documents even if the time period for discovery set in the Delaware action has expired.

Motions taken under advisement as of:

☐ ORDER TO BE ISSUED     ☒ NO ORDER TO BE ISSUED     ☐ R&R TO BE ISSUED     ☐ NO R&R TO BE ISSUED
☐ Exhibits retained by the Court          ☐ Exhibits returned to counsel

_____s/ Gabriel R. Gervey___
Signature of Law Clerk


EXHIBIT
C

# RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

FREDERICK L. COTTRELL, III
DIRECTOR

DIRECT DIAL
(302) 651-7509
COTTRELL@RLF.COM

March 2, 2007

## CONFIDENTIAL--FILED UNDER SEAL

**BY E-MAIL & HAND DELIVERY**
The Honorable Vincent J. Poppiti
BLANK ROME LLP
Chase Manhattan Center
1201 Market Street, Suite 800
Wilmington, DE 19801

Re:  *LG.Philips LCD Co., Ltd. v. ViewSonic Corp., et al.*, C.A. No. 04-343-JJF

Dear Special Master Poppiti:

In advance of the telephonic hearing scheduled for 11:00 EST today and in response to Mr. Kirk's letter of March 1, 2007 attaching certain correspondence concerning ongoing discovery discussions between Tatung and LPL, the Tatung Defendants respectfully submit a summary of the documents and information provided to LPL to assist Your Honor in evaluating the Tatung Defendants' compliance with their discovery obligations.

During the period from late January 2007 to the present, the Tatung Defendants have produced close to 10,000 pages of documents which include the following:

- Additional highly confidential Tatung America work instructions for *unaccused products*. Tatung America has produced all of the work instructions it could locate after performing a diligent search, including work instructions for sample products that have never been sold.
- Additional highly confidential Tatung exploded view drawings for *unaccused products*. Tatung has produced all of the exploded view drawings it could locate after performing a diligent search, including drawings for new products from this quarter (quarter 1, 2007).
- Highly confidential sales summaries from 2002 to the present containing model, price and quantity information for all of the visual display products identified in the Tatung Defendants' interrogatory responses. Notably, most of the sales data pertain to *unaccused products*.

RLF1-3121689-1



The Honorable Vincent J. Poppiti
March 2, 2007
Page 2

- Highly confidential Tatung CAD/CAM drawings of components for certain accused products.
- Additional highly confidential technical documents pertaining to certain accused products.
- Service manuals for certain accused products.
- Bills of materials/parts lists for certain accused products.
- Highly confidential OEM and ODM agreements with Tatung's customers.
- Documents relating to the Tatung Defendants' organizational structure.
- Tatung's annual reports.
- Highly confidential purchase orders, invoices and bills of lading for certain accused products.
- Highly confidential documents sufficient to identify the Tatung Defendants' customers and distributors.
- Highly confidential communications between Tatung and its customers regarding certain accused products.
- Brochures and advertisements.
- A correlation of Tatung model numbers to HP model numbers.
- Additional prior art related documents.

The documents identified above are responsive to a number of LPL Document Requests, including Nos. 6,7, 10, 13, 15, 16, 25, 51, 52, 57, 59, 61, 62, 64, 65, 67, 68, 69 and 70.

In addition, the Tatung Defendants have served amended and supplemental interrogatory responses identifying, among other things, additional products and prior art.

The Tatung Defendants have made available for inspection, and LPL has examined, disassembled and photographed, more than 40 monitor and television products.

Tatung also has provided to LPL an amended chart which identifies the exploded view drawing(s) (by bates number(s)) that cover particular series or groups of products. All of the products identified in Tatung's amended and supplemental interrogatory responses have been categorized. Altogether, Tatung produced at least 66 drawings covering 307 products. (*See* Amended Chart at Exhibit A.) After performing a diligent search, Tatung was unable to locate drawings for three products.

Finally, Tatung will be producing today so-called "Process Flow Charts" for certain accused products.

It is important to remember that what the Tatung Defendants agreed to produce during

The Honorable Vincent J. Poppiti
March 2, 2007
Page 3

the parties' December 2006 meet and confers and during the January 2007 hearing were 1) documents sufficient for LPL to evaluate infringement; 2) sales summaries; and 3) additional documents pertaining to the three previously identified accused products. The Tatung Defendants have lived up to this agreement. Until November 2006, LPL had accused only one Tatung product of infringing the patents-in-suit. In November, LPL identified two additional accused products. *It was not until mid-January 2007 that LPL identified 14 additional accused products.* As a result, the Tatung Defendants have been forced to engage in piecemeal supplementations and are still in the process locating additional responsive documents pertaining to some of the newly identified accused products.

Because LPL now has all of the information it needs to evaluate infringement (including the amended categorization chart, the exploded view drawings and the work instructions for all products), the Tatung Defendants respectfully request that Your Honor set a deadline by which LPL must identify all allegedly infringing Tatung and Tatung America products.

Respectfully,

Frederick L. Cottrell, III

FLC,III/afg
cc:     Clerk of Court (via CM/ECF)
        Richard Kirk, Esquire (via electronic mail)
        Cormac T. Connor, Esquire (via electronic mail)
        Lora Brzezynski, Esquire (via electronic mail)
        Mark Krietzman, Esquire (via electronic mail)
        Scott R. Miller, Esquire (via electronic mail)
        Jeffrey B. Bove, Esquire (via electronic mail)

# EXHIBIT A

# Greenberg
# Traurig

Valerie W Ho
Tel 310 586 7841
Fax 310 586 7800
HoV@gtlaw com

March 1, 2007

**Via E-Mail and U.S. Mail**

Rel Ambrozy, Esq.
McKenna Long & Aldridge LLP
1900 K Street, N W.
Washington, D.C. 20006

Re:  *LG Philips LCD Co., Ltd. vs. ViewSonic Corporation, et al.*
     Delaware District Court, Case No. 04-343 JJF

Dear Rel:

Attached is an updated chart regarding the exploded view drawings that have been produced for Tatung Company's products. This chart includes all of the products identified in Tatung's amended and supplemental responses to LPL's interrogatories nos. 2 and 3. Please note that as previously discussed, only the products ending with a "U" designation are destined for North America. The other products are qualified and destined for other locations such as Europe and Asia. It remains our position that only the products destined for North America could be at issue potentially. However, for the sake of completeness, we have included even the non-North American products in the attached chart. The chart identifies by bates numbers the drawing(s) that corresponds to a particular group of products. The bolded items are the ones that were not included in the first chart provided as an attachment to Mr. Merideth's letter dated January 31, 2007. Tatung has now produced at least 66 drawings covering 307 products. It has produced all of the drawings it could locate after performing a diligent search. A few of the recently produced drawings are for new products from the current quarter (First Quarter of 2007) and will be included in a further supplementation of the interrogatory responses.

Please feel free to call me if you have any questions.

Very truly yours,

Valerie W. Ho

*LA 126735232v1 3/1/2007*

Greenberg Traurig, LLP | Attorneys at Law | Los Angeles Office | 2450 Colorado Avenue | Suite 400E | Santa Monica, CA 90404 | Tel 310 586 7700 | Fax 310 586 7800 | www.gtlaw.com

Rel Ambrozy, Esq.
March 1, 2007
Page 2

cc:    Cass Christenson (via email)
        Lora Brzezynski (via email)
        Richard Kick (via email)
        Scott Miller (via email)
        Jeffrey Bove (via email)
        James Heisman (via email)
        Tracy Roman (via email)
        Frank Merideth (via email)
        Mark Krietzman (via email)
        Steve Hassid (via email)

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

L15BCVK-U03                           TDE006371
    L15BCVK-U13

L15CCAE                               TDE005010
    L15CCAE-U07
    L15CCAE-U17
    L15CCAE-U27
    L15ECAE
    L15ECAE-U27
    L15ECAE-U37

L15CCAT                               TDE006372
    L15CCAT-U01
    L15CCAT-U05
    L15CCAT-U13
    L15CCAT-U23
    L15CCAT-U32
    L15CCAT-UA3
    L15CCAT-UB3

L15CCQT                               TDE005012
    L15CCQT-U09
    L15CCQT-U19
    **L15DCAV-U16**

L15FCBT                               TDE005006
    L15FCBT-U02
    L15FCBT-U09
    L15FCBT-U12

L17ACAE                               TDE005024
    L17ACAE-U07
    L17ECAE-U07

**L17ACAH-J05 Non-North American product**   **TDE006375**

L17ACLN-U03                           TDE005116, TDE005117
    L17ACLN-U13
    L17ACLN-UB3
    L17ACTN-U01
    L17ACTN-U23
    L17ACTN-U32
    L17ACTN-UC3
    L17ACTN-UD2

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

L17AMTN-U01                          TDE006385
    L17AMTN-U03
    L17AMTN-U22
    L17AMTN-U23
    L17AMTN-U32

**L17CCAT-U05**                     **TDE005026, TDE006376**
    L17CMAT-E05 Non-North American Product
    L17CM(Q)AT-E05 Non-North American Product
    L17CQAT-E05

**L17DSAV-U16**                     **TDE013138**

L17FCBT                             TDE005118, TDE005119
    L17FCBT-U02
    L17FCBT-U 12

L17FCMT                             TDE005115
    L17FCMT-U05

L17ECBQ-U08                         TDE0013140
    L17KCBQ-U08
    **L17EMBQ-U08**

**L17NCDT-U00**                     **TDE006379**

**L17PCAG**                         **TDE005120**
    **L17PCAG-U65**
    **L17PCAG-UA5**

L17PCBG                             TDE005121
    L17PCBG-U05
    L17PCBG-U15
    L17PCBG-UA5
    **L17PCBG-U25**
    **L17PCBG-U65**
    **L17PCBG-U75**
    **L17PCBG-UB5**

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **L17UCCT-U01** | **TDE013007, TDE013157** |
| **L17UCCT-U02** | |
| **L17UCCT-U12** | |
| **L17UCCT-U22** | |
| **L17UCCT-U25** | |
| **L17UCCT-U32** | |
| **L17UCCT-U42** | |
| **L17UCCT-U62** | |
| **L17UCCT-U72** | |
| **L17UCCT-U82** | |
| | |
| **L17WCAG-U15** | **TDE013141** |
| | |
| **L17WCBG-U05** | **TDE013142** |
| **L17WCBG-U15** | |
| | |
| L19ACLN | TDE005113 |
| L19ACLN-U13 | |
| | |
| **L19ACTN-U23** | **TDE005112** |
| | |
| **L19AMTN-U32** | **TDE006380** |
| | |
| L19CMAT-U32 | TDE006381 |
| L19CYAT-U05 | |
| | |
| L19FCBT | TDE005114 |
| L19FCBT-U12 | |
| | |
| **L19FCMT-U05** | **TDE005115** |
| | |
| **L19NCDT-U00** | **TDE013668** |
| | |
| **L20WCAQ-U19** | **TDE013143, TDE013144** |
| | |
| **L22YMTT-U09** | **TDE013139** |

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

L5CDS                                    TDE005014, TDE006367

    L5CDSDP-C81 Non-North American Product
    L5CDSDP-D01 Non-North American Product
    L5CDSDP-D02 Non-North American Product
    L5CDSDP-D12 Non-North American Product
    L5CDSDP-J05 Non-North American Product
    L5CDSDP-J15 Non-North American Product
    L5CDSDP-J21 Non-North American Product
    L5CDSDP-J22 Non-North American Product
    L5CDSDP-J25 Non-North American Product
    L5CDSDP-J31 Non-North American Product
    L5CDSDP-J32 Non-North American Product
    L5CDSDP-S03 Non-North American Product
    L5CDSDP-U01
    L5CDSDP-U11
    L5CDSDP-U21
    L5CDSDP-U22
    L5CDSDP-U26
    L5CDSDP-U31
    L5CDSDP-U32
    L5CDSDP-U72
    L5CDSDP-U81
    L5CDSDP-U82
    L5CDSDP-U91
    L5CDSDP-U92
    L5CDTDP-D01 Non-North American Product
    L5CDTDP-D11 Non-North American Product
    L5CDTDP-E01 Non-North American Product
    L5CDTDP-E11 Non-North American Product
    L5CDTDP-E81 Non-North American Product
    L5CDTDP-J05 Non-North American Product
    L5CDTDP-J15 Non-North American Product
    L5TDS
    L5TDSDP-U01
    L5PDS
    L5PDSDP-U01

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**L5CES/T**                                          **TDE005016**

    L5CESDP-U81
    L5CESPP-U12
    L5CESPP-U20
    L5CESPP-U32
    L5CESPP-U41
    L5CESPP-U42
    L5CESPP-D42
    L5CESPP-E11 Non-North American Product
    L5CESPP-S01 Non-North American Product
    L5CESPP-U01
    L5CETPP-E02 Non-North American Product
    L5CETPP-E11 Non-North American Product
    L5CETPP-E22 Non-North American Product
    L5CETPP-E32 Non-North American Product
    L5CETPP-E42 Non-North American Product
    L5CETPP-E82 Non-North American Product
    L5CETPP-E92 Non-North American Product
    L5CETPP-S01 Non-North American Product
    L5PESPP
    L5PESPP-U01

**L5CTSDP**                                          **TDE005019**

    L5CTSDP-D01 Non-North American Product
    L5CTSDP-J05 Non-North American Product
    L5CTSDP-S04 Non-North American Product
    L5CTSDP-U01
    L5CTSDP-U03
    L5CTSDP-U05
    L5CTSDP-U06
    L5CTSDP-U13
    L5CTSDP-U22
    L5CTSDP-U32
    **L5CTSDP-U52**
    L5CTSDP-U62
    L5CTSDP-U81
    **L5CTSDP-U82**
    L5CTSDP-UA3

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

L5PHS                                   TDE005021, TDE013667
    L5PHSDP
    L5PHSDP-D09 Non-North American Product
    L5PHSDP-E09 Non-North American Product
    L5PHSDP-E39 Non-North American Product
    L5PHSDP-E49 Non-North American Product
    L5PHSDP-J09 Non-North American Product
    L5PHSDP-J19 Non-North American Product
    L5PHSDP-J29 Non-North American Product
    L5PHSDP-S09 Non-North American Product
    L5PHSDP-S19 Non-North American Product
    L5PHSDP-U09
    L5PHSDP-U19
    L5PHSDP-U29
    L5PHTDP
    L5PHTDP-E19 Non-North American Product
    L5PHTDP-E29 Non-North American Product

L5PVTPP                                 TDE005023, TDE006369
    L5PVTPP-J15 Non-North American Product
    L5PVTPP-U25
    L5SVTPP-U45

**L5XKTPP-U03**                              **TDE013145**

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

P42HFHH-U05                          TDE015113
    P42HFHH-U06
    P42HFHH-U07
    P42HFHH-U08
    P42HFHH-U09
    P42HFHH-U10
    P42HFHH-U11
    P42HFHH-U12
    P42HFHH-U13
    P42HFHH-U14
    P42HFHH-U15
    P42HFHH-U16
    P42HFHH-U17
    P42HFHH-U18
    P42HFHH-U19
    P42HFHH-U20
    P42HFHH-U21
    P42HFHH-U22
    P42HFHH-U23
    P42HFHH-U24
    P42HFHH-U25
    P42HFHH-U26
    P42HFHH-U27
    P42HFHH-U28
    P42HFHH-U29
    P42HFHH-U30
    P42HFHH-U31
    P42HFHH-U32
    P42HFHH-U33
    P42HFHH-U34
    P42HFHH-U35
    P42HFHH-U36
    P42HFHH-U37
    P42HFHH-U38
    P42HFHH-U39
    P42HFHH-U40
    P42HFHH-U41
    P42HFHH-U42
    P42HFHH-U43
    P42HFHH-UB5
    P42HSHT-U09
    P42HSHT-U09H

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**P46CCWV After a diligent search Tatung Co. has not been able to locate an assembly drawing for this product.**
    **P46CCWV-U01**
    **P46CCWV-U02**

PTAB915DN0 Non-North American Product        TDE006384
    PTAB915DN01 Non-North American Product
    PTAB915DN02 Non-North American Product
    PTAB915DN03 Non-North American Product
    PTAB915DN04 Non-North American Product
    PTAB915DN07 Non-North American Product
    PTAB915DN09 Non-North American Product
    PTAB915DN10 Non-North American Product
    PTAB915DN11 Non-North American Product
    PTAB915DN12 Non-North American Product

TTABB10                        TDE006385
    TTABB10N01
    TTAB910N01 Non-North American Product
    **TTAB910N02 Non-North American Product**
    TTAB910N04 Non-North American Product
    RTABB10
    RTABB10S01 Non-North American Product
    TTAB510
    TTAB510N03 Non-North American Product

TTAB910E Non-North American Product        TDE006386
    TTAB910EA01 Non-North American Product
    TTAB910EG01 Non-North American Product
    TTAB910EN01 Non-North American Product
    TTAB910EN02 Non-North American Product

**TTAB915DN01 Non-North American Product After a diligent search Tatung Co. has not been able to locate an assembly drawing for this product.**

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

TTABA12DB Non-North American Product     TDE006387
    TTABA12DB04 Non-North American Product
    TTABA12D Non-North American Product
    TTABA12DF02 Non-North American Product
    TTABA12DN04 Non-North American Product
    TTABA12DN06 Non-North American Product
    TTABB12DB Non-North American Product
    TTABB12DB15 Non-North American Product
    TTABB12DCN1 Non-North American Product
    TTABB12DCN1 Non-North American Product
    TTABB12DDN6 Non-North American Product
    TTABB12DH05 Non-North American Product
    TTABB12DJ06 Non-North American Product
    TTABB12DN0 Non-North American Product
    TTABB12DN01 Non-North American Product
    TTABB12DN02 Non-North American Product
    TTABB12DN03 Non-North American Product
    TTABB12DN04 Non-North American Product
    TTABB12DN07 Non-North American Product
    TTABB12DN10 Non-North American Product
    TTABB12DN12 Non-North American Product
    TTABB12DN14 Non-North American Product
    TTABB12DN15 Non-North American Product
    TTABB12DN16 Non-North American Product
    TTABB12DN18 Non-North American Product
    TWN5213K03V Non-North American Product
    TWN5213K20V Non-North American Product

**V15PCAP-U03**       **TDE015115**

**V17AFTW**       TDE006395
    V17AFTW-U01
    V17AFTW-U05

**V17ULAJ**       **TDE006364**
    **V17ULAJ-U06**

HIGHLY SENSITIVE CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

V23CLTT                              TDE006399, TDE015114,
    V23CLTT-U01                  TDE015116, TDE015117
    V23CLTT-U02
    V23CLTT-U05
    **V23CLTT-U62**
    V27CMTT-U01
    V30CMTT-U62
    **V30CMTT-U01**
    V30CMTT-U03
    V30CMTT-U05
    **V23DLWX-U12**

**V23ULAJ-U06 After a diligent search Tatung Co. has not been able to locate an assembly drawing for this product.**

**V26ALAH-U15**                      **TDE013669**

**V32ALAH-U15**                      **TDE006400**

**V32FLBB-U21**                      **TDE006402**

VTAB830 Non-North American Product        TDE006403
    VTAB830-E01 Non-North American Product
    VTAB830-E02 Non-North American Product
    VTAB830-N01 Non-North American Product
    VTAB830-P05 Non-North American Product