**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LG.PHILIPS LCD CO., LTD.

       Plaintiff,

                            **Case No. 07-MC-80223-KLR**

TATUNG COMPANY; TATUNG           *D. Delaware Case No. 04-343-JJF*
COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION

       Defendants.

_____

**REPLY OF PLAINTIFF LG.PHILIPS LCD CO., LTD.**
**TO TATUNG DEFENDANTS' OPPOSITION**
**TO MOTION FOR EXPEDITED RELIEF**

       Plaintiff LG.Philips LCD Co., Ltd. ("LPL" or "Plaintiff") respectfully submits

this Reply to Defendants Tatung Company and Tatung Company of America, Inc.'s

(collectively, "Tatung") Opposition to LPL's Motion for Expedited Relief From Order

Pursuant to Fed. R. Civ. P. 60(b) and Local Rule 7.1(E) ("LPL's Motion"). **[DE 10.]**

**I.**      **OTHER COURTS HEARING IDENTICAL MOTIONS FOR**
        **PROTECTIVE ORDERS FILED BY TATUNG HAVE DENIED THE**
        **MOTION**

       Tatung's submissions to this Court have been virtually identical to motions it has

submitted in at least 14 other jurisdictions related to 23 other subpoenas across the

country. For that reason, the resolution of those related disputes merits consideration by

this Court. To date, eight separate courts have heard argument regarding 13 Tatung

motions since LPL first filed its emergency Motion in this Court on March 14, 2007. A

majority of these courts have accepted LPL's arguments, by either denying Tatung's

1

motions for protective orders outright or by transferring the dispute to the District of
Delaware for resolution as requested by LPL.

Three courts immediately denied the Tatung Defendants' motions upon
conclusion of the parties' oral arguments. (*See* Exs. 1-3.) Indeed, the Northern District
of California concluded that "Tatung has not articulated any clearly defined and serious
injury that would result in the absence of the protective order it seeks." (*See* Ex. 1.)
Similarly, the Eastern District of California also denied Tatung's motion and concluded
that:

> Plaintiff counters that it properly seeks information about
> *all* potentially infringing products, not just those that
> have so far been identified. The court agrees. Under Federal
> Rule of Civil Procedure 26(b)(1), "the parties may obtain
> discovery on any matter, not privileged that is relevant to
> the claims or defenses of any party . . . [and] relevant
> information need not be admissible at the trial if the
> discovery appears reasonably calculated to lead to the
> discovery of admissible evidence."

(*See* Ex. 2.) The Court there also found Tatung's arguments regarding the trade secret or
confidential nature of the documents at issue to be unconvincing. (*Id.*) In light of the
fact that the court in Main Case entered a protective order governing the use and
disclosure of business confidential information, the court failed to understand why the
discovery should not be produced. (*See id.*)

In both the Eastern and Northern Districts of California, the Court denied
Tatung's motion, in part, because of Tatung's failure to produce the discovery sought by
the Plaintiff. In the Eastern District, the court held that "it appears that defendants have
been less than forthcoming with information directly sought from it during discovery."
Indeed, the court held that because the "plaintiff has had to obtain through third party

2

discovery information that defendants allegedly denied the existence of" and "[g]iven the difficulty in obtaining information directly from defendants, third party discovery efforts appear to be justified." (Ex. 2; *see also* Ex. 1 (holding by the Northern District court that "[a] party in litigation is not obligated to take the word of an opponent regarding what relevant documents do or do not exist."))

Importantly, the Northern District court also concluded that Tatung's motions were made with a goal of seeking tactical advantage, rather than protecting any substantive rights, and expressed particular concern about Tatung's actions in this jurisdiction:

> Indeed, it appears to the Court that Tatung's pattern of filing 23 motions for protective orders around the country bears all the indicia of a litigation tactic designed to avoid presenting this issue to the Delaware court, which knows the most about this case, and to multiply the cost of litigation. In this regard, the Court also notes that Tatung appears to have engaged in a pattern of questionable conduct in a matter pending in the United States District Court for the Southern District of Florida related to a similar motion for protective order related to another of the 23 subpoenas served in the Main Action.

(*See* Ex. 1.) The courts denying the Tatung Defendants' motions have agreed that the Tatung Defendants have failed to meet their burden to establish good cause for a protective order. (Ex. 1-3.)

Courts in four other jurisdictions granted LPL's request to the have the motions transferred to the District of Delaware. (*See* Ex. 4-6.). Tatung has indicated that it would not oppose such a measure here. **[DE 10 at p. 5.]** Tatung's Opposition implies, however, that transfer is not truly necessary, because an impending ruling is likely to impose restrictions similar to those in the Order at issue here. That is incorrect.

Although the parties are waiting for the Special Master's ruling in the main case on the appropriate scope of discovery, the impending ruling will apply solely to exchange of discovery *between the parties to the litigation, not to discovery obtainable from third parties*. LPL expects the court's ruling to permit discovery with respect to additional identified and unidentified accused products, rather than only with respect to those that have already been specifically identified.

Even in Arkansas, New Jersey, and Minnesota, where the courts granted in part and denied in part Tatung's motion, those courts allowed LPL to obtain discovery regarding Tatung generally and also permitted LPL to obtain discovery related to additional products not currently accused if such discovery is later permitted by the Special Master in Delaware. (*See* Exs. 7 and 8.) Contrary to Tatung's position that the motion should be granted, no court that has heard argument on these issues has unconditionally granted Tatung's requested relief.

## II.   THE TATUNG DEFENDANTS' MOTION IS NOTHING MORE THAN AN ATTEMPT TO INTERFERE WITH LPL'S LEGITIMATE THIRD PARTY DISCOVERY

Tatung's interference with valid third party discovery is inappropriate and is nothing more than an attempt to delay the third party discovery until after the March 30, 2007 discovery deadline. As LPL explained at length in its original Motion, Tatung's tactics have been effective with respect to Sensormatic. **[DE 3 p. 8.]** The tactics have been effective with other third parties, as well.[1] Tatung's decision to wait almost one

---

[1] For example, on March 8, 2007, LPL received correspondence from Tyco Electronics Corp. ("Tyco"), who LPL had also served with a Subpoena. (*See* Ex. 9.) Prior to that date, Tyco had also agreed to produce documents in response to the Subpoena. In the correspondence on March 8, however, Tyco stated that, "I understand that [Tatung] intends to file a motion for protective order with regard to this subpoena. In light of this, Tyco will await the disposition of this motion by the court before providing any material in response to the subpoena." (*Id.*) These communications clearly show that Tatung's motions are delaying LPL's legitimate discovery in this action.

month to file its motions for protective order and Tatung's disruptive communications with third parties are tactics that Tatung has used before in the Main Case and in at least one prior patent infringement case.

In the Main Case, during the jurisdictional discovery phase, "Tatung failed to appear for depositions on multiple occasions, failed to produce witnesses prepared to testify on noticed and relevant topics, and failed to respond to interrogatories and requests for production of documents," which forced LPL to waste its resources just to prove that Tatung's products are sold in Delaware. (Ex. 10, Report & Recomms. at 9 (Aug. 16, 2005) (imposing sanctions on Tatung).) Ultimately, after the Special Discovery Master in the Main Case reviewed Tatung's pattern of delay and discovery abuse, Tatung withdrew its jurisdictional defense. (*See generally id.*)

Tatung has also taken steps to disrupt third party discovery in at least one other case. *See Safer Display Technology, Ltd. v. Tatung Co.*, 227 F.R.D. 435 (E.D. Va. 2004) (copy attached hereto). In that case, represented by the same counsel as in the Main Case, Tatung engaged in similar delays before it finally withdrew its jurisdictional defense. *See Safer Display*, 227 F.R.D. at 437. Notably, in *Safer Display*, Tatung worked diligently to impede third party discovery by contacting and attempting to dissuade third parties from producing discovery, (*see* Ex. 11 at 9-10), and filing motions for protective orders for which Tatung lacked standing, (*see id.* at 10-11).

Tatung's argument that it has not interfered with legitimate discovery is undermined by the extension of the discovery deadline in the Main Case. Contrary to Tatung's suggestion, the Special Discovery Master in Delaware agreed with LPL's position here regarding the need to extend third party discovery in light of the interference caused by Tatung. Ex. 12 at 26-27. ("I note in [Tatung's] papers and I note [Tatung's] argument that these depositions were scheduled when they were, but my view of expecting that you are going to be getting an extension has more to do with where we are as a result of the third-party practice in terms of these other applications in

5

the other districts than it is a function of when the depositions were noticed.") Indeed, upon agreement of both LPL and Tatung, the Special Discovery Master extended the deadline for third party discovery until May 11, 2007.

As Tatung is aware, all of these emergency hearings have been scheduled to occur simultaneously with depositions of Tatung's witnesses.[2] Because LPL's lead trial counsel are busy taking and defending depositions this week, it appears that Tatung strategically filed these requests for expedited hearing in an attempt to prevent LPL from obtaining significant and relevant information it needs from the third parties or to divert LPL's focus from the Tatung depositions. Tatung's continuing pattern of dilatory tactics and improper interference with LPL's discovery efforts should not be allowed to continue.

## III.    THE SCOPE OF THE SUBPOENA IS REASONABLE, AND IN ANY EVENT, TATUNG'S OBJECTIONS ARE MISPLACED

In its Motion, Tatung argues that any discovery should be limited to the accused products. This, however, is precisely why LPL issued the Subpoenas. In its Complaint, LPL identified to Tatung an example of a product that LPL alleged to infringe the Patents-in-Suit. However, because Tatung makes hundreds of products, most of which are sold under brand names belonging to third parties, LPL has no way to know, without Tatung's assistance, which of Tatung's hundreds of products use infringing technology. LPL's attempts to obtain information regarding Defendants' products has been ongoing since November 2005. However, the Defendants have objected to producing documents that would enable LPL to identify those products, and continue to resist LPL's efforts to this day. In fact, during a hearing on March 12, 2007, Tatung conceded that it has not

---

[2] Tatung argues that they violated no rules by failing to serve LPL with the motion by email even though they were seeking expedited relief. Even if no rules were violated, however, it is clear that Tatung went against the prior practice in this action of serving all counsel by email, even though Tatung served many other documents by email in the same week related to other issues in the Main Case. Tatung's choice not to follow that practice was improper and in bad faith.

produced all such documents and that it would produce additional documents in April 2007, after the deadline for the close of third party discovery.

In light of the Delaware Court's Scheduling Order, requiring that third party discovery be completed by March 30, Tatung's efforts to limit the scope of LPL's subpoena to products that have been accused of infringement will artificially narrow the scope of the subpoena to products that are currently accused, even though that list will likely expand in April, after LPL finally receives Tatung's supplemental document production.

In addition, Tatung's objections to the scope of the Subpoena are misplaced. Specifically, objections based on burden or scope of a Subpoena should be made by the party upon whom the Subpoena is served. As the burden will not be borne by Tatung, Tatung does not have standing to raise that issue. To the extent that Tatung believes that the documents produced by third parties are not relevant to the litigation, or exceed the bounds of admissible evidence, Tatung can raise those arguments in advance of trial. *See Cook v. Rockwell Intern. Corp.*, 935 F.Supp. 1452, 1465 (D.Colo. 1996) ("Defendants had no standing to object to the breadth of the order [with respect to third party subpoena] but were restricted to appropriate objections as to relevance and admissibility before trial.") Notably, Tatung filed the Motions for Protective Order without regard for the fact that several of the third parties had either already produced the requested documents or agreed to produce the requested documents with objection. As the party to whom the Subpoena was served has not filed a Motion for Protective Order with respect to the breadth of the Subpoena, Tatung's objection on that basis should be denied.

## IV. **CONCLUSION**

It is vitally important that this Court either vacate its Order or transfer the Tatung Defendants' Motion because otherwise, LPL will be unable to obtain the critical discovery it needs from Sensormatic. Because the Tatung Defendants have refused to

provide discovery relating to Sensormatic, if the Court does not vacate its Order or

transfer the Tatung Defendants' Motion, LPL will have no further recourse and will not

ever get access to the discovery it needs from Sensormatic.

Dated: March 22, 2007

Respectfully Submitted,

Martin B. Woods, Esq.
Fla. Bar No. 340294
mwoods@swmwas.com
Marissa D. Kelley, Esq.
Fla. Bar No. 379300
mkelley@swmwas.com
STEARNS WEAVER MILLER
WEISSLER
ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: 954-462-9500
Facsimile: 954-462-9567

OF COUNSEL:
Shari L. Klevens, Esq.
sklevens@mckennalong.com
Lora A. Brzezynski, Esq.
lbrzezynski@mckennalong.com
Cormac T. Connor, Esq.
cconnor@mckennalong.com
McKenna Long & Aldridge, LLP
1900 K Street, NW
Washington, DC 20006
*Attorneys for LG.Philips LCD Co., Ltd.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served a copy of the within and

foregoing on all counsel or parties of record on the attached service list by electronic mail

and U.S. Mail.

Submitted this 22d day of March, 2007.

Marissa D. Kelley, Esq.
Florida Bar Number: 379300
mkelley@swmwas.com
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: 954-462-9500
Facsimile: 954-462-9567
*Attorney for LG Philips*

9

## SERVICE LIST

Richard D. Kirk, Esq.
rkirk@bayardfirm.com
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE 19899

Jeffrey B. Bove, Esq.
jbove@cblh.com
James D. Heisman, Esq.
jheisman@cblh.com
Jaclyn M. Mason, Esq.
jmason@cblh.com
Connolly Bove Lodge & Hurtz, LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Tracy R. Roman, Esq.
troman@raskinpeter.com
Raskin Peter Rubin & Simon, LLP
1801 Century Park East
Suite 2300
Los Angeles, CA 90067

Scott R. Miller, Esq.
smiller@cblh.com
Connolly Bove Lodge & Hurtz, LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Frederick L. Cottrell, III, Esq.
Cottrell@RLF.com
Anne Shea Gaza, Esq.
Gaza@RLF.com
Richards Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Frank E. Merideth, Jr., Esq.
meridethf@gtlaw.com
Valerie W. Ho, Esq.
hov@gtlaw.com
Mark H. Krietzman, Esq.
krietzmanm@gtlaw.com
Greenberg Traurig, LLP
2450 Colorado Avenue
Suite 400E
Santa Monica, CA 90404

Geoffrey M. Cahen, Esq.
caheng@gtlaw.com
Greenberg Traurig, LLP
5100 Town Center Circle
Suite 400
Boca Raton, FL 33486

Shari L. Klevens, Esq.
sklevens@mckennalong.com
Lora A. Brzezynski, Esq.
lbrzezynski@mckennalong.com
Cormac T. Connor, Esq.
cconnor@mckennalong.com
McKenna Long & Aldridge, LLP
1900 K. Street, NW
Washington, DC 20006

# EXHIBIT 1

```
 1   ANN G. GRIMALDI (BAR NO. 160893)
     McKENNA LONG & ALDRIDGE LLP
 2   101 California Street
     41st Floor
 3   San Francisco, CA  94111
     Telephone:    (415) 267-4000
 4   Facsimile:    (415) 267-4198

 5   Attorneys for Plaintiff
     L.G. Philips LCD Co., Ltd.
 6

 7

 8              UNITED STATES DISTRICT COURT

 9             NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11
```

| | |
|---|---|
| 12   L.G. PHILIPS LCD CO., LTD., | CASE NO. C 07 80073 WHA |
| 13                    Plaintiffs, | [PROPOSED] ORDER DENYING TATUNG'S MOTION FOR PROTECTIVE ORDER AND SETTING BRIEFING SCHEDULE FOR LPL'S MOTION TO COMPEL, IF ANY, AGAINST THIRD PARTY SAFEWAY, INC. |
| 14           v. | |
| 15   TATUNG COMPANY, TATUNG CO. OF AMERICA, INC.; AND VIEWSONIC | |
| 16   CORPORATION, | |
| 17                    Defendants. | |
| 18 | |
| 19 | |

```
20         The Motion for Protective Order Limiting Scope of Third Party Deposition and Subpoena

21   (the "Motion"), brought by Defendants Tatung Company and Tatung Co. of America, Inc.

22   (collectively, "Tatung"), came on for hearing on an expedited basis on March 16, 2007.  Jong P.

23   Hong of Greenberg Traurig appeared for Tatung; Ann G. Grimaldi of McKenna Long & Aldridge

24   LLP appeared for Plaintiff LG. Philips LCD Co., Ltd. ("LPL"); and John Dahlberg of Dillingham

25   & Murphy LLP appeared for third party Safeway, Inc.  The Court, having considered the parties'

26   papers and arguments of counsel (including counsel for third party Safeway, Inc.), and for the

27   reasons set forth below, DENIES Tatung's Motion in toto.

28
```

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

1    **I.    BACKGROUND AND THE PARTIES' CONTENTIONS**

2        The Motion arises out of a patent infringement lawsuit pending in the United States

3    District Court for the District of Delaware, *LG. Philips LCD Co., Ltd. v. Tatung Company, et al.*,

4    Case No. 04-343-JJF (the "Main Action").  As part of discovery efforts in the Main Action, on or

5    about February 13, 2007, LPL served a subpoena duces tecum and deposition notice in this

6    District on third party Safeway, Inc. (the "Subpoena").  At approximately the same time, LPL

7    served similar subpoenas on 22 other third parties located around the nation.  Tatung has filed

8    motions for protective orders, as to all these subpoenas, in over a dozen jurisdictions.

9        According to the papers filed by the parties, March 30, 2007 is the discovery cut-off date

10    in the Main Action.  Due to the exigent nature of these circumstances, and given that this Court

11    has jurisdiction to make orders associated with subpoenas issued in this District, the Court

12    granted Tatung's request to hear this matter on an expedited basis.

13        In its Motion, made pursuant to Federal Rule of Civil Procedure 26(c), Tatung challenges

14    the scope of the Safeway subpoena on two primary grounds.  First, Tatung contends that the

15    scope the subpoena is overbroad in that it encompasses information related both to products that

16    LPL has accused of infringing the subject patent (the "Accused Products") and to products that

17    (although the proper subject of the complaint) LPL has not accused of infringing the subject

18    patent (the "Non-Accused Products").  Tatung argues that the scope of the Subpoena must be

19    limited to the Accused Products only.  According to both LPL and Tatung, the Special Master in

20    the Main Action soon will be ruling on the issue of whether LPL is entitled to discovery from

21    Tatung with respect to Non-Accused Products.

22        Second, Tatung asserts that the information requested by the Subpoena calls for trade

23    secrets and sensitive and confidential business information.  Tatung purports to establish the need

24    for a protective order on that basis through the Declaration of Jackson Chang, General Manager

25    of Display BU Sales for Tatung Company.

26        For its part, LPL contends that it is entitled to all the requested discovery called for by the

27    Subpoena.  At a minimum, the requested information may assist in establishing claims for

28    inducement to infringe.  Furthermore, according to LPL, Tatung finally has agreed to produce

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 2 -

[PROPOSED] ORDER DENYING TATUNG'S MOTION FOR PROTECTIVE ORDER AND SETTING BRIEFING SCHEDULE FOR LPL'S
MOTION TO COMPEL, IF ANY, AGAINST THIRD PARTY SAFEWAY, INC.

1  certain technical drawings on April 6, 2007 (*i.e.*, after the March 30 discovery cut-off), through

2  which LPL will determine what other products to accuse of infringement. LPL asserts that it

3  must be free to take full discovery from Safeway now, before the cut-off, for otherwise it may be

4  foreclosed completely from taking necessary discovery as to such new Accused Products. In

5  addition, LPL asserts that third party discovery is necessary in order to determine whether

6  Tatung's prior discovery responses and productions are complete. As to Tatung's claims

7  regarding trade secrets and confidential business information, LPL asserts that a protective order

8  addressing these issues already exists in the Main Action and that Tatung has not made a

9  sufficient showing as to why that protective order is insufficient to protect its interests. With

10  respect to both of Tatung's arguments, LPL asserts that Tatung has not met its burden of

11  demonstrating good cause for a protective order under Federal Rule of Civil Procedure 26(c).

12  **II.    ANALYSIS AND FINDINGS**

13  The legal standard for a motion for protective order under Federal Rule of Civil Procedure

14  26(c) is well established. The burden is on the moving party to establish good cause for such an

15  order. Good cause, in turn, is defined as a demonstration that a clearly defined and serious injury

16  will result in the absence of a protective order. Tatung has failed to meet that standard here.

17  As a threshold matter, the Court holds that Tatung does have standing to challenge the

18  Subpoena through a Rule 26(c) motion, as it has here. The core dispute, however, is between

19  LPL and Tatung, parties in the Main Action; third party Safeway has filed no motion relating to

20  the Subpoena. As a practical matter, this Motion should have been filed in Delaware, before the

21  Delaware judge who has presided over the Main Action since its inception in 2004. Since Tatung

22  has chosen this District in which to make this Motion, and since this Motion has been brought

23  before the discovery cut-off and is therefore timely, this Court will rule fully on the substantive

24  merits.

25  Third party discovery is a time-honored device to get at the truth of a claim or defense. A

26  party in litigation is not obligated to take the word of an opponent regarding what relevant

27  documents do or do not exist. Indeed, it is common experience to find that third parties are in

28  possession of documents that parties to an action have asserted do not exist.

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    LPL is entitled to take discovery from Safeway.  The Court finds that the scope of the

2    Subpoena is reasonable, and the Court will not impose any limitations regarding Accused or Non-

3    Accused Products, or any other limitations, on it.  The Court also finds that the deposition notice

4    served on Safeway, and the topics identified therein, are reasonable; the Court will not impose

5    any limitations on the scope of topics to be covered.  In sum, the Court concludes that Tatung has

6    not articulated any clearly defined and serious injury that would result in the absence of the

7    protective order it seeks.

8        As to Tatung's claims regarding trade secrets and confidential business information, the

9    Court observes that there is a strong public policy in this District to maintain the transparency of

10   legal proceedings and to deny requests for secrecy absent good cause.  The Court concludes that

11   Tatung has failed to make the necessary showing of good cause here.  Whether because of

12   unfamiliarity with the requirements and policies of this District, or some other reason, Tatung

13   utterly has failed to meet the required standard with its submission of the Declaration of Jackson

14   Chang, which the Court finds conclusory.

15       Indeed, it appears to the Court that Tatung's pattern of filing 23 motions for protective

16   orders around the country bears all the indicia of a litigation tactic designed to avoid presenting

17   this issue to the Delaware court, which knows the most about this case, and to multiply the cost of

18   litigation.  In this regard, the Court also notes that Tatung appears to have engaged in a pattern of

19   questionable conduct in a matter pending in the United States District Court for the Southern

20   District of Florida related to a similar motion for protective order related to another of the 23

21   subpoenas served in the Main Action.

22       Turning now to Safeway's position, the Court makes the following determinations.

23   Because Safeway has failed to move for a protective order with respect to the noticed deposition,

24   it must make its witness available pursuant to the terms of the Subpoena and notice.  *See* FRCP

25   26(c), 45.  With respect to the document requests, however, the Court understands that Safeway

26   has served objections.  Thus, it is LPL's burden to move to compel production.  *See* FRCP 45(c).

27

28

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    **III.    ORDER**

2        Tatung's Motion is DENIED *in toto*. The scope of the Subpoena and deposition notice

3    shall not be limited in any respect.

4        The deposition of Safeway shall proceed as per the Subpoena and deposition notice.

5        With respect to the document requests contained in the Subpoena, the Court trusts that

6    counsel for LPL and Safeway will be able to reach agreement regarding Safeway's objections. If

7    they cannot, and if LPL wishes to file a motion to compel, then the Court sets the following

8    briefing schedule for LPL's motion:  LPL's opening papers to be filed no later than noon on

9    March 20, 2007; Safeway's response to be filed and served no later than noon on March 21, 2007;

10    hearing on the motion is set for 9:00 a.m. on March 23, 2007.

11        The Court will entertain no further motions in this matter after the Main Action's

12    discovery cut-off date of March 30, 2007.

13        This Order is made without prejudice to Safeway's rights to seek appropriate relief as

14    allowed by the Federal Rules of Civil Procedure, and is made without prejudice to Tatung's rights

15    to seek, consistent with any requirements applicable in the Main Action, protection of documents

16    produced by Safeway.

17

18    **IT IS SO ORDERED.**

19    Date:    March 20, 2007.

20

                                    _____
21                                    The Honorable William H. Alsup

22

23

24

25

26

27

28

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

– 5 –
[PROPOSED] ORDER DENYING TATUNG'S MOTION FOR PROTECTIVE ORDER AND SETTING BRIEFING SCHEDULE FOR LPL'S
MOTION TO COMPEL, IF ANY, AGAINST THIRD PARTY SAFEWAY, INC.

# EXHIBIT 2

## Timothy R. Sullivan

**From:**   caed_cmecf_helpdesk@caed.uscourts.gov
**Sent:**   Wednesday, March 21, 2007 5:33 PM
**To:**   caed_cmecf_nef@caed.uscourts.gov
**Subject:**   Activity in Case 2:07-mc-00018-FCD-EFB L.G. Phillips LCD CO, LTD. v. Tatung Company, et. al. "Order"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

### U.S. District Court

### Eastern District of California - Live System

Notice of Electronic Filing

The following transaction was received from Hinkle, T entered on 3/21/2007 at 5:32 PM PDT and filed on 3/21/2007

**Case Name:**   L.G. Phillips LCD CO, LTD. v. Tatung Company, et. al.
**Case Number:**   2:07-mc-18
**Filer:**
**Document Number:** 8

**Docket Text:**
ORDER signed by Judge Edmund F. Brennan on 3/21/07 in Misc. S-07-0018 FCD/EFB and Misc. F-07-0009 EFB ORDERING: (1) The Tatung Defendants' motion for a protective order is denied; (2) Third-party Pelco's motion to quash or modify the subpoena duces tecum and notice of deposition is denied; (3) notwithstanding the denial, plaintiff shall limit the use of confidential or sensitive information produced by Pelco (as described in the order); and (4) notwithstanding the denial of defendants' and third-party Pelco's motions, the parties shall comply with any order issued by the Delaware Special Master. (Hinkle, T)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1064943537 [Date=3/21/2007] [FileNumber=1537507-0
] [9a75af84414456f70fe556661c9aca9033066d9bbe92ed2f5c4202545919825f5e1
6e03aca62be95a4692a8c6b9b430de642d0640593781a461cb8bf23b31d34]]

**2:07-mc-18 Electronically filed documents will be served electronically to:**

Marc Bradley Koenigsberg     koenigsbergm@gtlaw.com, brownsh@gtlaw.com

Timothy R. Sullivan     trs@calitigation.com

**2:07-mc-18 Electronically filed documents must be served conventionally by the filer to:**

Richard D. Kirk-CAED NOT ADMITTED
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10   L.G. PHILIPS LCD CO. LTD.,

11            Plaintiff,                    Misc. F-07-0009 EFB
                                           Misc. S-07-0018 FCD EFB
12        vs.

13   TATUNG COMPANY, et al.,                ORDER

14            Defendants.
     _____/

15

16        The above-captioned miscellaneous cases were before the undersigned on Wednesday,

17   March 21, 2007, for hearing on defendant's motion for protective order and third-party Pelco's

18   motion to quash, or alternatively, modify the subpoena duces tecum and notice of deposition.[1]

19   Timothy R. Sullivan appeared as plaintiff's counsel.  Marc Koenigsberg appeared as defense

20   counsel, and Donald R. Fischbach appeared as counsel for Pelco.

21   I.   **BACKGROUND**

22        The underlying action is a patent infringement case, which is currently pending in the

23   District of Delaware.  Plaintiff, LG Philips LCD Co. Ltd. ("LG"), owns two patents which relate

24   ───────────────

25   [1] Defendants' motion was filed in the Sacramento division of this court, while Pelco's
     motion to quash was filed in the Fresno division.  Because both motions sought to limit the scope
     of Pelco's deposition and its production pursuant to a subpoena duces tecum, the matters were
26   deemed related and heard together by the undersigned.

1

1   to mounting systems used in visual display products such as liquid crystal display monitors,

2   laptop computers and televisions. Defendants Tatung Company and Tatung Company of

3   America (collectively referred to as "defendants" and/or "Tatung") are manufacturers and

4   resellers of computer monitors and other visual display products. Plaintiff alleges that

5   defendants have directly infringed its patents with respect to twenty of defendants' products (the

6   "accused products"). Plaintiff also alleges that defendants have induced other parties, including

7   third-party Pelco, to infringe plaintiff's patents. Pelco, a partnership organized under the laws of

8   California, is a Tatung customer.

9        On February 14, 2007, plaintiff noticed the deposition of Pelco for March 28, 2007,

10  which was later rescheduled for March 22, 2007 in Fresno, California.[2]  Plaintiff also served

11  Pelco with a subpoena duces tecum identifying documents Pelco was to produce either at or

12  before the deposition. On March 15, 2007, defendants filed with this court a motion for

13  protective order to limit the scope of the Pelco deposition and related document production to the

14  accused products in the underlying Delaware litigation. In support of its motion, defendants

15  argued that the sought-after discovery was irrelevant and unduly burdensome, and that it sought

16  defendants' confidential business and trade information.

17        Both plaintiff and defendants point out that currently pending before the Special Master

18  in Delaware are one or more discovery motions concerning the very issue of whether plaintiff is

19  entitled to conduct discovery on "unaccused" products. As of the March 21, 2007, hearing, the

20  Special Master had not yet issued an order on those motions. The discovery cut-off in this case

21  is March 30, 2007.[3]

22

23       [2] As discussed at the hearing, there was some confusion by the parties and Pelco, as to
where and when the deposition was to take place. In documents filed with the court, one
24  deposition notice indicates the deposition is to occur in Sacramento, while another indicates
Fresno. The parties indicated that the deposition will occur in Fresno, California.
25

       [3] After the hearing, counsel for plaintiff contacted the court and advised it that the
26  discovery deadline had just been extended to sometime in May 2007. In light of that

2

1    On March 7, 2007, third-party Pelco filed a motion to quash or modify the scope of the

2    subpoena and scheduled deposition.  Pelco sought to limit the scope of plaintiff's discovery,

3    citing concerns that the requested discovery sought confidential, trade-secret information.  After

4    determining that the motions filed by Pelco and defendants were inextricably related, Pelco's

5    motion was reassigned to the undersigned for expedited hearing, in light of the impending

6    deposition.

7    II.    **ANALYSIS**

8    Defendants' motion and Pelco's motion mirror each other in many ways as they seek to

9    limit the scope of the third-party discovery served on Pelco.

10   A. **Defendants' Motion**

11   Defendants seek a protective order limiting the scope of discovery aimed at third-party

12   Pelco to the accused products in the underlying suit.  Defendants argue that any discovery

13   beyond the accused products is irrelevant.  Plaintiff counters that it properly seeks information

14   about *all* potentially infringing products, not just those that have so far been identified.  The

15   court agrees.  Under Federal Rule of Civil Procedure 26(b)(1), "parties may obtain discovery on

16   any matter, not privileged that is relevant to the claims or defense of any party. . . .[and] relevant

17   information need not be admissible at the trial if the discovery appears reasonably calculated to

18   lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  In the present case,

19   plaintiff represents that it has asserted claims that defendants have induced third-parties to

20   infringe plaintiff's patents.  The discovery propounded on Pelco appears to seek information

21   related to that claim insofar as it seeks to identify further incidents of infringement regarding the

22   patents-in-suit.

23   Defendants also seeks to limit Pelco's discovery disclosures based on their claims that

24   such discovery is aimed at obtaining defendants' proprietary trade secret information.

25   ──────────────

26   development, the parties and Pelco are free to decide among themselves whether the deposition
     will occur on March 22, 2007, or at some other time agreed upon by all those concerned.

3

1    There is no absolute privilege for trade secrets and similar confidential information.

2    *Chembio Diagnostic Sys. v. Saliva Diagnostic Sys.*, 236 F.R.D. 129, 136 (E.D.N.Y. 2006).

3    However, Federal Rule of Civil Procedure 26(c)(7) provides that a district court, "for good

4    cause shown," may order "that a trade secret or other confidential research, development, or

5    commercial information not be revealed or be revealed only in a designated way." *Id.* (citations

6    omitted). To demonstrate good cause under this provision, a party is required to establish a

7    "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory

8    statements." *Bank of New York v. Meridien Biao Bank Tanz, Ltd.*, 171 F.R.D. 135, 143

9    (S.D.N.Y. 1997) (citations omitted). "Broad allegations of harm, unsubstantiated by specific

10   examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id.* The party seeking the

11   protective order must also show that the harm caused by its disclosure outweighs the need of the

12   party seeking the disclosure. *Id.*

13       As discussed in more detail in the following section, defendants have not made a

14   sufficient showing that the requested information qualifies as a trade secret or other confidential

15   information. Furthermore, they have not indicated how any harm in disclosure is not adequately

16   mitigated by the protective order already in place in the Delaware action.

17   **B. Pelco's Motion**

18       The court is similarly unpersuaded by Pelco's assertion the requested discovery threatens

19   to expose highly confidential business information and trade secrets. First, the court finds that

20   Pelco has failed to demonstrate that the requested information constitutes trade secret or highly

21   confidential business information.

22       "Trade secret or commercially sensitive information must be important proprietary

23   information and the party challenging the subpoena must make a strong showing that it has

24   historically sought to maintain the confidentiality of this information." *Gonzales v. Google, Inc.*,

25   234 F.R.D. 674, 684 (N.D. Cal. 2006) (citations omitted).

26   ////

4

1    Pelco's declaration supporting its motion merely asserts that it is not a publicly traded

2    company, i.e., that it is a partnership. Pelco makes no declarations with respect to safeguards it

3    uses or has historically used to protect the requested information. Pelco makes no showing that

4    the communications between it and defendants concerning the sale, manufacturing, marketing

5    and distribution of visual display products are protected by any privilege, or are otherwise

6    subject to confidentiality agreements. Furthermore, in a letter dated February 27, 2007, from

7    Pelco's counsel to plaintiff's counsel, Pelco indicates its willingness to produce several

8    categories of requested information including: "all contracts, supply agreements, licenses or

9    distribution agreements between Pelco and Tatung or ViewSonic; documents related to technical

10    specifications, manufacturing or assembly of Tatung and ViewSonic Products;" and, "documents

11    relating to the marketing of products to Pelco including brochures, etc." Pelco's very recently

12    demonstrated willingness to produce such information undercuts its current claims that this and

13    similar information are protected trade secrets.

14    The court also notes that in defendants' motion for a protective order, defendants claim

15    some of the information sought by plaintiff from Pelco are *defendants'* proprietary trade secret

16    information. Neither Pelco nor Tatung has suggested that a confidentiality agreement is in place

17    to govern their business relationship. Absent such an arrangement between Pelco and Tatung, it

18    remains unclear how Pelco – a third party not in privity with Tatung – can have in its possession

19    *Tatung's* proprietary trade secret information.

20    Further, neither Tatung nor Pelco have provided a convincing explanation as to how the

21    protective order currently in place in the Delaware action fails to protect the allegedly sensitive

22    information. That order applies to and protects confidential information produced by parties and

23    non-parties alike.   Under the provisions of that order, trade secret and highly sensitive business

24    information may be designated as "highly sensitive confidential information." Such a

25    designation limits the disclosure of such information to the parties' attorneys only. Thus, the

26    provisions of the protective order appear to obviate Tatung's and Pelco's concerns about plaintiff

5

1   obtaining a competitive advantage through Pelco's disclosure of the requested information.

2        Finally, based on plaintiff's representations in its opposition to defendants' motion for

3   protective order, it appears that defendants have been less than forthcoming with information

4   directly sought from it during discovery. *See, e.g.*, Plaintiff's Opposition to Tatung's Motion for

5   Protective Order, at 4:23-27 (noting that plaintiff has had to obtain through third party discovery

6   information that defendants allegedly denied the existence of). Given the difficulty in obtaining

7   information directly from defendants, third party discovery efforts appear to be justified.

8   Further, the protective order already in place accounts for and appears to adequately protect

9   defendants and Pelco alike from further disclosure of confidential information beyond the

10  parties' attorneys.

11  **III.    CONCLUSION**

12       In accordance with the foregoing, IT IS HEREBY ORDERED that:

13       1. Defendants' motion for a protective order is denied;

14       2. Pelco's motion to quash or modify the subpoena duces tecum and notice of deposition

15  is denied;

16       3. Notwithstanding the denial of Pelco's motion, plaintiff shall limit the use of any

17  confidential or sensitive information produced by Pelco (at the deposition or in response to the

18  subpoena) in accordance with the terms regarding the handling of "highly sensitive confidential

19  information" set forth in the protective order in place in the District of Delaware;

20       4. Notwithstanding the denial of defendants' and Pelco's motions, if the Special Master

21  in the District of Delaware issues an order prior to Pelco's scheduled deposition that limits

22  plaintiff's discovery to the accused products, the parties shall comply with the terms of any such

23  order or ruling.

24       IT IS SO ORDERED.

25  DATED: March 21, 2007.

        EDMUND F. BRENNAN
        UNITED STATES MAGISTRATE JUDGE

26

                                6

# EXHIBIT 3

## Balaci, Nicole

**From:** Klevens, Shari

**Sent:** Wednesday, March 21, 2007 2:30 PM

**To:** REARMOUNT-MLA

**Cc:** Balaci, Nicole

**Subject:** FW: Activity in Case 1:07-mc-10056-JLT LG Philips LCD CO., v. Tatung Co. et al "Order on Motion for Protective Order"

FYI

**From:** John Commisso [mailto:jcommisso@klhboston.com]
**Sent:** Wednesday, March 21, 2007 2:38 PM
**To:** Klevens, Shari; Balaci, Nicole
**Subject:** FW: Activity in Case 1:07-mc-10056-JLT LG Philips LCD CO., v. Tatung Co. et al "Order on Motion for Protective Order"

---- Original Message ----
From: "ECFnotice@mad.uscourts.gov" <ECFnotice@mad.uscourts.gov>
Date: 3/21/07 2:31 pm
To: "CourtCopy@mad.uscourts.gov" <CourtCopy@mad.uscourts.gov>
Subj: Activity in Case 1:07-mc-10056-JLT LG Philips LCD CO., v. Tatung Co. et al "Order on Motion for Protective Order"
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

United States District Court

District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Bowler, Marianne entered on 3/21/2007 at 2:21 PM EDT and filed on 3/21/2007

Case Name:    LG Philips LCD CO., v. Tatung Co. et al
Case Number:    1:07-mc-10056 <https://ecf.mad.uscourts.gov/cgi-bin/DktRpt.pl?108256>
Filer:
Document Number:

Docket Text:
Judge Marianne B. Bowler: Electronic ORDER entered denying [2] Motion for Protective Order, after hearing, because the matter at issue is currently being addressed by the discovery master in the Delaware action. (Bowler, Marianne)

The following document(s) are associated with this transaction:

1:07-mc-10056 Notice will be electronically mailed to:

John J. Commisso    jcommisso@klhboston.com

Andrew D. Kang    kanga@gtlaw.com

3/21/2007

Annapoorni R. Sankaran     sankarana@gtlaw.com, martink@gtlaw.com; watersj@gtlaw.com

1:07-mc-10056 Notice will not be electronically mailed to:

Lora A. Brzezynski
McKenna Long & Aldridge LLO
1900 K Street, NW
Washington, DC 20006

Cormac T. Connor
McKenna Long & Aldridge LLO
1900 K Street, NW
Washington, DC 20006

Valarie Ho
Greenberg Traurig
2450 Colorado Blvd
Santa Monica, CA 90404

Shari L. Klevens
McKenna Long & Aldridge, LLO
1900 K Street, NW
Washington, DC 20006

Frank Meredith , Jr
Greenberg Traurig
2450 Colorado Blvd
Santa Monica, CA 90404

Charlene Oh
Greenberg Traurig
2450 Colorado Blvd
Santa Monica, CA 90404

# EXHIBIT 4

1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

L.G. PHILIPS LCD CO., LTD.,

                Plaintiff,

v.

TATUNG CO., et al.,

                Defendants.

No. C07-398 MJP

ORDER

13
14
15

      This matter comes before the Court on Defendant Tatung Company and Tatung Company of America, Inc.'s motion for a protective order limiting the scope of a third-party deposition and subpoena and request for an expedited hearing. (Dkt. No. 1).

16
17
18
19
20
21

      This dispute involves a deposition notice and subpoena issued in this district and served on third-party Amazon.com in connection with a patent infringement lawsuit pending in the United States District Court for the District of Delaware.  Defendants filed a motion for protective order limiting discovery from Amazon.com.  Plaintiff has requested that the Court formally transfer this dispute to the District of Delaware.. (Dkt. No. 3 at 6-7).  In their Reply, Defendants state that they do not oppose the transfer. (Dkt. No. 5 at 3).

22
23
24
25
26

      The Court has the authority to transfer this matter to the court where the main action is pending.  See In re Digital Equipment Corp., 949 F.2d 228, 231 (8th Cir. 1991); Fed. R. Civ. P. 26(c) advisory committee's note ("The court in the district where the deposition is being taken may, and frequently will, remit the deponent or party to the court where the action is pending.").  Because the Delaware Court is in a better position to evaluate this dispute in light of the history of the discovery disputes between these parties and the facts at issue in the main case, and because neither party

ORDER - 1

1    opposes the transfer, the Court orders that this case be transferred to the United States District Court

2    for the District of Delaware.

3         The Clerk is directed to prepare all necessary materials and transfer them as expeditiously as

4    possible to the United States District Court for the District of Delaware.  The Clerk is also directed to

5    send copies of this order to all counsel of record.

6         Dated this 20th day of March, 2007.

7

8                                        Marsha J. Pechman
                                         United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER - 2

# EXHIBIT 5

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          SOUTHERN DISTRICT OF CALIFORNIA

10

11   L.G. PHILIPS LCD CO., LTD.,                    Civil No.    07cv0450-H (CAB)

12                                  Plaintiff,
                                                    **ORDER REGARDING DEFENDANT'S**
13         v.                                       **MOTION FOR A PROTECTIVE ORDER**

14   TATUNG COMPANY; TATUNG COMPANY
     OF AMERICA, INC.; and VIEWSONIC
15   CORPORATION,

                                    Defendants.
16

17         On March 20, 2007, the Court held a telephonic discovery conference on Defendant Tatung

18   Company's Motion for a Protective Order Limiting Scope of Third Party Deposition and Subpoena.

19   Shari Klevens, Esq., and Ross Hyslop, Esq., appeared for Plaintiff LG Philips LCD ("LG").  Charlene

20   Oh, Esq., and Nadia Bermudez, Esq., appeared for Defendant Tatung Company ("Tatung").  Thomas

21   Kovach, Esq., appeared for American Dynamics, the subpoenaed third party.

22         LG sued Tatung in the District of Delaware for patent infringement, Civil Action No. 04-343

23   (JJF) ("Delaware case").  On or about February 13, 2007, LG served 23 third-party subpoenas for

24   documents and depositions on Tatung customers in 15 different judicial districts, including service on

25   American Dynamics in the Southern District of California.  Tatung moved for a Protective Order in this

26   district arguing the subpoena was overly broad and harassing and required the disclosure of highly

27   sensitive business information that was not relevant to the patent infringement case.  LG opposed the

28   motion, arguing that the discovery is relevant to its infringement claims and investigation, Tatung's

                                                  1

1    confidentiality concerns were adequately addressed by the protective order in place in the Delaware case,

2    and Tatung had no standing to argue the subpoena was overly burdensome, since it was not Tatung's

3    burden to respond. American Dynamics neither moved for a protective order itself, nor joined Tatung's

4    written motion, although counsel for American Dynamics represented in the telephonic conference that

5    his client would seek to narrow the scope of the subpoena.

6        The issues raised in Tatung's motion are not limited to the American Dynamics subpoena.

7    Similar issues are being addressed with regard to many, if not all, of the other 22 third-party subpoenas

8    issued by LG. LG, therefore, requested this Court exercise its discretion to transfer Tatung's motion to

9    the District of Delaware, to be heard in the Delaware case. Tatung and American Dynamics joined in

10    that request indicating that it is the parties' intention to have all the related motions transferred to

11    Delaware for a uniform decision by the court in which the Delaware case is pending. There being no

12    objection to the request to transfer the motion, and in fact, the request having been made by all parties,

13    including the subpoenaed party, **IT IS HEREBY ORDERED** that Tatung's Motion for a Protective

14    Order Limiting the Scope of the Third Party Deposition and Subpoena served on American Dynamics be

15    transferred to the District of Delaware. The discovery sought from American Dynamics is stayed

16    pending a decision on Tatung's motion by the Delaware District Court.

17

DATED: March 21, 2007

18

19                            _____

20                            **CATHY ANN BENCIVENGO**
                            United States Magistrate Judge

21

22   cc:     Thomas H. Kovach
          Pepper Hamilton LLP

23        Hercules Plaza, Suite 5100
          1313 Market Street

24        P.O. Box 1709
          Wilmington, DE 19899-1709

25

26

27

28

07cv0450

# EXHIBIT 6

ORIGINAL

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAR 2 1 2007

CLERK, U.S. DISTRICT COURT
By _____
Deputy

LG.PHILIPS LCD CO., LTD., PLAINTIFF

v.

TATUNG COMPANY, *et al*, DEFENDANTS

**3-07 mc 0018-P-BD
ECF**
Referred to the U.S. Magistrate Judge

<u>**AGREED ORDER TRANSFERRING CASE TO UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**</u>

Defendants Tatung Company and Tatung Company of America, Inc. filed motions for protective orders relating to deposition subpoenas in this case and in case 3-07-mc 0017-N-BD. Plaintiff LG.Philips LCD Co., Ltd responded and requested, *inter alia*, transfer of the pending motions to the United States District Court for the District of Delaware where the main case is pending as case number 1:04-cv-00343-JJF. The parties agree that this Court has discretion to transfer the case as requested and additionally have agreed to the transfer and entry of this order. Based on the agreements of the parties as evidenced by their signatures below, the Court is of the opinion that the case should be transferred. Accordingly, this case is

ORDERED TRANSFERRED to the United States District Court for the District of Delaware.

Signed *March 21, 2007*

_UNITED STATES MAGISTRATE JUDGE_

**AGREED:**

Frank L. Broyles by Penelope Blackwell with permission

Attorney for Respondent: LG.Philips LCD Co., Ltd.

Penelope Brobst Blackwell

Attorney for Movants: Tatung Company and Tatung Company of America, Inc.

Page Solo

## Lori Powell

**From:** ecf_txnd@txnd.uscourts.gov
**Sent:** Wednesday, March 21, 2007 4:03 PM
**To:** Courtmail@txnd.uscourts.gov
**Subject:** Activity in Case 3:07-mc-00018 In Re Subpoena issued to Radio Shack Corporation Order Transferring to Another District

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

**U.S. District Court**

**Northern District of Texas**

### Notice of Electronic Filing

The following transaction was entered on 3/21/2007 at 4:02 PM CDT and filed on 3/21/2007
**Case Name:**       In Re Subpoena issued to Radio Shack Corporation
**Case Number:**    3:07-mc-18
**Filer:**
**Document Number:** 14

**Docket Text:**
Agreed Order Transferring case to United States District Court for the District of Delaware. (Signed by Judge Barbara M. G. Lynn on March 21, 2007) (mfw)

**3:07-mc-18 Notice has been electronically mailed to:**
Franklin L Broyles frankb@gucl.com, carak@gucl.com, lorip@gucl.com
Penelope Brobst Blackwell blackwellp@gtlaw.com, shepardsona@gtlaw.com

**3:07-mc-18 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1004035775 [Date=3/21/2007] [FileNumber=3037678-0
] [d2d3b53a2eb7af476ad00c9559b47094ba92c260f3ceb673321bc21311ceed86f6e
b3c69c3a41e9b3531d8f1140574e196c33e81f31bf0d40f3138851a6fd79d]]

## Lori Powell

**From:** ecf_txnd@txnd.uscourts.gov
**Sent:** Wednesday, March 21, 2007 4:05 PM
**To:** Courtmail@txnd.uscourts.gov
**Subject:** Activity in Case 3:07-mc-00018 In Re Subpoena issued to Radio Shack Corporation Case Transferred Out - District Transfer

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

### U.S. District Court

### Northern District of Texas

## Notice of Electronic Filing

The following transaction was entered on 3/21/2007 at 4:04 PM CDT and filed on 3/21/2007
**Case Name:** In Re Subpoena issued to Radio Shack Corporation
**Case Number:** 3:07-mc-18
**Filer:**
**WARNING: CASE CLOSED on 03/21/2007**
**Document Number:** No document attached

**Docket Text:**
Interdistrict Transfer to District of Delaware. (mfw)

**3:07-mc-18 Notice has been electronically mailed to:**
Franklin L Broyles frankb@gucl.com, carak@gucl.com, lorip@gucl.com
Penelope Brobst Blackwell blackwellp@gtlaw.com, shepardsona@gtlaw.com

**3:07-mc-18 Notice will not be electronically mailed to:**

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

TATUNG COMPANY, ET AL                                      PLAINTIFF

V.                          NO. 5:07-MC-0005-RTD

L.G. PHILLIPS LCD, CO., LTD.                              DEFENDANT

## O R D E R

Before the court is the Motion for Protective Order (Doc. 1) filed March 9, 2007 by the

Petitioner, TATUNG COMPANY and TATUNG COMPANY OF AMERICA seeking to limit

third party discovery from Wal-Mart Stores, Inc. and Sam's Club. The matter was referred to the

undersigned by Order (Doc. 3) entered March 12, 2007.

The Court did schedule a telephone conference on March 19, 2007 and the Petitioner,

TATUNG Company and TATUNG Company of America did appear by its attorneys Marshall

Ney and Frank Meredith and the Defendant, L.G. PHILLIPS LCD, CO., LTD. did appear by its

attorneys Stephen Schrantz and Shari Klevens.

This discovery dispute arises from an action pending in the United States District Court in

Delaware case number 04-343 and, at the current time, concerns 23 accused products. The

parties agree that discovery should be controlled by the District Court in Delaware. The parties

further agree that on March 16, 2007 the Special Master in Delaware did indicate that the

discovery, at this time, should be limited to the 23 accused products at issue in L.G. Phillips LCD

Co., Ltd. v. TATUNG Company, C.A. No. 04-343-JJF.

The Court having considered the papers submitted and the arguments presented, and for

good cause shown finds:

The third parties, Wal-Mart Stores, Inc. and Sam's Club, are instructed that the discovery sought by L.G. PHILLIPS LCD, CO., LTD. is hereby limited to the information concerning the 23 accused products at issue in L.G. Phillips LCD Co., Ltd v. TATUNG Company, C.A. No. 04-343-JJF or such other relevant information that does not disclose specific data or information concerning any un-accused products.

Any documents produced in response to the subpoena by third party Wal-Mart Stores, Inc. or Sam's Club shall be stamped CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER and shall be produced subject to the Stipulated Protective Order dated January 24, 2005 entered in the Delaware Action.

The Court may reconsider or modify this Order upon a showing by either party that the order is no longer consistent with the discovery orders entered by the United States District Court in Delaware.

IT IS SO ORDERED this 19th day of March, 2007.

_____    /s/ J. Marschewski
                          HONORABLE JAMES R. MARSCHEWSKI
                          UNITED STATES DISTRICT JUDGE

# EXHIBIT 8

**Balaci, Nicole**

| | |
|---|---|
| **From:** | Klevens, Shari |
| **Sent:** | Tuesday, March 20, 2007 3:07 PM |
| **To:** | Balaci, Nicole |
| **Subject:** | FW: Activity in Case 0:07-mc-00019-JNE-SRN LG Philips LCD Co., Ltd v. Tatung Company et al "Order on Motion for Protective Order" |

FYI

**From:** ecf-notice@mnd.uscourts.gov [mailto:ecf-notice@mnd.uscourts.gov]
**Sent:** Friday, March 16, 2007 12:34 PM
**To:** ecf-notice@mnd.uscourts.gov
**Subject:** Activity in Case 0:07-mc-00019-JNE-SRN LG Philips LCD Co., Ltd v. Tatung Company et al "Order on Motion for Protective Order"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### District of Minnesota

Notice of Electronic Filing

The following transaction was received on 3/16/2007 at 11:34 AM CDT and filed on 3/15/2007
**Case Name:**      LG Philips LCD Co., Ltd v. Tatung Company et al
**Case Number:**    0:07-mc-19
**Filer:**
**Document Number:** 24

**Docket Text:**
Minute Entry for proceedings held before Magistrate Judge Susan R. Nelson : The Motion for Protective Order of Defendants Tatung Company and Tatung Company of America, Inc. [1] is granted in part and denied in part. There is no dispute among the parties that the documents requested in the Third Party Subpoena to Best Buy, Inc. regarding accused products are relevant and should be produced, commencing immediately. The dispute concerns documents pertaining to unaccused products. The Court orders that Best Buy, Inc. may refrain from producing any documents regarding unaccused products until such time as the Special Master in the pending matter in Delaware rules on a substantially similar discovery motion pending at this time. If the Special Master orders the production of all or certain categories of documents relating to unaccused products, Best Buy, Inc. is hereby ordered to comply with the spirit of the Special Master's Order and produce those documents pursuant to this subp! oena. When the Special Master issues the ruling, the parties are instructed to immediately advise Best Buy, Inc. of the ruling. Best Buy, Inc. is to produce such documents even if the time period for discovery set in the Delaware action has expired. No Order will be issued.(Court Reporter Jodi Weisenburger) (jc)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1051215216 [Date=3/16/2007] [FileNumber=1336955-0
] [ac2c86ca040d9d46c8c73c3d2303afe1d141b289ad7fa69c7df36114e3477e93664
af4334194cf9d42507c179073a61da5600c838e7b56c70438d84171271524]]
**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1051215216 [Date=3/16/2007] [FileNumber=1336955-1
] [7c31c0e4db38b4710ed02ca1071828a89102ec334ef00aaf75331ae4afe2dc3ddbe
022098266f4fb919d90e518fb095675c86a06e89beae409175e9237b57475]]
**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1051215216 [Date=3/16/2007] [FileNumber=1336955-2
] [a6ebc1e11ac45de85efded75afa53879421b93740e1f36e038d251dbab91ab866e6
e71dda738fd9949c66ebcb75cdff9e3b9059aa8f277d8f29c18410b4ddd83]]

**0:07-mc-19 Notice will be electronically mailed to:**

Lora A Brzezynski    lbrzezynski@mckennalong.com

Daniel J Connolly    dconnolly@faegre.com, dboehme@faegre.com

Cormac T Connor    cconnor@mckennalong.com

William L Davidson    wld@lindjensen.com, jennifer.gordon@lindjensen.com;
lisa.neu@lindjensen.com

Thomas D Jensen    thomas.jensen@lindjensen.com, carol.ahrens@lindjensen.com

Shari L Klevens    sklevens@mckennalong.com

Sara J Lathrop    sara.lathrop@lindjensen.com, jennifer.green@lindjensen.com

Krisann Kleibacker C Lee    kklee@faegre.com, dybarra@faegre.c! om

Frank E Merideth , Jr    meridethf@gtlaw.com

Charlene Oh    ohc@gtlaw.com

Ted E Sullivan    ted.sullivan@lindjensen.com

**0:07-mc-19 Notice will be delivered by other means to:**

Rel-NA S Ambrozy
Not Admitted
,

Gaspare-NA J Bono

3/21/2007

Not Admitted
,

Cass-NA W Christenson
,

Richard-NA D Kirk
Not Admitted
,

# EXHIBIT 9

**Klevens, Shari**

| | |
|---|---|
| From: | Piraino, Russ [russ.piraino@tycoelectronics.com] |
| Sent: | Thursday, March 08, 2007 3:06 PM |
| To: | Klevens, Shari |
| Subject: | RE: LG.Philips LCD Co., Ltd. v. Tatung, et al., C.A. No. 04-343-JJF |

Shari:

I understand that Phillips intends to file a motion for protective order with regard to this subpoena.  In light of this, Tyco will await the disposition of this motion by the court before providing any material in response to the subpoena.  Thank you.

Russ Piraino

-----Original Message-----
From: Klevens, Shari [mailto:sklevens@mckennalong.com]
Sent: Thursday, March 01, 2007 3:27 PM
To: Piraino, Russ
Subject: LG.Philips LCD Co., Ltd. v. Tatung, et al., C.A. No. 04-343-JJF

Dear Russ:
This email is a follow up to our discussion this afternoon regarding Plaintiff LG.Philips LCD Co., Ltd.'s ("LG") third party subpoena ("Subpoena") to Tyco International, Ltd. ("Tyco") in the referenced action. I understand that your investigation related to the Subpoena has revealed that Tyco does not merely resell products purchased from Tatung and ViewSonic, but rather that any Tatung and/or ViewSonic products are incorporated into a limited number of custom-made products manufactured and sold by Tyco.  I further understand that such purchases account for less than 1% of Tyco's overall products sold.
In light of the above, LG is willing to limit its document requests if Tyco is willing to fully comply with the Subpoena as limited to the following:
1. A sales summary consisting of a printout from Tyco's sales database. The summary should reflect the purchase price, brand name, model number, quantity, and sales price of the products sold by Tyco and a sales summary showing all of this information for the products purchased by Tyco from each defendant.  These documents should also show the correlation between the Tatung or ViewSonic model number and Tyco's model numbers.
2. All contracts, supply agreements, and licenses between Tyco and Tatung or ViewSonic.
3. Documents related to the technical specifications, manufacturing, or assembly of Tatung and ViewSonic products, including any drawings and/or narrative descriptions of same.
4. Documents sufficient to identify OEMs or ODMs that manufactured Tyco's products incorporating visual display products manufactured by Tatung or Viewsonic, agreements or other documents that mention Tatung or ViewSonic between Tyco and any OEMs, and documents sufficient to show that Tatung or ViewSonic had knowledge of such agreements (such as correspondence with Tatung or ViewSonic).
5. Documents relating to product support or service on Tyco's visual display products provided by Tatung or ViewSonic through a warranty or

1

otherwise, including documents reflecting warranties provided by Tatung or
ViewSonic, and documents reflecting any type of repair assistance or help
desk assistance, including setting up repair centers in the US.
As we discussed, we agree to extend Tyco's deadline for producing the
requested documents until March 12, 2007.  Further, after a review of the
documents produced by Tyco in response to the Subpoena, we will determine
whether a deposition, currently scheduled on March 19, will be necessary.
We are hopeful that a deposition will not be required, especially if we can
obtain an affidavit from Tyco in lieu of deposition testimony.
Please contact me if you have any further questions.
Regards,
Shari

Shari L. Klevens
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
tel 202.496.7612
fax 202.496.7756

CONFIDENTIALITY NOTICE:
This e-mail and any attachments contain information from
the law firm of McKenna Long & Aldridge LLP, and are
intended solely for the use of the named recipient or
recipients. This e-mail may contain privileged
attorney/client communications or work product. Any
dissemination of this e-mail by anyone other than an
intended recipient is strictly prohibited. If you are not a
named recipient, you are prohibited from any further
viewing of the e-mail or any attachments or from making any
use of the e-mail or attachments. If you believe you have
received this e-mail in error, notify the sender
immediately and permanently delete the e-mail, any
attachments, and all copies thereof from any drives or
storage media and destroy any printouts of the e-mail or
attachments.

# EXHIBIT 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,       :
     :
        Plaintiff,      :
     :
        v.      :      Civil Action No. 04-343 JJF
     :
TATUNG CO., TATUNG COMPANY      :
OF AMERICA, INC.,      :
     :
        Defendants.      :

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON MOTION OF LG.PHILIPS LCD CO., LTD. FOR DISCOVERY SANCTIONS AGAINST THE TATUNG DEFENDANTS;

## SANCTIONS RECOMMENDED

This matter comes before me, as Special Master, on the motion of plaintiff LG.Philips LCD Co., Ltd. ("LPL") for the imposition of sanctions against defendants Tatung Co. ("Tatung Taiwan") and the Tatung Company of America, Inc. ("Tatung America" and, together with Tatung Taiwan, "Tatung" or the "Tatung Defendants") in connection with certain jurisdictional discovery ordered by the Court.

The Special Master recommends that LPL's motion for sanctions be **GRANTED**, as set forth herein.

## BACKGROUND

This is a patent infringement case brought by LPL against, *inter alia*, the Tatung Defendants alleging infringement of United States Patent Nos. 6,498,718 and 6,501,641 that relate to assembly mountings for flat panel display monitors used in such products as liquid crystal display ("LCD") and plasma televisions, and computer monitors. D.I. 1. The complaint

asserts grounds for jurisdiction over the Tatung Defendants on the basis of actual purchases in Delaware of equipment manufactured by Tatung that allegedly infringe the patents-in-suit. *Id.*

In lieu of answering the complaint, the Tatung Defendants jointly moved to dismiss for lack of personal jurisdiction, insufficient process and insufficient service of process and, in the alternative, to quash service. D.I. 16-17. Tatung's joint motion (the "Tatung Motion") was supported by the declaration of Tatung's counsel, Robert C. Weems, D.I. 19, as well as by the sworn declarations of David Shan-Juh Chang on behalf of Tatung Taiwan, D.I. 20, and Robin Tsou and Edward Chen on behalf of Tatung America, D.I. 19 at Exh. 3 and D.I. 21.

In response to the Tatung Motion, LPL moved for leave to conduct jurisdictional discovery of the Tatung Defendants. D. I. 34-35. On November 17, 2004 the Court granted LPL's request for jurisdictional discovery, set a 90-day deadline of February 15, 2005 for its completion, and reset the original Scheduling Order deadlines. D.I. 88. The Court also issued orders (i) providing that no further motions could be filed by the parties until the Court resolved the Tatung Motion, D.I. 93; and (ii) reserving the Court's decision on the Tatung Motion until after completion of the jurisdictional discovery, D.I. 94. Shortly thereafter, LPL served jurisdictional discovery upon each of the Tatung Defendants, in the form of interrogatories, requests for production of documents, and notices of depositions. D.I. 98, 99, 102-103.

## Jurisdictional Discovery Disputes Before the Court

Notwithstanding the Court's order that no further motions be filed by the parties until the Court resolved the Tatung Motion, the record discloses that the parties sought the Court's attention with numerous discovery disputes following entry of that order. For example, on December 20, 2004, Tatung America sent a letter to the Court seeking leave to file a motion for a protective order to quash deposition notices issued on December 2, 2004 by LPL for depositions

scheduled for December 22, 2004 and mid-January 2005. Tatung America refused to appear for

the Rule 30(b)(6) deposition scheduled in two days, arguing that its request to file a motion for a

protective order had the same effect as an actual motion and therefore excused its requirement to

appear, pursuant to Local Rule 30.2. D.I. 128 at 1, n.1. A volley of letters followed, D.I. 107-

108, prompting the Court to schedule *sua sponte* a date to hear what the Court deemed would be

LPL's motion to compel and request for sanctions, and to require additional briefing. D.I. 126-

30.

At the hearing held on January 24, 2005, the Court took steps to get the jurisdictional

discovery back on track. The record of that hearing establishes that – although almost 60 days

had elapsed since LPL propounded its jurisdictional discovery – the Tatung Defendants had yet

to respond to outstanding interrogatory requests, had failed to produce any responsive documents

whatsoever, and had refused to appear at scheduled depositions. In the words of LPL's counsel:

> [D]efendant Tatung Company of America has refused to appear for
> four depositions in this matter on two separate occasions. As a
> result of that, Your Honor, and as a result of their inadequate
> responses to interrogatories and document requests, **we really
> have no jurisdictional discovery at this point** two months after
> this Court ordered Tatung Company of America and Tatung
> Company to provide jurisdictional discovery.

D.I. 132 at 4:9-19 (emphasis added).

The tack taken by the Tatung Defendants has been to object to and seek to quash all of

the jurisdictional discovery sought by LPL, arguing primarily that the scope of LPL's discovery

exceeded the permissible scope of jurisdictional discovery and that neither the provisions of

Local Rule 26.2 nor the protective order proposed by LPL were adequate to protect Tatung's

confidential information. In the words of Tatung's counsel:

> There are two fundamental problems with plaintiff's discovery.
> They are: (1) plaintiff's refusal of a confidentiality order, such as
> the one approved by Judge Jordan [in another case] and (2)

3

> plaintiff's refusal to specify with some reasonable particularity its
> 30(b)(6) deposition categories, so that the designee(s) can be
> identified and prepared to testify [on behalf of] the company with
> answers other than an embarrassing (and potentially damaging) "I
> don't know."

D.I. 128 at pp. 1-2.

The Court first addressed and resolved the parties' impasse over the proposed terms of a protective order to protect confidential information disclosed during discovery, by obtaining LPL's agreement that it could live with the terms proposed by Tatung for the limited period of jurisdictional discovery.[1] D.I. 132 at pp. 10-22. The Court rejected Tatung's objections to the scope of discovery, by expressly determining that the deposition topics listed in the Rule 30(b)(6) deposition notices issued by LPL were within the permissible scope of jurisdictional discovery and were specific enough to permit Tatung to designate corporate designee(s). D.I. 132 at 38:4-8 and 42:2-5.

The Court then directed that the noticed depositions go forward, and attempted to provide reassurance to Tatung that the deposition questioning would stay within the scope of the noticed topics by providing a mechanism for handling objections by the Tatung Defendants to any deposition questioning that may exceed the permissible scope. D.I. 132 at 36:12-24; 37:1-24; and 38:1-3. The Court also directed that "all the documents relative to the declarations that you

---

[1]  The impasse between the parties centered on Tatung's demand that certain of LPL's counsel be restricted from prosecuting patents during the pendancy of this litigation, to avoid risk to confidential information that Tatung might disclose during discovery. In the Special Master's view, the provisions of Local Rule 26.2 adequately address this concern prior to the entry of a tailored protective order, especially given the narrow focus of jurisdictional discovery. Local Rule 26.2 provides as follows:

> If any documents are deemed confidential by the producing party and the parties
> have not been able to agree on an appropriate protective order, until a protective
> order is in effect, disclosure should be limited to members and employees of the
> firm of trial counsel who have entered an appearance, and, where appropriate,
> have been admitted *pro hac vice*. **Such persons are under an obligation to
> keep such documents confidential and to use them only for the purposes of
> litigating the case.** (Emphasis added).

Simply stated, jurisdictional discovery should not have been delayed in order to await the entry of a tailored protective order.

4

cited and answers to interrogatories that are incomplete ought to . . . be given over [by Tatung]

by the end of this week, the very first part of next week." D.I. 132 at 56:17-21. The Court

addressed LPL's request for sanctions with a clear cautionary note:

> I'm going to monitor what we have to do to keep this case moving.
> And at some point if I make a judgment that one side is recalcitrant
> and the other is acting in good faith, then **I [will] go all the way
> back and award fees and costs.**

D.I. 132 at 61:5-15 (emphasis added).

Following the hearing, the Court issued written orders that provided (i) for entry of the

restrictive form of protective order requested by the Tatung Defendants, but modified to limit its

duration to the jurisdictional discovery period; and (ii) that the depositions related to

jurisdictional discovery go forward, with instruction that "If [the Tatung] Defendants believe

[LPL's] examination exceeds the issues of jurisdiction, [Tatung] may object and instruct the

witness not to answer. [LPL] may then file a motion to compel on the objected-to question."

D.I. 133.

Within a few weeks, LPL found it necessary to again burden the Court when Tatung

Taiwan also refused to appear for noticed depositions. LPL moved for leave to file an expedited

motion to compel jurisdictional discovery from the Tatung Defendants and for a third extension

of the jurisdictional discovery period. D.I. 154. This prompted an additional round of letters and

email to the Court, D.I. 163-64, 166-67. The Tatung Defendants then filed a request for the

appointment of a special master, together with a motion for a protective order. D.I. 168. LPL

opposed the appointment of a special master and renewed its request for sanctions. D.I. 169.

By order dated February 17, 2005, the Court referred the pending discovery issues to the

Special Master Panel for assignment of a special master, with the Honorable Joseph J. Farnan, Jr.

noting:

5

> I believed that the rulings and instructions I provided to the parties at the January 24, 2005 hearing would avoid further conflict on the pending discovery matters. I apparently was wrong. As explained at the January 24 hearing, **this Court lacks the resources to manage overly contentious discovery disputes** effectively. Therefore, in the circumstances presented in this case, I find appointment of a special master pursuant to Federal Rule of Civil Procedure 53(a)(1)(c) to be warranted. Absent an appropriate finding by the master or me, the costs shall be shared equally.

D.I. 174 (emphasis added). By order dated February 25, 2005, I was appointed Special Master in this matter. D.I. 178.

## Jurisdictional Discovery Disputes Before Special Master

The additional submissions to and proceedings before the Special Master were not docketed as part of the official record in this case and, therefore, merit summarization and explication for the Court's and parties' consideration of the Special Master's Report and Recommendations.

On March 9, 2005, the Special Master conducted a teleconference with counsel for all parties, including defendant Viewsonic Corporation ("Viewsonic"), to discuss the procedural steps for bringing discovery disputes before the Special Master.[2] The teleconference then turned to the outstanding jurisdictional discovery issues, and Viewsonic was excused from the remainder of the teleconference. The Special Master continued the teleconference with LPL and Tatung to specifically discuss the outstanding jurisdictional discovery disputes. A hearing date on the discovery issues was set for March 30, 2005, and a schedule was set for written submissions by the parties prior to the hearing.

---

[2] The procedures agreed upon during the teleconference were later memorialized in the Special Master's March 11, 2005 Order for Initial Discovery Disputes.

After reviewing the parties' respective written submissions,[3] the Special Master conducted a lengthy hearing on March 30, 2005 to consider the arguments of LPL and the Tatung Defendants on the outstanding discovery disputes. At that hearing, the Special Master made rulings primarily with respect to the dispute over the counting of interrogatories.[4]

Because time constraints prevented the Special Master from fully addressing the parties' arguments as to the other categories of discovery during the March 30, 2005 hearing, the Special Master and parties agreed to continue the hearing to a later date. Following a teleconference with the parties on April 4, 2005, the Special Master set April 20, 2005 as the date for continuing the hearing and clarified that the hearing would address the remaining disputes as they related to depositions, answers to interrogatories, document production, extension of the jurisdictional discovery period, and sanctions.

On April 19, 2005, one day before the continued hearing date with the Special Master, Tatung America and Tatung Taiwan filed their respective answers to LPL's Complaint, in which each contested the jurisdiction of this Court. D.I. 186-187. One day later – at the start of the April 20, 2005 continued hearing before the Special Master – the Tatung Defendants consented by stipulation to the jurisdiction of this Court, D.I. 188, thereby mooting further consideration of Tatung's objections to the remaining jurisdictional discovery and LPL's motion to extend the period for jurisdictional discovery.

---

[3] As a preliminary matter, the Special Master notes that the parties collectively submitted to the Special Master thousands of pages of materials on their jurisdictional discovery disputes, most without correlation to the case docket, and many as mere attachments from which the Special Master had to glean and organize the facts. In *Brown v. SAP America, Inc.*, C.A. No. 98-507 at *1 (D. Del., March 3, 2004) (Robinson, C. J.) [available as 2004 WL 502221], this Court declined to address discovery motion submissions that totaled 1939 pages as too "voluminous [a] record in connection with motions ostensibly devoid of any material issues of fact."

However, in an attempt to keep the jurisdictional discovery on track and to properly consider the parties' positions on the issue of sanctions, the Special Master has reviewed and considered the complete submissions of both parties, requiring a considerable investment of time. The Court's inclination that sanctions should "go all the way back," if appropriate, necessitated review of select docket items including D.I. 16-17, 19-21, 25, 23-40, 47, 62, 93-94, 98-99, 105, 107-09, 123-26, 128-133, 144, 154, 163-64, 168-89, 174, 178, and 186-88.

[4] The Special Master's rulings with respect to the interrogatories are summarized *infra* at pages 19 to 28.

7

Accordingly, the Special Master turns to, and addresses herein, LPL's motions for

sanctions.

## DISCUSSION

> *Our system of discovery was designed to increase the likelihood
> that justice will be served in each case, not to promote principles
> of gamesmanship and deception in which [the party] who hides the
> ball most effectively wins the case.* <u>Abrahamsen v. Tran-State
> Express, Inc.</u>, 92 F.3d 425, 428-29 (6th Cir. 1996).

I.    **Analysis – Imposition of Sanctions**

Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 37(d) provides, in pertinent part:

> If a party . . . or a person designated under Rule 30(b)(6) . . . to
> testify on behalf of a party fails (1) to appear before the officer
> who is to take the deposition, after being served with a proper
> notice, or (2) to serve answers or objections to interrogatories
> submitted under Rule 33, after proper service of the
> interrogatories, . . . the court in which the action is pending on
> motion may make such orders in regard to the failure as are just,
> **and among others it may take any action [for sanctions]
> authorized under subparagraphs (A), (B), and (C) of
> subdivision (b)(2) of [Rule 37] . . . In lieu of any order or in
> addition thereto, the court shall require the party failing to act
> or the attorney advising that party or both to pay the
> reasonable expenses, including attorney's fees, caused by the
> failure unless the court finds that the failure was substantially
> justified** or that other circumstances make an award of expenses
> unjust.
>
>     **The failure to act described in this subdivision may not
> be excused on the ground that the discovery sought is
> objectionable** unless the party failing to act has a pending motion
> for a protective order as provided by Rule 26(c).

Fed. R. Civ. P. 37(d) (emphasis added).

On November 17, 2004, this Court granted LPL's request for jurisdictional discovery and

set a 90-day deadline for its completion.  At the hearing held on January 24, 2005 on what the

Court deemed to be LPL's motion to compel, the Court determined that the categories of

8

discovery identified by LPL in its 30(b)(6) deposition notices to the Tatung Defendants were within the permissible scope of the jurisdictional discovery previously ordered by the Court.

Based on the written submissions of the parties and the conduct of the March 30, 2005 hearing before the Special Master, the Special Master concluded then, and concludes now, that throughout the jurisdictional discovery period LPL exercised good faith and extraordinary effort in attempting to "meet and confer" to resolve Tatung's objections to the discovery sought. In this regard, the record before the Special Master discloses numerous efforts by LPL to support its positions to Tatung with relevant authority, and to address Tatung's objections – including, at times, with offers of compromise and to narrow the discovery sought – each and all vain attempts to persuade Tatung that discovery should go forward.

The record also discloses that, in contrast, the Tatung Defendants demanded capitulation instead of compromise. Tatung unilaterally blocked discovery by asserting layers of objections not supportable under relevant law. Notwithstanding the Court's express findings and prior orders, the Tatung Defendants continued to obstruct LPL from taking jurisdictional discovery through the March 30, 2005 hearing before the Special Master. Specifically, Tatung failed to appear for depositions on multiple occasions, failed to produce witnesses prepared to testify on noticed and relevant topics, and failed to respond to interrogatories and requests for production of documents on the same and/or similar topics.[5]

---

[5] In their briefing before the Special Master, the Tatung Defendants repeatedly attempt to excuse their actions by recharacterizing the jurisdictional discovery dispute:

> Although necessarily framed as a jurisdictional issue, in practicality the entire dispute was completely avoidable by a change of venue from Delaware to California.

See, e.g., May 20, 2005 Letter Brief from Jeffrey S. Goddess, Esquire, to Special Master at p. 1. This characterization is curious given that the Tatung Defendants never filed motions to transfer venue; they filed only motions to dismiss for lack of jurisdiction. D.I. 16-17. Consequently, the Special Master finds it difficult to ascribe any other motive to the Tatung Defendants' recalcitrance other than their hope that the period set by Court order for jurisdictional discovery would expire and operate to deprive LPL of an opportunity to obtain evidence needed to support a finding of personal jurisdiction.

The Special Master therefore concludes, for the reasons discussed below, that sanctions are just and appropriate pursuant to Fed. R. Civ. P. 37 where, as here, LPL made good faith efforts to obtain the discovery without court action and where the Tatung Defendants' failed to comply with their discovery obligations without substantial justification.

## A.     **Failure to Appear for Depositions**

### 1.     **Legal Standard**

This Court's standard for deposition practice under Rule 30(b)(6) of the Federal Rules of Civil Procedure is well settled:

> The Federal Rules of Civil Procedure allow for a broad scope of discovery that is not limited to admissible evidence, but evidence that is reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1). Rule 30(b)(6) provides that after receiving a notice of deposition, the corporation should "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf." Fed. R. Civ. P. 30(b)(6). Additionally, the deponent has a "duty of being knowledgeable on the subject matter identified as the area of inquiry." *Alexander v. Federal Bureau of Investigation*, 186 F.R.D. 148, 151 (D.D.C. 1999).

*Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 203 F.R.D. 159, 162 (D.Del. 2001); *accord, Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, No. Civ. A. 00-083 at *3 (D.Del., Feb. 18, 2005) (Farnan, J.) [available as 2005 WL440621].

### 2.     **Tatung America's Failure to Appear**

On November 17, 2004, the Court ordered a 90-day period of jurisdictional discovery. D.I. 88.  Shortly thereafter, LPL noticed a Rule 30(b)(6) deposition of Tatung America, scheduled for December 22, 2004.  LPL also noticed additional depositions of Tatung America employees for mid-January.  Two days before the noticed Rule 30(b)(6) deposition, Tatung America – under a Court order directed to both sides that they were not to file any motions regarding the jurisdictional discovery – sought leave to file a motion for a protective order and

refused to appear for both the Rule 30(b)(6) deposition and the depositions scheduled for mid-January. D.I. 128.

Tatung then failed to appear for properly noticed depositions, relying upon its own assumption that its request for leave to file a protective order had the same effect as an actual motion, and excused its requirement to appear at the depositions pursuant to Local Rule 30.2. D.I. 128 at p.1, n.1. The Court had previously barred both parties from filing any discovery motions until it decided Tatung's motion to dismiss on jurisdictional grounds, D.I. 93, in order to avoid the delay attendant to just such motions and permit the completion of discovery within the 90-day period allotted. In the face of this prohibition, the Special Master concludes that Tatung proceeded at its own peril and should not be permitted the benefit of the safe harbor created by Local Rule 30.2.

Moreover, a motion for a protective order is governed by Rule 26(c) which provides, in pertinent part "[u]pon motion by a party . . . **for good cause shown** . . . the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c) (emphasis added). Good cause requires a specific showing that, absent the protective order, the movant would suffer "a clearly defined and serious injury." *Glenmede Trust Company v. Thompson*, 56 F. 3d 476, 483 (3d Cir. 1995); *accord Emory v. AstraZeneca Pharmaceuticals*, Civ. A. No. 02-1466 at *1 (D. Del. Sept. 4, 2003) (Farnan, J.) [available as 2003 WL 22136301]; and *Visx Inc. v. LazerSight Inc.*, Civ. A. No. 99-789 at *1-2 (D. Del. Jan. 20, 2001) (Farnan, J.) [available as 2001 WL 34367297].

At the January 24, 2005 hearing on LPL's motion to compel, the Tatung Defendants were clearly unable to show the clearly defined and serious injury necessary to meet the requisite showing of good cause. In addressing Tatung's objections, the Court expressly determined that

all of the deposition topics noticed by LPL were within the permissible scope of jurisdictional discovery, D.I. 132 at 38:4-8, and each of them provided the requisite specificity. *Id.* at 42:2-5 ("I think the topics are specific enough that it should be readily apparent what type of person has to come as a designee.").

The Court also flatly rejected Tatung's arguments that depositions of certain of its senior management – so called "apex" depositions – should not go forward. Since an order barring a litigant from taking a deposition would constitute extraordinary relief, the party seeking such a protective order bears the burden of proving that the proposed deponent has nothing to contribute. *See, e.g., Speadmark, Inc. v. Federated Department Stores, Inc.*, 176 F. R. D. 116, 118 (S.D.N.Y. 1997). This is true even if the proposed deponent is a busy person. *Naftchi v. New York University Medical Center*, 172 F.R.D. 130, 132 (S.D.N.Y. 1997).

Tatung's argument that its executives lacked knowledge relating to jurisdiction was, in the Special Master's view, nothing short of specious in light of the fact that several of them – namely David Shan-Juh Chang on behalf of Tatung Taiwan and Robin Tsou and Edward Chen on behalf of Tatung America – had submitted sworn declarations in support of the Tatung Defendants' respective motions to dismiss on jurisdictional grounds. Accordingly, the Court directed that the depositions go forward. D.I. 132 at 56:22-23 ("these depositions ought to be rescheduled"); *See also, Scutellaro v. Walt Disney World Co., Inc.*, Civ. A. No. 92-671, *slip op.* at 6 (D.Del. July 14, 1993) (holding that if a senior executive "has knowledge of matters relevant to the instant suit, his position will not protect him from being deposed").

Following the January 24, 2005 hearing, and consistent with the Court's guidance and rulings, LPL renoticed the Rule 30(b)(6) and other depositions of Tatung America witnesses. Three depositions went forward on February 7-9, 2005. The deposition excerpts submitted to the

Special Master disclose, in the Special Master's view, a pattern by Tatung's counsel to disrupt, obfuscate and avoid proper discovery during those depositions.[6] The Special Master offers just a few examples:

**(a)** Tatung America failed to produce a Rule 30(b)(6) designee prepared to respond to certain information within the noticed deposition topics:

> Q:  What other retail distribution centers – to what other retail distribution centers does Tatung America ship Hewlett Packard and Compaq products from Compton?
> A:  Other than the fact that I can place a couple of them in Texas, **I don't know.**
> Q:  You can't identify any others then?
> A.  I'm **unable to identify any.**
> Q.  Do you know if there are any other retail distribution centers, besides the Wal-Mart and Sam's Club?
> A.  I think **it's easy to speculate that there are many others.**
> Q.  But do you know whether there are additional ones that you just can't identify?
> A.  Yeah **I know there are others**, sure.
> Q.  Do you have any idea how many, whether it's 10, more than 10, less that 10?  Can you give me any range?
> A.  I'm pretty sure it's more than 10.
> Q.  Do you know if it's more than 20?
> A.  No, **I don't know** for sure.
> Q.  Do you know in what states any of the other retail distribution centers are located, besides Texas?
> A.  I'm sorry, **I don't know** any other specific locations.
> LPL COUNSEL:  Mr. Weems, I assume that for information Mr. Sun is not able to provide, Tatung America will provide another witness as soon as Mr. Sun is finished testifying to provide that information.
> TATUNG COUNSEL:  No, Mr. Sun has been prepared on all these topics and as to what he can remember today and what he can't remember today.
> LPL COUNSEL:  Well does Tatung America intend to produce documents then that would provide this information?
> TATUNG COUNSEL:  I'm not here to be interrogated, Mr. Christenson.  You can spend your time asking questions of the witness.
> LPL COUNSEL: Okay.  I'll take that as a "no."

---

[6]  Although Tatung has designated these deposition transcripts as "Highly Confidential," the Special Master does not consider any of the information in the deposition excerpts contained herein to warrant a "confidential" designation.

13

Transcript of February 9, 2005 Deposition of Andrew Sun ("Sun Deposition") at 25:5-25 to 26:1-19 (emphasis added).

**(b)**    Tatung's counsel disrupted the flow of depositions with frequent requests for recess (some within minutes of the start of depositions)[7] and by inserting frequent and improper objections, such as the following:

> Q.   What is the Rancho Dominguez facility called?  Or what type
>       of facility does Tatung America have in Rancho Dominguez?
> TATUNG COUNSEL: **Objection, vague.**
> Q.   You can answer.
> A.   It's called – we call it C plant.

Sun Deposition at 17:5-11.

> Q.   So all of the Hewlett Packard and Compaq personal computers
>       served at that facility are manufactured by Tatung Company?
> TATUNG COUNSEL: **Objection, calls for speculation.**
> LPL COUNSEL:  I'm just trying to clarify, I think that's what he
>       said.  But you tell me.
> A.   Yeah, essentially all of them.

Sun Deposition at 18:10-17 (emphasis added).

> Q.   In 2004 were all of the computer monitors distributed out of
>       that facility LCD monitors?
> A.   No.  Some of them were CRT.
> Q.   Approximately what percentage in 2004 were LCD monitors?
> A.   I couldn't give you a good estimate.  I'd say the majority of
>       them are LCDs.
> Q.   So more than 50 percent?
> TATUNG COUNSEL: **Objection. Asked and answered.**
> THE DEPONENT:   Yeah, I think more than half of them are
>       LCDs.

Sun Deposition at 37:7-17 (emphasis added).

> Q.   Mr. Sun, do you agree that the distribution center in Arlington
>       distributes products?
> A.   It prepares products for distribution.

---

[7]  The "need to break" was asserted by both attorneys representing Tatung and, thus, appears to be tactical rather than motivated by any other need.

>        Q.  And specifically for distribution to retail distribution centers.
>             Right?
>        TATUNG COUNSEL:  **Objection. Argumentative.**
>        Q.  You can answer
>        TATUNG COUNSEL:  **And calls for speculation.**

Sun Deposition at 38:5-13 (emphasis added).

>        Q.  What type of operation does Tatung Company have in El
>             Paso?
>        TATUNG COUNSEL:  **Objection. Calls for speculation.**

Sun Deposition at 89:23-25 to 90:1 (emphasis added).

>        Q.  For 2004 how much revenue did Tatung America derive from
>             LCD products sold or delivered in Delaware?
>        TATUNG COUNSEL:  **Objection.** Scope, post complaint sales
>             **aren't relevant** for the jurisdictional inquiry.
>        THE DEPONENT:    I'm afraid I don't know.
>        Q.  Since January 1, 2000 how much revenue has Tatung America
>             derived from L17AMTN monitors sold or delivered in
>             Delaware?
>        TATUNG COUNSEL:  **Objection,** time, and times prior to the
>             issuance of the patent, prior to the filing of the complaint **are
>             not relevant.**

Sun Deposition at 108:25 to 109:1-11 (emphasis added).

**(c)**     Tatung counsel also engaged in an abusive "tag team" approach, with more than one

attorney asserting objections:

>        Q.  And my understanding at that time was you told me there were
>             no such operations.  And I want to be very sure I understand
>             whether Tatung Company has any other operations in the
>             United States beside [t]he El Paso Texas facility that you just
>             mentioned.
>        TATUNG COUNSEL (#1):   Could we have the question read
>             back?
>        TATUNG COUNSEL (#2):  **Objection.**
>        LPL COUNSEL:  Well, actually that wasn't a question.  I was
>             leading up to a question.
>             But the question is, does Tatung Company have any business
>             locations in the United States other than El Paso Texas.
>        TATUNG COUNSEL (#1):   Now let's have the full question read
>             back with its pre-preamble.
>        (Record read)

> TATUNG COUNSEL (#2): And I **object** to the extent it mischaracterizes prior testimony. I'm going to **object** that the prior record speaks for itself. I'm going to **object** that the question is unintelligible and confused.
> And subject to that, you can answer, if you can.
> THE DEPONENT: Other than the El Paso warehouse, I don't know of any other Tatung Company operations in the United States.

Sun Deposition at 94:24-25 to 95:1-24 (emphasis added).

> Q: Do you know whether Tatung Company has manufactured LCD products for ViewSonic Corporation since January 1, 2000.
> TATUNG COUNSEL (#1): **Asked and Answered.** You can answer again, sir.
> TATUNG COUNSEL (#2): And I just want to further note . . . Mr. Baum may not be aware of it, **ViewSonic counsel has specifically objected to the subpoenas issued to it.** Or actually I guess the notice or document request, something of that sort that was issued to it within the last 24, 48 hours. **So based on Viewsonic's objection, I think we have an obligation to instruct.**
> TATUNG COUNSEL (#1): And we'll consider your questions as you ask them and keep that objection in mind.
> So can we have the last question read back, please?
> (The reporter reads back the question as follows:
> "Q. Do you know whether Tatung Company has manufactured LCD products for Viewsonic Corporation since January 1, 2000?")
> THE DEPONENT: I don't know.

Sun Deposition at 134:18-25 to 135:1-14 (emphasis added).

**(d)**     Tatung's counsel used objections to improperly coach deponents during their testimony:

> Q. If you wanted to find out where those retail distribution centers for those various companies are located, how would you do that? Are there documents that you would be able to review that would give you that information?
> TATUNG COUNSEL: **Objection. Argumentative.** The witness has already testified they don't do the distribution part. They do the boxing.
> LPL COUNSEL: I object to speaking objections that coach the witness. That's improper. The record will reflect whatever the testimony was. And there's a question pending.

Sun Deposition at 40:21-25 to 41:1-7 (emphasis added).

> Q.  Does Tatung America keep copies of the monthly sales reports?
> A.  We can always get the number from the computer.
>
> TATUNG COUNSEL:  **Listen to the question, Robin. He asked you if Tatung keeps copies.  He didn't ask if you can you always get --**

Transcript of February 7, 2005 Deposition of Robin Tsou ("Tsou Deposition") at 39:17-22.

> Q.  Does Tatung America have lists of customers, for computer monitors?
> TATUNG COUNSEL:  Asked and answered.
> THE DEPONENT:  We don't have a customer list, but we can trace –
> TATUNG COUNSEL:  **He asked you if you have a customer list.**

Tsou Deposition at 41:4-10 (emphasis added).

Finally, the Special Master notes that the February 2005 depositions of Tatung America had to be conducted without benefit of Tatung America's response to the interrogatories and document production propounded by LPL more than two months earlier.  Although the Court had directed both Tatung Defendants at the January 24, 2005 hearing that responses to the interrogatories and responsive documents should be produced before any depositions went forward, Tatung America stood on its objection to the interrogatory count and did not provide further interrogatory responses.   Tatung America produced only 46 pages of responsive documents although, as will be discussed later herein, deposition testimony disclosed that other responsive documents clearly existed.

3.     **Tatung Taiwan's Failure to Appear**

On January 20, 2005, LPL noticed seven depositions of Tatung Taiwan, namely: one pursuant to Fed. R. Civ. P. 30(b)(6); one of David Shan-Juhn Chang, whose declaration supported Tatung Taiwan's jurisdictional challenge; one of Wen Yen K. Lin, President of Tatung

Taiwan and an officer of Tatung America, who had spoken publicly about Tatung's global

operations; and four of other employees of Tatung Taiwan. The depositions were noticed for

Taipei, Taiwan during the period of February 15-18, with four short depositions scheduled for

one day.

    LPL's counsel confirmed the depositions by letter dated January 21, 2005, stating:

> **These foreign depositions will require us to incur substantial**
> **pre-paid, non-refundable expense.** Already, [Taiwan America]
> has caused substantial inconvenience and costs to be incurred
> (including, for example, attorney fees and travel costs). We will
> ask the Court for relief at the appropriate time, including, but not
> limited to, full reimbursement. Similarly, we expect [Tatung
> Taiwan] to fulfill its obligation to attend these depositions and, if
> necessary, we will look to you and/or [Tatung Taiwan] to
> reimburse us for any expense that we incur as a result of further
> misconduct.

January 21, 2005 Letter from Cass W. Christenson, Esquire, to Robert C. Weems, Esquire

(emphasis added). By letter dated January 27, 2005, LPL's counsel confirmed Tatung Taiwan's

request for interpreters fluent in Mandarin Taiwanese for these depositions.

    The record before the Special Master reflects that Tatung requested that LPL postpone

the Taiwan depositions during a conversation with LPL's counsel on February 9, 2005. In a

February 10, 2005 letter from LPL's counsel to Tatung's counsel, LPL declined to postpone the

depositions, but suggested a compromise that might avoid the need for "apex" depositions:

> [W]e cannot accommodate your request to postpone the
> depositions considering Tatung's unjustified refusal to produce any
> documents. Additionally, we are convinced that the only way we
> will ever obtain the information we need (and you are required to
> produce) is to depose the individuals we have noticed, just like we
> had to do with Tatung America. As you know, these depositions
> have been noticed since January 20 and the document requests and
> interrogatories to Tatung were served at the end of November,
> 2004. Moreover, we have already purchased airplane tickets,
> contracted with a court reporter and an interpreter, and booked
> conference rooms and hotel rooms. All of those have strict
> cancellation policies. **In the spirit of cooperation, however, we**

18

> are willing to reschedule the depositions of W.S. Lin, K.Y.
> Lang, and A.C. Wang [the three "apex" deponents], currently
> scheduled for Tuesday, February 15, to Saturday February 19,
> if Tatung Company agrees to produce the documents
> referenced in our motion to compel on Tuesday, February 15
> at 9:00 a.m. at our counsel's hotel where they will be staying in
> Taiwan. Depending on the content of the documents and
> whether the deponents for the remaining depositions noticed
> for next week are forthright, including whether Tatung's
> 30(b)(6) witness is adequately prepared, we may be in a
> position to decide that the depositions of these three individuals
> are unnecessary.

February 10, 2005 Letter from Lora A. Brzezynski, Esquire, to Robert C. Weems, Esquire

(emphasis added).

Approximately 20 days after the depositions had been renoticed, counsel for the Tatung

Defendants advised LPL's counsel by letter dated February 11, 2005 – the day before LPL's

counsel was set to depart for Taiwan for the depositions – that Tatung Taiwan and its employees

would not appear for the depositions:

> Due to the present unresolved discovery issues, [LPL's] changing
> position on document production, and your refusal to defer
> overseas deposition until such matters have been worked out, we
> have been compelled to move for a protective order and to ask the
> Court to appoint a special master. Accordingly, **we will not be
> producing deponents in Taiwan until such matters are resolved**
> either by agreement or with the involvement of the Court.[8]

February 11, 2005 Letter from Robert C. Weems, Esquire to Lora A. Brzezynski, Esquire

(emphasis added). As of the date of the March 30, 2005 hearing with the Special Master, Tatung

Taiwan had not made any deponents available to LPL.

The Special Master finds that, against this backdrop, the claims by the Tatung Defendants

of good cause and substantial justification ring hollow, and the Special Master concludes that,

---

[8] According to counsel for LPL: "Tatung never objected to the location or dates of these depositions. Tatung also did not object to the Rule 30(b)(6) topics (the same topics that the Court had approved for Tatung America's deposition) until *after* refusing to appear for the depositions." March 18, 2005 Letter from Richard D. Kirk, Esquire, to Vincent J. Poppiti, Special Master (emphasis in original).

pursuant to Fed. R. Civ. P. 37(d), sanctions are appropriate for the repeated failure of the Tatung Defendants to appear for depositions, and for obstructive tactics at the depositions at which they did appear. In this regard, the Special Master finds that Tatung wielded its unilateral and last minute refusals to appear at depositions like the tactical weapons of delay the Special Master determines them to be. The Special Master therefore recommends that Tatung pay LPL's reasonable expenses caused by its failure to appear for and its obstruction of depositions, including attorney fees and Special Master fees. Fed. R. Civ. P. 37(d); *Haraway v. NASCAR, Inc.*, 213 F.R.D. 161, 165-66 (D.Del. 2003) (awarding defendants attorneys' fees and costs for plaintiff's failure to appear at deposition).

**B.    Failure to Respond to Interrogatories**

    **1.    Legal Standard**

Pursuant to Federal Rule of Civil Procedure 33(b):

> **Each interrogatory shall be answered separately and fully in writing under oath**, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable . . . **All grounds for and objection to an interrogatory shall be stated with specifity. Any ground not stated in a timely objection is waived** unless the party's failure to object is excused by the court for good cause shown.

Fed. R. Civ. P. 33(b)(1)(4) (emphasis added). Under Rule 37, "an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(3). When a party fails to comply with the provisions of Rule 33, "the court . . . may make such orders in regard to the failure as are just." *Woulard v. Brown*, No. Civ. A. 01-350 JJF at *1-2 (D.Del. Feb. 24, 2004) (Farnan, J.) [available at 2004 WL 758358] (quoting Fed. R. Civ. P. 37(d)).

## 2.    The Tatung Defendants' Failure to Respond

On November 29, 2004, LPL served twenty (20) interrogatories upon each of the Tatung Defendants. D.I. 98. Although there are a few differences between the interrogatories served on Tatung Taiwan and Tatung America, the parties agree that the sets of interrogatories propounded on each Tatung defendant are substantially similar in substance. *See, e.g.*, March 30, 2005 Transcript at 58:17-18 (Counsel for Tatung Defendants: "they're almost certainly identical").

The Tatung Defendants responded respectively to the interrogatories propounded by LPL on or about January 5, 2005. D.I. 113. Their responses are noteworthy in their similarities and by their stunning lack of response. Each Tatung Defendant objected to every interrogatory, asserting primarily boilerplate objections. Additionally, the Tatung Defendants argued that, when subparts are counted, LPL's interrogatories exceeded the maximum of 50 interrogatories permitted under Local Rule 26.1. Each Tatung Defendant renumbered the interrogatories posed by LPL's first four interrogatories into more than 50 subparts, and thereafter rested on its objection to count in refusing to further respond to interrogatories 5-20. Relying upon its boilerplate objections and its objections as to count, Tatung Taiwan did not answer any interrogatories. Tatung America partially answered only two interrogatories (Nos. 2 and 4), relying upon the selfsame objections.

At the January 24, 2005 hearing before Judge Farnan, the Court had made clear that the Tatung Defendants should respond to LPL's interrogatories before LPL's depositions of Tatung America and Tatung Taiwan – then scheduled for February 15 to 18 – took place:

> Interrogatories and documents, you're absolutely correct, should be resolved before deposition practice occurs. And we're focused on [late] February . . . **That's material that the party seeking deposition wants to have before they start the deposition . . . if there [are] interrogatories that are properly served, they need to be responded to,** and the same with documents.

21

D.I. 132 at 49:14-19 and 50:6-11 (emphasis added). The Court directed that "all . . . answers to interrogatories ought to . . . be given over by the end of this week, the very first part of next week." D.I. 132 at 56:17-21.

By directing Tatung to respond to LPL's interrogatories, the Court – in the Special Master's view – impliedly rejected Tatung's argument, suggested by *Moore's Federal Practice,* that it could preserve its objections to supernumerary interrogatories by answering (or objecting) up to the numerical limit and asserting boilerplate objections to the remainder without answering.[9] Notwithstanding the Court's direction, the Tatung Defendants did not supplement or further respond to LPL's interrogatories, and stood on their boilerplate objections and objections to count. On February 7, 2005, LPL requested leave to file an expedited motion to compel jurisdictional discovery, D.I. 154, and the issues involving several discovery disputes – including the disputed interrogatory count – were ultimately brought before the Special Master.

In this regard, the Special Master examined the primary authority relied upon by the Tatung Defendants in challenging LPL's interrogatory count, that being *Kendall v. GES Exposition Services, Inc.,* 174 F.R.D. 684 (D. Nev. 1997). According to the *Kendall* court:

> The Court therefore holds that **interrogatory subparts are to be counted as part of but one interrogatory for the purpose of [Local Rule 33-1(b)] if they are logically or factually subsumed within and necessarily related to the primary question** . . . [T]he more difficult question is determining whether the subparts are "logically or factually subsumed within and necessarily related to the primary question." . . . Probably the best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to **examine whether the first question is primary and subsequent questions are secondary to the primary question.** Or, can the subsequent question stand alone? Is it independent of the first question? **Genuine subparts should not be counted as separate interrogatories. However, discrete or separate questions should be counted as separate**

---

[9]  7 Moore's Federal Practice § 33.30[1]. *But see, id.* at § 33.171 ("Unstated grounds for objections normally are waived.").

22

> **interrogatories, notwithstanding that they are joined by a conjunctive word and may be related.**

174 F.R.D. at 685-86 (emphasis added).

After reviewing the interrogatory count urged by Tatung against the standard articulated in Tatung's own authority, the Special Master concluded that the position of the Tatung Defendants on the disputed interrogatory count was not supported by *Kendall*. Accordingly, at the hearing held on March 30, 2005, the Special Master ruled as follows with respect to the disputed interrogatory count:

> First interrogatory [,] I need not read it. The first is counted as two by both Tatung defendants. I consider it to be **one** seeking the identity of those individuals who assisted with the Tatung defendants' discovery responses.

March 30, 2005 Transcript at 58:22-24 and 59:1-2 (emphasis added).

> Interrogatory No. 2, Tatung counts No. 2 as 12 interrogatories. I'm satisfied that it is legitimately considered to be **one** interrogatory requesting information on products manufactured, imported into, purchased, offered for sale and/or sold by Tatung in Delaware or [,] as to the Tatung company [,] in the United States.

*Id.* at 58:17-23 (emphasis added).

> Interrogatory No. 3 Tatung counts as 12. I'm also satisfied that that is legitimately **one** seeking information on Tatung's manufacture, importation, purchase, offer for sale, and/or sale of a particular line that is visual display products in the United States.

*Id.* at 59:1 and 60:1-5 (emphasis added).

> [Interrogatory] No. 4 Tatung counts as 32 interrogatories. The Tatung defendants. I'm satisfied it is legitimately considered to be **one** seeking information on the amount of money made by the defendant[s] from the sale of its products and/or services in Delaware.

*Id.* at 60:6-10 (emphasis added).

> [Interrogatory] No. 5, I would note that No. 5 was neither answered nor counted by Tatung because the interrogatories that I

23

have just discussed with you have exceeded 25 by Tatung's count. I'm satisfied No. 5 is **one** aimed at determining how much money each Tatung defendant realized from the import, sale, or shipment of products intended for the United States market.

*Id*. at 60:11-17 (emphasis added).

[Interrogatory] No. 6, I'm satisfied that that is also legitimately **one** aimed at identifying each work location in the United States where Tatung has employed people since January the 1st 2000.

*Id*. at 60:18-21 (emphasis added).

[Interrogatory No.] 7 is **one** requesting information for each work location identified by Tatung's response to interrogatory No. 6.

*Id*. at 60:24 and 61:1-2 (emphasis added).

[Interrogatory No.] 8 is **one** aimed at quantifying Tatung's revenues from the United States.

*Id*. at 61:3-4 (emphasis added).

[Interrogatory No. 9] is legitimately **one** aimed at identifying Tatung customers of visual display products in the U.S. as to Tatung America and related information.

*Id*. at 61:9-11 (emphasis added).

[Interrogatory No.] 10 is legitimately **one** aimed at identifying shipments of Tatung visual display products to the U.S. as to Tatung America and related information.

*Id*. at 61:12-14 (emphasis added).

[Interrogatory No.] 11 is **one** aimed at identifying, including by person as to Tatung America, Tatung's shipments and delivery of products or services in Delaware and related information.

*Id*. at 61:15-18 (emphasis added).

[Interrogatory No.] 12 is **one** aimed at identifying Tatung's U.S. distributors.

*Id*. at 61:19-20 (emphasis added).

[Interrogatory No.] 13 is **one** seeking the identity of Tatung's distribution network and channels through which its visual display

products are distributed throughout the United States or to the United States or to Delaware.

*Id.* at 61:21-24 (emphasis added).

Interrogatory No. 14 I consider to be **four** separate interrogatories seeking information concerning the chain of distribution as to four discrete products, all of which were offered or purchased through different retail channels.

*Id.* at 62:1-5 (emphasis added).

[Interrogatory No.] 15 I consider to be **four** in that it seeks each step in the chain of distribution by which four separate discrete pieces of equipment arrived in Delaware.

*Id.* at 62:6-9 (emphasis added).

[Interrogatory No.] 16 I consider to be **two** in that it seeks, first, all of Tatung's products available for purchase through the Internet and, second, the identity of Web site vendors authorized to sell Tatung's visual display products.

*Id.* at 62:10-14 (emphasis added).

[Interrogatory No.] 17 is **one** seeking reports generated by Tatung with respect to the distribution, shipment, and sale of its visual display products in or to the United States.

*Id.* at 62:15-18 (emphasis added).

[Interrogatory No.] 18 is **one** asking that Tatung delineate its contacts with Delaware.

*Id.* at 62:19-20 (emphasis added).

[Interrogatory No.] 19 is **one** asking Tatung to identify any affirmative steps it's taken to prevent its products from reaching the Delaware market.

*Id.* at 62:21-23 (emphasis added).

[Interrogatory No.] 20 is **one** requesting the brand names and related information for Tatung visual display products manufactured, marketed, imported, distributed and/or sold in the United States.

*Id.* at 62:24 and 63:103 (emphasis added).

25

Accordingly, the Special Master concluded that the interrogatories propounded by LPL to each Tatung Defendant totaled 27, well within the 50 interrogatories permitted under Local Rule 26.1(b).  LPL then pressed for an order requiring the Tatung Defendants to respond to the interrogatories within a two-week period.

Having lost on the count issue, the Tatung Defendants requested that the Special Master proceed to consider their other objections to the interrogatories.  In Tatung's view, it couldn't object with specifity to certain of the interrogatories until the primary issue of count was resolved.  March 30, 2005 Transcript at 72:1-6 ("until we have a resolution of the issue of the counting, again, it's not possible because we don't know exactly where and how we have to be looking.").

LPL argued, with supporting authority, that to the extent other specific objections had not been raised in the Tatung Defendants' responses, those objections had been waived.  March 30, 2005 Transcript at pp. 64-70, and 90:16-19.  Tatung requested an opportunity to submit contrary authority, *Id.* at 92:2-7, and the Special Master set a schedule for written submissions.  *Id.* at 96:13-22.  Thereafter, the Special Master received a March 31, 2005 submission from Tatung's counsel stating he had been mistaken about the legal support for Tatung's position.  On April 1, 2005, LPL renewed its request to compel the Tatung Defendants to respond to the outstanding interrogatories.  However, the Special Master's further consideration of discovery issues relating to the interrogatories was mooted by the April 20, 2005 stipulation by the Tatung Defendants that, *inter alia*, consents to the jurisdiction of this Court.  D.I. 188.

In turning to the issue of sanctions, the Special Master concludes that sanctions are appropriate for the unjustified failure of the Tatung Defendants to respond to interrogatories.  It is undisputed that the Court ordered jurisdictional discovery on November 17, 2004 and set a 90-

26

day period (until February 15, 2005) for its completion. It is also undisputed that LPL

propounded jurisdictional interrogatories upon the Tatung Defendants on or about November 29,

2005. Finally, it is undisputed that the Tatung Defendants refused to respond to interrogatories

on the basis of boilerplate objections and/or their objections as to count.

Tatung participated in the January 24, 2005 hearing before the Court with the knowledge

that the Court considered it to be a hearing on a motion by LPL to compel discovery responses

from Tatung. At that hearing, the Court directed that any incomplete responses to interrogatories

should be submitted by Tatung to LPL within a week. It also cautioned Tatung that it was

subject to sanctions if it mistakenly relied upon its objections to interrogatory count:

> [T]hat rule has been around so long, lawyers ought to be able to
> count . . . but **if it's a counting problem, you better be sure
> you're going to win it** by a standard beyond a reasonable doubt,
> . . . and if you're arguing over whether [their] subparts are really
> questions, just think about that for a minute. That's even kind of a
> waste of a special master's time, **unless they're really playing
> with you. And then they're going to get sanctioned.** Not [just
> Tatung], but anybody that's fighting that kind of a thing on that
> kind of basis, you know, they're not going to do well.

D.I. 132 at 51:7-12; 52:10-24, and 53:1 (emphasis added). The Special Master concluded at the

March 30, 2005 hearing that Tatung's position – of counting the first four interrogatories

propounded by LPL as numbering in excess of 50 interrogatories – was not an argument

supported by even Tatung's own authority.

Pursuant to Rule 33, a party's answers or objections to interrogatories must be served

within 30 days. Fed. R. Civ. P. 33(b)(3). Objections to interrogatories must be stated

specifically and with particularity so that the objection can be reviewed and understood by both

the opposing party and the Court. Fed. R. Civ. P. 33(b)(4); *Josephs v. Harris Corp.*, 677 F. 2d

985, 992 (3d Cir. 1982) ("[T]he mere statement by a party that the interrogatory was 'overly

broad, burdensome, oppressive and irrelevant' is not adequate to voice a successful objection to

Case 9:07-cv-80223-KLR Document 1 Entered on FLSD Docket 03/22/2029 of Page 29 of 43

an interrogatory. On the contrary, the party resisting discovery 'must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive'") (citation omitted). *See also, Walker v. Lakewood Condo. Owners Assoc.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999) ("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all"). The Special Master concludes that the Tatung Defendants' objections to interrogatories were classic boilerplate and completely fail to meet the specificity test.

Having considered the parties' written submissions on the issue of sanctions, the Special Master concludes that sanctions are appropriate, pursuant to Fed. R. Civ. P. 37(d), where the failure of the Tatung Defendants to properly respond to interrogatories was neither substantially justified nor supported by relevant authority. The Special Master therefore recommends that Tatung pay LPL's reasonable expenses caused by its failure to respond to LPL's interrogatories, including attorney fees and Special Master fees. Fed. R. Civ. P. 37(d); *see also, Haraway,* 213 F.R.D. at 165-66 (noting "courts have readily awarded sanctions against individuals who have in some measure complied with Rule 37(d) but have violated the basic requirement of the Rule to cooperate in discovery."); *Woulard,* 2004 WL758358 at *1-2 (applying Rule 37(d) to sanction plaintiff who failed to respond to interrogatories or produce discovery).

## C.    **Failure to Produce Requested Documents**

### 1.    **Legal Standard**

Pursuant to Federal Rule of Civil Procedure 34(b):

> The party upon whom the request is served **shall serve a written response within 30 days after the service of the request . . . The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated. If objection is made to part of an item or category, the part shall be specified and inspection**

28

> **permitted of the remaining parts.** The party submitting the
> request may move for an order under Rule 37(a) with respect to
> any objection to or other failure to respond to the request or any
> part thereof, or any failure to permit inspection as requested.
>
> **A party who produces documents for inspection shall
> produce them as they are kept in the usual course of business
> or shall organize and label them to correspond with the
> categories in the request.**

Fed. R. Civ. P. 34(b) (emphasis added). Under Rule 37 "an evasive or incomplete disclosure,

answer, or response is to be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P.

37(a)(3). When a party fails to comply with the provisions of Rule 34, "the court . . . may make

such orders in regard to the failure as are just." *Woulard*, 2004 WL 758358 at *1-2 (quoting Fed.

R. Civ. P. 37(d)).

### 2.   The Tatung Defendants' Failure to Produce

On November 29, 2004, LPL served requests for production of documents upon each of

the Tatung Defendants. D.I. 98. The Tatung Defendants responded only by asserting boilerplate

objections to the production requests, and failed to produce any documents when they served

their objections to LPL on or about January 5, 2005. D.I. 113.

At the January 24, 2005 hearing with the Court, counsel for LPL – emphasizing the

importance of certain of those documents to scheduled depositions – urged the Court to compel

the production of responsive documents:

> *LPL Counsel*:  [W]e have served interrogatories, and we also
> served document requests in early December. And as of today,
> Your Honor, we haven't received a single document. Obviously, it
> would facilitate the deposition if I had in advance some of the
> documents. For example, Your Honor, one of the reasons I gave
> you [copies of the declarations submitted in support of Tatung's
> jurisdictional challenge] is that they refer in their declarations to
> records that they relied upon to put forth the facts, which include
> things like they are selling $132 million of product in the U.S. . . .
> that's in their own papers. So they've put those numbers in the

papers. They have also said those are based on specific records that they've reviewed, yet I don't have those records.

Your Honor, I would like to have those records before I take these depositions.

*Tatung Counsel*: Sounds like it's something he should have. . . He should have those documents.

*The Court*: Interrogatories and documents, you['re] absolutely correct, should be resolved before deposition practice occurs. And we're focused on [late] February . . . That's material that the parties seeking deposition wants to have before they start the deposition . . . If there's interrogatories that are properly served, they need to be responded to, **and the same with documents. . . . You've got to give them up.**

*Tatung's Counsel*: **We'll absolutely give them up.**

D.I. 132 at pp. 48-50 (emphasis added). The Court concluded with the following direction to Tatung: "It seems to me that all the documents relative to the declarations that [LPL] cited . . . ought to be able to be given over by the end of this week, the very first part of next week." *Id.* at 56:17-21.

On January 27, 2005, counsel for LPL confirmed that Tatung's counsel had agreed to forward to LPL by January 31 "all of the documents that the Tatung defendants agreed to produce and their responses to the request for documents and all of the documents discussed at the January 24, 2005 hearing." January 27, 2005 letter from Cass W. Christenson, Esquire to Robert C. Weems, Esquire. Tatung America subsequently produced only 46 pages of documents; Tatung Taiwan produced nothing. By letter dated February 3, 2005, LPL's counsel confirmed that he had been advised that counsel for Tatung was "not aware of any intention to produce further documents." In response, LPL advised that it would file a motion to compel unless it received assurance that all responsive documents would be produced. February 3, 2005 letter from Cass W. Christenson, Esquire to Robert C. Weems, Esquire. Roadblocked again,

LPL moved on February 7, 2005 for leave to file an expedited motion to compel jurisdictional discovery from the Tatung Defendants, including a request to compel the production of documents. D.I. 154.

While LPL's second motion to compel was pending, the re-noticed depositions of Tatung America proceeded without any further document production by either of the Tatung Defendants. During those depositions, witnesses identified the existence of documents that had not been produced, and that clearly appear to be responsive to LPL's requests for production. For example:

> Q:  So is it your understanding that the document marked TUS 36 and TUS 37 does not include any sales or shipments to Delaware for any time after December 31, 2003?
> A:  That's how it appears to me.
> Q.  And is it your testimony that you've reviewed a **sales tax report that shows sales and shipments of products to Delaware for the period that includes 2004**?
> TATUNG COUNSEL:  Objection. Asked and answered.
> THE DEPONENT:  Yeah, my recollection is not that clear but that's what I recall.
> LPL COUNSEL:   And [addressing Tatung counsel], as I understand Tatung America's position, Tatung America does not intend to provide that document during this deposition. Is that right?
> TATUNG COUNSEL:   You can ask your [next] questions, counsel.

Sun Deposition at 107:24-25 to 108:1-15 (emphasis added).

> Q.  Let's talk about the records that Tatung America keeps with respect to product sales.
> Does Tatung America have documents that show how many LCD monitors it sells each month?
> A.  Yes.
> Q.  What are those documents called?
> A.  **Mon[th]ly sales report**.
> Q.  Who prepares the monthly sales report?
> A.  I.T. room.
> Q.  Did you say I.T. room?
> A.  Yes.

Q.  And is that based on information in Tatung America's database?
A.  Yes.
Q.  Does the report then go to you, Mr. Tsou, as manager?
A.  Yes, I will have the report.
Q.  You receive the monthly sales reports?
A.  Yes.

Tsou Deposition at 38:18-25 to 39:1-11 (emphasis added).

Q.  What **information is included in the monthly sales report**?
A.  The **models** and the **customers** and the **quantity**.
Q.  Does it give a **dollar amount**?
A.  Yes.
Q.  When you say "models," would an example of a model be the L17AMTN?
A.  That's one of the models.
Q.  So from the monthly sales report can you determine how many of a particular model were sold each month?
A.  Yes.
Q.  How far back do the monthly sales reports go?
A.  I don't know.
Q.  Since the time that you have been a Sales Manager, have there always been monthly sales reports?
A.  Yes.

Tsou Deposition at 44:1-17 (emphasis added).

Q.  How can you trace customers, of monitors?
A.  Through the computer system.
Q.  Does Tatung America have documents that show where products were shipped?
Let me ask it again. Let me ask it again, more specifically. Does Tatung America have **documents showing where computer monitors are shipped**?
A.  Yes.

Tsou Deposition at 41:17-24 (emphasis added).

Q.  Are you familiar with any documents called inventory reports?
A.  Our inventory report?
Q.  Yes, at Tatung America.
A.  Yes.
Q.  What is an inventory report?
A.  To show the products we have on hand.
Q.  Would that include computer monitor products?
A.  Yes.

> Q. So **inventory reports would show the computer monitor products that Tatung America has available in its inventory for sale?**
>
> A. Yes.
>
> Q. Who prepares inventory reports? Well, first of all, are inventory reports prepared on a regular basis at Tatung America?
>
> A. Yes.
>
> Q. How often?
>
> A. Every week.

Tsou Deposition at 65:19-22 to 66:1-12 (emphasis added).

As of the March 30, 2005 hearing held before the Special Master, Tatung Taiwan had still not produced any documents whatsoever. Tatung America had not produced any additional documents to supplement its 46 page production. According to counsel for LPL, although additional responsive documents were identified during depositions of Tatung America employees, these responsive documents were never produced:

> **The depositions went forward with essentially – I was essentially in the dark without documents or interrogatory responses.** [I] proceeded with the depositions which I had to do because we were unable to obtain an agreement from [Tatung's] counsel to extend our discovery period. So we had a February 22 cutoff. Again, there was a sense of urgency to try to complete all this discovery. **[Tatung] would agree neither to provide additional time for discovery, nor to provide additional discovery.**
>
> We proceeded with the depositions and during the three depositions, which were on consecutive dates, February 7th, 8th, and 9th, I repeatedly asked during those depositions when **witnesses would identify documents that were on-site,** that [could we] take a break and the witness be permitted to obtain documents. I was consistently rebuked and **no further documents were produced during those depositions.**

March 30, 2005 Transcript at 23:10-15, 20-24 and 24:1-3 (emphasis added).

LPL's counsel further represented that, while its motion to compel was pending, LPL sought to resolve the impasse by voluntarily paring down the categories of their document

requests from approximately 42 categories to approximately 18 categories of documents "just to get the most minimum necessary information as quickly and efficiently as we could." March 30, 2005 Transcript at p. 24. In response to this offer, Tatung countered that it would agree only to create a special report that produced information with respect to only those models of Tatung equipment that LPL accused of infringement. However, Tatung's counteroffer was conditional on LPL's agreement to severely restrict or forego all other jurisdictional discovery, including depositions. The "catch 22" of Tatung's counteroffer was that, without the additional discovery from Tatung, LPL could not identify for Tatung all of the accused products necessary to permit the creation of a meaningful report. *Id.* at pp. 27-31. The impasse manufactured by the Tatung Defendants therefore continued unabated, with LPL counsel representing to the Special Master at the March 30, 2005 hearing:

> We are now four months into jurisdictional discovery. **We have essentially no interrogatory answers, we have 46 pages of documents from Tatung America, zero documents from Tatung Company, and we have got no deposition testimony from Tatung Company.**

March 30, 2005 Transcript at 34:7-10 (emphasis added).

Pursuant to Rule 34, a party must produce documents for inspection within 30 days after the service of the request. Fed. R. Civ. P. 34(b). It is undisputed that throughout the pendency of the jurisdictional discovery period, Tatung Taiwan refused to produce any documents whatsoever responsive to LPL's document request. Tatung America produced only 46 pages of responsive documents. It is clear from the transcript of the parties' January 24, 2005 hearing before the Court that the Court did not expressly excuse the Tatung Defendants' duty to produce documents for inspection. To the contrary, the Court expressly instructed Tatung:

> That's material that the party seeking deposition wants to have before they start the deposition. So as a general matter if [there

34

> are] interrogatories that are properly served, they need to be
> responded to, and **the same with documents**. And we all agree.

D.I. 132 at 50:6-12 ((emphasis added).

In addition to those documents the Special Master ordered produced at the March 30, 2005 hearing, it is clear to the Special Master that, at a minimum, the documents reviewed by those who submitted declarations in support of Tatung Taiwan's motion to dismiss on jurisdictional grounds would have been within a subset of documents responsive to LPL's document production requests. *See* D.I. 20. It is also clear from the Special Master's review of the transcripts of the depositions of Tatung America and its employees that certain documents reviewed by declarants – as well as other documents responsive to LPL's document requests – exist, but were not produced. *See supra* at pp. 29-31 (citing, e.g., sales tax report that shows sales and shipments of product to Delaware for period including 2004; monthly sales reports, computer shipment reports, inventory reports, and reports of transactions with third party vendors).

Therefore, having considered the parties' written submission on the issue of sanctions, the Special Master concludes that sanctions are appropriate, pursuant to Fed. R. Civ. P. 37(d), where the failure of the Tatung Defendants to properly produce documents for inspection was neither substantially justified nor supported by relevant authority.[10] The Special Master therefore recommends that Tatung pay LPL's reasonable expenses caused by its failure to respond to LPL's document requests, including attorney fees and Special Master fees. Fed. R. Civ. P. 37(d); *Haraway*, 213 F.R.D. at 165, 66 (noting "courts have readily awarded sanctions against individuals who have in some measure complied with Rule 37(d) but have violated the basic

---

[10] The Special Master does not pause in this regard even though several of the document requests were "fine tuned" during the course of the March 30, 2005 hearing. The effort in this regard is something that the Tatung Defendants could have forestalled had they made a good faith effort to meet and confer. In this regard, the Special Master concludes they did not.

requirement of the Rule to cooperate in discovery"); *Novartis Pharmaceuticals*, 203 F.R.D. at

164 (finding production of only domestic sales and marketing documents to be "inadequate to

satisfy burden under Rule 26(b) to produce all relevant, non-privileged documents); *Woulard*,

2004 WL 758358 at *1-2 (applying Rule 37(d) to sanction plaintiff who failed to respond to

interrogatories or produce discovery); and *Liafail, Inc. v. Learning 2000, Inc.*, C.A. Nos. 01-599,

01-678 at *3 (D.Del. Dec. 23, 2002) (Sleet, J.) [available as 2002 WL 31954396] ("where the

nature of the alleged breach of a discovery obligation is the non-production of evidence, the

court has brought discretion in fashioning an appropriate sanction.").

**D.    Sanctions are Warranted**

For the foregoing reasons, the Special Master concludes that the persistent failures of the

Tatung Defendants to comply with their discovery obligations – without substantial justification

and unsupported by relevant legal authority – has unfairly burdened judicial resources, including

this Court's scheduling orders for both jurisdictional discovery and the management of this case.

Additionally, the Tatung Defendants' failures to appear at depositions, failures to respond to

interrogatories, and failures to produce documents responsive to document requests have

prejudiced LPL by forcing it to incur unnecessary attorney fees, expenses and delay.   The

Special Master therefore recommends:

**(1)**    that sanctions be assessed against the Tatung Defendants, jointly and severally,

for the unreimbursed expenses and reasonable costs, including attorney fees, incurred by LPL in

(i) preparing for any noticed deposition for which a deponent did not appear; (ii) preparing

papers in support of its motions to compel and/or for sanctions; (iii) preparing papers in

opposition to motions by the Tatung Defendants for protective orders; (iv) preparing for and

attendance at the January 24, 2005 hearing before the Court; (v) preparing papers submitted to

the Special Master on the jurisdictional discovery disputes; (vi) preparing for and attendance at

the March 30, 2005 hearing before the Special Master; (vii) preparing for and participation in the April 4, 2005 teleconference with the Special Master; (viii) preparing for and attendance at the April 20, 2005 aborted hearing before the Special Master; and (ix) upon application, such other and further costs and expenses as may be reasonable and just;

(2)    that LPL **not later than August 26, 2005** submit to the Special Master, by affidavit, a summary of the unreimbursed expenses and costs for which it seeks reimbursement pursuant to subparagraph (1) above, with detail sufficient to permit assessment of the reasonableness of such costs (detail that would implicate either the attorney-client or work product privilege may be submitted for *in camera* review);

(3)    that the Tatung Defendants, jointly and severally, pay all amounts due as sanctions to LPL within thirty (30) days of a determination by the Special Master that the amounts for which LPL seeks reimbursement are reasonable; and

(4)    that sanctions be imposed against the Tatung Defendants, jointly and severally, in the amount of LPL's *pro rata* share of the costs for the Special Master's services in connection with the jurisdictional discovery phase, so that the Tatung Defendants will pay 100% of such costs.

**These findings and recommendations will become a final order of the Court after the Special Master has ruled on the reasonableness of the amount of sanctions, unless objection is timely taken in accordance with the provisions of Fed. R. Civ. P. 53(g)(2).**

**II.    Analysis – Assessment of Sanctions**

Having concluded that the imposition of sanctions is warranted, the Special Master turns to the issue of whether the recommended sanctions should be imposed against the Tatung Defendants, their counsel or both. Fed. R. Civ. P. 37(d). In this regard, the Special Master is mindful of the opinion issued in *Safer Display Technology, Ltd. v. Tatung Company and Tatung*

*Co. of America, Inc.*, No. Civ. A. 2:04CV154 (E.D. Va. Dec. 29, 2004) (Doumar, D. J.) [available as 2004 WL 3330838], and the underlying case record (herein after, the "Virginia Action"). LPL has referenced the Virginia Action for judicial notice in several of its motions before the Court and submissions to the Special Master.

This Court, where appropriate, has taken judicial notice of facts in the public record. *See, e.g., In re Delmarva Securities Litigation,* 794 F. Supp. 1293, 1299 (D.Del, 1992) ("this Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the parties seeking to have them considered"); *accord, PHP Liquidating, LLC v. Robbins PHP Liquidating,* 291 B.R. 592, 602 n. 7 (D.Del. 2003).

Facts of the type contained in judicial case records and opinions are particularly appropriate for judicial notice. As reasoned by Judge Stapleton of the Third Circuit: "it is not seriously questioned that that filing of documents in the case record provides competent evidence of certain facts – that a specific document was filed, that a party took a certain position, that certain judicial findings, allegations, or admissions were made." *Nantucket Investors II v. California Federal Bank (In re Indian Palms Associates, Ltd.),* 61 F. 3d 197, 205 (3d Cir. 1995). *See also, Furnari v. Warden, Allenwood Federal Correctional Institution,* 218 F. 3d 250, 255 (3d. Cir. 2000) (taking judicial notice of affidavit submitted by government attorney in an unrelated trial that described a witness as unreliable); and *Capital City & Trust v. Kroh (In re George P. Kroh),* 88 B.R. 987, 988-89 (Bankr. W. D. Mo. 1988) (taking judicial notice of findings of fact and conclusions of law entered in adversary actions against other parties by the same debtor as "highly relevant evidence of [debtor's] plan and scheme to obtain loans using false financial statements," as well as of the debtor's intent).

38

Accordingly, the Special Master takes judicial notice of certain of the findings of facts and conclusions of law made by the presiding judge in the Virginia Action on the basis that the opinion is a matter of public record that is available and verifiable in the public records of the United States District Court for the Eastern District of Virginia, as well as by computer through the Westlaw and other legal research databases. Judicial notice of the Virginia Action is taken solely for the purpose of determining against whom sanctions should properly be imposed.

In the Virginia Action, a patentee (Safer Display Technology, Ltd.) brought an infringement action against the same corporate entities referenced as Tatung Taiwan and Tatung America in the instant case. The similarities do not end there:

- In both the Virginia Action and the instant action, Tatung Taiwan filed motions to dismiss for lack of personal jurisdiction.[11]

- In both the Virginia Action and the instant case, declarations by David Shan-Juh Chang supported the motions of Tatung Taiwan to dismiss the litigations on jurisdictional grounds.[12]

- In both the Virginia Action and the instant case, declarations by Robin Tsou also supported motions to dismiss litigations on jurisdictional grounds.[13]

- In both the Virginia Action and the instant case, the Courts ordered a limited period of jurisdictional discovery.[14]

---

[11]  In the Virginia Action, *see* 2004 WL 3330838 at *1. In the Delaware action, *see* D.I. 16.

[12]  In the Virginia Action, *see* D.I. 8, 10 and 16 on civil docket for case 2:04-CV-00154-RGD (E.D. Va.). In the Delaware action, *see* D.I. 20.

[13]  In the Virginia Action, *see* D.I. 105 on civil docket for case 2:04-CV-00154-RGD (E.D. Va.). In the Delaware action, *see* D.I. 19, Exh. 3.

[14]  In the Virginia Action, *see* 2004 WL 3330838 at **1-2 (60-day period of jurisdictional discovery). In the Delaware action, *see* D.I. 88 (ordering a 90-day period of jurisdictional discovery, scheduled to end on February 15, 2005).

- In both cases, the limited periods for jurisdictional discovery were prolonged by multiple discovery objections and/or disputes.[15]

- In both cases, the "meet and confer" communications between counsel did not further resolution of the discovery disputes but, rather, served to prolong the jurisdictional discovery period.[16]

- In both cases, the patent holders were forced to file motions to compel Tatung Defendants to respond to basic discovery.[17]

- In both cases, Tatung Taiwan insisted that depositions of its employees be noticed for Taiwan, but allowed none of the noticed depositions to go forward.[18]

- In both cases, Tatung Taiwan refused to go forward with the noticed deposition of David Shan-Juh Chang, whose declaration supported its motions to dismiss on jurisdictional grounds.[19]

- In both cases, the Tatung Defendants avoided going forward with noticed depositions just days before they were scheduled, by filing motions for protective orders.[20]

- In both cases, jurisdictional discovery went nowhere as the close of the jurisdictional discovery periods approached.[21]

---

[15] In the Virginia Action, *see* 2004 WL 3330838 at *2. In the Delaware action, *see supra* at pp. 2-7.

[16] In the Virginia Action, *see* 2004 WL 3330838 at *2 ("amicability and communication between counsel for the parties has deteriorated significantly, which has also prolonged the jurisdictional discovery period"). In the Delaware action, *see infra* at p. 41.

[17] In the Virginia Action, *see* D.I. 116 *passim*. In the Delaware Action, *see supra* at pp. 3-7.

[18] In the Virginia Action, *see* D.I. 116 at pp. 12-14. In the Delaware Action, see supra at pp. 17-19.

[19] In the Virginia Action, *see* D.I. 116 at pp. 12-13. In the Delaware Action, *see supra* at pp. 17-19.

[20] In the Virginia Action, *see* D.I. 116 at pp. 13-14. In the Delaware Action, *see* pp. 2-7.

[21] In the Virginia Action, *see* D.I. 116 at p. 13. In the Delaware Action, *see* D.I. 132 at p. 4:13-19.

- In both cases – after burdening the Court and patent holders with substantial costs and delays – Tatung Taiwan belatedly agreed to consent to the jurisdiction of the courts.[22]

There is, however, at least one significant difference between the Virginia Action and the instant case. In the instant case, the Tatung Defendants are jointly represented by entirely different counsel than represented the Tatung Defendants in the Virginia Action.[23] It does not appear from the docket sheets in either action that any individual attorney appeared for the Tatung Defendants in both cases.

The marked similarity in the conduct of the Tatung Defendants during jurisdictional discovery in both cases cannot, in the Special Master's view, be attributed to advice of counsel. For that reason, the Special Master concludes that the Tatung Defendants are the architects of their own ill-conceived discovery strategy. It is particularly disappointing that the Tatung Defendants determined to follow that strategy in this case, even after similar conduct had been subject to the consideration of sanctions in the Virginia Action. As succinctly noted by the Honorable Robert G. Doumar in the Virginia Action:

> The Stalingrad Defense, in which the proponent tries to wear down the adversary until he succumbs to the depths of a longsome, frigid winter, cannot be implemented without severe costs to the proponent himself.

2004 WL 3330838 at *1. The Special Master agrees. Accordingly, the Special Master concludes that the sanctions recommended herein be assessed against – and only against – the Tatung Defendants, jointly and severally.

---

[22] In the Virginia Action, *see* D.I. 110 on docket 2:04-cv-00154 and 2004 WL 3330838 at **5-11. In the Delaware action, *see* D.I. 188.

[23] In the Virginia Action, the Tatung Defendants were represented by attorneys from various offices of the law firm of Greenberg & Traurig LLP. In the Delaware action, the Tatung Defendants are represented by lead counsel Robert C. Weems, Esquire, of the Law Offices of Baum & Weems and by Delaware co-counsel Jeffrey S. Goddess, Esquire, of the law firm Rosenthal Monhait Gross & Goddess, P.A.

41

## END NOTE

The Special Master would be remiss at the close of this chapter if several observations with respect to the course of jurisdictional discovery were not made.

**First**, it is clear to the Special Master that the discovery disputes between the parties were capable of reasonable resolution in accordance with controlling law and without burdening the Court's time. It is fair to say that the "meet and confer" process between counsel was an abject failure in moving issues towards resolution. Rather, the process served to further entrench the parties in their respective positions and to unnecessarily prolong jurisdictional discovery. Primary among the reasons for this failure was an abrogation of the duty to comply with the rules that govern litigation in this Court, coupled with a breakdown in the civility and professionalism in the communications between counsel.

**Second**, it is a privilege for an attorney to be admitted to practice *pro hac vice* before the Delaware District Court. In the opinion of the Special Master, it is a privilege that can and should be withdrawn if attorneys so admitted fail to comply with the applicable rules of the Court, and to conduct themselves with the civility and professionalism required of members of the Delaware bar.

**Third**, going forward − to avoid the risk of sanctions in a form beyond mere monetary sanctions − the Special Master cautions counsel to rethink their game plan and resolve not to engage in the conduct that so tainted the jurisdictional discovery in this case.

ENTERED this 16th day of August, 2005.

_____

Vincent J. Poppiti (DSBA No. 100614)
Special Master

42

# EXHIBIT 11

RECEIVED

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### (Norfolk Division)

FILED

DEC 2 3 2004

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| SAFER DISPLAY TECHNOLOGY, LTD., | ) |
| | ) |
| Plaintiff, | ) Civil Action No.: 2:04cv154 |
| v. | ) Judge Robert G. Doumar |
| | ) |
| TATUNG COMPANY and | ) Pursuant to Local Rule 5 and the Protective |
| TATUNG CO. OF AMERICA, INC. | ) Order Entered on September 28, 2004, the |
| | ) Declaration of Douglas Weinstein and |
| Defendants. | ) Attachments Thereto are Filed Under Seal. |
| | ) |
| | ) |

## PLAINTIFF SAFER'S SUBMISSION REGARDING COURT'S HEARING FOR DECEMBER 29, 2004 ON TATUNG'S MOTION FOR LEAVE TO WITHDRAW ITS JURISDICTIONAL CHALLENGE

### I.     Introduction

Tatung's litigation tactics have needlessly driven up litigation costs since July. It should be sanctioned for its tactics and ordered to pay Safer's attorney fees.

In attempting to have this case dismissed for lack of personal jurisdiction, Tatung never denied that its accused computer monitors were sold in Virginia. Instead, it put Safer to the burden of proving sales of Tatung monitors in Virginia—sales that would be expected from a multibillion-dollar company that annually sells hundreds of millions of dollars of products in the United States.

In refusing to submit to the jurisdiction of this court, Tatung forced Safer to pursue jurisdictional discovery from defendants and from third party distributors and sellers, and then Tatung obstructed Safer's efforts to collect that discovery. While Tatung did finally submit to the jurisdiction of this Court, it did so only after consuming significant resources of the Court

116

and the parties, and on the eve of depositions ordered by the Court. In a final display of hubris, Tatung has attempted to shift blame to Safer for the unnecessary wheel spinning and litigation costs that resulted directly from Tatung's litigation tactics.

On December 22, 2004, Safer discovered evidence indicating that Tatung-Taiwan was the exclusive manufacturer for North America for at least two different monitors for a national computer vendor whose monitors are undeniably sold in Virginia, which means that Tatung's jurisdictional challenge was apparently not brought in good faith.[1] Judge Doumar explicitly warned Tatung that "if all they are doing is running up the costs" with their jurisdictional challenge, "then they're going to pay for it." That is precisely what Tatung has done, despite the Court's express warning, and despite its exclusive North American supply contract with the nationwide computer vendor. Accordingly, Tatung should be ordered to pay Safer's attorneys' fees.

## II.    Background

### A.    The Parties

Plaintiff Safer Display Technology, Ltd. ("Safer") is the owner of U.S. Patent No. 4,270,145 ("the '145 patent") which covers, *inter alia,* computer monitors with on-screen display features. (Complaint (Dkt. No. 1) ¶ 13.) At least 28 corporations have taken a license to practice the valuable on-screen display features covered by the '145 patent, including Sony, Toshiba, Samsung, Sharp, NEC, JVC, LG Electronics, and Phillips Magnavox. In its Complaint, Safer alleges that Tatung Company ("Tatung-Taiwan") and Tatung Company of America, Inc. ("Tatung-U.S.") infringed, or induced others to infringe, the '145 patent by selling and importing

---

[1] Safer has no reason or evidence to believe that this manufacturing contract was cancelled and/or not fulfilled. Safer thus concludes that the exclusive manufacturing relationship indeed existed. In fact, confidential discovery from Tatung-Taiwan and third parties all indicates that Safer is entirely correct in this conclusion. (See Weinstein Decl. ¶¶ 3-17.)

2

into the U.S. Tatung-Taiwan's computer monitors with on-screen display features during 1998 and 1999. (*Id.* ¶¶ 11, 13.)

Defendant Tatung-Taiwan is a multibillion-dollar manufacturer and self-described "worldwide leader in the design and manufacturing of a vast array of digital consumer products." (www.tatung.com.) Tatung-Taiwan's website lists its subsidiary, Tatung-U.S., as one of its worldwide business locations. (Neal Decl. Supporting Safer's Opposition to Tatung-Taiwan's Motion to Dismiss ("Neal Decl.") (Dkt. No. 11), ¶ 8.) Tatung-Taiwan is a 50% owner of Tatung-U.S., and Tatung-Taiwan's General Manager is also one of the four directors of Tatung-U.S. (*Id.* ¶ 6.) During the years 1998 and 1999 at issue in this lawsuit, Tatung-Taiwan sold over $498,000,000 and $380,000,000 in products into the United States. (*Id.* ¶ 11.) Furthermore, Tatung-Taiwan has sold and continues to sell large numbers of monitors to computer distributors, including Compaq and Hewlett-Packard. (Weinstein Decl. ¶¶ 8, 10, 17.). These computer distributors place their names and model numbers on the monitors and then sell them nationwide, including in Virginia, through national distribution channels.

A large part of Tatung-Taiwan's jurisdictional challenge has been its assertion that, although it admittedly sells its monitors to national computer vendors such as Compaq and Hewlett-Packard, it supposedly did not know whether its monitors were sold in Virginia because it was possible that there were additional monitors made by other manufacturers that were similarly rebranded and resold by Compaq and Hewlett-Packard. Indeed, counsel for Tatung-Taiwan specifically argued that to Judge Bradberry on December 1, 2004 (Weinstein Decl. Tab 33, at 16:9-13 ("we don't know how many manufacturers Hewlett-Packard or Compaq have other than Tatung").) That statement is contradicted by evidence indicating that Tatung-Taiwan

3

was the exclusive North American manufacturer for a national computer distributor in 1998. (This confidential relationship is discussed in the Weinstein Decl. ¶¶ 3-17, submitted under seal.)

**B.  Tatung's- Taiwan's Sales of Infringing Monitors in the U.S. is Evident From its Application For FCC Authorization**

In addition, according to the Federal Communications Commission ("FCC"), the U.S. agency responsible for regulating electronic devices including monitors, Tatung-Taiwan applied for and obtained FCC authorization for certain of its monitors. (Weinstein Decl. ¶ 18.) There would be no reason for Tatung-Taiwan to seek FCC approval for its monitors if Tatung-Taiwan did not intend for its monitors to be sold in the U.S. (*Id.*)

Furthermore, Safer has recently learned from information from the FCC that Tatung-Taiwan applied for authorization to sell Compaq MV700 color monitors with on-screen display functions during the applicable time period (1998-99). (Weinstein Decl. ¶¶ 18-23.) Safer has further learned from documents recently produced by Circuit City, Ingram Micro, and Office Depot that these companies had significant sales of Compaq MV700 monitors in Virginia during the applicable period. (The specific numbers of monitors sold by these companies are confidential and discussed in the supporting Weinstein Declaration (¶¶ 10-16), submitted under seal.)

Safer was on the brink of taking depositions to prove that these Compaq MV700 monitors were manufactured by Tatung-Taiwan, and was pursuing similar jurisdictional information from Hewlett-Packard, when Tatung-Taiwan abruptly moved to withdraw its jurisdictional challenge on December 9, 2004. (Dkt. No. 108.) And as explained above, approximately two weeks later, Safer discovered evidence that Tatung-Taiwan was an exclusive manufacturer for North America for at least two monitors sold nationally and in Virginia.

4

**C.** **Tatung-Taiwan's Challenge to Personal Jurisdiction Lacked a Good Faith Basis**

Tatung-Taiwan's deadline to respond to Safer's complaint was extended by a stipulated order to July 15, 2004. (Dkt. No. 4). On that date, Tatung-Taiwan filed its Motion to Dismiss, contending—despite its exclusive manufacturing relationship for North America with a national computer vendor, sales of hundreds of million dollars of its consumer electronics products in the U.S., its sales to nationwide vendors like Compaq and Hewlett-Packard, and its 50% ownership and managerial control over Tatung-U.S.—that this Court supposedly lacks personal jurisdiction over Tatung-Taiwan. (Dkt. Nos. 6 and 7.) Tellingly, Tatung-Taiwan did not argue in its papers that its monitors were *not* sold in Virginia, even though Tatung-Taiwan was legally obligated to reasonably investigate whether its defense was valid (see Argument at pp. 17-18 below). Furthermore, Tatung-Taiwan could not argue in good faith that its monitors were not sold in Virginia because it knows, at a bare minimum, that (1) it was the exclusive manufacturer for North America for a national computer vendor in 1998, and (2) that its monitors were sold by Compaq and Hewlett-Packard in nationwide distribution channels to retailers such as Circuit City, Best Buy, and Office Depot, who sell monitors in Virginia. Finally, it defies reason that a sophisticated, global, multi-billion dollar company like Tatung-Taiwan would not know where its monitors and other products are sold in the United States.

Despite its duty to investigate its jurisdictional defense, Tatung-Taiwan argued instead that this action should be dismissed because Safer, without the benefit of any discovery, could not yet prove that accused monitors had been sold in Virginia.[2] Tatung-Taiwan's motion to

---

[2] In opposing Tatung-Taiwan's motion to dismiss for alleged lack of personal jurisdiction, which was filed prior to jurisdictional discovery, Safer explained that this Court has personal jurisdiction over Tatung-Taiwan for at least two reasons summarized very briefly here. First, the exercise of personal jurisdiction comports with traditional notions of fair play and

dismiss was heard by Judge Doumar on August 25, 2004. The Court rejected Tatung-Taiwan's argument that this case should be dismissed without discovery, noting that "defendant really knows what they're doing, what they're selling, not the plaintiff." (Weinstein Decl. Tab 32 at 33:21-22.) Judge Doumar similarly noted that "the facts establishing jurisdiction are mostly in the knowledge of the defendant, not in the knowledge of the plaintiff." (*Id.* at 16:22-24.) Accordingly, the Court deferred deciding Tatung-Taiwan's motion and granted Safer a limited 60 day period to take jurisdictional discovery. The Court stated that, under the Federal Circuit's *Beverly Hills Fan* decision, Tatung-Taiwan would be found subject to personal jurisdiction if its allegedly infringing monitors had been sold in Virginia. (*Id.* at 33:10-12; 37:15-18.) Judge Doumar warned Tatung-Taiwan that a "Stalingrad defense" would be unacceptable (*Id.* at 40:3-11) and that the Court wanted to "get to what is the real issue in the case." (*Id.* at 9:9-10.)

Judge Doumar also warned Tatung-Taiwan as follows: "Let me be very frank with you. If all [Tatung-Taiwan is] doing is running up the costs, then they're going to have to pay for it." (*Id.* at 26:3-4.) Endeavoring to focus on the "real issues," the Court asked Tatung-Taiwan's counsel whether he was wasting time with jurisdictional discovery because "the fact of the matter is [Safer] could find out how many products were being sold by each of your defendants here, and they could find out which products were sold to whom. It just -- if they're going to turn up with the same answer, *aren't we wasting our time*?" (*Id.* at 11:24-12:3, emphasis added.) Four months later, the answer is a resounding "Yes." Tatung-Taiwan's jurisdictional challenge

---

substantial justice under a "stream of commerce" analysis. (S. Opp. to Mot. Dismiss at 5-9 (Dkt. 11), citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994).) Second, Safer explained that this Court has personal jurisdiction over Tatung-Taiwan because Tatung-U.S. is the agent of Tatung-Taiwan, Tatung-Taiwan exerts control over Tatung-U.S., and the conceded jurisdiction over Tatung-U.S. in Virginia for selling products in Virginia, including those made by Tatung-Taiwan. (*Id.* at 9-11; Tatung's Rebuttal Brief in Support of Defendant's Motion for Protective Order (Dkt. No. 42) at 3 ("Tatung U.S. submitted to personal jurisdiction in Virginia as it conducts business in Virginia.").)

has been a colossal and completely unnecessary waste of time and resources for the Court, Safer, and at least nine third parties.

### D. Tatung-Taiwan Repeatedly Attempted to Obstruct Jurisdictional Discovery and Depositions of Witnesses From Taiwan

As Safer previously explained to the Court, finding proof that Tatung-Taiwan monitors were sold in Virginia from third party documents was originally a difficult, multi-step process for Safer because Tatung-Taiwan sells its monitors to branded computer vendors, such as Compaq, who place their own names and model numbers on the monitors before they are sold by retailers such as Office Depot. For Safer to prove that sales of Compaq monitors by Office Depot in Virginia were in fact sales of Tatung-Taiwan manufactured monitors required it to "connect the links" and compare various records from Tatung-Taiwan to the branded vendor to the retailer, which was complicated by the fact that, prior to the date that Tatung-Taiwan withdrew its motion to dismiss, none of the documents received from third party monitor vendors and retailers have specifically identified or tracked Tatung-Taiwan as the manufacturer of rebranded monitors sold in Virginia. Indeed, Tatung-Taiwan acknowledged the difficulty of this task at the time, going so far as to argue that "connecting the links is a hopeless endeavor" because the third party documents produced so far do not contain Tatung-Taiwan's own product numbers. (Tatung-Taiwan's Mem. Supporting to Withdraw its Motion to Dismiss (Dkt. 108) at 6.)

For this reason, and also because Safer had not yet received sufficient documents from third parties to take their depositions (Weinstein Decl. Tab 33 at 10:17-11:2; 17:23-19:1), Safer had for months been trying to schedule depositions with knowledgeable witnesses from Tatung-Taiwan. Safer has always believed that people in charge of Tatung-Taiwan's sales and marketing—as opposed to the manager of personnel who was selected to submit a terse

declaration supporting Tatung-Taiwan's motion to dismiss—*must* know where the monitors rebranded by Compaq and others are being sold throughout the U.S.[3]  Given that Safer had only one 60 day shot at taking jurisdictional discovery, however, it had no choice but to pursue information from third parties as well, including Viewsonic, Compaq, Hewlett-Packard, Best Buy, Office Depot, and Wal-Mart.  As explained more fully below, Tatung-Taiwan's counsel have repeatedly stalled and refused to produce witnesses from Taiwan, and once they were ordered by Judge Bradberry to promptly produce witnesses from Taiwan, Tatung-Taiwan withdrew its jurisdictional challenge.  Tatung-Taiwan's counsel have also impeded and delayed discovery from third parties, including Safer's attempts to obtain from Compaq its contracts with Tatung-Taiwan.  All the while, Tatung-Taiwan has tried to take advantage of the very delays it caused by arguing that personal jurisdiction must not exist because of the time it has taken Safer to collect the evidence.  The Court should see this gameplaying for what it is.

On August 27, 2004, two days after the hearing on Tatung-Taiwan's motion to dismiss, Safer served jurisdictional document requests and interrogatories on Tatung-Taiwan and Tatung-U.S.  On August 31, 2004, Safer served third party subpoenas seeking relevant jurisdictional documents and testimony from third parties designed to uncover Tatung-Taiwan's distribution network and sales into Virginia.  These subpoenas generally sought documents and testimony in mid- to late-September and early October (i.e., well within the 60 day frame).[4]  Specifically,

---

[3] The same is apparently not true for employees of Tatung-U.S. because they claim that they do not sell to HP, and presumably other branded vendors. (Supp. Decl. of D. S. J. Chang Supporting Tatung Co.'s Mtn. to Dismiss (Dkt. No. 10), ¶ 5.)  Indeed, it appears from discovery from Tatung-U.S. that it sells to much smaller vendors, including in Virginia, than the national vendors like Compaq, Hewlett-Packard, and Viewsonic.

[4] Because Judge Doumar also ordered at the August 25 hearing that Safer could take merits discovery as well as jurisdictional discovery, Safer also pursued merits discovery during this time frame from both defendants and third parties. (Weinstein Decl. Tab 33 at 33:3-5.)  Judge Bradberry reviewed that transcript and confirmed that that was the order on October 27,

8

Safer initially served third party subpoenas on Best Buy, Wal-Mart, eMachines, Office Depot, CompUSA, Circuit City, and Viewsonic.

        **1.**     **Tatung-Taiwan Acted to Dissuade Third Parties From Producing Subpoenas From Discovery**

Tatung-Taiwan moved quickly to block these discovery efforts by Safer. First, on September 9 and 10, 2004, Tatung-Taiwan wrote individually to the third parties subpoenaed by Safer and falsely told them that there were "ongoing negotiations with plaintiff's counsel concerning the scope and propriety of the subpoenas" (Weinstein Decl. Tab 16), an obvious attempt to dissuade the third parties from producing any discovery. Tatung-Taiwan's letters further attempted to obstruct discovery by stating that there was an "increasing likelihood" that Tatung-Taiwan would move for a protective order. (*Id.*) Safer promptly admonished Tatung-Taiwan that (1) there had been no negotiations regarding the third party subpoenas, (2) Tatung-Taiwan had no standing to challenge the subpoenas, and (3) "your letters have impeded the progress of discovery, and we request that you cease further actions that delay our rightful discovery of these documents." (Weinstein Decl. Tab 17.)

Unfortunately, however, the damage had been done. For example, although Compaq located some contracts with Tatung-Taiwan, counsel for Tatung-Taiwan first instructed Compaq that they should not be produced because Tatung-Taiwan had filed a (meritless) motion seeking to limit discovery to televisions, even though monitors and not televisions were specifically

---

2004. (*Id.* Tab 34 at 39:12-23.) Although the Court subsequently limited discovery to jurisdictional issues on November 16 (*Id.* Tab 35 at 27:13-19), before that date the Court had expressly permitted Safer and defendants to pursue merits discovery. Accordingly, rather than have to take jurisdictional discovery now and merits discovery later from the same witnesses, Safer originally sought merits discovery from the same witnesses from whom Safer was also seeking jurisdictional discovery. Although Tatung-Taiwan has repeatedly tried to make an issue out of this, Tatung-Taiwan has no basis for complaint given the two express orders from the Court, and given that Tatung-Taiwan inundated Safer with merits interrogatories, document requests, and requests for admissions during the same time period.

accused of infringing in the complaint (discussed in section D.2 below). Later, apparently after its meritless motion was denied, Tatung-Taiwan instructed Compaq that the contracts were supposedly not responsive to the subpoena because they were executed prior to 1998. (Ottinger Decl. ¶ 6.) In subsequent follow-up efforts by Safer's counsel, however, Compaq advised that the contracts were automatically renewed or renewable on an annual basis, and that they were apparently operative during the relevant 1998-99 timeframe. (*Id.*) Still later, Tatung-Taiwan told Compaq that the contracts should not be produced because Tatung-Taiwan was withdrawing its jurisdictional challenge. (*Id.* ¶ 7.) (Despite these admonitions from Tatung-Taiwan's counsel, Compaq eventually produced these contracts on December 22, 2004, nearly two weeks after Tatung-Taiwan moved to withdraw its jurisdictional challenge. The content of these confidential documents is discussed in the Weinstein Declaration at ¶¶ 6-8.)

In addition, in its letter to Wal-Mart, Tatung-Taiwan's counsel went so far as to say that one of his partners "will be in your offices next week on another matter but will touch base with you." (Weinstein Decl. Tab 16.) Very soon thereafter, Wal-Mart sent Safer a certification that it had no responsive documents. (Weinstein Decl. Tab 18.) Interestingly, Wal-Mart later retracted that certification and, in late November, produced responsive documents after Safer sent a second deposition subpoena seeking testimony regarding Wal-Mart's efforts to locate responsive documents. (*Id.* Tabs 20 and 21.)

### 2.     Tatung-Taiwan Also Blocked Third Party Discovery By Filing a Meritless Motion for a Protective Order

Tatung-Taiwan's letters and communications with the subpoenaed third parties also delayed jurisdictional discovery because the third parties delayed producing documents until after the resolution of Tatung-Taiwan's motion for protective order. (Weinstein Decl. Tab 33 at 17:23-19:1.) On September 17, 2004, soon after it wrote to the third parties, Tatung-Taiwan

filed a motion for protective order asking the Court to, *inter alia,* completely preclude third party depositions until further notice. (Mem. Supporting Tatung's Motion for Protective Order (Dkt. No. 27) at 2.) Tatung-Taiwan also moved to block discovery regarding accused products. That is, Tatung-Taiwan tried to completely prevent discovery of monitors and limit discovery to televisions, even though monitors are expressly accused of infringing in Safer's complaint and televisions are not. (*Id.*) The Court predictably denied these meritless requests when the motion was finally heard on October 27,[5] but during the pendency of that motion, Tatung-Taiwan blocked discovery for approximately two months because the subpoenaed third parties delayed producing their documents until after the resolution of the motion. (Weinstein Decl. Tab 33 at 17:23-19:1.) For instance, as of November 10, the only documents received from third parties was a single spreadsheet from Office Depot, and these were produced only after Office Depot was informed of the denial of Tatung-Taiwan's meritless motion. (*Id.* Tab 22.) On December 1, just eight days before Tatung-Taiwan dropped its jurisdictional challenge, Safer's counsel reported to the Court that, finally, "we're getting documents from those third parties now" and that Safer had also received documents from Wal-Mart. (*Id.* Tab 33 at 10:20-23.)

### 3. Tatung-Taiwan's Inadequate Document Production

Tatung-Taiwan blocked jurisdictional discovery on other fronts as well. For instance, as of October 5, 2004, Tatung-Taiwan had produced only 14 documents, and none of them sufficiently identified all of the sales and shipments of Tatung-Taiwan video monitors or customers of Tatung-Taiwan, among other deficiencies. (Weinstein Decl. Tab 23.) On October

---

[5] Tatung-Taiwan disingenuously tries to give the impression that it prevailed in its first motion for a protective order because the Court slightly narrowed the time frame from which documents would be produced in discovery. Given that the Court rejected Tatung-Taiwan's primary tactical requests to block discovery from third parties and discovery regarding monitors (the accused products), the motion can only be viewed as a failure.

15, Safer was forced to file a motion for an expedited hearing on its motion to compel because defendants had failed and refused to comply with even the most basic discovery requests (e.g., sales and import records, and the manuals and technical documents relating to on-screen display). (Dkt. No. 48.) Although Tatung-Taiwan later produced summary documents showing sales to certain computer vendors at a high level (Weinstein Decl. ¶ 17 and Tab 10), these are insufficient because they lack the underlying documents' detail regarding key internal numbers for tracking models such as serial numbers. Although Defendants also subsequently produced approximately 7000 pages of documents, nearly all of these were asserted prior art that had absolutely no relevance to jurisdiction. (Weinstein Decl. Tab 24 at 2.)

### 4. Tatung-Taiwan Refused to Produce Knowledgeable Witnesses from Taiwan

Tatung-Taiwan also repeatedly stalled and refused to produce Tatung-Taiwan witnesses for deposition. On September 23, Safer served notices for depositions in early October of David Shun-Juh Chang, the Tatung-Taiwan employee who submitted two declarations supporting its motion to dismiss, as well as a notice for a Rule 30(b)(6) deposition of Tatung-Taiwan. These depositions were set in October in the offices of Safer's counsel in Washington, D.C. Tatung-Taiwan objected and demanded that the depositions proceed in Taiwan. Safer's counsel promptly agreed to travel to Taiwan but, because only two inches of documents had been received from Tatung-Taiwan, Safer suggested pushing the depositions back approximately one week to October 20. (Weinstein Decl. Tab 25.) Tatung-Taiwan's counsel, apparently surprised by Safer's agreement to travel to Taiwan and in search of another excuse, refused to produce the witnesses in Taiwan on October 20. (*Id.* Tab 26.) Tatung-Taiwan now complained that it would be too expensive to take the depositions in Taiwan until after defendants' document production was completed, and that the depositions should not be heard until the Court had ruled on

12

defendants' motion for a protective order (which was denied two weeks later, as explained above). (*Id.* at 2.) Tatung-Taiwan's counsel requested that the depositions be pushed back a "few weeks" into November. (*Id.*)

Thus, by mid-October, Safer's attempts to obtain jurisdictional discovery were going nowhere, thanks to Tatung-Taiwan. The 60 day period ordered by Judge Doumar would close in less than two weeks. Safer kept trying, however, and on October 14 it noticed depositions in Taiwan for five Tatung-Taiwan witnesses recently identified as knowledgeable in Tatung-Taiwan's responses to Safer's interrogatories. Specifically, Safer noticed the depositions of (1) O. Shaih and Jerry Huang (each identified by Tatung-Taiwan as responsible for sales, marketing, and distribution, and relevant to the stream of commerce jurisdiction analysis); and (2) W.S. Lin, K.Y. Lang, and A.C. Wang (each identified by Tatung-Taiwan as serving on the board of management of Tatung-Taiwan and Tatung-U.S., and relevant to the agency jurisdiction analysis). On October 22, Tatung-Taiwan refused to produce these individuals. (Weinstein Decl. Tab 27.) Although Tatung-Taiwan stated that it would "attempt" to provide a corporate designee to testify regarding a handful of the topics requested by Safer (*id.* at 2), Tatung-Taiwan offered no dates for any depositions. Instead, Tatung-Taiwan filed a second motion for protective order on October 26 (Tatung's Motion to Limit Depositions (Dkt. 57)), and counsel for Tatung-Taiwan refused to schedule depositions in Taiwan until after Tatung-Taiwan's second motion for protective order was heard. (Weinstein Decl. Tab 28 at 2 ("We will not travel to Taiwan until after our motion has been heard.").) This was the same stall tactic that counsel had used while Tatung-Taiwan's first motion for protective order was pending.

Tatung-Taiwan's counsel also insisted that third party depositions be taken before the Tatung-Taiwan witnesses (Weinstein Decl. Tab 29), even though Tatung-Taiwan knew (1) that it

had blocked discovery from third parties with its earlier letters and communications, so that Safer was not yet in a position depose the third parties, and (2) that linking sales of Tatung-Taiwan's monitors with the third party documents alone is an extremely difficult task. Tatung-Taiwan also stated that it would not make any Tatung-Taiwan witnesses available until January or February of 2005 (*id.*), which Safer explained was unacceptable, particularly given that the deposition notices had been pending for months and the Court's admonition to speed the pace of jurisdictional discovery. (*Id.* Tab 30.)

Tatung-Taiwan continued to refuse to produce any witnesses from Taiwan until Magistrate Judge Bradberry's December 1, 2004, order that Tatung-Taiwan witnesses must appear for deposition within the month of December. (Weinstein Decl. Tab 33 at 30:3-4.) Eight days later, Tatung-Taiwan filed a motion seeking leave to withdraw its motion to dismiss. (Dkt. No. 107.) Tatung-Taiwan's stated reasons for moving to withdraw its jurisdictional challenge were clearly pretextual and not supported by the record, as evidenced by the Court's subsequent order that Tatung-Taiwan support its motion by citations to the record. (Dkt. No. 109.)

It is plain that Tatung-Taiwan moved to withdraw the challenge because Safer, after months of effort, was finally getting an opportunity to depose witnesses from Taiwan and was on the verge of proving that Tatung-Taiwan's monitors had been sold in Virginia. For instance, Safer was planning to extensively question Tatung-Taiwan witnesses regarding, *inter alia*, the Compaq MV700 monitor it manufactured for Compaq and its warranty and return records from retailers in Virginia. Safer was also corresponding with Compaq and requesting that its contracts with Tatung-Taiwan be produced when Tatung-Taiwan moved to withdraw its challenge.

### E. Defendant's Allegations that Safer Was Driving Up Costs Are Baseless

Defendants have repeatedly but baselessly argued that Safer has attempted to drive up costs in this litigation. Nothing could be further from the truth. Safer, as the plaintiff in this case, has every interest in achieving a prompt and cost-effective resolution of defendants' infringement. Indeed, Safer has agreed upon licenses with 28 parties, including former co-defendant Jean. Tatung-Taiwan, on the other hand, has an incentive to delay and complicate these proceedings as it did with its jurisdictional challenge.

As explained in Safer's opposition to defendants' second motion for a protective order (Dkt. 72 at 1-4), until November 16, the Court had *twice* expressly stated that both parties could take merits discovery along with jurisdictional discovery, and defendants themselves had served Safer with interrogatories, document requests, and requests for admissions directed to the merits of this case. Once Judge Doumar subsequently limited discovery to jurisdictional issues, however, Safer obviously agreed to abide by that Order (Weinstein Decl. Tab 33 at 19:19-23), yet Tatung-Taiwan is still arguing about Safer's earlier efforts to obtain merits discovery as a red herring. Furthermore, Safer did not set 27 or 28 depositions in this case as defendants have alleged, as explained in our papers. (Dkt. 72 at 1.) Defendants double dipped in arriving at that number by including depositions noticed in other consolidated cases, including the now settled case against Jean. In truth, Safer noticed seven depositions for Tatung-Taiwan (one 30(b)(6), five individuals identified by Tatung-Taiwan as knowledgeable in response to interrogatories, and a Tatung-Taiwan employee relevant to the agency analysis), and two for Tatung-U.S. (one 30(b)(6) and one individual identified by Tatung-U.S. as knowledgeable in response to interrogatories). In addition, Safer noticed six potential depositions of third parties in the event that they would be needed to prove sales in Virginia, but Safer has not yet received sufficient

15

documents from those third parties and is not ready to take their depositions now. (Weinstein Decl. Tab 33 at 10:17-11:2; 17:23-19:1.)

Importantly, Safer has always told defendants that it might not need to take all of these noticed depositions, and that it would stop once it discovered proof of sales in Virginia, as Safer's counsel confirmed to the Court. (Weinstein Decl. Tab 33 at 4:14-5:3; 10:17-11:2.) As Judge Bradberry pointed out, there were really no more than eight depositions at issue in early December (*Id.* at 11:3-8), and Safer has always needed to proceed with the Tatung-Taiwan witnesses first.

It was also made clear by Judge Bradberry that jurisdictional depositions and discovery would not proceed endlessly as Tatung-Taiwan pretends, but rather that jurisdictional discovery would stop once solid evidence of jurisdiction was discovered. (Weinstein Decl. Tab 33 at 25:1-26:7; 30:3-10; 31:16-25; 39:14-25.) But given the tight time constraints and Tatung-Taiwan's efforts to stymie discovery, Safer had no choice but to notice these potential depositions up front and proceed until it uncovered undisputable evidence of sales in Virginia.

Furthermore, Tatung-Taiwan has driven up the costs in this case with extensive motion practice. In addition to the meritless motions to block discovery of third parties and of accused monitors described above, it also filed a motion for summary judgment asserting that Safer did not own the patent-in-suit. Although the motion was unfounded and summarily denied by Judge Doumar, Safer nevertheless was forced to respond to this theoretically dispositive motion in writing and in Court. Tatung-Taiwan also filed another motion to "correct" an already correct order that was summarily denied by Magistrate Judge Bradberry, but Safer again had to respond and appear in Court to oppose that motion.

16

### III.  Argument

#### A.  Tatung-Taiwan Should be Sanctioned for Unreasonably and Vexatiously Multiplying These Proceedings

As explained above, Tatung-Taiwan has wasted an enormous amount of time and money by raising its unsupported jurisdictional challenge and by continuously interfering with Safer's attempts to obtain jurisdictional discovery from defendants and third parties.  This Court has multiple sources of authority to sanction Tatung-Taiwan's unsupported, dilatory, vexatious, and wasteful litigation tactics, including (1) its inherent authority (*Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 45-46 (1991) (courts have inherent authority to sanction attorneys and parties who have shown "bad faith by delaying or disrupting the litigation" or who have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons")); (2) Rule 11 of the Federal Rule of Civil Procedure; and (3) 28 U.S.C. § 1927 (party's attorney may be ordered to pay opposing party's attorneys' fees if he "multiplies the proceedings in any case so unreasonably and vexatiously").

Although the Court may *sua sponte* order sanctions against a party or attorney under Rule 11 (Fed. R. Civ. P. 11(c)(1)(B)), Safer is apparently precluded from moving for sanctions under that Rule because Tatung-Taiwan has withdrawn its jurisdictional challenge, even though the evidence indicates that the defense was unsupported (Weinstein Decl. at ¶¶ 4-23) and after so much time and money has been wasted over the issue.  Fed. R. Civ. P. 11(C)(1)(A).  Regardless, Safer may and does move for sanctions, including attorneys' fees, under the Court's inherent power and § 1927, for the many reasons explained above.

Moreover, Tatung-Taiwan had an affirmative duty to reasonably investigate its allegation of no personal jurisdiction before wasting months of time and money litigating the issue, and failure to do so is itself a basis for sanctions.  *Continental Air Lines, Inc. v. Group Sys. Int'l Far East, Ltd.,* 109 F.R.D. 594, 597-600 (C.D. Cal. 1986); *Ortho Pharm. Corp. v. Sona Dist., Inc.,*

117 F.R.D. 170, 171-72 (S.D. Fla. 1986). Thus, even if Tatung-Taiwan can somehow explain the newly discovered evidence indicating that Tatung-Taiwan was the exclusive manufacturer for North America for at least two different monitors for a national computer vendor whose monitors are undeniably sold in Virginia, Tatung-Taiwan should nevertheless be sanctioned for failing to investigate its asserted defense.

**IV.    Conclusion**

Safer respectfully requests that the Court sanction Tatung-Taiwan by, among other things, an award of attorneys' fees incurred in opposing Tatung-Taiwan's motion to dismiss for lack of jurisdiction and all of the related discovery disputes, motion practice, and hearings that have flowed therefrom. Safer conservatively estimates and represents that Tatung-Taiwan's tactics have cost many tens of thousands of dollars of attorney time. Safer respectfully requests that, if deemed necessary, the Court allow Safer a reasonable period of time to make an evidentiary showing to support its request for attorneys' fees. Safer also suggests that the Court should order that Tatung-Taiwan pay a sanction to the Court due to the considerable time and effort that the Court has had to expend over Tatung-Taiwan's unreasonably duplicative litigation tactics.

Dated:  December 23, 2004

Respectfully submitted,

John M. Ryan (Va. Bar No. 4301)
Richard H. Ottinger (Va. Bar No. 38842)
VANDEVENTER BLANK LLP
500 World Trade Center
Norfolk, VA  23510
(757) 446-8600

Laura P. Masurovsky (Va. Bar. No. 32379)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C.  20005-3315
(202) 408-4000

Roger D. Taylor
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
3200 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, GA  30308
(404) 653-6400

Attorneys for Plaintiff,
Safer Display Technology, Ltd.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that as of the date noted below the original or a true copy of the foregoing pleading was served in the manner indicated upon all parties herein, or their counsel of record, as follows:

| | |
|---|---|
| Stephen E. Noona | Manner of Service: |
| Kristan B. Burch | _____   First Class US Mail |
| Kaufman & Canoles, PC | \_\_\_\_\_  Overnight Delivery |
| 150 W. Main Street | \_\_\_\_\_  Facsimile |
| Norfolk, VA 23510 | \_\_\_\_\_  Electronically |
| *Counsel for Tatung Company, Tatung Co. of* | __X__  Hand Delivery |
| *America, Inc..* | \_\_\_\_\_  Other: _____ |

19

Mark L. Hogge
Kathryn L. Clune
Greenberg Traurig, LLP
800 Connecticut Avenue, Suite 500
Washington, D.C. 20006
*Counsel for Tatung Company, Tatung Co. of
America, Inc..*

Manner of Service:
  X First Class US Mail
    Overnight Delivery
    Facsimile
  X Electronically (w/o attachments)
    Hand Delivery
    Other: _____

Mark Krietzman
Greenberg Traurig LLP
2450 Colorado Ave., Suite 400 E
Santa Monica, CA 90404
(310) 586-7700
*Counsel for Tatung Company, Tatung Co. of
America, Inc..*

Manner of Service:
  X First Class US Mail
    Overnight Delivery
    Facsimile
  X Electronically (w/o attachments)
    Hand Delivery
    Other: _____

Rolf Marshall
Preston Gates Ellis & Rouvelas Meeds, LLP
1735 New York Avenue, N.W., Suite 500
Washington, D.C. 20006
*Counsel for Envision Peripherals, Inc.*

Manner of Service:
  X First Class US Mail
    Overnight Delivery
    Facsimile
    Electronically
    Hand Delivery
    Other: _____

Michael J. Bettinger
Ralph Alldredge
Preston Gates & Ellis, LLP
55 Second Street, Suite 1700
San Francisco, California 94105
*Counsel for Envision Peripherals, Inc.*

Manner of Service:
  X First Class US Mail
    Overnight Delivery
    Facsimile
    Electronically
    Hand Delivery
    Other: _____

Done this date: December 23, 2004

Of Counsel

# EXHIBIT 12

Hearing

---

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD, )
                                 )
           Plaintiffs,         )    C.A. No. 04-343(JJF)
                                   )
v.                                    )
                                   )
TATUNG CO., TATUNG COMPANY OF )
AMERICA, INC., and VIEWSONIC )
CORPORATION,               )
                                   )
           Defendants.        )

       Hearing of above matter taken pursuant to
notice before Renee A. Meyers, Registered Professional
Reporter and Notary Public, in the law offices of BLANK
ROME, LLP, 1201 North Market Street, Wilmington,
Delaware, on Friday, March 16, 2007, beginning at
approximately 3:00 p.m., there being present:

BEFORE:   VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

         THE BAYARD FIRM
         RICHARD D. KIRK, ESQ.
          222 Delaware Avenue, Suite 900
          Wilmington, Delaware   19899
          for Plaintiffs

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street     Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Hearing

8 (Pages 26 to 29)

Page 26

1    MR. MERIDETH: That delay is not a
2  reason to continue the Court established deadline.
3    I agree that if the Courts are putting
4  off these depositions until there is a decision, that's a
5  different thing, but the -- we are all under the same
6  burden when someone serves 23 deposition notices, with
7  only 30 days left to go in the case, it's going to be a
8  real difficult logistical problem.
9    SPECIAL MASTER POPPITI: I am willing to
10 make -- to literally sit down with the calendar and start
11 going through your scheduled depositions of third
12 parties. I don't think that that's going to be very
13 productive for anyone.
14    I think it makes a great deal of sense
15 for me to expect that between now and, somebody pick a
16 date in the new week, that you all have the opportunity
17 to sit down, discuss the parameters of what you would
18 expect to be a reasonable extension, make some
19 determination as to what depositions need to be
20 forestalled, and if any can go forward, make that
21 judgment as well, because I certainly can't do that for
22 you on this record.
23    You are going to, notwithstanding the --
24 and, Mr. Merideth, I note in your papers and I note your

Page 27

1  argument that these depositions were scheduled when they
2  were, but my view of expecting that you are going to be
3  getting an extension has more to do with where we are as
4  a result of the third-party practice in terms of these
5  other applications in the other districts than it is a
6  function of when the depositions were noticed.
7    MR. MERIDETH: I would be happy to
8  discuss those dates with counsel for LG Phillips.
9    SPECIAL MASTER POPPITI: Is it important
10 to discuss outside limits in this conversation, or can
11 you all do that as well?
12    MR. MERIDETH: I think we can all do it.
13 I think, you know, there are a number of third-party
14 witnesses that we also have subpoenaed and there are also
15 some issues with regard to objections that have been made
16 to some of those subpoenas. I think it would be
17 worthwhile for us to sit down and talk about a schedule
18 for all of the third-party discovery, and, hopefully, we
19 can get it completed during the month of April. I just
20 don't want to have an open-ended extension with respect
21 to everything, and I think if we sat down and tried to
22 work with the third parties and work between ourselves,
23 that we can come up with a reasonable schedule.
24    SPECIAL MASTER POPPITI: Well, and you

Page 28

1  and everybody on this phone call understands where we
2  have been with the history of this and understands where
3  we have been with my two visits to Judge Farnan's chamber
4  to tweak the scheduling order, and each of those times
5  resulted in the Court issuing a scheduling order that did
6  not extend the time for third-party discovery.
7    We are in a different environment right
8  now. It seems to me it needs to be extended. It makes a
9  great deal of sense to do it globally, and it will not
10 affect any of the other -- any of the other dates, so you
11 are still working within the time frames, the critical
12 time frames of hearings that have already been
13 established, hearings and ultimate trial.
14    And can you all wrap this up by the
15 teleconference that's presently scheduled for 6:30 on
16 Monday?
17    MR. CONNOR: Yes. We will do our best
18 to do that.
19    MR. MERIDETH: Yes, Your Honor.
20    SPECIAL MASTER POPPITI: So, no
21 discussion about an outside limit? Wouldn't that help
22 frame the discussion or no?
23    MR. MERIDETH: I think that there are
24 other things that we need to take into account, and,

Page 29

1  specifically, the schedule with respect to some of the
2  third-party witnesses who are the ones who, frankly, are
3  also bearing a considerable burden with respect to having
4  to produce all of this data on a very short time period,
5  and it would probably be wise for us to touch base with
6  them and see what their schedules are and make sure that
7  we have the proper places and the proper times and the
8  proper people.
9    SPECIAL MASTER POPPITI: Can you do all
10 that by Monday or do you need --
11    MR. MERIDETH: Probably Monday may be
12 too ambitious. Maybe by Tuesday or Wednesday, I would
13 think we would, and I am not sure it's going to make any
14 difference whether it's Monday or Wednesday, frankly.
15    SPECIAL MASTER POPPITI: Anyone want to
16 speak from the other side?
17    MR. CONNOR: I guess I am just not
18 hearing a response as to a global extension for
19 deposition time.
20    SPECIAL MASTER POPPITI: I think I heard
21 Mr. Meredith say, rather than discuss it now, it really
22 is more important to have your discussion off-line,
23 permit each of you to discuss issues with respect to
24 third parties so that when we reconvene on this issue to